# EXHIBIT

# 1

1    HC06CRWR677826-JBC-nar

2

3

FILED

APR - 6 2006

4                                    FRESNO COUNTY SUPERIOR COURT

5    By _____
                                                     DEPUTY

6

7

8          SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

9                          CENTRAL DIVISION

10

11   In re                          )   No. 06CRWR677826    Dept. 98B
                                     )
12   SYLVESTER STRONG, SR.,          )
                                     )   ORDER
13              Petitioner           )
                                     )
14   On Habeas Corpus.               )
                                     )
15   _____ )

16          Having considered the petition for writ of habeas corpus

17   dated March 26, 2006 and filed on March 30, 2006, the court finds

18   that petitioner's assertions are inaccurate and do not justify the

19   requested relief at this time.

20          Petitioner states that he was sentenced pursuant to a

21   plea agreement to a term of 18 years, he is being unlawfully

22   detained beyond the maximum term, and he should be released

23   immediately.  The circumstances of this case are summarized in the

24   Opinion affirming petitioner's judgment issued by the Fifth

25   Appellate District on November 15, 1989.  (Also see prior petition

26   03CRWR676847 and the order issued on October 14, 2003.)  Contrary

27   to what petitioner claims, he was sentenced to a term of 15 years

28   to life plus three years for second-degree murder and assault with

COUNTY OF FRESNO
Fresno, CA         HC06CRWR677826-JBC.doc

-1-

1  a deadly weapon. As a "life prisoner," his initial parole hearing
2  was scheduled for September 24, 2001. The Board of Prison Terms
3  subsequently informed this court of parole hearings set in 2002,
4  2003, and 2004. Petitioner has provided no information (such as
5  transcripts and supporting reports) concerning his parole hearings
6  or the reasons parole has repeatedly been denied.

7          For the reasons stated above, further consideration of
8  this matter is not warranted. The petition is denied.

9          DATED this 6th day of APRIL 2006.

10

11                              Jonathan B. Conklin

12                                   **JONATHAN B. CONKLIN**
                                     **JUDGE OF THE SUPERIOR COURT**
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HC06CRWR677826-JBC.doc

# EXHIBIT
# 2

#
13
1-6-88

APR 04 1988



FILED

APR -1 1988

By ..................
FRESNO COUNTY CLERK

DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF  ) CASE NUMBERS:
CALIFORNIA                   )
                             ) Superior Court    380750-0
            Vs.              )
                             ) Arraignment Date  4-11-88
SYLVESTER STRONG,            )
                             ) Municipal Court   F012661-0
                             )
                             ) District Attorney 87S0589
                             )
                             )
_____Defendant(s).  )       INFORMATION

### COUNT ONE

The District Attorney of the County of Fresno hereby accuses
SYLVESTER STRONG of committing the following crime at and in the
County of Fresno, State of California:

VIOLATION OF SECTION 187 OF THE PENAL CODE, a felony. The
said defendant, on or about December 10, 1987, did willfully,
unlawfully, and with malice aforethought murder DIANE STRONG, a
human being.

It is further alleged that in the commission of the above
offense, the said defendant personally used a deadly and
dangerous weapon, to wit: a knife, within the meaning of Penal
Code Section 12022(b).

### COUNT TWO

And the said SYLVESTER STRONG is further accused by the
District Attorney of the County of Fresno by this Second Count
of this Information of committing the following crime at and in
the County of Fresno, State of California:

1    VIOLATION OF SECTION 245(a)(1) OF THE PENAL CODE, a felony.

2    The said defendant, on or about December 10, 1987, did willfully

3    and unlawfully commit an assault upon LAVELLE JONES, with a

4    deadly weapon, to wit:  a knife, and by means of force likely to

5    produce great bodily injury.

6        It is further alleged that in the commission of the above

7    offense, the said defendant personally used a deadly and

8    dangerous weapon, to wit:  a knife, within the meaning of Penal

9    Code Section 12022(b).

10                           COUNT THREE

11       And the said SYLVESTER STRONG is further accused by the

12   District Attorney of the County of Fresno by this Third Count of

13   this Information of committing the following crime at and in the

14   County of Fresno, State of California:

15       VIOLATION OF SECTION 245(a)(1) OF THE PENAL CODE, a felony.

16   The said defendant, on or about July 2, 1987, did willfully and

17   unlawfully commit an assault upon DIANNE STRONG, with a deadly

18   weapon, to wit:  a knife, and by means of force likely to

19   produce great bodily injury.

20       It is further alleged that in the commission of the above

21   offense, the said defendant personally used a deadly and

22   dangerous weapon, to wit:  a knife, within the meaning of Penal

23   Code Section 12022(b).

24                           COUNT FOUR

25       And the said SYLVESTER STRONG is further accused by the

26   District Attorney of the County of Fresno by this Fourth Count

27   of this Information of committing the following crime at and in

28   the County of Fresno, State of California:

1    VIOLATION OF SECTION 245(a)(1) OF THE PENAL CODE, a felony.

2    The said defendant, on or about September 8, 1987, did willfully

3    and unlawfully commit an assault upon DIANNE STRONG, with a

4    deadly weapon, to wit:  a knife, and by means of force likely to

5    produce great bodily injury.

6        It is further alleged that in the commission of the above

7    offense, the said defendant personally used a deadly and

8    dangerous weapon, to wit:  a knife, within the meaning of Penal

9    Code Section 12022(b).

10                              COUNT FIVE

11       And the said SYLVESTER STRONG is further accused by the

12    District Attorney of the County of Fresno by this Fifth Count of

13    this Information of committing the following crime at and in the

14    County of Fresno, State of California:

15       VIOLATION OF SECTION 245(a)(1) OF THE PENAL CODE, a felony.

16    The said defendant, on or about July of 1987, to on or about

17    December of 1987, did willfully and unlawfully commit an assault

18    upon DIANNE STRONG, with a deadly weapon, to wit:  gasoline, and

19    by means of force likely to produce great bodily injury.

20                                    EDWARD W. HUNT
                                       District Attorney for
21                                    the County of Fresno,
                                       State of California
22

23

                                      by
24                                        DENNIS J. COOPER
                                       Senior Deputy District Attorney
25
                                            The foregoing instrument is a correct
26                                          copy of the original on file in this
                                            office
27
                    ATTEST:  OCT 25 1988
28
                                            GALEN LARSON, County Clerk
                                            State of California, County of Fresno

# EXHIBIT
# 3

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

NOV 15 1989

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
KEVIN A. SWANSON, Clerk

FIFTH APPELLATE DISTRICT

By ——————————
Deputy

THE PEOPLE,                          )
                                     )          No. F011515
        Plaintiff and Respondent,    )
                                     )          (Super. Ct. No. 380750-0)
            v.                       )
                                     )          O P I N I O N
SYLVESTER STRONG, SR.,               )
                                     )
        Defendant and Appellant.     )
_____)

THE COURT*

        APPEAL from a judgment of the Superior Court of Fresno
County.  Mario Olmos, Judge.

        Andrew French Loomis, under appointment by the Court of
Appeal, for Defendant and Appellant.

        John K. Van de Kamp, Attorney General, Richard B.
Iglehart, Chief Assistant Attorney General, Arnold O. Overoye,
Senior Assistant Attorney General, W. Scott Thorpe and Clayton S.
Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.

                            *  *  *

        Strong pled guilty to second degree murder (Pen. Code,
§ 187)[1] and assault with a deadly weapon (§245, subd. (a)(1)).  He

_____

[1]     All statutory references are to the California Penal Code;
all rule references are to the California Rules of Court.

*Before Best, Acting P.J., Stone (W.A.), J., and Baxter, J.

admitted having used a deadly weapon in the commission of both crimes (§ 12022, subd. (b)). The plea bargain provided for dismissal of three other counts of assault with a deadly weapon, the prosecutor reserving the right to comment at sentencing. Strong was sentenced to prison for 15 years to life on the murder plus a consecutive three-year middle base term on the assault. On this appeal from the judgment, he contends that the sentencing judge erred in 1) relying on facts pertaining to the dismissed assault counts; 2) finding that the crimes involved separate victims; and 3) ignoring "several statutory circumstances in mitigation."

Sentencing occurred October 21, 1988. The judge had read and considered a probation officer's report (RPO) dated October 12, 1988, together with numerous letters. The instant crimes occurred on December 10, 1987, when Strong broke into the house of his ex-wife, Diana, stabbed her to death, and cut Lavelle Jones, a man who was on the premises. The instant crimes culminated a series of violent crimes by Strong against Diana.

1) He was convicted of battery based on a January 1987 incident in which he slapped her face. 2) He was convicted of corporal injury on his spouse based on a February 1987 incident in which he struck her in the face with his fist numerous times. 3) In July 1987 Diana told police that he had swung a knife at her, inflicting a scratch, and struck her on the lip and shoulder with his fist. 4) In September 1987 she told police that he cut her with a knife, after she tried to defend herself with a knife during a fist fight. 5) Finally, their five-year-old son testified to an

2.

incident in the last half of 1987 in which Strong poured gasoline
on Diana.   Incidents 3), 4), and 5) formed the basis for the three
assault counts dismissed pursuant to plea bargain in the instant
case.

In a letter to the court, Strong's counsel argued for
concurrent terms.   According to counsel, his client hoped to
reconcile with Diana.   On December 10, his mother and sister told
him Diana had been by their house to visit them.   Sorry that he had
missed her and wanting to discuss reconciliation, he got a ride to
her house.   When he arrived he saw Jones's truck parked in front.
He knew Jones and his reputation "as a man who played around with
married women."   When he was not admitted upon knocking, he became
enraged.   He killed Diana and injured Jones because of this rage.
Counsel reasoned that "the court should impose a concurrent
sentence for the assault on Mr. Jones because this assault occurred
due to a situation that is highly unlikely to reoccur.   Mr. Jones
was not the object of Mr. Strong's anger.   Mr. Strong was
frustrated, hurt, and angry because of the break up [sic] of his
marriage.   Dianne [sic] Strong's tragic death terminates the cause
of Mr. Strong's anger making it unlikely that there will be a
reoccurance [sic] of this type of violence from Mr. Strong."

At sentencing Strong's counsel reprised this argument for
concurrent terms.   Counsel acknowledged the obvious:   his client's
violent conduct pattern made him a serious danger to his wife.   He
denied that this pattern showed any danger to society at large.
Counsel reasoned that "all his problems revolved around the breakup
of his marriage that I think he will freely admit were due to his
abuse of the substance of cocaine."

After listening to lengthy comments from both counsel, the
judge denied probation.  The judge then analyzed the case as
follows:

> "And in reviewing the factors that have been cited
> for reasons for imposition of the consecutive terms in
> this case, I think that -- and I might add, those are
> different and distinct from those that are cited for the
> imposition of the aggravated term in this case.  The
> criteria for the aggravated term in this report are the --
> that the defendant's prior convictions are increasingly
> serious, he was on probation at the time he committed the
> offense.
>
> "I think we've already cited the factors in
> mitigation, that he voluntarily acknowledged wrongdoing,
> he was having -- had a history of cocaine use; apparently
> not known to some people, but I think that history is
> apparent.
>
> "But aside from the -- those factors in aggravation,
> there are two very distinct and important factors that I
> think justify the imposition of the consecutive terms in
> this case, is obviously separate acts of violence and
> separate victims.  I think Mr. Dreiling addressed it in
> his letter.  However, the fact remains that Mr. Jones was
> injured, sustained injury by attempting to come to the
> assistance of the victim in this case.  And I think Mr.
> Cooper in his letter outlines what the evidence would have
> shown at a trial; that is, that the fatal injury, the
> fatal knife cut to the jugular was inside the residence
> after the body -- after Mr. Strong took the victim back
> into the house, and after the contact with Mr. Jones and
> the injury of Mr. Jones.
>
> "And equally as important is the pattern of violent
> conduct, which I think does indicate a danger to society.
> Certainly Mr. Jones found that to be the case.  But the
> dismissed counts indicate prior incidents of violent
> behavior involving a knife by Mr. Strong against the
> victim.  They all involve a pattern of attempting to seek
> funds from the victim to support his cocaine habit.
> Perhaps there was a mixture of other motives, perhaps his
> desire to reconcile with her, but I think the contention
> is that on this incident of the killing, that that was
> done out of a sense of outrage and perhaps passion that
> Mr. Lavelle Jones was viewed as a possible suitor of the
> victim, but I don't think it's a -- I think that pattern
> is consistent with the other incidents."

4.

Harvey Error

In People v. Harvey (1979) 25 Cal.3d 754, our Supreme Court held that "Implicit in such a plea bargain [providing for the dismissal of a count in consideration of a defendant's agreement to plead guilty to other counts], we think, is the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (Id., at p. 758.) Strong contends that the sentencing judge violated Harvey when he considered the facts underlying the three dismissed assaults. He reasons that "the prosecution's unilateral reservation of a right to comment on the dismissed counts is not sufficient" to show an explicit waiver of the defendant's Harvey rights.

This argument is totally devoid of merit. During the guilty plea proceedings, the prosecutor summarized in detail the plea bargain, including the following: "In return for the defendant's pleas and admissions regarding those two counts [the murder and the assault on Jones], the People are prepared to move to dismiss Counts 3, 4, and 5 of the Information and the enhancement appended to Counts 3 and 4 while reserving the right to comment on those three counts . . . ." The judge then summarized the background of the plea bargain negotiations. Asked for comment, Strong's counsel stated that "the agreement as stated by the Court and counsel is as I understand it." The court then added "I would concur with [the prosecutor's] comments."

5.

The record undermines any claim that the prosecutor's reservation of a right to comment on the dismissed counts was a unilateral statement not binding on the defense.    Rather, the right to comment was one of the terms of the plea bargain, as summarized by the prosecutor and as confirmed by defense counsel.    We reject Strong's contention that this term, as stated by the prosecutor, was ambiguous.    The only reasonable meaning was that the prosecutor could comment on and the sentencing judge could consider the facts underlying the dismissed counts.    A right to comment on dismissed counts would be completely worthless unless it included the right to have the comments considered by the sentencing judge.    In short, the instant record shows the "contrary agreement" required by People v. Harvey.

## "Separate Victims"

Strong contends that, in finding that the crimes involved "separate victims," the judge erroneously invoked rule 425(a)(4), "Any of the crimes involved multiple victims."    Respondent concedes that the judge erred.    Both the contention and the concession are wrong.

As the quoted passage reveals, the judge found that "aside from the . . . factors in aggravation [cited in the RPO], there are two very distinct and important factors that I think justify the imposition of the consecutive terms . . . ."    The judge then cited "obviously separate acts of violence and separate victims," explaining his reasoning.    The judge continued, "And equally as important is the pattern of violent conduct, which I think does indicate a danger to society."    Thus, the two distinct factors were

6.

1) separate acts of violence and separate victims and 2) pattern of violent conduct.

Contrary to the parties, the judge did not find that either the murder or the assault involved multiple victims. Rather, the judge found that the murder and assault involved separate violent acts committed against separate victims, Diana and Jones. The commission of separate acts of violence supports consecutive terms, without regard to the number of victims (rule 425(a)(2)). The judge could find additional relevance in the fact that these separate acts here were committed against two different persons (rule 408(a), (court may consider "additional criteria reasonably related to the decision being made")).

## Mitigating Factors

Finally, Strong argues that the judge failed to consider as mitigating factors supporting concurrent terms 1) that the crimes resulted from a single course of conduct; 2) that they occurred at the same time and place; and 3) that "they were not likely to recur since they arose from the breakup of [Strong's] marriage." In the technical world of determinate sentencing, factors 1) and 2) are not "Circumstances in Mitigation" under rule 423, but instead are "Criteria Affecting Concurrent or Consecutive Sentences" under rule 425(a)(1) and (3). This being the case, the judge's failure to mention them in referring to "factors in mitigation" does not show that he failed to consider these factors or to give them any weight.

Factor 3) invokes rule 423(a)(3), "The crime was committed because of an unusual circumstance, such as great provocation,

7.

which is unlikely to recur."  According to Strong, the "unusual
circumstance" was the breakup of his marriage.  We cannot agree
that a defendant's domestic problems mitigate a year-long, course
of violent conduct, such as occurred here.  Strong's domestic
problems and his violence against Diana long predated December 10,
1987.  By the time that he finally murdered her, there was nothing
unusual about his domestic problems or his resorting to violence.
His violent course of conduct against Diana necessarily stopped
with her murder.  It is outrageous to suggest that Strong derives
some mitigating benefit from carrying his violence to the ultimate
crime.  (Cf. People v. Boerner (1981) 120 Cal.App.3d 506, 510,
fn. 4 (contention that victims' illegal alien status mitigated
robbery was "outrageous").)

        The judgment is affirmed.



NOV 28 1989

RECORDS OFFICE
-OLSOM STATE PRISON

# EXHIBIT

# 4

1   197

1               IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   IN AND FOR THE COUNTY OF FRESNO

3              Before the Honorable Mario G. Olmos, Judge

4                           Department Six

5                             -oOo-                    SEP 14 1988

6   THE PEOPLE OF THE STATE   )                   FRESNO COUNTY CLERK
    OF CALIFORNIA,            )                   By _____
7                             )     No. 380750-0              DEPUTY
                Plaintiff,    )
8                             )     CHANGE OF PLEA
        vs.                   )
9                             )
    SYLVESTER STRONG,         )
10                            )
                Defendant.    )
11  _____)

12                            -oOo-

13  Fresno, California             September 12, 1988

14

15                     REPORTER'S TRANSCRIPT

                              -oOo-
16

    A P P E A R A N C E S:
17

    FOR THE PEOPLE:               EDWARD W. HUNT, District
18                                Attorney of Fresno County
                                  BY: DENNIS COOPER
19                                Deputy District Attorney

20  FOR THE DEFENDANT:            JOSE VILLARREAL, Public
                                  Defender of Fresno County
21                                BY:  CHARLES DREILING
                                  Deputy Public Defender
22

23                            -oOo-

24  Reported by:                  MICHAELYN J. MANN, C.S.R./RPR
                                  CERTIFICATE NUMBER 4292
25
                                                    . . 7118
26

1 · · 'SEPTEMBER 12, 1988

2 THE COURT: At this time, I'll call case number

3 380750-0, matter of Sylvester Strong.

4 MR. COOPER: Dennis Cooper for the People, Your Honor.

5 MR. DREILING: Charles Dreiling for Mr. Strong, who is

6 present in court in custody, Your Honor.

7 MR. COOPER: Your Honor, in this matter, the People are

8 prepared to accept certain pleas from the defendant. To be

9 more specific, the People are prepared to accept a plea of

10 guilty to Count 1 as second degree murder, and an admission

11 of the enhancement pursuant to Penal Code Section

12 12022 (b). Also, a plea of guilty to Count 2 of the

13 Information, and an admission of the enhancement to Count 2,

14 also pursuant to Penal Code Section 12022 sub (b).

15 In return for the defendant's pleas and admissions

16 regarding those two counts, the People are prepared to move

17 to dismiss Counts 3, 4 and 5 of the Information and the

18 enhancement appended to Counts 3 and 4 while reserving the

19 right to comment on those three counts, and also while

20 reserving the right to comment on two other incidents which

21 were at one time part of proceedings in the municipal court

22 of Fresno County. I do not have municipal court action

23 numbers for them, but I do have District Attorney file

24 numbers for them, one of them being DA number 87 M 02704,

25 and 87 M 04835. The People's motions to dismiss those

26 counts would be made hopefully without prejudice to

1   reinstate those counts until such time as the judgment and
2   sentencing concerning this matter would become final.

3        THE COURT:  All right.  The record should reflect this
4   matter was called this morning off the master trial calendar
5   for assignment for jury trial.  And I believe there were
6   discussions initiated by Mr. Dreiling on behalf of Mr.
7   Strong about the possibility of a resolution of this matter
8   short of a jury trial.

9        The record should reflect that I spoke to Mr. Dreiling
10  and Mr. Cooper this morning and briefly this afternoon
11  outside the presence of the Court Reporter, discussed the
12  case, the background of the case.  And the record should
13  reflect that I handled a motion to sever in this case, so I
14  was aware of much of the background of the case because of
15  the issues raised at the time of the motion to sever.  I
16  believe there may have been an accompanying motion.  But I
17  just recall specifically the motion to sever.

18       And from those discussions, it appeared to the Court
19  that counsel were not in disagreement regarding what the
20  probable outcome would be in this case.  And that's, I
21  think, reflected in the People's offer.  Mr. Dreiling
22  advised the Court further of the -- certain background
23  information about Mr. Strong, circumstances of this
24  particular killing.

25       And it was my position that based on that background,
26  and the likely disposition, likely outcome by way of jury,

4
200

1    that the Court could for a plea at this point put a midterm

2    lid on the second count, the 245 subparagraph (a),

3    subparagraph (1) and stay the two enhancements, and that

4    that would not be an unlikely -- or that would not be a

5    substantial difference from what the likely outcome of a

6    jury trial would be in any case.

7    In fact, there might be some benefit to Mr. Strong by

8    way of the enhancements, that -- if those were established,

9    then realistically, I think, there might be an additional

10    two-year penalty imposed. But the Court was willing to give

11    Mr. Strong the benefit of that in return for his plea. I

12    think the possibility in this case is that there might be an

13    aggravated term imposed on Count 2. However, that would be

14    -- that would be, I think a situation that is not as likely

15    as a midterm. And I'm not sure what the Probation

16    Department would do in light of the remaining counts if the

17    conviction were obtained by the People.

18    But I think the most likely outcome is the one I

19    described, and essentially, I would be giving Mr. Strong the

20    benefit of the doubt on the two enhancements, and that if

21    the People's offer, while standing -- my understanding is

22    that I would impose a midterm lid on Count 2 and also

23    condition a stay on the two enhancements in return for the

24    plea.

25    MR. COOPER: If I may, Your Honor. Pursuant to 1192.7,

26    the People's offer specifying Count 1 as second degree

5   201

1   murder is extended because although there does exist some

2   evidence consistent with first degree murder, and there --

3   and for that reason, there is some evidence from which a

4   jury might return a verdict of first degree murder, the

5   evidence clearly and perhaps even more than is required

6   would make out the elements of second degree murder and I --

7   the plaintiff's position is that with confidence, we feel a

8   jury would return a verdict of guilty concerning second

9   degree murder. We see that for these evidentiary reasons,

10   this disposition is a reasonable one with respect to

11   Count 1.

12   And concerning the -- Counts 3 through 5, and

13   considering the workings of Penal Code Section 1170.1, I

14   believe it is, the plaintiff sees no substantial difference

15   in sentencing should the defendant be convicted of those

16   three counts.  The plaintiff is -- although while not

17   endorsing or joining in or modifying the offer in accordance

18   with the specifics the Court has just outlined, the

19   plaintiff does not choose to withdraw the dispositional

20   offer because the specifics as the Court laid out do not

21   amount to a substantial net change and expected or possible

22   sentencing from the original dispositional offer.  And the

23   plaintiff is in those respects relying on a great likelihood

24   of a consecutive sentence with respect to Count 2.  Thank

25   you.

26       THE COURT:  Mr. Dreiling?

1    MR. DREILING: Your Honor, that -- the agreement as

2  stated by the Court and counsel is as I understand it.

3    THE COURT: Yes. And I would concur with Mr. Cooper's

4  comments. I think they reflect not only resolving the

5  position, but the matters we discussed previously. And I

6  would not be entertaining this particular plea but for the

7  matters stated before on the record by Mr. Cooper, that in

8  fact, this is a matter that a jury more likely than not

9  would return a verdict on Count 1 as a second degree. And

10  the People made an offer with regard to all counts because

11  of the reasons stated by Mr. Cooper. And it's unlikely that

12  the matters would come back as consecutives, I think, on

13  Counts 3 through 5. And that more likely, those factors

14  would be used as a means of imposing a midterm or aggravated

15  term with regard to Count 2.

16    And -- so Mr. Dreiling, is your -- is Mr. Strong ready

17  to proceed with the plea on those conditions, the conditions

18  outlined by Mr. Cooper with regard to the offer and the

19  Court's indication that it would put a midterm lid on Count

20  2 and stay any penalties on the one-year enhancement?

21    MR. DREILING: Yes, Your Honor. Based on the

22  conditions as stated by the Court and counsel, we are ready

23  to proceed with the withdrawal of the previously-entered

24  plea of not guilty and entering new and different pleas of

25  guilty to Counts 1 and 2.

26    THE COURT: Is that correct, Mr. Strong?

1  DEFENDANT STRONG: Yes.

2  THE COURT: Other than the conditions that have just

3  been set out here on the record, and you understand, Mr.

4  Strong, I indicated I talked to both your attorney and to

5  Mr. Cooper earlier. You were not present, there was no

6  court reporter present, unlike the lady who is taking down

7  everything this morning. But I believe we've set forth all

8  those discussions here on the record now with regard to what

9  we have discussed. I just wanted to make sure that you were

10  aware that we had discussed these. And you were not

11  present, there's no record of that. But it's my practice

12  when we have those occasions to set those matters on the

13  record in your presence, like we've done here this morning

14  -- I mean this afternoon.

15  And I believe we -- Mr. Dreiling, is there anything

16  else that we have discussed that's not --

17  MR. DREILING: I don't believe so, Your Honor.

18  THE COURT: Mr. Cooper, is there anything we have

19  discussed that is not part of the record now?

20  MR. COOPER: No, Your Honor.

21  THE COURT: Mr. Strong, you understand your case was

22  called this morning for purposes of assignment of your case

23  to a jury for a decision by a jury as to your guilt or

24  innocence of the charges set forth in the Information.

25  DEFENDANT STRONG: Yes, I understand that.

26  THE COURT: And do you understand that if the Court

8
204

1   takes a plea from you, either guilty or a plea of no
2   contest, which would be the same as far as this court is
3   concerned for all purposes, that you would be giving up your
4   right to a jury trial in this case?

5   DEFENDANT STRONG: Yes, I understand that also.

6   THE COURT: And do you understand a jury to be 12
7   citizens of the community selected at random who would
8   listen to the evidence presented in your case? They would
9   also receive instructions of law from the judge who was
10  assigned the case, and all 12 members of the jury would have
11  to decide and agree as to your guilt beyond a reasonable
12  doubt and to a moral certainty before you could be found
13  guilty of a charge. Do you understand by pleading guilty,
14  you give up your right to a jury trial?

15  DEFENDANT STRONG: Yes, I do.

16  THE COURT: Do you give up your right to a jury trial?
17  DEFENDANT STRONG: Yes.

18  THE COURT: Do you understand that you also have the
19  right to have a trial before a judge who would hear and
20  decide your case without a jury? Do you understand by
21  entering a plea of guilty or no contest, you would be giving
22  up your right to a court trial?

23  DEFENDANT STRONG: Yes, I do.

24  THE COURT: Do you give up your right to a trial before
25  a judge?

26  DEFENDANT STRONG: Yes, I do.

1 THE COURT: You also have the right to cross-examine

2 and confront all witnesses who testify against you; that is

3 to see and hear and have your attorney question any and all

4 witnesses who testify against you.  Do you understand that

5 by entering a plea of either guilty or no contest, you give

6 up your right to confront such witnesses?

7 DEFENDANT STRONG:  Yes, I do.

8 THE COURT:  Do you give up your right to confront such

9 witnesses?

10 DEFENDANT STRONG:  Yes.

11 THE COURT:  You also have the right to have the Court

12 order any witnesses to appear on your own behalf and testify

13 in your behalf in this case at no cost to you.  Do you

14 understand by entering a plea of guilty or no contest, you

15 give up the right to compel the attendance of such

16 witnesses?

17 DEFENDANT STRONG:  Yes, I do.

18 THE COURT:  Do you give up the right to compel the

19 attendance of such witnesses?

20 DEFENDANT STRONG:  Yes.

21 THE COURT:  You also have the right to present evidence

22 in your own behalf in defense of the charges that have been

23 filed against you.  Do you understand by entering a plea of

24 guilty, you give up this right also?

25 DEFENDANT STRONG:  Yes.

26 THE COURT:  Do you give up your right to present

1    evidence in your own behalf?

2         DEFENDANT STRONG:  Yes.

3         THE COURT:  You also have the privilege against

4    self-incrimination; that is, you have the right to remain

5    silent, that you cannot be forced or coerced or made to

6    testify if you do not wish to do so, that at no time do you

7    have to testify in order to prove your innocence or to

8    disprove the charges against you.  The burden is on the

9    District Attorney represented here by Mr. Cooper to prove

10   your guilt beyond a reasonable doubt.  You have absolutely

11   no burdens -- you have no burden whatsoever in this case.

12        DEFENDANT STRONG:  Yes.

13        THE COURT:  Also, if you decide to exercise your right

14   to remain silent and not testify, you have the further right

15   not to have your silence commented upon or used against you

16   in any way by the prosecutor.  Do you understand that?

17        DEFENDANT STRONG:  Yes, I do.

18        THE COURT:  You also have the right to testify in your

19   own behalf.  But by pleading guilty, you give up that

20   right.  Do you understand that?

21        DEFENDANT STRONG:  Yes.

22        THE COURT:  Do you understand that as a result of this

23   -- by giving up this privilege, that by pleading guilty, you

24   give up this right, you admit the commission of the crimes

25   charged, thereby incriminating yourself?

26        DEFENDANT STRONG:  Yes, I do.

1    THE COURT: Do you give up your right against

2  self-incrimination?

3    DEFENDANT STRONG: Yes.

4    THE COURT: Do you have any questions about the rights

5  you've just given up?

6    DEFENDANT STRONG: No, I don't.

7    THE COURT: Has your attorney explained each of these

8  rights to you?

9    DEFENDANT STRONG: Yes.

10    THE COURT: Are you giving up these rights freely and

11  voluntarily?

12    DEFENDANT STRONG: Yes.

13    THE COURT: Do you have any questions about the charges

14  filed against you in this case?

15    DEFENDANT STRONG: No, I don't.

16    THE COURT: Do you understand by entering this plea,

17  you are -- you have given up all of your rights, there won't

18  be any trial and you won't have any right to appeal?

19    DEFENDANT STRONG: Yes, I do.

20    THE COURT: With regard to the factual basis, how do

21  counsel wish to proceed with that?

22    MR. DREILING: Your Honor, perhaps I'll make a brief

23  statement.

24    THE COURT: All right. Would counsel stipulate to the

25  use of the preliminary hearing transcript in addition to the

26  statement?

1    MR. DREILING: Yes, Your Honor, I'd offer to stipulate
2  that the preliminary hearing transcript contains a factual
3  basis supporting the pleas.

4       THE COURT: Would you join in that?

5       MR. COOPER: Yes, I would. And I'd encourage the Court
6  to make that part of the factual basis.

7       THE COURT: I'll so incorporate that. But in addition
8  to that, Mr. Dreiling, could you make either a statement or
9  summarize the testimony presented at the preliminary hearing
10  that would support the plea in this case.

11      MR. DREILING: The testimony at the preliminary hearing
12  was that on December the 10th of last year, 1987, Mr. Strong
13  went to the home of his former wife and there, uh, broke
14  through the front door and entered that home, and inside
15  that home, uh, slashed at a Mr. Lavelle Jones with a knife,
16  causing him to be cut slightly on the hand, and ultimately
17  caused his wife to be stabbed with a knife, and she
18  subsequently died.

19      THE COURT: Mr. Cooper, is that a correct summary of
20  the preliminary hearing testimony, or is there any other
21  matter you wish to add at this point?

22      MR. COOPER: Well, Your Honor, it is somewhat general,
23  but with the knowledge that the Court would also consider
24  the preliminary hearing transcript, I'm satisfied.

25      THE COURT: All right. Do you understand that, Mr.
26  Strong?

1       DEFENDANT STRONG: Yes, I do.

2       THE COURT: And you understand that's the preliminary

3    hearing transcript, that testimony presented at that

4    hearing, plus the statement that was made by your attorney

5    is going to be used by the Court to determine that in fact

6    you are the person who committed the offense set forth in

7    the Information with regard to Count 1 and Count 2.

8       DEFENDANT STRONG: I understand that.

9       THE COURT: That would be the information the Court

10   would rely on to support your plea to those two counts.

11      DEFENDANT STRONG: Yes.

12      THE COURT: And with regard to Count 1, you understand

13   that Count 1 as murder in the second degree carries a state

14   prison term of 15 years to life.

15      DEFENDANT STRONG: Yes, I understand that.

16      THE COURT: And that the enhancement alleged in the

17   Information for Count 1, that you personally used a deadly

18   and dangerous weapon, to wit, a knife, within the meaning of

19   Penal Code Section 12022 subparagraph (b), carries an

20   additional one-year enhancement; in other words, an

21   additional one-year term.

22      DEFENDANT STRONG: Yes.

23      THE COURT: With regard to Count 2, that's also a

24   felony, violation of section 245, subparagraph 1 (a),

25   subparagraph 1 of the Penal Code, that you on or about that

26   same date, December 10th, did willfully and unlawfully

14
210

1   commit an assault upon Lavelle Jones with a deadly weapon,

2   to-wit, a knife, that felony carries a minimum state prison

3   term of two years, a midterm of three, a maximum of four and

4   in addition to that, a fine of 10,000 dollars.  Do you

5   understand that?

6        DEFENDANT STRONG:  Yes.

7        THE COURT:  And that the enhancement alleged in that

8   count that you personally used a deadly and dangerous

9   weapon, to-wit, a knife, within the meaning of Penal Code

10   Section 12022 subparagraph (b) would carry an additional

11   one-year term.  Do you understand that?

12        DEFENDANT STRONG:  Yes.

13        THE COURT:  As a further consequence of your plea of

14   guilty, you are advised that if you are not a citizen of the

15   United States, you may be deported, excluded from admission

16   to the United States or be denied naturalization pursuant to

17   the laws of the United States.  Do you understand that's a

18   possible consequence if you are not a citizen of the United

19   States?

20        DEFENDANT STRONG:  Yes, I do.

21        THE COURT:  As a further consequence of your plea of

22   guilty, you are advised you could be placed on parole for a

23   period of time after your release from state prison.

24        DEFENDANT STRONG:  Yes.

25        THE COURT:  And I believe for second degree, it's seven

26   years.

1   MR. COOPER: For life, Your Honor.

2   THE COURT: It's life? You may be right.

3   MR. COOPER: Was the Court dealing with the possible

4   term of parole?

5   THE COURT: Yes.

6   MR. COOPER: It's my understanding --

7   THE COURT: Yes, just for the term of parole.

8   MR. COOPER: Could we approach the bench on that,

9   Judge?

10   THE COURT: Yes.

11   (Discussion held at bench among counsel

12   and the Court; not reported.)

13   THE COURT: I just found Penal Code Section 3000.1, and

14   it reads as follows:

15   "In the case of any inmate sentenced under

16   Section 1168 for any offense of first or second

17   degree with a maximum term of life imprisonment,

18   the period of parole, if parole is granted, shall

19   be for the remainder of the inmate's life."

20   So you understand a lifetime parole, that would be the

21   possible consequence with regard to Count 1.

22   DEFENDANT STRONG: Yes.

23   THE COURT: And Mr. Strong, I've been advised that you

24   are not currently on probation or parole, but if you were on

25   probation or parole, that your plea of guilty may be the

26   basis for a revocation of your parole or probation and be

1  used to find you in violation of your parole or probation

2  and that you could then be sentenced to the maximum time in

3  custody either in jail or state prison for any time which

4  you are currently on probation or parole.  Do you understand

5  that would be a further consequence?

6  DEFENDANT STRONG: Yes, I do.

7  THE COURT:  Has anyone threatened you or your family or

8  friends in order to get you to plead guilty or no contest?

9  DEFENDANT STRONG:  No.

10  THE COURT:  Is your plea freely and voluntarily made?

11  DEFENDANT STRONG:  Yes.

12  THE COURT:  Other than the statements made here by your

13  attorney, the District Attorney and myself with regard to

14  the conditions, have any other promises been made in order

15  to get you to change your plea?

16  DEFENDANT STRONG:  No.

17  THE COURT:  So you understand you're looking at a

18  possible prison term of 15 years to life on Count 1.

19  DEFENDANT STRONG:  Right.

20  THE COURT:  And the additional one-year enhancement for

21  the use of a knife would be stayed.  And with Count 2,

22  there's been no determination yet of -- with regard to

23  whether or not that will be concurrent or consecutive, but

24  that could result in an an additional four-year term.  The

25  Court's already made a commitment that you would serve,

26  however, no more than three years.  That could be in

1    addition to the 15 year to life term that could be imposed

2    on Count 1. Do you understand that?

3         DEFENDANT STRONG:  Yes.  So what would the total be?

4         THE COURT:  You understand what the sentencing -- what

5    the law requires is that on the determinate sentence for

6    Count 2, the assault with a deadly weapon, that that would

7    be a term that would be served -- could be served

8    consecutive to and prior to any indeterminate term.  So that

9    basically, the Court would impose a three-year midterm,

10   that's the promise that it's making and that the one-year

11   enhancement would be stayed, and that would be served first,

12   and it could be served consecutive to the indeterminate term

13   of 15 years to life.  So that what you could be looking at

14   is 18 years to life.  Do you understand that?

15        DEFENDANT STRONG:  Yes, I do.

16        THE COURT:  With regard to -- I know it wasn't

17   discussed, we haven't discussed it before, but on the issue

18   of probation, have you discussed that with Mr. Strong?

19        MR. DREILING:  No.

20        THE COURT:  Do you want to indicate for the record what

21   -- what position there is with regard to the issue of a

22   grant of probation in this case?

23        MR. DREILING:  I don't believe there's any issue

24   concerning probation, Your Honor.

25        THE COURT:  Well, that's what I want to get on the

26   record, that that has not been discussed or mentioned to Mr.

1   Strong, that that's not an issue.

2        MR. DREILING:  It's not an issue in this case.

3        THE COURT:  Mr. Strong, do you understand, Mr. Strong,

4   that this is a state prison term, there's not going to be

5   any -- the -- well, you did not discuss that at all with

6   him?

7        MR. DREILING:  No.  I didn't discuss probation.

8        THE COURT:  Because I think the record should reflect

9   whether or not that -- whether a state prison term is the

10  only term that is --

11       MR. DREILING:  I suppose theoretically, probation would

12  be available for Count 2.  But it's moot by Count 1.

13       THE COURT:  Mr. Cooper?

14       MR. COOPER:  Your Honor, could we come to the bench?

15       THE COURT:  Yes.

16            (Discussion held at bench among counsel and

17            the Court; not reported.)

18       THE COURT:  Mr. Strong, I think we should place on the

19  record the conversation I've just had with your attorney and

20  with Mr. Cooper.  And that is with regard to the -- even

21  though there's no statutory prohibition against a grant of

22  probation, do you understand that in this case, as a

23  practical matter, you're looking at a state prison term, a

24  state prison term within the parameters that I described

25  earlier.

26       DEFENDANT STRONG:  Yes, I understand.

1      THE COURT: So any hope, desire, expressed or

2   unexpressed regarding a grant of probation are not

3   realistic. I want you to be aware of that.

4      DEFENDANT STRONG: I understand that.

5      THE COURT: All right. Mr. Strong, have you told your

6   attorney all the facts and circumstances that are known to

7   you about this case?

8      DEFENDANT STRONG: Yes, I have.

9      THE COURT: Have you had sufficient time to talk to

10   your attorney about the facts and circumstances of this

11   case?

12      DEFENDANT STRONG: Yes.

13      THE COURT: And Mr. Dreiling, have you had sufficient

14   time to talk to Mr. Strong about this case?

15      MR. DREILING: Yes, I have, Your Honor.

16      THE COURT: Mr. Dreiling, do you join in your client's

17   waiver of his right to a jury trial, right to appeal?

18      MR. DREILING: Yes.

19      THE COURT: His right to confront and cross-examine

20   witnesses?

21      MR. DREILING: Yes.

22      THE COURT: And his privilege against

23   self-incrimination?

24      MR. DREILING: Yes, I do.

25      THE COURT: Do you consent to his pleas as set forth

26   earlier this afternoon?

20 2 1 6

1        MR. DREILING: Yes.

2        THE COURT: Is there anything else before the Court

3   takes a plea from Mr. Strong?

4        MR. COOPER: I have nothing, Your Honor.

5        THE COURT: Permission to withdraw the

6   previously-entered pleas of not guilty to all charges is

7   granted; the plea is hereby withdrawn.

8        The Court finds that Mr. Strong is in full possession

9   of his faculties, understands the nature of these

10   proceedings, the consequences of his plea, and that he

11   understands all of his rights and knowingly and

12   intelligently gives them up.

13        Mr. Strong, with regard to Count 1 alleging a violation

14   of Section 187 of the Penal Code, that you on or about

15   December 10th, 1987 did willfully and unlawfully and with

16   malice -- that should be amended. I was wondering with

17   regard to the enhancements, perhaps I ought to go through

18   that with him, too.

19        Mr. Strong, you understand that the jury, in addition

20   to any charge in this case, will be required to make a

21   finding of whether or not you in fact used a knife with

22   regard to each of the counts in which those are alleged.

23   And do you understand that the jury must make those findings

24   by proof beyond a reasonable doubt also?

25        DEFENDANT STRONG: Yes, I understand that.

26        THE COURT: And I'm going to be asking you whether or

1  not you admit using a knife, and they carry the same rights

2  that I've previously indicated with regard to the underlying

3  charge, that is, a charge of murder and the charge of

4  assault with a deadly weapon. And you understand you would

5  have all the same rights I previously have explained with

6  regard to those enhancements as well as to the same rights

7  that you have to those charges that are set forth in the

8  Information. Do you understand that?

9      DEFENDANT STRONG: Yes.

10     THE COURT: And that by admitting the violations, you

11 would be giving up all those rights with regard to those

12 charges and to the enhancements, and you would be making the

13 same admission, if you will, as you would in your plea to

14 the underlying charges. Do you understand that?

15     DEFENDANT STRONG: Yes.

16     THE COURT: With regard to the charge set forth in the

17 Information in Count 1, murder in the second degree, what is

18 your plea, Mr. Strong, guilty or not guilty or no contest?

19     DEFENDANT STRONG: No contest.

20     THE COURT: And do you understand, Mr. Strong, as far

21 as this court is concerned and for all purposes, the plea of

22 no contest is the same as a guilty plea?

23     DEFENDANT STRONG: Yes, I do.

24     THE COURT: And with regard to the enhancement that's

25 alleged that you personally used a deadly and dangerous

26 weapon, to-wit, a knife, do you admit or deny that

1   before the Court.

2       THE COURT:  Those are the two misdemeanor matters, the

3   conviction and the filing?  Are those --

4       MR. COOPER:  Yes, Your Honor, as I specified with the

5   DA numbers earlier.

6       THE COURT:  All right.  It's ordered that the

7   defendant's pleas and waiver of constitutional rights be

8   accepted and entered in the minutes of this court.

9       The Court Reporter is to prepare, certify and file a

10  transcript of these proceedings.

11      The Court will order that a probation officer's report

12  be prepared and served on the parties on or before October

13  2nd, 1988.  And the hearing on the report and recommendation

14  of the probation office and imposition of sentence will be

15  29 days from today.  28 days falls on a court holiday.

16  That's October 10th.  So the next date is October 11th,

17  Tuesday, 8:30.  I don't believe we require a time waiver.

18      MR. COOPER:  Your Honor, I'd request that the

19  sentencing hearing actually occur on any day after

20  the 18th or any day prior to the 4th inasmuch as I

21  will not be in the jurisdiction during the -- between

22  the 4th and the 18th.

23      THE COURT:  All right.  Do you want to set -- the

24  Probation Department is very much overloaded.  I'd like to

25  set it -- if Mr. Cooper is not going to be here until

26  October 18th.

24    220

1    MR. COOPER: Actually, the 19th would be the first day
2    I would be on the job.

3        THE COURT: Do you want to do that that week?

4        MR. DREILING: That's fine, Your Honor.

5        THE COURT: Why don't we do this. We'll make that
6    October 21st. That's a Friday, 8:30.

7        MR. COOPER: That's fine.

8        THE COURT: In this department. Mr. Strong, you're
9    entitled to have your hearing on the report and
10   recommendation of the probation office and imposition
11   of sentence within 28 days from today. By setting it
12   on the 21st of October, that's going to take us beyond
13   that 28-day period of time. It requires your agreement
14   and consent. Do you agree to having your hearing on
15   the report and recommendation of the probation office
16   and imposition of sentence on Friday, October 21st,
17   8:30 in this department?

18       DEFENDANT STRONG: Yes.

19       THE COURT: Anything else before we recess on this
20   matter?

21       MR. DREILING: No.

22       MR. COOPER: No, Your Honor.

23       THE COURT: All right, we'll recess.

24       Mr. Strong will be remanded to custody.

25       I'll return -- Mr. Cooper, is this your Information or
26   Mr. Dreiling's?

$^{22}218$

1  enhancement?

2      DEFENDANT STRONG: I admit that.

3      THE COURT: With regard to Count 2, that alleges a

4  violation of Section 245 (a) subparagraph (1), that you did

5  willfully and unlawfully commit an assault upon Lavelle

6  Jones with a deadly weapon, to-wit, a knife, and with means

7  likely to produce great bodily injury.

8      DEFENDANT STRONG: Yes.

9      THE COURT: Do you admit or deny that -- I'm sorry.

10 What is your plea, guilty or not guilty or no contest?

11     DEFENDANT STRONG: No contest.

12     THE COURT: With regards to the enhancement set forth

13 in Count 2, that you personally used a dangerous and deadly

14 weapon, to-wit, a knife, do you admit or deny that

15 enhancement?

16     DEFENDANT STRONG: I admit the knife.

17     THE COURT: People have a motion with regard to Counts

18 3, 4 and 5?

19     MR. COOPER: Yes, Your Honor, to dismiss in light of

20 the pleas that have just been entered with the reservations

21 that I expressed earlier on the record, both as to right to

22 comment and as to the dismissal being without prejudice

23 until the judgment and sentence should become final.

24     THE COURT: Correct.

25     MR. COOPER: And the reservation of the right of the

26 other two incidents which are not part of the Information

25   221

1       MR. COOPER: Not mine, Your Honor.

2       THE COURT:  Mr. Dreiling, I'll return this to you.

3           (Proceedings concluded.)

4                    -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

26

222

1   STATE OF CALIFORNIA    )   ss.

2                          )

3   COUNTY  OF   FRESNO    )

4

5        I, MICHAELYN J. MANN, Certified Shorthand Reporter, do

6   hereby certify that the foregoing pages numbered 2 through

7   25, inclusive, comprise a full, true and correct transcript

8   of my shorthand notes and a full, true and correct statement

9   of the proceedings held in the afore-mentioned matter.

10

11  DATED: September 13, 1988

12  Fresno, California.

13

14

15                             Michaelyn J Mann

16                        MICHAELYN J. MANN, C.S.R.
                           CERTIFICATE NUMBER 4292
17                         OFFICIAL SHORTHAND REPORTER

18

19

20

21

22

23

24

25

26

# EXHIBIT

# 5

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number D-99287
                          )
SYLVESTER STRONG          )
                          )
_____)

**INMATE COPY**


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2006

4:37 P.M.

**PENDING REVIEW AND APPROVAL**


PANEL PRESENT:

PHILIP INGLEE, Presiding Commissioner
MS. MOORE, Deputy Commissioner

OTHERS PRESENT:

SYLVESTER STRONG, Inmate
DEJON LEWIS, Attorney for Inmate
CORRECTIONAL OFFICER(S), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____     No        See Review of Hearing
_____     Yes       Transcript Memorandum


**Ramona Cota          Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings........................................... 1

Case Factors........................................ 16

Pre-Commitment Factors............................. 42

Post-Commitment Factors............................ 62

Parole Plans....................................... 53

Closing Statements................................. 89

Recess............................................. 98

Decision........................................... 99

Adjournment....................................... 114

Transcriber Certification......................... 115

--oOo--

1

1               **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER MOORE:**   -- the record

3    at 4:37.

4          **INMATE STRONG:**   How are you doing?

5          **DEPUTY COMMISSIONER MOORE:**   Very well.

6          **PRESIDING COMMISSIONER INGLEE:**   This is a

7    Subsequent Parole Consideration Hearing.  It's

8    for Sylvester Strong, S-T-R-O-N-G, D-99287.

9    Today's date is May the 31st, 2006, the time, as

10   previously noted is 4:37.  We are located at CFT

11   (sic) Soledad.  The inmate was received on 11/2

12   of 1988.  He was committed from Fresno County.

13   The life term began on 11/2/1988; the inmate's

14   minimum eligible parole date was 12/10 of 1999.

15   The controlling offense for which the inmate had

16   been committed is set forth in case number

17   3807500.  Charged in count one, murder second

18   degree, assault with a deadly weapon, in this

19   case a knife, Penal Code Section 187 and

20   245(a)(1).  The terms was 18 years to life, five

21   years, excuse me, 15 years base, 3 years added

22   to for the use of a knife.

23         **DEPUTY COMMISSIONER MOORE:**   Actually the

24   three years added was for the ADW, assault with

25   intent to do great bodily injury, I believe for

26   the second victim.  The 187 then the 245.

27         **PRESIDING COMMISSIONER INGLEE:**   Okay.

1    **DEPUTY COMMISSIONER MOORE:**  My read on
2  the abstract of judgment.
3    **PRESIDING COMMISSIONER INGLEE:**  All
4  right.  Why don't we go for just a short recess.
5    **DEPUTY COMMISSIONER MOORE:**  Okay.
6            (Off the record.)
7    **DEPUTY COMMISSIONER MOORE:**  We're back on
8  the record.
9    **PRESIDING COMMISSIONER INGLEE:**  Okay.
10  And the inmate received a term of 18 years to
11  life.  Fifteen years being the base and then the
12  second charge three years.  Which would be run
13  consecutively with the original, with the three
14  year charge going first.  Now you had a
15  question.
16    **ATTORNEY LEWIS:**  If I could direct you to
17  the court's judgment, not the abstract of
18  judgment.  On page five --
19    **DEPUTY COMMISSIONER MOORE:**  What court
20  judgment?
21    **ATTORNEY LEWIS:**  It's in the legal
22  documents.
23    **DEPUTY COMMISSIONER MOORE:**  You're
24  talking about the sentencing document?
25    **ATTORNEY LEWIS:**  Yes.
26    **DEPUTY COMMISSIONER MOORE:**  On page five?
27    **ATTORNEY LEWIS:**  The (overlapping) and

3

1  judgment.

2       **DEPUTY COMMISSIONER MOORE:**  What line?

3       **ATTORNEY LEWIS:**  Page 5 lines 15 through

4  20.  And on page 22.

5       **DEPUTY COMMISSIONER MOORE:**  The use of

6  the word enhancement?

7       **ATTORNEY LEWIS:**  No.  My client was

8  sentenced to -- He took a plea bargain for an 18

9  year lid.  And somehow, somewhere in the

10 documents life got tacked on.  This was not the

11 agreement that he and the DA had.  Where is the

12 incentive for him to take a life term?  He took

13 an 18 year lid.  It's mentioned in this judgment

14 twice.  An 18 year lid on page 5 lines 15

15 through 20.  And then on page 22 there's a

16 maximum term of 18 years on line 14 right there.

17 This is a subject that he has going on in the

18 court but we were hoping that we could use this

19 venue today to show that there has been a

20 mistake made on the abstract on judgment which

21 has just carried on year after year after year.

22      **DEPUTY COMMISSIONER MOORE:**  If I may ask

23 specifically, what is the error you believe

24 exists on the abstract of judgment?

25      **ATTORNEY LEWIS:**  Well it says 18 to life

26 when he didn't accept that deal.  He accepted an

27 18 year lid.

4

1        **DEPUTY COMMISSIONER MOORE:** What is the
2   difference?
3        **ATTORNEY LEWIS:** Eighteen to life, 18
4   year lid, meaning that he was only to do up to
5   18 years, not life.
6        **DEPUTY COMMISSIONER MOORE:** If I may,
7   Commissioner?
8        **PRESIDING COMMISSIONER INGLEE:** You mean
9   like a determinate sentence?
10       **ATTORNEY LEWIS:** Yes.
11       **PRESIDING COMMISSIONER INGLEE:** Sure, go
12  ahead.
13       **DEPUTY COMMISSIONER MOORE:** If I may.
14       **ATTORNEY LEWIS:** I mean, if I'm lacking
15  information please --
16       **DEPUTY COMMISSIONER MOORE:** You are.
17       **ATTORNEY LEWIS:** Okay.
18       **DEPUTY COMMISSIONER MOORE:** One, the
19  appeal, it was not brought up on appeal.  They
20  reviewed it under the *Harvey* case.  There were
21  multiple victims and several different aspects
22  of the plea bargain that were developed and
23  ruled on and affirmed by the Appellate Court.
24  This is an indeterminate sentence.  On a murder
25  you cannot receive determinate time.  Any appeal
26  on this matter should have taken place and had
27  to be timely in 1987 or after.  To bring it up

5

1   now is inappropriate.  The sentence has been --
2   For each of Mr. Strong's hearing dates it has
3   been the same throughout.  It would not be an
4   appropriate time to bring up any concerns
5   regarding that.  The sentence was 15 years to
6   life plus three years for the assault with
7   intent to do great bodily injury on victim
8   Jones.  The remaining charges were dismissed,
9   the remaining three charges and the
10  enhancements.
11       **ATTORNEY LEWIS:**  The reason I'm bringing
12  it up, because, you know, I'm pretty learned
13  when it comes to the English language.  And if
14  it says to me, a maximum term of 18 years, and I
15  don't see life there or with enhancements, and
16  this was the motivation for him taking the plea
17  agreement in the first place, I thought that I
18  was compelled to bring it up here today.
19  Because this is a life hearing.  He shouldn't
20  even be doing life.
21       **DEPUTY COMMISSIONER MOORE:**  On page 5
22  lines 17 through 20 it indicates, "So it would
23  be the court placed an 18 year lid on this in
24  return for Mr. Strong's plea to second degree
25  murder, which has been offered by the people."
26  I think counsel, based on your experience and my
27  experience and this panel's experience, the only

6

1  sentence existing in California at the time that

2  this plea was entered is 15 to life for second

3  degree murder.  There were a number of

4  enhancements that could have been added for

5  weapons and multiple charges that could have

6  been added and were not.

7      **PRESIDING COMMISSIONER INGLEE:**  Let me,

8  let me --

9      **ATTORNEY LEWIS:**  I understand that but

10 that's not what I read, Commissioner.

11     **PRESIDING COMMISSIONER INGLEE:**  All

12 right, let me.  We're getting off, I believe --

13     **ATTORNEY LEWIS:**  Absolutely.

14     **PRESIDING COMMISSIONER INGLEE:**  -- into

15 an area which has nothing to do with a parole

16 hearing.  Your client may have objections.  He

17 may even have a basis for an appeal.  But this

18 is not the forum for it.

19     **ATTORNEY LEWIS:**  I understood that from

20 the very beginning but I thought I'd bring it to

21 your attention.

22     **PRESIDING COMMISSIONER INGLEE:**  No,

23 that's fine, that's fine, but we need to move

24 ahead.

25     **ATTORNEY LEWIS:**  Absolutely.

26     **PRESIDING COMMISSIONER INGLEE:**  And we

27 need to give this man a parole hearing and

7

1  that's what we intend to do.

2  **ATTORNEY LEWIS:**  All right.

3  **PRESIDING COMMISSIONER INGLEE:**  In my

4  concern over wanting to be sure that I had the

5  correct verbiage on here because of the nature

6  of this crime and how many different aspects of

7  the crime there is to review.  I was given some

8  direction by my Deputy Commissioner, which led

9  us then into other fields of interest that go, I

10  think, well beyond what we can or are expected

11  to do at this hearing.

12  **ATTORNEY LEWIS:**  I understand.

13  **PRESIDING COMMISSIONER INGLEE:**  All

14  right.  So we're going to move on now.  This

15  hearing is being tape-recorded.  And for the

16  purpose of voice identification each of us will

17  be required to state our first and last name,

18  spelling our last name.  When it comes to the

19  inmate's turn you will spell your last name and

20  state your CDC number.  Starting with myself my

21  name is Philip Inglee, that's I-N-G-L-E-E, I'm a

22  Commissioner.

23  **DEPUTY COMMISSIONER MOORE:**  Deputy

24  Commissioner Moore, M-O-O-R-E, with the Board of

25  Parole Hearings.

26  **ATTORNEY LEWIS:**  DeJon Lewis, L-E-W-I-S,

27  attorney for Mr. Strong.

8

1        **INMATE STRONG:** My name is Sylvester
2    Strong.  My number is D-99287.
3        **PRESIDING COMMISSIONER INGLEE:** And spell
4    your last name, please.
5        **INMATE STRONG:** S-T-R-O-N-G.
6        **PRESIDING COMMISSIONER INGLEE:** All
7    right, thank you.  Mr. Strong, in front of you
8    is an ADA statement.  I'd like to have you read
9    that if you would, please.
10       **INMATE STRONG:** "The Americans
11            with Disabilities Act, ADA, is a
12            law to help peoples with
13            disabilities.  Disabilities are
14            problems that make it harder for
15            some peoples to see, hear,
16            breathe, talk, walk, learn, think,
17            work, or take care of themselves
18            than it is for others.  Nobody can
19            be kept out of public places or
20            activities because of a
21            disability.  If a disability has
22            -- If you have a disability you
23            have the right to ask for help to
24            get ready for your BPT Hearing,
25            get to the hearing, talk, read
26            forms and papers and understand
27            the hearing process.  The BPT will

9

1          look at what you ask for to make

2          sure that you have a disability

3          that is covered by the ADA and

4          that you have asked for the right

5          kind of help.  If you do not get

6          help or if you don't think you got

7          the kind of help you need, ask for

8          a BPT 1074 Grievance Form.  You

9          can also get help to fill it out."

10         **PRESIDING COMMISSIONER INGLEE:**  Did you

11    understand what you read?

12         **INMATE STRONG:**  Yes sir.

13         **PRESIDING COMMISSIONER INGLEE:**  Very

14    good.  This record reflects that you signed a

15    BPT Form 1073.  You signed that on 7/12 of 2005.

16    At that time you said you did not need any help

17    for your parole hearing.  Is that still true

18    today?

19         **INMATE STRONG:**  Yes sir.

20         **PRESIDING COMMISSIONER INGLEE:**  Do you

21    have any problems walking up and down stairs or

22    for a distance of 100 yards or more?

23         **INMATE STRONG:**  No sir.

24         **PRESIDING COMMISSIONER INGLEE:**  Do you

25    need glasses or a magnifying glass in order to

26    see or read documents?

27         **INMATE STRONG:**  I use reading glasses.

10

1      **PRESIDING COMMISSIONER INGLEE:**  Are they
2   adequate for today's hearing?

3      **INMATE STRONG:**  Yes sir.

4      **PRESIDING COMMISSIONER INGLEE:**  Good.  Do
5   you have any hearing impairments?

6      **INMATE STRONG:**  No.

7      **PRESIDING COMMISSIONER INGLEE:**  Have you
8   ever been included in the CCCMS or EOP program?

9      **INMATE STRONG:**  No sir.

10      **PRESIDING COMMISSIONER INGLEE:**  Are you
11   familiar with these programs?

12      **INMATE STRONG:**  I heard of them.

13      **PRESIDING COMMISSIONER INGLEE:**  They are
14   for inmates that have either emotional problems
15   or mental illness and they will have programs
16   specifically keyed for their benefit.  Have you
17   ever participated or been part of any program
18   such as this?

19      **INMATE STRONG:**  No sir.

20      **PRESIDING COMMISSIONER INGLEE:**  Have you
21   ever taken psychotropic medication, either in
22   prison or on the street?

23      **INMATE STRONG:**  No sir.

24      **PRESIDING COMMISSIONER INGLEE:**  How far
25   did you go in school before you arrived in
26   prison?

27      **INMATE STRONG:**  Twelfth grade.

Case 3:07-cv-04927-SI  Document 1-2  Filed 09/21/2007  Page 57 of 125

11

1       **PRESIDING COMMISSIONER INGLEE:**  Did you
2   graduate?

3       **INMATE STRONG:**  Yes sir.  Washington
4   Union High School.

5       **PRESIDING COMMISSIONER INGLEE:**  Good.
6   Have you taken, did you take any special
7   education classes while you were growing up?

8       **INMATE STRONG:**  No sir.

9       **PRESIDING COMMISSIONER INGLEE:**  Do you
10  suffer from any disability that would prevent
11  you from participating in today's hearing?

12      **INMATE STRONG:**  No sir.

13      **PRESIDING COMMISSIONER INGLEE:**  All
14  right.  Counsel, do you have any comments or
15  concerns regarding the ADA rights of your
16  client?

17      **ATTORNEY LEWIS:**  No I do not.

18      **PRESIDING COMMISSIONER INGLEE:**  This
19  hearing is being conducted pursuant to Penal
20  Code Sections 3041, 3042 and the rules and
21  regulations of the Board of Prison Terms
22  governing parole consideration hearings for life
23  inmates.  The purpose of today's hearing is to
24  consider your suitability for parole.  In doing
25  so we will consider the nature and number of the
26  crimes you were committed for, your prior
27  criminal and social history and your behavior

12

1   and programming since your commitment. We have

2   had an opportunity to review your Central File

3   and your prior hearing transcript. You'll be

4   given the opportunity to correct or clarify the

5   record. We will consider your progress since

6   your commitment and since your last hearing.

7   Your updated counselor's report and

8   psychological report will also be considered.

9   Any change in parole plans should be brought to

10  our attention. We will reach a decision today

11  and inform you whether or not we find you

12  suitable for parole and the reasons for our

13  decision. If you are found suitable for parole

14  the length of your confinement will be explained

15  to you. The hearing will be conducted in two

16  phases. I will discuss with you the crime that

17  you were committed for, your prior criminal and

18  social history, your parole plans and any

19  letters of support and opposition that may be in

20  file. Deputy Commissioner Moore will discuss

21  with you your progress since your commitment,

22  your counselor's report and your psychological

23  evaluation. Once that is concluded your

24  attorney will be given an opportunity to ask you

25  questions and also the Commissioners. The

26  questions from -- I'll skip through that, we

27  don't have a district attorney with us today.

13

1   Before we recess for deliberations your

2   attorney, and you will be given an opportunity

3   to make a final statement regarding your parole

4   suitability.  Your statement should be directed

5   as to why you feel you are suitable for parole.

6   We will then recess and clear the room for our

7   deliberations.  Once we have completed our

8   deliberations we will resume the hearing and

9   announce our decision.  The California Code of

10  Regulations states that regardless of time

11  served a life inmate shall be found unsuitable

12  for and denied parole if in the judgment of the

13  panel the inmate would pose an unreasonable risk

14  of danger to society if released from prison.

15  You have certain rights.  These rights include

16  the right to a timely notice of this hearing,

17  the right to review your Central File and the

18  right to present relevant documents.  Counsel,

19  has your inmate's rights been met in this

20  regard?

21          **ATTORNEY LEWIS:**  Yes they have.

22          **PRESIDING COMMISSIONER INGLEE:**  You also

23  have the right to be heard by an impartial

24  panel.  Sir, o you have any objection to any

25  member of this panel?

26          **INMATE STRONG:**  No sir.

27          **PRESIDING COMMISSIONER INGLEE:**  Counsel,

14

1  do you have any objections to any member of the
2  panel?
3         **ATTORNEY LEWIS:**  No.
4         **PRESIDING COMMISSIONER INGLEE:**
5  Mr. Strong, you will receive a copy of our
6  written tentative decision today.  That decision
7  is subject to review by the Decision Review Unit
8  and by the entire Board meeting as a body.  It
9  will become effective within 120 days.  It is
10  also subject to review by the Governor.  A copy
11  of the tentative decision and a copy of the
12  transcript will be sent to you.  As of May 1st,
13  2004 there were major changes limiting your
14  former rights to appeal Board decisions or
15  actions directly to the Board.  The old Board
16  regulations were repealed.  The current policy
17  is entitled Administrative Appeals
18  Correspondence and Grievances Concerning Board
19  of Prison Terms Decisions.  It is available in
20  the prison library for your review.  We are not
21  here to -- You are not required to admit your ·
22  offense or discuss your offense if you do not
23  wish to do so.  However, this panel does accept
24  as true the finding of the court and you are
25  invited to discuss the facts and circumstances
26  of the offense if you so desire.  The Board will ·
27  review and consider any prior statements you

1   Before we recess for deliberations your
2   attorney, and you will be given an opportunity
3   to make a final statement regarding your parole
4   suitability. Your statement should be directed
5   as to why you feel you are suitable for parole.
6   We will then recess and clear the room for our
7   deliberations. Once we have completed our
8   deliberations we will resume the hearing and
9   announce our decision. The California Code of
10  Regulations states that regardless of time
11  served a life inmate shall be found unsuitable
12  for and denied parole if in the judgment of the
13  panel the inmate would pose an unreasonable risk
14  of danger to society if released from prison.
15  You have certain rights. These rights include
16  the right to a timely notice of this hearing,
17  the right to review your Central File and the
18  right to present relevant documents. Counsel,
19  has your inmate's rights been met in this
20  regard?
21  ATTORNEY LEWIS: Yes they have.
22  PRESIDING COMMISSIONER INGLEE: You also
23  have the right to be heard by an impartial
24  panel. Sir, o you have any objection to any
25  member of this panel?
26  INMATE STRONG: No sir.
27  PRESIDING COMMISSIONER INGLEE: Counsel,

15

1   have made regarding the offense in determining

2   your suitability for parole.  Deputy

3   Commissioner, is there any confidential material

4   in the file, and if so, will it be used today?

5        **DEPUTY COMMISSIONER MOORE:**  There is no

6   confidential material.

7        **PRESIDING COMMISSIONER INGLEE:**  All

8   right.  I have passed a hearing checklist marked

9   Exhibit One on to your attorney so we will all

10  be proceeding with the same set of documents.

11  Counsel, do you have all your documents?

12       **ATTORNEY LEWIS:**  I do sir.

13       **PRESIDING COMMISSIONER INGLEE:**  Okay.

14  Are there any additional documents to be

15  submitted?

16       **ATTORNEY LEWIS:**  No.

17       **PRESIDING COMMISSIONER INGLEE:**  Are there

18  any preliminary objections?

19       **ATTORNEY LEWIS:**  None.

20       **PRESIDING COMMISSIONER INGLEE:**  Will the

21  inmate be speaking to the panel?

22       **ATTORNEY LEWIS:**  Yes he will be.

23       **PRESIDING COMMISSIONER INGLEE:**  Will he

24  be speaking on all subjects?

25       **INMATE STRONG:**  Yes I will.  As you just

26  stated -- (alarm sounding)

27       **DEPUTY COMMISSIONER MOORE:**  It's a test.

16

1      **PRESIDING COMMISSIONER INGLEE:**  All

2   right, go ahead.  I want to be sure you're going

3   to be on the transcript.

4      **INMATE STRONG:**  Okay.  As you just

5   stated, you take the court's finding to be true,

6   as well as I do too.  There's few things that --

7   I'll talk about the case but there might be

8   something today that I haven't said previously

9   that I might want to say today concerning the

10  case.

11     **PRESIDING COMMISSIONER INGLEE:**  All

12  right.  That's your option, obviously, it's your

13  right to do so.  If you have any objection or

14  any concern just let us know. With that in mind

15  I will swear you in now, please raise your right

16  hand.  Do you solemnly swear or affirm that the

17  testimony you give in this hearing will be the

18  truth, the whole truth and nothing but the

19  truth?

20     **INMATE STRONG:**  Yes sir I do.

21     **PRESIDING COMMISSIONER INGLEE:**  Thank

22  you.  Counsel, if there is no objection we will

23  incorporate by reference the Statement of Fact.

24  And that is going to come not from the Appellate

25  Decision, because that is a very poor rendering

26  of the Statement of Fact.  I am going to use the

27  probation officer's report pages two through

17

1  five.

2      **ATTORNEY LEWIS:**  That will be fine.

3      **PRESIDING COMMISSIONER INGLEE:**  That
4  gives a complete rendering of the situation.
5  All right, Mr. Strong.

6      **INMATE STRONG:**  Yes sir.

7      **PRESIDING COMMISSIONER INGLEE:**  Tell us
8  what happened.

9      **INMATE STRONG:**  On December the 10th,
10  1987 I went to my wife's house, Diana Strong,
11  and I forced my way in.  I didn't have no
12  business being there because we was going
13  through a divorce.  In short, I ended up, she
14  ended up getting stabbed and she lost her life
15  by the cost of my hands.

16      **PRESIDING COMMISSIONER INGLEE:**  Okay.
17  You made it sound almost like a third person.
18  But you are, you are saying you were the
19  responsible party.

20      **INMATE STRONG:**  Yes sir.

21      **PRESIDING COMMISSIONER INGLEE:**  In her
22  death.

23      **INMATE STRONG:**  Yes sir.

24      **PRESIDING COMMISSIONER INGLEE:**  All
25  right.  All right.  How do you feel about it?

26      **INMATE STRONG:**  I was with Diana from the
27  time she was 19 to the time she was 30.  We had

18

1    a good lifestyle.  We had a good lifestyle.  We
2    had, I guess what you would say what the
3    American Dream was, the house, the cars, good
4    jobs.  And somewhere along the line I guess I
5    got too confident in myself and I started using
6    cocaine.  And that was -- That started the
7    destruction of our family right there by me
8    using cocaine.  And everything after that just
9    went to the waysides as far as I was concerned.
10   I lost -- Now that I look back, I lost self-
11   respect for myself.  I just got caught up in it.
12        **PRESIDING COMMISSIONER INGLEE:**  Can you
13   tell us about the actual killing?  I mean, I
14   know that you've already said you stabbed her
15   and she died from that action.

16        **INMATE STRONG:**  Right.

17        **PRESIDING COMMISSIONER INGLEE:**  But can
18   you tell us about what actually happened that
19   day.

20        **INMATE STRONG:**  Well previously I had
21   called her and we was talking on the phone.  And
22   we was going through a divorce and there was a
23   property settlement.  I was waiting for my
24   property settlement from her.  So when I talked
25   to her I asked her about it.  And somehow it got
26   twisted around it was about money.  But in fact
27   I hadn't been at -- I was living with my mother

19

1  for two months and me and her had been talking
2  on the phone prior to that. And that day,
3  December the 10th of '87 she came over to my
4  mother's house and dropped off the insurance
5  policy. And I found that she was over there and
6  I called her and I told her I was coming over.
7  When I went over there I saw the gardener's
8  truck there. And I knocked on the door and they
9  wouldn't let me in and I kicked the door in and
10 I went in.

11        **PRESIDING COMMISSIONER INGLEE:** Stop and
12 hold your thought for a second. Did you have a
13 knife with you at the time?

14        **INMATE STRONG:** That's Mr. Jones version
15 and that's what I said I wanted to discuss
16 today. Because I agreed to that based upon the
17 DA telling me about the plea bargain. But in
18 fact that knife came off the refrigerator. I
19 never had the knife when entering the house.
20 And I never had the courage to say it in front
21 of the Board until today because it just keep on
22 -- My understanding when I took the plea
23 bargain, that I wouldn't have a life sentence.
24 I know I pleaded guilty to second-degree murder
25 but in return they told me they put an 18 year
26 lid on it. And so I keep finding out after
27 hearing after hearing, they keep telling me I

20

1    have 18 to life.  Today I have the courage to

2    say that that was the DA's version.  I never had

3    a chance to tell my -- I never was put on the

4    witness stand and told my version.  That was

5    Mr. Jones' version about me coming through the

6    door with the knife.

7         **PRESIDING COMMISSIONER INGLEE:**  This is

8    the gardener?

9         **INMATE STRONG:**  Yes sir.

10        **PRESIDING COMMISSIONER INGLEE:**  Let me

11   ask you a question.  You've been in prison for a

12   long time.

13        **INMATE STRONG:**  I know.

14        **PRESIDING COMMISSIONER INGLEE:**  You're

15   heard -- These discussions have gone on from the

16   moment you, when the case was over, when your

17   trial was over.

18        **INMATE STRONG:**  I never went to trial,

19   sir.

20        **ATTORNEY LEWIS:**  He took a plea.

21        **PRESIDING COMMISSIONER INGLEE:**  You took

22   a -- I'm sorry.  But there was adjudication

23   though.  I mean, you heard what you were being

24   charged with.

25        **INMATE STRONG:**  Yeah, but at that time I

26   was --

27        **PRESIDING COMMISSIONER INGLEE:**  That's

21

1   what I'm referring to.

2        **INMATE STRONG:** Yeah. At that time I

3   was, at that time I wasn't in the right state of

4   mind. And what the counselor, my counselor,

5   whatever he told me I went along with and I

6   believed him. But then as I said, each time I

7   keep coming to these hearings and I keep hearing

8   18 to life, that wasn't the term that I pleaded

9   to.

10       **PRESIDING COMMISSIONER INGLEE:** But you

11  have had all these years where this has been

12  used. Have you appealed this?

13       **INMATE STRONG:** Appealed it no, I'm

14  telling you now.

15       **PRESIDING COMMISSIONER INGLEE:** Well this

16  is not, we're not the appeal process.

17       **INMATE STRONG:** Right, right.

18       **PRESIDING COMMISSIONER INGLEE:** I don't

19  mind you saying it.

20       **INMATE STRONG:** Yeah, yeah.

21       **PRESIDING COMMISSIONER INGLEE:** I

22  sincerely don't mind you saying it. But we are

23  not the forum to necessarily get that turned

24  around.

25       **INMATE STRONG:** I understand that. But I

26  haven't even had the courage to say it in here.

27       **PRESIDING COMMISSIONER INGLEE:** I don't

22

1  understand, the courage.  You seem like a rather
2  -- You seem like a man who would speak his mind.
3      **INMATE STRONG:**  Yeah, to a degree.  But I
4  never have.  I just went along with the flow.
5  And that's the only discrepancy I have in the
6  statement.

7      **PRESIDING COMMISSIONER INGLEE:**  Well your
8  minimum eligible parole date is 1999.

9      **INMATE STRONG:**  Yes it was.

10     **PRESIDING COMMISSIONER INGLEE:**  That in
11  itself is not necessarily all end all but it at
12  least gives you a marker.  But when 1999 rolled
13  past and things kept on going on did it not
14  occur to you at the time that something was
15  amiss?

16     **INMATE STRONG:**  Oh yes it did.  But
17  again, I just, I didn't have the courage to say
18  it in front of, in here or nowhere.  I just
19  didn't.

20     **PRESIDING COMMISSIONER INGLEE:**  Okay, go
21  ahead.  So you came in.  And what you're telling
22  us today is that you took a knife off the
23  refrigerator.

24     **INMATE STRONG:**  Yes sir, that's where the
25  weapon came from, the refrigerator.  When I
26  first entered the house.  Like I say, when I
27  entered the house I asked Mr. Jones, was he in

23

1    there, excuse me ma'am, are you in there fucking
2    my wife?

3         **PRESIDING COMMISSIONER INGLEE:**  Whatever
4    you have to say here to explain what really
5    happened.

6         **INMATE STRONG:**  Yeah, yeah.

7         **PRESIDING COMMISSIONER INGLEE:**  You're
8    not going to be hurting anyone's feelings, I can
9    assure you.

10         **INMATE STRONG:**  Okay.  And he said --

11         **PRESIDING COMMISSIONER INGLEE:**  I can't
12   speak for you but I'm sure that's the case.

13         **INMATE STRONG:**  And he said, he said he
14   wasn't so I asked him to leave.  So I stood up
15   in front of the refrigerator.  As he passed me
16   Mr. Jones struck me and I went down.  When I
17   went down and I came back up, that's when I
18   reached up on top of the refrigerator and
19   grabbed the knife.

20         **PRESIDING COMMISSIONER INGLEE:**  How large
21   a man was Mr. Jones?

22         **INMATE STRONG:**  He was a little larger
23   than I was, you know.  And that's when the
24   struggle started.

25         **PRESIDING COMMISSIONER INGLEE:**  Well,
26   you're right.  I'll read through the summary of
27   the crime, and this is a short summary.  It

24

1  states down here:

2          "Sylvester knocked at the door.

3           Diane would not open the door

4           because she had a restraining

5           order and Sylvester wasn't

6           supposed to be on the premises.

7           Sylvester became upset and broke

8           down the front door, broke the

9           front door open.  He had a knife

10          in his right hand."

11  Mr. Jones said the prisoner accused him of going

12  with his wife and said:

13          "Bitch, I'm going to kill you.

14          Diane took off running but

15          Sylvester grabbed her with the

16          left hand and started hitting her

17          with his right hand with the knife

18          still in his hand."

19  At that point Mr. Jones started to leave.  So

20  what's written down here is basically what

21  you're refuting at this time, is that correct?

22          **INMATE STRONG:**  The only thing I'm

23  refuting is that I came through the door with

24  the knife.

25          **PRESIDING COMMISSIONER INGLEE:**  Well it

26  doesn't indicate down here that you possibly had

27  to defend yourself.  There's a reason why you

25

1  took the knife off the -- If in fact you took
2  the knife off the refrigerator.

3      **INMATE STRONG:**  Yes sir.

4      **PRESIDING COMMISSIONER INGLEE:**  Did you
5  mean to use it on Mr. Jones or did you truly
6  mean to murder your wife?

7      **INMATE STRONG:**  Mr. Jones was the
8  culprit.  The person I was after was Mr. Jones.

9      **PRESIDING COMMISSIONER INGLEE:**  But you
10 seemed to miss Mr. Jones and brutally murdered
11 your wife.  I'm not trying to make you feel any
12 worse than you're feeling today I'm sure, but
13 that's the point.

14     **INMATE STRONG:**  But see, but see, as I
15 just stated earlier, that was the, that was
16 Mr. Jones' statement.  I never had a chance and
17 I never did tell nobody other than my attorney
18 what actually happened.

19     **PRESIDING COMMISSIONER INGLEE:**  Because
20 of the plea, the plea agreement.

21     **INMATE STRONG:**  Yes sir.  And that was
22 part of the plea bargain agreement from the DA,
23 to tell his version and I agree to it.  But I
24 never told nobody my version of how it happened
25 other than my attorney.

26     **PRESIDING COMMISSIONER INGLEE:**  Well you
27 have mentioned the fact in your previous version

1   down here.  You tell it.

2        **INMATE STRONG:**  But it's --

3        **PRESIDING COMMISSIONER INGLEE:**  In the

4   prisoner's version, and I'm only reading a

5   portion of it.

6        **DEPUTY COMMISSIONER MOORE:**  On the Board

7   Report.

8        **PRESIDING COMMISSIONER INGLEE:**  This is

9   on page two.

10        **DEPUTY COMMISSIONER MOORE:**  I think he

11   was asking which Board Report.

12        **PRESIDING COMMISSIONER INGLEE:**  I'm

13   sorry?

14        **DEPUTY COMMISSIONER MOORE:**  I think

15   Mr. Strong was inquiring as to which document

16   you're referring to, the Board Report.

17        **PRESIDING COMMISSIONER INGLEE:**  This is

18   the October, no more than that.  It's the only

19   other full Board Report I have right now that

20   has the complete, has a complete history in

21   here.  And that is the report of, the Board

22   Report of 2004.

23        **DEPUTY COMMISSIONER MOORE:**  October 2004?

24        **PRESIDING COMMISSIONER INGLEE:**  Which

25   goes back a couple of years.  You say in this

26   regard:

27        "Sylvester says he went to his

wife's home in hopes of talking to her about reconciliation. He did not have a knife when he got there."

So you apparently have already told somebody this.

"When he broke the door down he saw Mr. Jones and said, are you fucking my wife? Strong then told Jones to leave. As Mr. Jones was leaving he hit strong and knocked him down. Strong got up and took the knife from above the refrigerator. Jones and Strong were struggling in the entryway at the time Diana ran up and was stabbed in the neck. Mr. Jones ran to his truck and left. Strong got a pillow for her head, opened her blouse to check her wound and called 911."

That's essentially what you're saying you have not said to anybody but here it is in writing.

**INMATE STRONG:** Well, like I said, it had been a number of years.

**PRESIDING COMMISSIONER INGLEE:** Well it was two years ago that you apparently -- Two

28

1    years, possibly a little longer than that.  But
2    in that time period you apparently told your
3    counselor that because it's here.

4         **INMATE STRONG:**  But I never told the
5    Board that.

6         **PRESIDING COMMISSIONER INGLEE:**  Well you
7    meant to in 2004, apparently, because this is,
8    this is the document that the last hearing group
9    would have looked at.  The reason why I'm
10   reading it is because they haven't brought all
11   the facts forward into the new, into the updated
12   Board Report, which is the November 2005.  What
13   they're saying under the summary of the crime is
14   it remains the same as stated in the previous
15   hearing.  So I have to go back and refer to a
16   previous hearing in this regard.  And that's the
17   last previous hearing.  And in fact, as I said
18   -- So anyway, I don't carry this beyond what we
19   need to.  But it seems to me you have already
20   told people of this in the past.  All right.
21   Okay, well we have two stories.  We have the
22   story that came out of your plea bargain and
23   then we have a subsequent story that you
24   apparently had told at least two years ago and
25   again today.  Counsel, is there anything you
26   want to say about this?

27        **INMATE STRONG:**  No.

29

1       **PRESIDING COMMISSIONER INGLEE:** All

2  right. Anything else about the actual murder?

3  How many times was your wife stabbed?

4       **INMATE STRONG:** My understanding, once.

5  But what do they call it --

6       **ATTORNEY LEWIS:** The autopsy?

7       **INMATE STRONG:** The autopsy indicated

8  more.

9       **PRESIDING COMMISSIONER INGLEE:** I was

10  going to say, it's quite a bit. Okay, I'll just

11  read the -- I didn't have it tabbed but I just

12  found it.

13       "The Fresno County coroner's post-

14       mortem record indicates that

15       victim Diana Strong suffered a

16       stab wound from the back through

17       to the palm of her left hand. The

18       victim's left thumb had a quarter-

19       inch deep incision wound. A stab

20       wound was located one inch to the

21       right midline of the neck. The

22       stab wound extended through the

23       right arterial jugular vein and

24       cut the --"

25  I'll have to spell it.

26       "-- A-Z-Y-G-O-U-S vein. The

27       direction of the wound is from the

30

```
 1          upper rear to a 30 degree downward
 2          angle.  The stab wound was
 3          estimated to be two and a half
 4          inches.  Victim Diana strong was
 5          pronounced dead at Valley Hospital
 6          by Dr. Michael Solomon.  The cause
 7          of death is recorded as himeric
 8          (phonetic) shock due to a stab
 9          wound of the neck and chest."
10   Okay, anything else sir?  I know these are not
11   easy things to talk about, I understand.  Okay,
12   let's take a look at your prior criminal record.
13        DEPUTY COMMISSIONER MOORE:  I have some
14   questions about the offense.
15        PRESIDING COMMISSIONER INGLEE:
16   Certainly.  Let's go to the Deputy Commissioner
17   and she has some questions for you.
18        DEPUTY COMMISSIONER MOORE:  Were you
19   under the influence of cocaine on December 10th?
20        INMATE STRONG:  Yes ma'am I was.
21        DEPUTY COMMISSIONER MOORE:  When had you
22   used it?
23        INMATE STRONG:  When?
24        DEPUTY COMMISSIONER MOORE:  Uh-hmm.
25        INMATE STRONG:  During that course of
26   that day.
27        DEPUTY COMMISSIONER MOORE:  What time of
```

31

1   day did the stabbing and murder occur?

2          **INMATE STRONG:** I believe around 6:30.

3          **DEPUTY COMMISSIONER MOORE:** Were you

4   smoking it, snorting it or shooting it?

5          **INMATE STRONG:** I was, I was smoking it.

6          **DEPUTY COMMISSIONER MOORE:** Rock or

7   powder?

8          **INMATE STRONG:** Rock.

9          **DEPUTY COMMISSIONER MOORE:** And how long

10  had you been using cocaine prior to this event?

11         **INMATE STRONG:** About ten months.

12         **DEPUTY COMMISSIONER MOORE:** And there

13  were a number of other incidents in the month

14  prior to the murder, isn't that correct?

15         **INMATE STRONG:** Yes ma'am it is.

16         **DEPUTY COMMISSIONER MOORE:** Violent,

17  involving violence?

18         **INMATE STRONG:** Yes ma'am.

19         **DEPUTY COMMISSIONER MOORE:** Was anyone on

20  your case, you know, about the cocaine prior to

21  the day of the murder?

22         **INMATE STRONG:** Anyone like who, ma'am?

23         **DEPUTY COMMISSIONER MOORE:** Anyone.

24         **INMATE STRONG:** Yes, I had -- You know, I

25  look back.  I had peoples telling me that I need

26  to put myself in check and I didn't hear them.

27         **DEPUTY COMMISSIONER MOORE:** Were you

1  still employed by the City of Fresno when this
2  happened on December 10th?
3        **INMATE STRONG:**  No, I had -- No I wasn't.
4        **DEPUTY COMMISSIONER MOORE:**  How come you
5  weren't still employed?
6        **INMATE STRONG:**  I wasn't able to function
7  in my duties at work.
8        **DEPUTY COMMISSIONER MOORE:**  Were you
9  fired?
10       **INMATE STRONG:**  No, I just left.
11       **DEPUTY COMMISSIONER MOORE:**  When did you
12 quit work, about?
13       **INMATE STRONG:**  I can tell you.  I left
14 October the 15th, 1987.
15       **DEPUTY COMMISSIONER MOORE:**  And then
16 what, after six or seven years as a city
17 employee?
18       **INMATE STRONG:**  Eight.
19       **DEPUTY COMMISSIONER MOORE:**  Eight years.
20 So when you arrived at the house, your wife's
21 house, there was a restraining order in place?
22       **INMATE STRONG:**  Yes ma'am.
23       **DEPUTY COMMISSIONER MOORE:**  And how long
24 had that restraining order been in place?
25       **INMATE STRONG:**  Probably within maybe
26 three months.
27       **DEPUTY COMMISSIONER MOORE:**  About the

33

1   same time you quit work.

2        **INMATE STRONG:**  Yes ma'am.

3        **DEPUTY COMMISSIONER MOORE:**  Things were

4   escalating quickly.

5        **INMATE STRONG:**  Yes.

6        **DEPUTY COMMISSIONER MOORE:**  And the

7   restraining order told you to not do what?

8        **INMATE STRONG:**  I wasn't allowed to be on

9   the premises.

10       **DEPUTY COMMISSIONER MOORE:**  What else?

11  And contact?

12       **INMATE STRONG:**  That's being on the

13  premises.

14       **DEPUTY COMMISSIONER MOORE:**  How about

15  telephonic contact?  Were you allowed --

16       **INMATE STRONG:**  No, they didn't.  To my

17  understanding, I can't quite say but we talked

18  on the phone, you know.

19       **DEPUTY COMMISSIONER MOORE:**  What is it

20  you were so angry about that you kicked the door

21  in?

22       **INMATE STRONG:**  Because there was another

23  man inside the welding (sic) that I once lived

24  in and she wouldn't open the door and let me in.

25       **DEPUTY COMMISSIONER MOORE:**  And why

26  wouldn't she open the door?

27       **INMATE STRONG:**  Because I had a

34

1   restraining order, I wasn't supposed to be
2   there.
3
4       **DEPUTY COMMISSIONER MOORE:**  And how many
5   times had you laid hands on her before?
6       **INMATE STRONG:**  Whatever the record said.
7   It was at least three or four different
8   incidents that I had spousal abuse on Diana
9   Strong.
10      **DEPUTY COMMISSIONER MOORE:**  Did your
11  daughter Monique (phonetic) --
12      **INMATE STRONG:**  My son.  No, Monique --
13      **DEPUTY COMMISSIONER MOORE:**  Did your
14  daughter Monique live with you and Mrs. Strong?
15      **INMATE STRONG:**  No, Monique no.  She
16  didn't live with me.  The only one that was
17  living there was Sylvester Junior.
18      **DEPUTY COMMISSIONER MOORE:**  Monique is
19  younger than Sylvester?
20      **INMATE STRONG:**  She's older.
21      **DEPUTY COMMISSIONER MOORE:**  Older.
22      **INMATE STRONG:**  They made a mistake on
23  that.
24      **DEPUTY COMMISSIONER MOORE:**  Okay.  And
25  when you broke through the door was Sylvester at
26  home?
27      **INMATE STRONG:**  No he wasn't.

35

1    **DEPUTY COMMISSIONER MOORE:**  Does he go by
2  Junior?

3         **INMATE STRONG:**  Yes.

4         **DEPUTY COMMISSIONER MOORE:**  Where was he?
5         **INMATE STRONG:**  With his aunt Sarah.

6         **DEPUTY COMMISSIONER MOORE:**  How angry --
7  Describe to us how angry you were when you
8  busted through the door.

9         **INMATE STRONG:**  I was really pissed off
10  to the fact that she wouldn't open the door and
11  there was another man in there.  And we had been
12  talking on the phone for like two months, you
13  know.

14         **DEPUTY COMMISSIONER MOORE:**  What did that
15  mean to you?

16         **INMATE STRONG:**  I was under -- When I was
17  under the influence, you know.  Under the
18  influence all kinds of crazy things.  I'm
19  thinking they might be in there engaging into
20  some sexual act.  You know, everything that's
21  unimaginable was coming through once she, once
22  they wouldn't open the door, the door wasn't
23  opened.

24         **DEPUTY COMMISSIONER MOORE:**  Did you think
25  you still had control or rights to control her?
26         **INMATE STRONG:**  I didn't have no rights.
27  I didn't even have the right to be there.  ✓

36

1    **DEPUTY COMMISSIONER MOORE:** Today you say
2    that.  I'm talking about December 10, 1987.
3         **INMATE STRONG:** I didn't know it, no.  I
4    didn't know what I was thinking at that time.
5         **DEPUTY COMMISSIONER MOORE:** On the other
6    dates that you assaulted your wife were you
7    under the influence of cocaine?
8         **INMATE STRONG:** Yes ma'am.
9         **DEPUTY COMMISSIONER MOORE:** And today you
10   indicate that you did not go into the house with
11   the knife.  In October of '04 when you spoke to
12   CC-I correctional counselor Hilliard (phonetic).
13   Does that name sound familiar to you?
14        **INMATE STRONG:** Yes.
15        **DEPUTY COMMISSIONER MOORE:** CC-I Hilliard
16   wrote down your statement that you did not come
17   in with a knife.  That you went and got it over
18   the refrigerator.
19        **INMATE STRONG:** Yes ma'am.
20        **DEPUTY COMMISSIONER MOORE:** How did you
21   -- Were there knives stored on top of the
22   refrigerator?
23        **INMATE STRONG:** We had a chop -- On top
24   of the refrigerator we had a chopping block.
25   And it was right over the top of the freezer and
26   it just sat up there.  Once I was struck -- I
27   know it was there and I just stood up and

37

1  reached up.  Unfortunately I grabbed the longest

2  one in the block.

3          **PRESIDING COMMISSIONER INGLEE:**  These are

4  knives that are in a wooden --

5          **INMATE STRONG:**  Yes sir.

6          **PRESIDING COMMISSIONER INGLEE:**  I

7  understand.

8          **DEPUTY COMMISSIONER MOORE:**  So how is it

9  that Mr. Jones struck you?  Where is it?  What

10  did he do?

11          **INMATE STRONG:**  When I -- I was standing

12  by the refrigerator and I asked him to leave.

13  And as he was leaving --

14          **DEPUTY COMMISSIONER MOORE:**  Did you ask

15  him to leave?

16          **INMATE STRONG:**  Yeah, I told him to get

17  the fuck out.

18          **DEPUTY COMMISSIONER MOORE:**  That's not

19  asking.

20          **INMATE STRONG:**  Well.

21          **DEPUTY COMMISSIONER MOORE:**  That's

22  telling.

23          **INMATE STRONG:**  Well, yes.

24          **DEPUTY COMMISSIONER MOORE:**  Okay.

25          **PRESIDING COMMISSIONER INGLEE:**  It

26  wouldn't cause any confusion with me if you had

27  done that.

38

1          **ATTORNEY LEWIS:**  Clear as a bell.

2          **DEPUTY COMMISSIONER MOORE:**  So you told

3    him to get out.

4          **INMATE STRONG:**  Yes ma'am.

5          **DEPUTY COMMISSIONER MOORE:**  And what

6    happened?

7          **INMATE STRONG:**  He walked by me.  As he

8    walked by he and he turned back he struck me.

9          **DEPUTY COMMISSIONER MOORE:**  Tell me what

10   that means.  Did he tap you on the shoulder,

11   forehead, what?

12         **INMATE STRONG:**  No, he hit me in my face.

13         **DEPUTY COMMISSIONER MOORE:**  With what?

14         **INMATE STRONG:**  With his face.

15         **DEPUTY COMMISSIONER MOORE:**  And what

16   happened to you?

17         **INMATE STRONG:**  I went down.

18         **DEPUTY COMMISSIONER MOORE:**  To the

19   ground?

20         **INMATE STRONG:**  In the kitchen, in the

21   kitchen.  We was in the kitchen area in front of

22   the refrigerator, I went down.  When I went down

23   I stood back up.  When I stood back up I just

24   reached straight up and grabbed the knife.

25         **DEPUTY COMMISSIONER MOORE:**  And where was

26   Mr. Jones when you reached for the knife?

27         **INMATE STRONG:**  Headed for the front

76

1          **INMATE STRONG:** He became a gang member.
2          **DEPUTY COMMISSIONER MOORE:** Here in
3   Fresno?
4          **INMATE STRONG:** Yes.
5          **DEPUTY COMMISSIONER MOORE:** Which gang?
6          **INMATE STRONG:** From my understanding
7   they call theyself (sic) a Deuce Diamond Crip.
8          **DEPUTY COMMISSIONER MOORE:** At 11 years
9   old?
10         **INMATE STRONG:** He was getting into it
11  the last time I saw him.  I recognized his
12  little outfit that he had on and we talked about
13  it.  After that he --
14         **DEPUTY COMMISSIONER MOORE:** So you
15  haven't had contact with him?  He's 23 now?
16         **INMATE STRONG:** Yeah, he'll be 23 July
17  the 1st.
18         **DEPUTY COMMISSIONER MOORE:** Have you seen
19  him since?
20         **INMATE STRONG:** You know, I don't want to
21  talk about Sylvester but I will say this.
22  Sylvester is off the track right now.  Sylvester
23  is incarcerated as well.
24         **DEPUTY COMMISSIONER MOORE:** Locally or in
25  the state prison?
26         **INMATE STRONG:** In the state prison.
27         **DEPUTY COMMISSIONER MOORE:** Have you

77

1    attempted to try -- Drugs part of his life?

2        **INMATE STRONG:** Truthfully, all I know,

3    he was involved in gangs. I don't know. But I

4    keep in contact with Sylvester through his

5    grandmother Ruby, Diana's mother. I correspond

6    with Sylvester right now. We write, you know.

7    I always write him. But I lost, I lost control

8    of him at 11, you know. In fact, that was the

9    last time I kissed him on the cheek and he told

10   me I couldn't do that no more.

11       **DEPUTY COMMISSIONER MOORE:** Some pretty

12   serious consequences for taking the life of his

13   mother.

14       **INMATE STRONG:** Yes. And that I can

15   never change and that's something I have to live

16   with the rest of my life.

17       **DEPUTY COMMISSIONER MOORE:** So coming

18   back to NA. Has it been recommended to you that

19   you work the steps?

20       **INMATE STRONG:** They tell us to work them

21   as we need them, you know.

22       **DEPUTY COMMISSIONER MOORE:** What sort of

23   literature have you read in NA?

24       **INMATE STRONG:** The literature that they

25   offer us in there, you know. They have little

26   pamphlets and stuff.

27       **DEPUTY COMMISSIONER MOORE:** Have you ever

78

1   read the book that AA uses called Alcoholics
2   Anonymous?

3       **INMATE STRONG:**  We have sessions in NA
4   that we take turns reading out the book.

5       **DEPUTY COMMISSIONER MOORE:**  The big book?
6       **INMATE STRONG:**  Yeah, the big blue book.
7       **DEPUTY COMMISSIONER MOORE:**  And have you
8   over obtained a copy of that for yourself?

9       **INMATE STRONG:**  No, when we go in there
10  we read it out.  They just have a couple of them
11  and they just pass them around within the
12  meeting.

13      **DEPUTY COMMISSIONER MOORE:**  What does
14  that book recommend?  That's pretty much the
15  bible of recovery, isn't it?

16      **INMATE STRONG:**  The thing is, my theory
17  is it's just, it's two things.  You're going to
18  use or you're not going to use, you know.  And
19  you find ways to -- It takes time to find out
20  how not to use and why you use and all that.
21  But we read the book.

22      **DEPUTY COMMISSIONER MOORE:**  Okay.
23  There's some other things that you've completed
24  since your last hearing.  The community reentry
25  video and discussion occurred.  Also anger
26  management class in July of '05.

27      **INMATE STRONG:**  Yes.

79

1        **DEPUTY COMMISSIONER MOORE:**  And there was
2   a tobacco awareness program that you also went
3   through in January of '06.  And I do want to,
4   even though it was prior to your last hearing,
5   in August of '02 you participated in a 13-week
6   IMPACT program.

7        **INMATE STRONG:**  Yes ma'am.

8        **DEPUTY COMMISSIONER MOORE:**  What did you
9   get from that?

10       **INMATE STRONG:**  With IMPACT?

11       **DEPUTY COMMISSIONER MOORE:**  Uh-hmm.

12       **INMATE STRONG:**  That was a real awesome
13  class.  We had various topics.  I mean, from
14  domestic violence to gangs to murder.  It was a
15  very interesting class that Captain Garrett
16  (phonetic) here at CTF was the sponsor of it.

17       **DEPUTY COMMISSIONER MOORE:**  And you
18  learned about your impact on what, your
19  behavior?

20       **INMATE STRONG:**  Basically when I went to
21  the IMPACT class was to try to get some
22  understanding on domestic violence.

23       **DEPUTY COMMISSIONER MOORE:**  Did you?

24       **INMATE STRONG:**  Yes.

25       **DEPUTY COMMISSIONER MOORE:**  What did you
26  learn?

27       **INMATE STRONG:**  That I cannot control no

80

1   person but myself.  That if my wife Gloria today
2   tell me she don't want to be with me, I have to
3   respect that.  I can't make her do something
4   that she don't want to do.  She's a grown
5   person.

6       **DEPUTY COMMISSIONER MOORE:**  Does Gloria
7   know about your history?

8       **INMATE STRONG:**  Gloria, in fact, was
9   working at the hospital.  Yeah, she know about
10  it, she know the whole case.

11      **DEPUTY COMMISSIONER MOORE:**  Okay.  We
12  also have a laudatory chrono, which you spoke
13  about earlier, and that was written by CC-I
14  Palmer in September of '05 in which you
15  participated with other inmates in making a
16  financial donation for the victims of the
17  Katrina Hurricane in the Louisiana/Mississippi
18  area.

19      **INMATE STRONG:**  Yes I did.

20      **DEPUTY COMMISSIONER MOORE:**  Good
21  community service.  I'm going to move on now.
22  Is there anything else you want to tell me about
23  programming, laudatory chronos, work, academics,
24  anything that I've missed or overlooked?

25      **INMATE STRONG:**  You covered everything
26  other than since the last Board Hearing I just
27  received seven laudatory chronos, which you

81

1    mentioned.

2         **DEPUTY COMMISSIONER MOORE:** Okay. Yes,

3    all for attendance at NA and AA. Consistent

4    without a break, I would note.

5         **INMATE STRONG:** Yeah.

6         **DEPUTY COMMISSIONER MOORE:** Okay. Your

7    disciplinary history involves two 115s that

8    occurred in '93, excuse me. One for disruptive

9    -- Both in September of '93. Disruptive

10   behavior and threatening staff. About following

11   the rules. Not wanting to follow the rules and

12   getting your back up in a loud way would

13   probably be the best way to characterize that.

14        **INMATE STRONG:** Yes ma'am.

15        **DEPUTY COMMISSIONER MOORE:** The 128s, you

16   had six of them total and the last one was in

17   October of '99. Again about getting your back

18   up. Loud and disrespectful to staff. Wanting

19   to control your world is how I would

20   characterize them. And the last one was in

21   October of '99. And that's -- So nothing in the

22   past almost seven years, six-and-a-half years in

23   that respect and nothing for twelve-and-a-half

24   years as far as a 115. You've been clear. And

25   with no violence involved in any of them, any of

26   the write-ups. Anything else that I need to

27   cover before I go to your psychological report?

82

1        **INMATE STRONG:** No, that's basically

2    about everything.

3        **DEPUTY COMMISSIONER MOORE:** Okay. The

4    psychological evaluation I'm going to review is

5    dated October 11, 2004. Is that yours, the one

6    you have, counsel?

7        **ATTORNEY LEWIS:** Yes it is.

8        **DEPUTY COMMISSIONER MOORE:** And it is

9    entitled the psychological evaluation and it's

10   written by Dr. Sexton, S-E-X-T-O-N, consulting

11   psychologist, and Senior Supervising

12   Psychologist, Zika, Z-I-K-A. They indicate that

13   there was an interview of you for about two

14   hours that lasted -- In October of '04. Do you

15   recall that?

16       **INMATE STRONG:** Yes ma'am I do.

17       **DEPUTY COMMISSIONER MOORE:** Okay. They

18   reviewed all of your records as well. They

19   found -- They reviewed your criminal history as

20   we've done here. They also reviewed the 115s

21   and noted the '93, the two incidents in '93. In

22   the question about the commitment offense you

23   discussed your substance abuse, the relationship

24   with your wife, your feelings of abandonment at

25   great length. It was clear to the doctor that

26   you had a deep understanding of the underlying

27   causes for the offense and through numerous

83

1  courses that you've taken while incarcerated

2  have learned alternative behaviors.  And your

3  remorse appeared to the doctor to be genuine and

4  heartfelt.  You indicated that you continue to

5  be in communication with the victim's family.

6  That although you've remarried the victim's

7  mother, I think you referred to her as Ruby.

8       **INMATE STRONG:**  Yes ma'am, Ruby Pinson.

9       **DEPUTY COMMISSIONER MOORE:**  Continues to

10  be your mother-in-law and you are in contact

11  with her.  That she has forgiven you for the

12  offense and it appears to the doctor that her

13  forgiveness is very important to you.

14       **INMATE STRONG:**  Yes it was.

15       **DEPUTY COMMISSIONER MOORE:**  There were

16  some brief psychiatric contacts while you were

17  incarcerated, mostly for self-referrals for

18  depression.  One time you were placed on

19  Vistaril, V-I-S-T-A-R-I-L.  You're currently not

20  taking any medication and it doesn't appear to

21  have any lasting -- You do not appear to have

22  any current issues regarding depression or

23  anything like that.  They do make note that it

24  seems to be at about the time after a Board

25  Hearing or just before a Board Hearing that you

26  self-referred.

27       **INMATE STRONG:**  Yes ma'am it was.

1    **DEPUTY COMMISSIONER MOORE:** Okay.
2    Consistent with previous reports there is no
3    evidence that you've ever experienced psychotic
4    symptoms or significant mood disorders. You are
5    clear, well spoken and articulate. Your
6    intellectual functioning appears to be in the
7    average range. Under diagnostic impressions
8    there were no diagnoses determined to be present
9    other than being a life prisoner. They indicate
10   your GAF score is at 85. The doctor does say
11   that your diagnosis has changed from previous
12   reports in his opinion. In the past there was a
13   label of adult antisocial behavior. The doctor
14   states that there is no indication of that at
15   this time and that the diagnosis has been
16   removed from his clinical impressions of you.
17   It's clear that you've chosen not to abuse
18   cocaine. Not because you don't have the
19   availability, because you don't wish to have
20   used it. And as a result the substance abuse,
21   poly-substance abuse has been dropped from your
22   diagnosis as well. I might also offer the
23   opinion that sometimes that can be as a result
24   of institutional remission of the abuse because
25   of institutional, you know, incarceration. But
26   as you've stated, you can come by it while
27   you're inside.

1        **INMATE STRONG:** Very easily.

2        **DEPUTY COMMISSIONER MOORE:** Yeah. Refers

3   to 35 chronos for self-help programs. And this

4   was in '04, you've only added to that number.

5   And a limited yet significant arrest history.

6   It's clear -- The doctor says it's clear that

7   your aggressive behavior from the late '80s and

8   early '90s is now changing for the better. As a

9   result your violence potential compared to other

10  inmates with whom you reside is considered to be

11  below average. You have no assaultive history

12  while you have been incarcerated. The doctor

13  says it is somewhat difficult to predict the

14  probability of aggressive behavior in the

15  community. As people mature and change,

16  behavior they have once found acceptable becomes

17  unacceptable. What can be said is that compared

18  to the average parolee in the community you are

19  much less likely to be violent while on parole

20  due in part to your age, greater maturity and

21  your substance-free thinking or intellect. You

22  appear to have no more violence potential than

23  the average male in the general population of a

24  similar age. And I believe you're 52 now?

25       **INMATE STRONG:** Yes ma'am, I am 52.

26       **DEPUTY COMMISSIONER MOORE:** Okay. There

27  are no current factors which would predict an

86

1   increase in violence potential in the community.
2   Substance abuse would clearly increase that
3   potential.  But it does not appear that
4   substance abuse is currently a problem nor is it
5   anticipated that it will be an issue for him
6   when he is placed on parole.  The comment about
7   your numerous self-help, no current
8   recommendation for additional self-help programs
9   from the doctor, and that you appear to have
10  reached your maximum benefit while incarcerated
11  from self-help.  What are your plans regarding
12  NA upon your release?

13      **INMATE STRONG:**  Well there's numerous NA
14  programs in Fresno.  My mother is going to make
15  sure that I get in one.  That's our discussions
16  when she comes up to visit me.  My mother visits
17  me regularly.  And she wants me to get into it.

18      **DEPUTY COMMISSIONER MOORE:**  How often do
19  you think you're going to have to go to
20  meetings?

21      **INMATE STRONG:**  Well, I'm going to try to
22  make them as often as possible.

23      **DEPUTY COMMISSIONER MOORE:**  Well how many
24  do you think you need a week?

25      **INMATE STRONG:**  I would say I'm going to
26  try to at least make a average of at least four
27  a week, you know.

1    **DEPUTY COMMISSIONER MOORE:** What else are
2  you going to do when you start going to
3  meetings? Do you need to get a sponsor?

4    **INMATE STRONG:** My sister-in-law has been
5  my, she's going to be my sponsor.

6    **DEPUTY COMMISSIONER MOORE:** And I'm going
7  to recommend to you that that not occur. You
8  need a man to be your sponsor. Not a family
9  member and not a woman.

10   **INMATE STRONG:** Okay.

11   **DEPUTY COMMISSIONER MOORE:** You have a
12 lot of footwork to do on the 12 steps of
13 Narcotics Anonymous, a lot. It needs to be with
14 a man who has been clean and sober and is doing
15 the deal.

16   **INMATE STRONG:** Okay, I acknowledge that.

17   **DEPUTY COMMISSIONER MOORE:** So I want to
18 give you a little redirection on that.

19   **INMATE STRONG:** Okay.

20   **DEPUTY COMMISSIONER MOORE:** Get into
21 service as soon as you can. Do you know what
22 that means when I say, get into service in NA?

23   **INMATE STRONG:** No I don't.

24   **DEPUTY COMMISSIONER MOORE:** You start
25 cleaning coffee cups, you clean up the ashtrays,
26 you set up the chairs. You find a position
27 where you're the greeter at the meeting and you

88

1  welcome the people.

2       **INMATE STRONG:** Oh, once on the streets.

3  Yeah, okay, I understand you now.

4       **DEPUTY COMMISSIONER MOORE:** On the

5  streets.

6       **INMATE STRONG:** Yeah, okay. I do that

7  here.

8       **DEPUTY COMMISSIONER MOORE:** Get into

9  service on the outside.

10      **INMATE STRONG:** Okay.

11      **DEPUTY COMMISSIONER MOORE:** Is there

12 anything else that you'd like to add at this

13 time regarding post-conviction factors?

14      **INMATE STRONG:** That's it ma'am.

15      **DEPUTY COMMISSIONER MOORE:** Okay.

16 Commissioner, thank you, I have completed my

17 presentation.

18      **PRESIDING COMMISSIONER INGLEE:** Okay.

19 All right, I have no questions. Do you have any

20 questions, counselor?

21      **ATTORNEY LEWIS:** No I do not.

22      **PRESIDING COMMISSIONER INGLEE:** All

23 right, would you go to the summary, please.

24      **DEPUTY COMMISSIONER MOORE:** You are going

25 to be interrupted in the middle of it just to

26 let you know.

27      **ATTORNEY LEWIS:** Will I?

89

1    **DEPUTY COMMISSIONER MOORE:**  Yeah, I'm
2    going to --

3    **PRESIDING COMMISSIONER INGLEE:**  You want
4    to take it, just go ahead and change those out?
5    **DEPUTY COMMISSIONER MOORE:**  Well I
6    haven't gotten the tapes unwrapped yet so you
7    may want to begin, sir.

8    **ATTORNEY LEWIS:**  Mr. Strong should be
9    found suitable for parole.  The following
10   supports Mr. Strong in his contention that he
11   has earned a second chance by being suitable for
12   parole.  He has definitely taken responsibility
13   for the life crime.  He has admitted guilt to
14   the Board here today and at other times.  He
15   admitted guilt to the psychological evaluators,
16   to a host of people.  And also he pled guilty to
17   the crime as well.  Mr. Strong has a stable
18   upbringing and he has experienced reasonable,
19   stable relationships with others.  Mr. Strong
20   has been commended with excellent and/or above
21   average work reports while incarcerated and he
22   has also worked well with others, his
23   supervisors and peers, and he has a great
24   attitude.  Mr. Strong has expressed remorse for
25   his crime, with not only psychiatric evaluators
26   but here today, and he is truly sorry.  More
27   importantly, however, Mr. Strong has

90

1   demonstrated his remorse by programming.  By
2   attending NA regularly, by going through
3   vocational training, by going through the IMPACT
4   program, anger management and a host of other
5   self-help programs.  Mr. Strong has committed --
6   Mr. Strong committed his crime as a result of
7   significant stress in his life due to drug
8   addiction, cocaine, and the fact that Mr. Jones
9   struck him.  Causing him to be enraged, which
10  caused the fight that ensued where his wife got
11  in the middle of that and was summarily struck
12  by the knife and killed.

13      **DEPUTY COMMISSIONER MOORE:**  And that's a
14  good pause point right there.

15      (Tape One was changed to Tape Two.)

16      **DEPUTY COMMISSIONER MOORE:**  We're back on
17  the record on tape two, it's 6:21.

18      **ATTORNEY LEWIS:**  Mr. Strong's education,
19  although he doesn't have a degree in college he
20  does have a high school diploma that was awarded
21  to him in 1972.  He can read and write and in
22  fact he held a job with the SPCA of Fresno for
23  several years, indicating that he can and has
24  more of a grade point average than what the
25  record shows.  Mr. Strong lacks any significant
26  history of violent crime as a juvenile, although
27  he had some run-ins with the law with respect to

1   domestic violence with his wife.  At the time of
2   the crime Mr. Strong was 33 years old and he is
3   now age 52.  At age 52 the probability of
4   recidivism is vastly reduced.  And in fact, the
5   circumstances surrounding the crime it seems to
6   me is one that probably would never occur again,
7   not in this gentleman's life, with respect to
8   how it went down.  Mr. Strong's parole plans are
9   solid and feasible.  He is now married,
10  remarried.  He has a residence that is assured
11  with his mother, Dorothy Potts, which she has
12  submitted support letters indicating so.
13  Mr. Strong has a job offer as a stocker at the
14  Cigarette Outlet in Fresno, which is owned and
15  operated by his uncle, John Cummings.  There are
16  letters in the file that show that Mr. Cummings
17  is willing to hire my client, although he didn't
18  sign them and place the date or his address on
19  the letter.  Mr. Strong has marketable skills
20  enabling him to readily find employment.  It is
21  believed that he could go back to the SPCA and
22  get his job as an animal control officer.  And
23  he also certifications in furniture upholstery,
24  which as mentioned earlier, he has excellent job
25  reports.  Mr. Strong's institutional activities
26  indicate an enhanced ability to function with
27  the law upon his release.  Through his

92

1    incarceration he has only received two 115s, the
2    last one of which was in 1993.  Mr. Strong has
3    engaged in numerous self-help groups, IMPACT,
4    anger management.  The IMPACT group was 13
5    weeks, tobacco awareness and a few others.  His
6    assessment of dangerousness by Dr. Sexton as
7    low.  Dr. Sexton opined that my client would be
8    less likely to be violent and he has maxed out
9    on all programs the CDC has to offer.  That was
10   indicated on the last page of his report.  In
11   conclusion, Mr. Strong has a network of support
12   which includes his mother, his family, his wife,
13   and including the victim's mom.  The family
14   support will not be there forever because people
15   do drift away.  Parole is more likely to be
16   successful if there is a family network
17   available.  Mr. Strong has a job offer.  This
18   will not always be available.  Mr. Strong has
19   parole plans that are feasible.  And Mr. Strong
20   has demonstrated that he can succeed without
21   resorting to violence.  The murder of his wife
22   was not an intentional act, it was a
23   circumstance that happened and it was an
24   accident.  We respectfully request that
25   Mr. Strong be given an opportunity to reenter
26   into society to be a viable member of society so
27   that he can continue on in his life and to maybe

93

1   share some of his experiences and some of his,
2   you know. With regards to.youth out there maybe
3   he can maybe show someone out there that it's
4   not, violence is not the way and maybe he can
5   change a few outlooks. Maybe he can save his
6   son. Maybe he can help some people out there.
7   We submit.

8       **PRESIDING COMMISSIONER INGLEE:** All
9   right, thank you very much. Give me a second,
10  give me a second. Mr. Strong, this is now your
11  opportunity to tell us why you're suitable for
12  parole.

13      **INMATE STRONG:** Okay. Before I say that
14  I would like to go back to Deputy Commissioner
15  Moore. That you never went back and talked
16  about that domestic violence package that I had
17  in my C File.

18      **DEPUTY COMMISSIONER MOORE:** You are
19  correct. And I know where it is, I will now do
20  that. The only document that I could find and
21  review since the last hearing, and I'm just
22  going to double-check, was the three hour video
23  review that was offered. Carl Reddick
24  (phonetic) was the video instructor. Do you
25  recall that?

26      **INMATE STRONG:** Yes ma'am.

27      **DEPUTY COMMISSIONER MOORE:** And that was

1  on July of 2005 and Charlie Walker signed off on

2  your chrono on that. And it was about anger

3  management and what drives your emotions.

4  That's what I was looking at when I spoke with

5  you. The only other chronos that have been put

6  in your file since the date of the last hearing

7  is the tobacco awareness, your laudatory chronos

8  for all of your attendance at NA. But there is

9  no -- Treatment and Management of Hepatitis and

10  the Katrina contribution. So there was no other

11  -- What I was looking at was that anger

12  management.

13     **INMATE STRONG:** What I was referring to,

14  I gave my counselor, Counselor Nuñez, a package

15  on domestic violence that I had received from

16  the streets and he told me he was going to

17  insert it into my file. It was at least three

18  or four pages of --

19     **ATTORNEY LEWIS:** (Inaudible).

20     **INMATE STRONG:** Yes.

21     **DEPUTY COMMISSIONER MOORE:** Okay, let me

22  just double-check one more thing.

23     **INMATE STRONG:** And plus I had something

24  from -- Right there, yes.

25     **DEPUTY COMMISSIONER MOORE:** Okay. This

26  is, it's in the miscellaneous section of the C

27  File. And it appears to be a handout, a

95

1 booklet. A domestic violence booklet from
2 Oakland County. Did you get to review this or
3 was it given directly?

4 **INMATE STRONG:** I got a chance to review
5 it but I wanted him to insert it in my file and
6 return it to me before I came to the Board. But
7 somehow they changed counselors and he never --
8 I put a request in to get it back but I never
9 did.

10 **DEPUTY COMMISSIONER MOORE:** You want to
11 get a copy of this. There are referrals in here
12 for resources both nationally and statewide. A
13 number of factors regarding the cycle of
14 violence and how domestic violence in
15 relationships occurs, not only with spouses and
16 girlfriends but family members. And there's
17 also from the Emergency College of -- American
18 College of Emergency Physicians a multiple page
19 document, four pages regarding how to observe
20 and identify domestic violence. And also from
21 the USDA Safety, Health and Employee Welfare
22 Division, a domestic violence awareness handbook
23 that appears to be in excess of ten pages. And
24 the web site that you referred to is from the
25 Mayo Clinic-dot-com that you asked a friend to
26 access for you. And again, talks about
27 recognition, having a safety plan for the

96

1    victims, knowing the signs and how in a

2    relationship domestic violence is about power

3    and control. And also gives a number of

4    resources. Thank you for pursuing that with me.

5    It's in your best interest that I did put that

6    on the record. And if you could please try and

7    get a copy of this back to you through your

8    counselor.

9         **INMATE STRONG:** I will do that, thank

10   you.

11        **DEPUTY COMMISSIONER MOORE:** Thank you.

12        **INMATE STRONG:** You're welcome.

13        **PRESIDING COMMISSIONER INGLEE:** Tell us

14   why you are suitable for parole.

15        **INMATE STRONG:** Well, the reason I feel

16   I'm suitable for parole is first of all I

17   changed my way of thinking. Meaning by that, I

18   know what, I know what got me here. I used to

19   think it was drugs but it was something deeper

20   than drugs. I had to look at myself and what

21   really got me to thinking that I was up so high

22   in life that I can use drugs and control drugs.

23   Then I said well, maybe it's something else. I

24   had lost respect for myself. I just had lost

25   respect, you know. When a person use drugs they

26   trying to escape something. And to me it was I

27   thought I had it all so why not do drugs. I

1   know I hurt a lot of peoples.  I know I hurt
2   Diana my wife's family, my family and friends,
3   my son, you know.  I hurt a lot of peoples I
4   don't even know about.  And the only way I could
5   change that was to change myself and know that
6   if I use drugs any more in my life I'm subject
7   to go back to where I was and I don't want to go
8   back there no more.  And I think I try to work
9   these programs that the Department of
10  Corrections offered me, to take advantage of
11  them.  At first I wasn't willing to take
12  advantage of them, that's why I started taking
13  advantage of them in '96.  I was still going
14  through head-trips.  But once I realized that I
15  put myself here and I could help myself if I
16  would just follow the rules that the Department
17  of Corrections had laid out for me.  And that's
18  when I started feeling good about myself and
19  knowing that if I do this it's a chance that I
20  would be returned back to society.  I have
21  grandchildren.  I have peoples that I want to be
22  with.  I can apologize to everybody but the
23  person that I really want to apologize to I can
24  never apologize to.  The only thing I can do is
25  try to be a better person when I get out and
26  hopefully let something come out of that.  Other
27  than that that's about it.

98

1          **PRESIDING COMMISSIONER INGLEE:** Okay,

2    very good.  We will now go into recess for

3    deliberation.  The time is now 6:33.

4                    **R E C E S S**

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

99

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3       **DEPUTY COMMISSIONER MOORE:** Back on the

4    record, it's 7:30.

5       **PRESIDING COMMISSIONER INGLEE:** All

6    parties that were here before have since

7    returned. This is in the matter of Sylvester

8    Strong, S-T-R-O-N-G, CDC number D-99287.

9    Mr. Strong, the panel reviewed all information

10   received from the public and relied on the

11   following circumstances in concluding that the

12   prisoner is suitable for parole.

13       **INMATE STRONG:** Thank you.

14       **PRESIDING COMMISSIONER INGLEE:** And would

15   not pose an unreasonable risk of danger to

16   society or a threat to public safety if released

17   from prison. First off the prisoner has no

18   juvenile record of assaulting others. Until his

19   instant offense the inmate had a stable social

20   history as exhibited by reasonable, stable

21   relationships with others. While in prison he

22   has enhanced his ability to function within the

23   law upon release through participation in the

24   following areas of educational programs, self-

25   help, vocational programs and institutional job

26   assignments. I will ask the Deputy Commissioner

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 1   05/31/06**

100

1   if she would detail each one of these four
2   areas.
3        **DEPUTY COMMISSIONER MOORE:**  Thank you.
4   Mr. Strong, in reviewing your C File and
5   discussing with you today the following is what
6   I have determined to be present and proven
7   within the file.  In regards to educational
8   programs you came into prison with a high school
9   diploma.  You have not sought further
10  educational programs, per se, at an academic
11  level.  What you have sought is self-help.  And
12  it's evident in the past ten years that you have
13  been very active in your programming.
14  Specifically you have received and taken part in
15  and enrolled in programs regarding parenting,
16  anger management, employability.  Since 1996
17  there are consistent chronos for attendance in
18  12 step programs, whether they are AA, NA or a
19  generic 12 step recovery program, specifically
20  at this facility, at this institution after you
21  arrived here.  There were a few before but
22  predominately here at CTF Soledad.  You have
23  been involved in several employability programs.
24  You also participated in the IMPACT program in
25  2002, a 13 week program.  That as you testified
26  to earlier and this is evidenced in the C File,
27  **SYLVESTER STRONG  D-99287  DECISION PAGE 2   05/31/06**

1    talk about the impact on victims as you were
2    seeking more information about domestic
3    violence.  Because of a lack of domestic
4    violence programming here at CTF you did go
5    further than other inmates in that you sought
6    outside information regarding domestic violence
7    awareness.  How to deal with it.  Alternative
8    behaviors by seeking out information from
9    Oakland County with the domestic violence
10   handbook and other documents that you asked
11   friends on the outside to provide to you and are
12   found in the C File.  You have also participated
13   in community reentry programs on multiple
14   occasions.  As recent as 2006 but also prior to
15   that in your work towards becoming suitable
16   towards parole.  You have been active throughout
17   the past ten years, becoming very aware of the
18   programming needs that you have needed to become
19   suitable.  The next area is that of vocational
20   programs.  You have worked in the PIA upholstery
21   shop since June of 2001, receiving above average
22   to exceptional work reviews.  Your most recent
23   one, as I indicated, was in February of '06 by
24   supervisor Arroyo, A-R-R-O-Y-O, in which you
25   were found to be an exceptional employee.  You
26   have also received laudatory chronos from Arroyo
27   **SYLVESTER STRONG  D-99287  DECISION PAGE 3   05/31/06**

1   in '02 about your work.  You have received a
2   number of other laudatory chronos regarding your
3   contributions financial to the Katrina hurricane
4   victims.  And also on two occasions in 2000 and
5   2001 in which another inmate, either in your
6   cell or on your tier, was in a medical emergency
7   and you took it upon yourself to notify staff of
8   a man down and a need for medical attention.  In
9   one instance a cellmate, I believe, was
10  transported for immediate care to the hospital
11  for an appendix operation, appendectomy, and
12  another you thought may have been having a
13  stroke and received medical care.  You have also
14  participated in a parenting program.  I don't
15  know if I mentioned that earlier but I feel it's
16  very important, considering what you've told us
17  about your contact with your son up until the
18  age of 11 and where he is now and understanding
19  your impact.  What you've done made what his
20  reports look like when he talks about his
21  childhood.  Your vocational programs also
22  indicate that you are trying to maintain your
23  skills with upholstery by recently going through
24  upholstery training seminars that were offered
25  here at CTF.  Prior to that you were involved in
26  the masonry section.  I think it was at another
27  **SYLVESTER STRONG  D-99287  DECISION PAGE 4   05/31/06**

1  institution, at Pleasant Valley.

2       **INMATE STRONG:**  Yes ma'am, it was
3  Pleasant Valley.

4       **DEPUTY COMMISSIONER MOORE:**  And you
5  completed five of the eight units towards
6  completion.  And due to transfer that was why
7  you were unable to complete it.  Your reports
8  while there were, asking good questions, always
9  wanting to do more, seeking more information.
10  And the teacher and supervisor in that area
11  thought that you could make that a marketable
12  skill for yourself and you had indicated an
13  intention as such.  We've talked about
14  vocational programs, institutional job
15  assignments.  You have always -- Not always.  I
16  want to note a change, '93 to '95 was a
17  transitional time for you in prison.  You were
18  receiving some negative reports of attitude
19  towards supervisors and staff in your work as a
20  sewing machine operator, I believe at one time.
21  And in '93 -- Just as we go to '95 and you
22  started attending 12 step program and you
23  started to actively programming all of those
24  ratings changed.  They became average to above
25  average.  You started participating rather than
26  being a victim is the observation that I made.
27  **SYLVESTER STRONG  D-99287  DECISION PAGE 5   05/31/06**

1  Prior to that change you were a sewing machine
2  operator and receiving average and some fours
3  and fives on occasion.  Doing the job and
4  showing up.  Things changed in '95 and '96 in
5  your institutional job assignments, your
6  attitude and your work productivity.  You became
7  a good employee.  And those would be the areas
8  that I have been able to review and take from
9  your program, from your C File regarding your
10 programming.

11         **PRESIDING COMMISSIONER INGLEE:**  Until
12 your domestic problems with your deceased wife
13 began in 1987 you did not have any history of
14 violent crime.  Because of maturation, growth,
15 greater understanding and advancing age this has
16 all gone to reduce your probability of
17 recidivism in the future.  You have excellent
18 parole plans, which include a family job offer
19 and family support in general.  This also
20 includes living with your mother once paroled.
21 You have maintained close family ties while in
22 prison through both letters and visits and other
23 forms of communication such as telephone.  You
24 have maintained positive institutional behavior
25 which indicates a significant improvement in
26 self-control, with your last 115 being received
27 **SYLVESTER STRONG  D-99287  DECISION PAGE 6   05/31/06**

105

1    in 1993.   You have shown sincere signs of
2    remorse.   You have indicated that you understand
3    the nature and magnitude of the offense that you
4    committed.   You have accepted full
5    responsibility for your criminal behavior.   And
6    you have expressed a desire to change towards
7    good citizenship through both your discussion
8    today and also how you have demonstrated this
9    work through your self-help programming over the
10   last 10 to 15 years.   Now I want to talk about
11   your base term of confinement.   The base offense
12   of which the prisoner was convicted, what you
13   were convicted for, is murder second degree,
14   which is Penal Code 187.   This offense occurred
15   on 12/10/1987.   The term is derived from the
16   matrix located in CCR Title 15 at 2402(c)
17   second-degree murder, offense committed on or
18   after 11/8/1978.   In this regard the panel finds
19   that category C-III is appropriate in that C
20   indicates that the death of the victim resulted
21   from sincere, excuse me, severe trauma inflicted
22   with deadly intensity.   In regard to III.
23   Excuse me, I believe I said C-III and I meant
24   C-II so that will have to be a correction.   This
25   is C-II.   C being correct, that being severe
26   trauma.   II, is actually prior relationship.   In
27   **SYLVESTER STRONG  D-99287  DECISION PAGE 7   05/31/06**

1 that you had a strong prior relationship with

2 the deceased and you were involved in a personal

3 relationship with the prisoner (sic). In this

4 case a family member or your former wife.

5 **DEPUTY COMMISSIONER MOORE:** And if I may,

6 Commissioner. You said 2402 rather than 3.

7 **PRESIDING COMMISSIONER INGLEE:** We should

8 put it on, why don't you put it on --

9 (Off the record.)

10 **DEPUTY COMMISSIONER MOORE:** We're back on

11 the record.

12 **PRESIDING COMMISSIONER INGLEE:** It has

13 been brought to my attention that I may have

14 made a couple of errors in what I had been

15 previously discussing in regard to the base term

16 of confinement and I basically want to go back

17 through that again to be sure that we have

18 stated it correctly. The base life offense of

19 which the prisoner has been convicted is murder,

20 second degree. That is Penal Code 187. The

21 offense occurred on 12/10 of 1987. The term is

22 derived from the matrix located at CCR Title 15

23 at, this is where the correction will be made,

24 2403(c), second-degree murder, offense committed

25 on or after 11/8/1978. The panel finds that

26 category C-II is appropriate in that C-III,

27 **SYLVESTER STRONG  D-99287  DECISION PAGE 8   05/31/06**

1    excuse me, C is that the death resulted from
2    severe trauma inflicted with deadly intensity.
3    The inmate was acquainted with the victim and
4    that qualifies under prior relationship in that
5    the victim was involved in a personal
6    relationship with the prisoner.  In this case,
7    his former wife.  Which contributed to the
8    motivation for the act resulting in death.  The
9    panel assessed 228 months for the base offense
10   and notes that this is the middle term in the
11   matrix.  In this regard C-II.  The panel also
12   found that the prisoner personally used a deadly
13   weapon, in this case a knife, in the commission
14   of the crime under Penal Code Section 12022(b)
15   and accordingly assessed the following one-half
16   of 12 months, which is 6 months.  The total term
17   is calculated at 228 months for the base term, 6
18   months for the weapon, for the total term of 234
19   months.  The time credit from 11/2/1988 to
20   5/31/2006 is 68 months for a total period of
21   confinement being at 166 months.  Special
22   conditions of parole.  The following special
23   conditions of parole are hereby imposed.  You
24   will not use alcoholic beverages.  You will
25   submit to alcohol testing whenever required.
26   You will submit to anti-narcotic testing
27   **SYLVESTER STRONG  D-99287  DECISION PAGE 9   05/31/06**

1    whenever required.  You will submit to THC
2    testing, this is for marijuana, whenever
3    required.  You will participate in a substance
4    abuse program such as AA or NA as directed by
5    your parole officer.  You will attend parole
6    outpatient clinics as directed by your parole
7    officer.  You will have no contact with the
8    victim's family without the parole officer's
9    approval.
10                    (Off the record.)
11          **DEPUTY COMMISSIONER MOORE:**  We are back
12   on the record at 12 until 8.
13          **PRESIDING COMMISSIONER INGLEE:**
14   Mr. Strong, this is your first step.  You know
15   that this still has to be approved.  You're
16   reviewed by and eventually approved by the
17   Governor.  Let me suggest to you, you can handle
18   this the way you like.  But my limited
19   background in this area has taught me over time
20   to warn prisoners about going off and becoming
21   too vocal about the fact that they just got a
22   parole.  I have heard, I can't tell you that I
23   actually experienced it or known somebody
24   specifically but I have heard that at times
25   sometimes prisoners who don't possibly will not
26   have a friend who might do something to
27   **SYLVESTER STRONG  D-99287  DECISION PAGE 10  05/31/06**

109

1  aggravate them and possibly cause them to be in
2  some type of altercation.  I would just avoid
3  this.  This is a personal observation and not an
4  order, okay.
5      **INMATE STRONG:**  Yes sir.
6      **PRESIDING COMMISSIONER INGLEE:**  Again,
7  lots of luck.  You deserve, you deserve the
8  opportunity for parole and we certainly hope
9  that you get it.
10     **INMATE STRONG:**  Okay.  I'd like to thank
11 both the panel members.
12     **DEPUTY COMMISSIONER MOORE:**  May I offer
13 some comments, Commissioner?
14     **PRESIDING COMMISSIONER INGLEE:**
15 Certainly, (inaudible).
16     **DEPUTY COMMISSIONER MOORE:**  Mr. Strong.
17     **INMATE STRONG:**  Yes ma'am.
18     **DEPUTY COMMISSIONER MOORE:**  The process
19 of review is still in existence, as Commissioner
20 Inglee has said.  This isn't a done deal.  Be
21 patient.  You have to go to work tomorrow don't
22 you?
23     **INMATE STRONG:**  Yes ma'am.
24     **DEPUTY COMMISSIONER MOORE:**  And you have
25 a lot to do.  And any type of occurrence of a
26 115 or a 128 between now and when that date
27 **SYLVESTER STRONG  D-99287  DECISION PAGE 11  05/31/06**

110

1  comes could affect all of this completely and
2  totally.  I want to talk to you about NA.  The
3  first place you go if released is where?
4      **INMATE STRONG:**  To NA.
5      **DEPUTY COMMISSIONER MOORE:**  Now that was
6  a trick question.  The first place you go is
7  your parole.
8      **INMATE STRONG:**  Oh, yeah, yeah.
9      **DEPUTY COMMISSIONER MOORE:**  You report to
10 parole.
11     **INMATE STRONG:**  Yeah, yeah.
12     **DEPUTY COMMISSIONER MOORE:**  The second
13 place you're probably going to go is see your
14 mom.
15     **INMATE STRONG:**  Yes.
16     **DEPUTY COMMISSIONER MOORE:**  The third
17 place you're going to go is to an NA meeting.
18     **ATTORNEY LEWIS:**  He's married.
19     **DEPUTY COMMISSIONER MOORE:**  The third
20 place he's going to go is to an NA meeting.
21 Before he continues his relationship on the
22 outside.
23     **INMATE STRONG:**  I agree with you.
24     **DEPUTY COMMISSIONER MOORE:**  Good answer.
25 Within the first 10 to 14 days, in which you
26 will probably have attended 10 to 14 NA
27 **SYLVESTER STRONG  D-99287  DECISION PAGE 12  05/31/06**

111

1  meetings, you are to get a sponsor.  Your parole
2  agent will be all over you on that.

3        **INMATE STRONG:**  Yes ma'am.

4        **DEPUTY COMMISSIONER MOORE:**  It has to be
5  a man who is working the steps, who is clean and
6  sober, who has a job.  You might want to look
7  for one that's married.  Because wives, spouses,
8  family members can make you crazy when you're an
9  addict.  And you have to live life one day at a
10  time with them.  Find a man who has done that as
11  you work the steps with that man.  I wish you
12  the best of luck.  There's a lot of challenges
13  in front of you.  The world has changed somewhat
14  since your incarceration.  And I wish you good
15  luck.

16        **INMATE STRONG:**  Thank you very much.
17        **PRESIDING COMMISSIONER INGLEE:**  We do
18  have one more thing to do that I omitted.  And
19  that is in regard to the last psychological
20  report and I want to make an update to that.
21  The last psychological report was done by S.
22  Sexton, Ph.D.  That date is 10/11/2004.  In this
23  regard Dr. Sexton states that inmate Strong's
24  diagnosis has changed somewhat from previous
25  reports.  Although it was reported that the
26  inmate engaged in adult antisocial behavior
27  **SYLVESTER STRONG  D-99287  DECISION PAGE 13  05/31/06**

112

1   there is no indication of that at this time.
2   For that reason this diagnosis has been removed.
3   In the past the inmate has been given a
4   diagnosis of cocaine abuse in institutional
5   remission.  Unfortunately most institutions have
6   drugs readily available for inmates who wish to
7   abuse them.  It is clear that this inmate has
8   chosen not to abuse cocaine.  Not because he
9   does not have the availability but he no longer
10  wishes to abuse it.  This is also true of
11  cannabis abuse.  As a result both of these
12  diagnoses will be dropped.  In the assessment of
13  dangerousness, all the above factors have been
14  taken into account.  It is significant that the
15  inmate is currently 50 years of age and has
16  remained CDC 115-free for approximately 11
17  years.  This combined with the nearly 35 self-
18  help programs that he has attended while
19  incarcerated and his limited yet significant
20  arrest history it is clear that the inmate's
21  aggressive behavior is changing for the better.
22  As a result, when the inmate's violence
23  potential is compared to those of inmates with
24  whom he resides it is considered to be below
25  average.  Inmate Strong has no assaultive
26  history with the Department of Corrections.  It
27  **SYLVESTER STRONG  D-99287  DECISION PAGE 14  05/31/06**

1  is somewhat difficult to predict the probability
2  of aggressive behavior in the community.  As
3  people mature and change, behavior that they
4  once found acceptable becomes unacceptable.
5  What can be said is that as compared to the
6  average parolee in the community this inmate is
7  much less likely to be violent while on parole,
8  due in part to his age, greater maturity and
9  substance-free intellect.  He appears to have no
10 more violence potential than the average male in
11 the general population of equal age.  There are
12 no current precursors that would predict an
13 increase in violence potential in the community.
14 Substance abuse would clearly indicate that
15 potential but it does not appear that substance
16 abuse is currently a problem with this inmate.
17 Nor is it anticipated that it will be an issue
18 for him when he is placed on parole.  As inmate
19 Strong has participated in numerous self-help
20 programs no current recommendation can be given
21 in this area.  He has participated in most other
22 programs available in the CDC and he appears to
23 have reached maximum benefit.  If given the
24 opportunity to parole his prognosis is very
25 good.  Signed S. Sexton, Ph.D., consulting
26 psychiatrist, Correctional Training Facility,
27 **SYLVESTER STRONG  D-99287  DECISION PAGE 15  05/31/06**

114

1    Soledad.  Mr. Strong, good luck.

2              **INMATE STRONG:**  Thank you sir.

3              **PRESIDING COMMISSIONER INGLEE:**

4    Certainly.

5              **INMATE STRONG:**  Thank you, Ms. Moore.

6              **DEPUTY COMMISSIONER MOORE:**  Good luck to

7    you sir.

8                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                  PENDING REVIEW

23   **PAROLE GRANTED**               AND APPROVAL

24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 16  05/31/06**

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 114, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF SYLVESTER STRONG, CDC NO. D-99287, on MAY 31, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated June 8, 2006, at Sacramento County, California.

Ramona Cota
______________________
RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**