# EXHIBIT
# 6



FILED
CONFIDENTIAL

OCT 25 1988

FRESNO COUNTY CLERK

By_____ DEPUTY

SYLVESTER STRONG

---

SUPERIOR  COURT OF CALIFORNIA, COUNTY OF FRESNO

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff

vs.

SYLVESTER STRONG

Defendant

ACTION NUMBER  380750-0

REPORT AND RECOMMENDATION OF THE PROBATION OFFICER

Probation No. 173170

| | |
|---|---|
| CII A06162328 | FBI 150972T10 |
| ///SO 125490 | DA 87S0589 |
| Race: Black | |

TO THE HONORABLE JUDGE OF THE ABOVE ENTITLED COURT:

Pursuant to the statutes and at the direction of the court, your probation officer hereby respectfully submits the following report and recommendation as to the above named defendant, after ( ) conviction in court trial ( ) verdict in jury trial (X) plea: No Contest

| | |
|---|---|
| 2962 South Fig, Fresno, CA<br>Address | Charge(s)Count 1: PC 187 w/ PC 120022(b) Enchancement, Murder in the 2nd Degree with Personal Use of a Knife; Count 2: PC 245(a) (1) w/ PC 12022(b) Assault w/a Deadly Weapon with Personal Use of a Knife. |
| 34 (2-15-54) / 475 days (317/158)<br>Age        Time in Custody | December 10, 1987<br>Date of Offense |
| Public Defender<br>Attorney | December 10, 1987<br>Date of Arrest |
| October 21, 1988       8:30 AM<br>Date of Sentencing      Time | Mario G. Olmos              Six<br>Judge                       Dept. |

BRIEF SUMMARY OF FACTS:

Count One: On December 10, 1987 the defendant stabbed Dianna Strong in the neck with a knife, and as a result of the stabbing, the victim died.

Count Two: On December 10, 1987 the defendant assaulted Lavelle Jones with a knife, and as a result of this assault the victim suffered a laceration wound on his left middle finger.

## OPENING STATEMENT

On September 12, 1988 in Superior Court No. 380750-0, the defendant entered a no-contest plea to felony violation of Section 187 of the Penal Code, Murder in the Second Degree. The defendant admitted the Penal Code Section 12022(b) Enchancement, attached to this Count. The defendant further entered a no-contest plea to felony violation of Section 245(a)(1) of the Penal Code, Assault with a Deadly Weapon, and the defendant admitted the Penal Code Section 12022(b) Enhancement, attached to this Count. Information obtained from a transcript of the Change of Plea Hearing, dated September 12, 1988, indicates the plea agreement was conditioned on dismissal of the following: Count Three, alleging felony violation of Penal Code Section 245(a)(1) with a Penal Code Section 12022(b), Enhancement; Count Four, alleging felony violation of Penal Code Section 245(a)(1) with a Penal Code Section 12022(b), Enhancement; Count Five, alleging felony violation of Penal Code Section 245(a)(1). The right to comment was reserved on these dismissed Counts and Fresno Municipal Court Action Numbers M002984-3 and M003363-1. The Court imposed the following conditions on the plea: The defendant would serve no more than the mid term sentence on Count Two, and the Penal Code Section 12022(b), Enhancements attached to Count One and Count Two would be stayed.

The matter was referred to the Fresno County Probation Department for preparation of a presentence report and recommendation, and sentencing was calendared for October 21, 1988 at 8:30 AM in Department Six of the Fresno County Superior Court.

## CIRCUMSTANCES OF THE OFFENSE

The following information was obtained from a transcript of the preliminary hearing in Fresno Municipal Court No. F012661-5, dated: March 18, 1988, Fresno Police Department Reports, Case Numbers 87-43558, 87-59641, 87-82888, and Fresno County Coroner's Postmortem Record, Case No. A87-769:

In reference to Count One and Two: On December 10, 1987 at 7:14 PM, Fresno Police Officers were dispatched to 2564 South Barton, Fresno, regarding a caller who had just stabbed his wife. The caller was later identified as Sylvester Strong, the defendant. The stabbed victim was later identified as Dianna Strong.

Lavelle Jones testified he had done gardening for the victim, Dianna Strong, starting in September, 1987. He said he was acquainted with Dianna's husband, Sylvester Strong (the defendant). Mr. Jones said on the night when Dianna was killed, he had gone to her house about 6:40 PM to talk to her about his moving her furniture. While he was there, Dianna talked on the telephone on three occasions. During the last telephone conversation he heard Dianna say,"I don't have no money right now". Mr. Jones said after this call Dianna told him it was Sylvester, and she acted a little bit nervous. He said Dianna then told him she owed Sylvester some money, and he wanted the money out of the house.

Mr. Jones testified about five to ten minutes later there was a knock at the door. He said Dianna looked out, and she said, "Sylvester". Witness Jones said Sylvester became upset, kept knocking, and the defendant told Dianna to open the door. Mr. Jones said Dianna told him she wasn't going to open the door because she had a restraining order and Sylvester wasn't supposed to be on the premises.

Mr. Jones reported he was standing in the kitchen with Dianna when the defendant broke open the front door. He said the defendant stumbled in a bit, stood up, and he saw the defendant had a knife in his right hand. Jones said the defendant was real upset, and he was sweating and perspiring quite a bit. Mr. Jones stated the defendant accused him of going with his wife and then the defendant started calling Dianna names. He said the defendant told Dianna, "Bitch, I am going to kill you".

Mr. Jones testified Dianna took off running, but the defendant grabbed her with his left hand. The witness said the defendant started hitting Dianna with his right hand and that the defendant had the knife in his hand. He said he heard Dianna screaming, "Sylvester, don't hurt me". He indicated he started to leave, and he stood at the front door and said, "Sylvester, don't you all hurt each other". Jones said Dianna then ran down the hall and ran into him trying to get out of the front door. He said he noticed she was losing her balance, and she fell to her knees on the concrete by the door entry. Mr. Jones stated he looked around, and saw the defendant had the knife and he was coming towards him. Jones said the defendant then cut him on his hand. He said the defendant said he was going to kill him (Mr. Jones) too, and then Mr. Jones ran out of the door.

Witness Jones said he backed up, and as he was backing up he observed the defendant reach down towards Dianna. He said he kept backing up, and he got in his truck and left. Mr. Jones said he did not know he had been cut until he was driving down Cedar Avenue.

Ron Shamp testified that he is a Police Officer with the Fresno Police Department. He said on December 10, 1987 at approximately 7:30 PM he was dispatched to 2564 South Barton, Fresno, regarding a husband who stabbed the wife. Upon arrival at this location, Officer Shamp contacted a man, and in Court he identified this man as the defendant. As they were walking back towards the house, the defendant told Officer Shamp he was the person who had the knife. The defendant yelled at Officer Shamp to hurry; that she was in the house. Upon entering the house, the officer observed the victim on the floor on her back with a butcher knife next to her left hand. Officer Shamp said he and Officer Manfredi placed the defendant under arrest. He then transported the defendant to Police Headquarters. Officer Shamp stated while en route to the Police Headquarters, the defendant made a spontaneous statement that he should have come out of the house with the knife so the officers would shoot him. Officer Shamp said approximately 45 minutes to an

hour later, he transported the defendant to Valley Medical Center for a blood sample to be taken. The toxicology report on the defendant's blood sample was negative to ethyl alcohol but positive to cocaine metabolite, 0.250 milligrams per liter.

Michael Manfredi testified he is a Police Officer with the Fresno Police Department. He stated on December 10, 1987 at approximately 7:30 PM he was dispatched to 2564 South Barton, Fresno. Officer Manfredi said he contacted the defendant who appeared highly excited, and he was sweating profusely. Officer Manfredi said he then asked the defendant if he had been using any drugs that day, and the defendant said he had not; that he had just run to the house. The officer testified there was a Black female laying face up in the entryway, but there were no other persons present in the house.

Officer Manfredi said he observed a large smear of blood on the entry porch, a deep pool of blood on the threshold, and blood on the screen door. The front door had a dead bolt which was extended in the locked position. The doorknob was imbedded in the entry wall. The wood frame had been broken and splintered apart at the point where the dead bolt locked into the wall. The brass plate was located ten feet back in the hallway.

Officer Manfredi said in the kitchen area, there was an artificial fingernail in the sink, the phone was off the hook, and it was stained with blood. He said there was blood smeared on top of the highchair. On top of the refrigerator there was a butcher block knife holder with a knife missing. Officer Manfredi said in the living room area there was a large blood stain in the carpeting, blood drippings on the desk, blood on the leaves of an artificial plant, and blood on the wall.

Officer Manfredi testified the victim was laying on her back with her hands at her sides. She had a stab wound in the upper right breast area under the collar bone. She was bleeding, and her eyes were blank and glassy. Officer Manfredi said she was not making any noise, and there was no sign of movement. Also, in the entry way, officers located a kitchen knife with a six or seven inch blade. This knife was the same brand as the ones found in the kitchen. It was laying next to the victim at the end of her left hand.

The Fresno County Coroner's Postmortem Record indicates victim Dianna Strong suffered a stab wound from the back and through to the palm of her left hand. The victim's left thumb had a 1/4 inch deep incised wound. A stab wound was located one inch to the right mid line of the neck. This stab wound extended through the right internal jugular vein, and cut the Azygous vein. The direction of the wound is from front to rear with a 30 degree downward angle. The stab wound was estimated to be two-and-a-half inches. The victim, Dianna Strong, was pronounced dead at Valley Medical Center emergency room at 7:48 PM on December 10, 1987 by Doctor Michael Solomon. The cause of death is recorded as a Hemorrhagic Shock due to Stab Wound to Neck and Chest.

In reference to Count Three (dismissed): Manuel Orozco testified he is a Police Officer with the Fresno Police Department. He stated on July 2, 1987,

he was dispatched to 2564 South Barton, Fresno. Officer Orozco said he contacted Dianna Strong, who reported she and her husband had been in a argument over his drug habit. Mrs. Strong told Officer Orozco her husband wanted some money, and when she refused to give him the money, he threw an unopened knife at her. She reported her husband then picked up the knife, swung it at her, and caused a six-inch scratch on her right thigh. Mrs. Strong reported her husband then punched her to the left of her lip, and struck her on her right shoulder with his fist. She stated her husband had taken a derringer from the house. The victim identified her husband as Sylvester Strong (the defendant).

In reference to Count Four (dismissed): Luther Reagan testified that he is a Police Officer with the Fresno Police Department. He stated on September 8, 1987, he was dispatched to 2564 South Barton, Fresno. Officer Reagan contacted Dianna Strong, and observed she had a minor cut on her left thumb, and a minor cut on her abdomen. She appeared agitated, frightened, and explained that she had gotten into a fist fight with her husband. In the process, she had picked up a knife to defend herself, but she was cut with a knife by her husband. She identified her husband as Sylvester Strong (the defendant). Mrs. Strong wanted the problem solved, but she did not want any official action as far as reports.

In reference to Count Five (dismissed): Sylvester Strong, Jr. testified he is five years old, and in kindergarten. He said on one occasion his dad (the defendant) put gasoline on his mom. He said one time his dad got his mom with a knife on the ankle. Witness Strong said one time his dad hit his mom on her face, and she was bleeding by the corner of the eye.

## DEFENDANT'S STATEMENT

The defendant was interviewed by your officer at the Fresno County Jail on October 4, 1988. At the time of this interview, the defendant made the following verbal statement: "I pled guilty to Second Degree Murder, and on the Assault pled no-contest. If I wouldn't have been under so much pressure and I would have been thinking clearly, it would never have happened. I really feel real sorry I did it because as far as my wife, she was a good person, and as far as Mr. Jones, I feel bad about cutting him. If I would have been in my right mind, none of this would have happened. My son won't be able to grow up to see his mother, and I really feel bad about that. I hated to come to this point to see what drugs was doing to my life and my family".

At the time of the preparation of this report, your officer has not received a written statement from the defendant. If a written statement is received prior to sentencing, it will be submitted for the Court's consideration.

VICTIM STATEMENT AND ASSESSMENT:

This matter has been referred to the Victim Services Unit and an Impact Statement requested. None has been received to date. If a statement is received prior to the date of sentencing, it will be submitted for the Court's consideration.

STATEMENT OF THE DISTRICT ATTORNEY

A statement of views has been received from the Fresno County District Attorney's Office. It has been read and considered and is attached to this report for the Court's consideration.

DEFENSE STATEMENT

As of the date of dictation, no statement has been received at the Probation Office. Should one be received prior to sentencing, it will be attached to the report for the Court's consideration.

RESTITUTION

Restitution appears to be an issue in this matter.

PRIOR JUVENILE RECORD

The defendant stated he went to Juvenile Hall on one occasion in Fresno for attempting to steal cars with friends. He stated he was never placed on probation.

PRIOR CRIMINAL RECORD

The following is the defendant's prior criminal record as provided by the California Identification and Investigation Bureau, Fresno County District Attorney, and Fresno Municipal Court Records:

| DATE | ARRESTING AGENCY | CHARGE | DISPOSITION |
|------|------------------|--------|-------------|
| 1-26-87 | Fresno PD | PC 242, Battery | 9-10-87: Fresno MC #MO02984-3; PG-PC 242; 18 mos Cond Sent; 30 ds jl, ss, except 3 ds; $100 FN. |

The circumstances of this offense were on January 26, 1987 the defendant slapped Dianna Strong on the left side of her face. The officer noted the

victim's left eye was slightly red and watery.  The defendant denied hitting his wife and stated, "The next time you come out it will be for something".

| 2-12-87 | Fresno PD | PC 273.5, Inflict. Corporal Injury on Spouse | 2-26-88: Fresno MC #M003362-1; PG;PC 273.5; 2 yrs Cond. Sent; 60 ds jl; $250 FN, ss. |
|---------|-----------|----------------------------------------------|---------------------------------------------------------------------------------------|

The circumstances on this offense were on February 12, 1987 the defendant struck his wife, Dianna Strong, in the face with his fist numerous times. Officers noted the victim's face was completely swollen and puffy, she was cut and bleeding below her left eye.

## PROBATION HISTORY

Three months prior to the instant offense on September 10, 1987 in Fresno Municipal Court No. M02984-3 the defendant was placed on 18 months Conditional Sentence (probation) regarding a battery committed on victim Dianna Strong. The defendant was therefore on probation at the time of the commission of the instant offense, and his performance on probation is considered completely unsatisfactory.

Subsequent to the current offense the defendant was placed on two years conditional sentence (probation) on February 26, 1988 in Fresno Municipal Court No. M003362-1 regarding an assault on victim Dianna Strong which occurred on February 12, 1987.  The defendant is therefore currently on probation (Conditional Sentence) is two Municipal Court matters regarding previous assaults on victim Dianna Strong.

## SOCIAL HISTORY

The following information was obtained during an interview with the defendant at the Fresno County Jail on October 4, 1988:

## FAMILY HISTORY

The defendant stated his true name is Sylvester Strong. He is 34 years of age. The defendant was born on February 15, 1954 in Fresno, California. The defendant reported that he was raised by his mother, and that his parents were never married. The defendant said that he was never told the name of this father, but he believes his father was a man named Pre Hacket. Defendant Strong indicated Mr. Hacket had been employed in explosives. He said Mr. Hacket died in the early 1970's.  Defendant Strong reported his mother, Dorothy Potts, is employed as an In Home Care Worker.

The defendant reported he has six brothers, and one sister. He reported his brother, Randy Herbert, is presently in Jamestown (prison). The defendant

-7-

thinks his brother is in Jamestown for a Burglary. The defendant said one of his brothers resides in Hayward, California, and the rest of his siblings live in the Fresno area.

Defendant Strong reported that he graduated from Washington Union High School in 1972. He indicated that he never participated in any job training program. The defendant stated that he was never in the military service. He reported that he has participated in recreation programs for children at the North Avenue Community Center. In addition, the defendant said he worked part time as an instructor in basketball and track at the North Avenue Community Center. The defendant said his hobby is showing dogs. Defendant Strong said that his religious preference is Christian.

The defendant said prior to his arrest, he was residing with his mother at 2962 South Fig, Fresno, California. He stated he had resided at this location for two months. Defendant Strong said he previously resided at 2564 South Barton, Fresno from February 1979 through October 1987.

## MARITAL HISTORY

The defendant stated that he is single. He reported one prior marriage to Dianna Strong, nee Pinson (the victim). The defendant said they were married on June 6, 1980 in Las Vegas, Nevada. The defendant said they began experiencing marital problems in 1986. He stated they separated several times, but they tried to work things out. Defendant Strong said they were last separated in October 1987, and legally divorced on November 19, 1987.

The defendant reported that he has one son, Sylvester Strong, II, age six years. The defendant said his son is living with his maternal grandmother, Ruby Pinson, at 2564 South Barton, Fresno.

## EMPLOYMENT HISTORY

The defendant reported that on the day of this incident, he had started working for the Department of Social Services as an In Home Care Aide. Defendant Stong stated that he had previously worked in Animal Control for the Society for the Prevention of Cruelty to Animals for seven years. He stated he left this job because he could not function due to the stress of his marriage dissolving.

## FINANCIAL STATUS AND REPORT FEES

Attached hereto and to be considered a part of this report unless waived is the form containing a recommendation in regard to Presentence Investigation Report fees, pursuant to Section 1203.1b of the Penal Code.

The defendant reported that on the day of this incident, he had begun employment as an In Home Care Aide, and he was to earn $3.75 per hour. Defendant Strong reported that he did not have any assets. However, he noted that he was supposed to receive $3000.00 from a property settlement with his spouse, but he has never received it. The defendant said that he has been trying to find out why he has not received this settlement. Defendant Strong said that he owes $8000.00 to $9,000.00 to finance companies.

## USE OF ALCOHOL/CONTROLLED SUBSTANCES

The defendant stated that he did not use alcohol before he came to the jail. Defendant Strong acknowledged that he was an abuser of cocaine. He stated "that stuff took me over". The defendant said he first used cocaine in 1985. The defendant said he last used cocaine on December 10, 1987. Defendant Strong said he used about a gram of cocaine each month. He said he used cocaine whenever he had money; maybe twice a week. The defendant said he was using cocaine at this rate for maybe three or four years. The defendant was asked if his cocaine use was ever a problem for him, and he said when he was using cocaine he would do things he would not normally do. The defendant said that he was addicted, but that he has finally kicked the habit since he has been incarcerated. The defendant said that his use of cocaine was 99% of his downfall.

The defendant said that he received treatment for drug abuse in the ARC at Community Hospital in Clovis in 1986. He said that he was in this program for four days, but he left. The defendant said that he returned for three days, but he did not complete the program. Defendant Strong stated that he was not ready for the drug treatment program.

## PSYCHOLOGICAL OR MEDICAL HISTORY

The defendant stated that since he has been in the jail, he has developed high blood pressure. He said that he is presently taking medication for high blood pressure. Defendant Strong said that otherwise his health is pretty good. When asked about his mental health, the defendant responded that he is "coming back to stable". The defendant said that he has never received treatment for mental health. Defendant Strong said that there is no history of mental illness in his family.

## STATEMENT OF REFERENCES AND INTERESTED PARTIES

As of the date of this dictation, no character references have been received on behalf of the defendant. If any are received prior to the date of sentencing, they will be submitted for the Court's consideration.

## CUSTODY

The defendant was in custody from December 10, 1987 through the date of
sentencing on October 21, 1988. Therefore, the defendant is entitled to
received total time credits of 475 days (317 actual; 158 good time/work time).

## DISCUSSION AND EVALUATION

### FACTORS AFFECTING PROBATION

Regarding Rule 414a, the defendant is statutorily prohibited from a grant of
probation pursuant to provisions of Penal Code Section 1203(e)(2), except in
unusual cases. After considering the criteria affecting probation in unusual
cases pursuant to Rule 416, your officer finds that the defendant's case does
not come within the enumerated criteria.

Regarding Rule 414b, it does appear likely the defendant will be a danger to
others if not imprisoned based on the circumstances of the current offense,
and the defendant's prior criminal record.


(The recommended application of the following factors and circumstances is set
forth in the Conclusion section of this report.)


### CIRCUMSTANCES IN MITIGATION

Your officer finds no circumstances in mitigation within the meaning of Rule
423a, facts relating to the crime.

Under Rule 423b, facts relating to the defendant, the following facts appear
to apply:  In light of the defendant's statements regarding his history of
cocaine use, it appears the defendant was suffering from a mental or physical
condition that significantly reduced his culpability for the crime (Subsection
2).  The defendant voluntarily acknowledged wrongdoing at an early stage of
the criminal process, however, your officer notes that Counts 3, 4, and 5 were
dismissed at the time of the plea agreement (Subsection 3).


### CIRCUMSTANCES IN AGGRAVATION

Under Rule 421a, facts relating to the crime, the following facts are
applicable:  The defendant forced entry into the victim's residence, his being
armed with a deadly weapon immediately after his entrance, and his continuing
his assaultive conduct after attempts of victim Lavelle Jones to dissuade him,
indicate planning and premeditation (Subsection 8).  Your officer notes that
Counts 3, 4, and 5 were dismissed at the time of the plea agreement with the
right to comment reserved.

Under Rule 42lb, facts relating to the defendant, the following facts are applicable: The defendant has engaged in a pattern of violent conduct which indicates a serious danger to society (Subsection 1). The defendant's prior convictions as an adult are of increasing seriousness (Subsection 2). The defendant was on probation when he committed the crime (Subsection 4). The defendant's prior performance on probation was unsatisfactory (Subsection 5).

## ENHANCEMENTS

Under Count One, Penal Code Section 187, the defendant admitted the Penal Code Section 12022(b) enhancement, Personal Use of a Deadly Weapon, a knife. This enhancement adds a one year term in addition and consecutive to the sentence provided for Count One.

Under Count Two, Penal Code Section 245(a)(1), the defendant admitted the Penal Code Section 12022(b) enhancement, Personal Use of a Deadly Weapon, a knife. This enhancement adds a one year term in addition and consecutive to the sentence provided for Count Two, however, pursuant to Penal Code Section 654, your officer will recommend imposition of this enhancement be stayed.

## CONCURRENT/CONSECUTIVE SENTENCE

In considering the criteria affecting the concurrent or consecutive sentence, your officer has given great weight to the following criteria affecting the decision to impose consecutive rather than concurrent sentences: Under Rule 425a, facts relating to the crimes, the following fact applies: The crimes involve separate acts of violence on separate victims (Subsection 2).

Under Rule 425(b) the following circumstances in aggravation were applied: The defendant's action demonstrated planning and premeditation (Rule 42la,8). Counts 3, 4, and 5 were dismissed at the time of the plea agreement (Rule 42la). The defendant has engaged in a pattern of violent conduct which indicates a serious danger to society (Rule 42lb,1).

## CONCLUSION

Defendant Sylvester Strong is appearing in Superior Court for sentencing following his plea to Second Degree Murder and Assault with a Deadly Weapon. Although this is the defendant's first felony conviction, he is statutorily prohibited from a grant of probation pursuant to provisions of Penal Code Section 1203(e)(2).

The facts of the present case indicate on December 10, 1987 the defendant forcibly entered victim Dianna Strong's residence, and assaulted Dianna Strong and Lavelle Jones with a knife. Victim Dianna Strong was stabbed twice, and her wound proved to be fatal. Victim Lavelle Jones suffered a laceration wound on his finger.

The facts of the dismissed Count Three indicate that on July 2, 1987 the defendant while personally armed with a knife, assaulted victim Dianna Strong. The victim suffered a six inch laceration wound on her right thigh, and she was punched in her face and shoulder.

The facts of the dismissed Count Four reveal that on September 8, 1987 the defendant and victim, Dianna Strong, became involved in an altercation, and victim Dianna Strong suffered laceration wounds from a knife on her thumb and abdomen.

The facts of the dismissed Count Five reveal that between July, 1987 through December 10, 1987 the defendant assaulted the victim, Dianna Strong, on one occasion by pouring gasoline on her.

Your officer is recommending the defendant be committed to State Prison for the protection of society, and to punish the defendant under Rule 410. After considering the circumstances in mitigation and aggravation, your officer finds the circumstances in aggravation outweigh the circumstances in mitigation. Your officer takes note of the following factors in recommending imposition of the aggravated term sentence in Count Two: The defendant's prior convictions as an adult are of increasing seriousness (Rule 421b,2); the defendant was on probation when he committed the crime (Rule 421b,4); the defendant's prior performance on probation was unsatisfactory (Rule 421b,5). Thus, your officer feels the aggravated term sentence is justified in Count Two.

Your officer is recommending that the sentences for these crimes be served consecutively. Your officer has given greater weight to the following criteria in recommending imposition of consecutive sentences: The defendant's actions involved separate acts of violence on separate victims; Counts 3, 4, and 5 were dismissed at the time of the plea agreement (Rule 421a); and the defendant has engaged in a pattern of violent conduct which indicates a serious danger to society (Rule 421b).

Your officer will recommend the Penal Code Section 12022(b) enhancement which mandates a consecutive one-year term be attached to Count One. Your officer will further recommend the Penal Code Section 12022(b) enhancement on Count Two be stayed pursuant to provisions of Penal Code Section 654. Thus, your officer is recommending the defendant be committed to State Prison for a total term of 20 years to life.

RECOMMENDED PRISON TERM

| CRIME | MIT/MID/AGG | | | BASE TERM | ENHANCEMENTS | CONSEC/CONCURR | |
|---|---|---|---|---|---|---|---|
| Ct.2 PC 245(a)(1) | 2 | 3 | 4 | 4 yrs | Yes PC 12022(b), stayed 654 | N/A | N/A |

Ct.1                    15 yrs     Yes/PC 12022(b),   Yes/   N/A
PC 187                  to Life    1 yr              15 yrs
                                                     to Life

Total years:  Twenty years to Life

## RECOMMENDATION

It is recommended that the defendant, Sylvester Strong, be committed to the California Department of Corrections for the agravated term of four years in Count Two.

It is further recommended that in Count Two the Penal Code Section 12022(b) enhancement be stayed pursuant to Penal Code Section 654.

It is further recommended that the defendant be committed to the California Department of Corrections for the consecutive term of 15 years to life in Count One.

It is further recommended that the defendant receive a consecutive one year term for the Penal Code Section 12022(b) enhancement in Count One.

It is further recommended that the defendant receive total time credits of 475 days (317 actual; 158 good time/work time).

In compliance with Government Code Section 13967, it is respectfully recommended that a restitution fine of $150.00 be imposed.

Respectfully submitted,

ROGER PALOMINO, INTERIM
CHIEF PROBATION OFFICER

By: _Al Edwards_
Al Edwards, Deputy

Dated:  October 12, 1988

Read and Approved:

Supervising Probation Officer
kmh

-13-

***************

The foregoing report has been read and considered.

Dated: 10/21/88

Mario
JUDGE OF THE SUPERIOR COURT

COURT FINDING

| CRIME | MIT/MID/AGG | BASE TERM | ENHANCEMENTS | CONSEC/CONCURR |
|-------|-------------|-----------|--------------|----------------|
| Ct.1, PC 187 | — | 15 yrs/life | 12022(b) stayed | cons |
| Ct.2, PC 245(a)(1) | Mid | 3 yrs | 12022(b) stay | — |

TOTAL YEARS: 18 yrs to life

-14-

# EXHIBIT

# 7

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**SYLVESTER STRONG, D-99287**
**SECOND-DEGREE MURDER**

**AFFIRM:** _____

**MODIFY:** _____

**REVERSE:** _____X_____

On December 10, 1987, Sylvester Strong stabbed to death his wife Diana Strong and also cut and wounded Lavelle Jones.

Prior to the offense, Diana Strong obtained a divorce and a restraining order against Sylvester Strong. According to the testimony of Lavelle Jones, set forth in the probation report, Lavelle went to Diana's house on the evening of the offense. While he was there, Diana had a telephone conversation during which she told the caller, "I don't have no money right now." When the call ended, Diana acted nervous and told Lavelle that Sylvester was the caller. Sylvester came to her house soon after, and told Diana to open the door. Diana told him she would not open the door because she had a restraining order and he was not supposed to be on the premises. Sylvester then broke open the door and stumbled inside. Lavelle testified that Sylvester was holding a knife. Sylvester accused Lavelle of going with Diana, and he started calling Diana names and said, "Bitch, I am going to kill you." Diana tried to run but Sylvester grabbed her and started hitting her. He was still holding the knife. Diana screamed, "Sylvester, don't hurt me." Lavelle began to leave and said, "Sylvester, don't you all hurt each other." Diana ran into Lavelle as she tried to leave through the front door. She lost her balance and fell to her knees by the entryway. Sylvester approached Lavelle, cut his hand with the knife and said he was going to kill him too. Lavelle ran out of the house. While walking toward his truck he observed Sylvester reach down towards Diana. Lavelle then entered his truck and drove away.

According to a Fresno police officer's testimony, set forth in the probation report, he was dispatched to Diana's residence and observed Sylvester in the front of the house. Sylvester told him that he was the person with the knife and told him to hurry because she was in the house. According to another officer's testimony, set forth in the probation report, he was also dispatched to Diana's residence and observed large amounts of blood in various locations throughout the home. The second officer also observed that the wooden door frame of the front door was broken and had splintered apart. In the kitchen, he saw a butcher block knife holder with a knife missing and an artificial fingernail in the sink. The second officer saw Diana lying on her back near the entryway. She had a stab wound in the upper right breast area under the collar bone. She was bleeding, and her eyes were blank and glassy. She was not moving or making any noise. A kitchen knife was near her hand. It had a six or seven inch blade and was the same brand as those found in the kitchen. According to the probation report, the Fresno County

Sylvester Strong, D-99287
Second-Degree Murder
Page 2

Coroner's Postmortem record indicated that Diana also suffered a stab wound through the palm
of her left hand and another in her thumb. She was also stabbed in the middle of her neck, and
the two and a half inch wound extended through the right internal jugular vein and cut the
Azygous vein. Diana was taken to a hospital emergency room where she was pronounced dead.
She died from hemorrhagic shock due to stab wounds to the neck and chest.

Sylvester was arrested at the scene. He was charged with murder and four counts of assault with
a deadly weapon. One assault charge pertained to Sylvester cutting Lavelle. The other three
assault charges related to prior instances in which Sylvester assaulted Diana, twice with a knife
and once by pouring gasoline on her. Pursuant to a plea agreement, Sylvester pled no contest to
second-degree murder and to one count of assault with a deadly weapon for assaulting Lavelle.
In exchange for his no contest plea, the remaining counts were dismissed. He was sentenced to
15 years to life in prison for murder, plus a consecutive three-year term for assault with a deadly
weapon. The judgment was affirmed on appeal.

Sylvester was 33 years old when he perpetrated the life offense. He told the 2006 Board that
around age 15 he was sent to juvenile hall for attempting to steal cars with his friends. His adult
criminal history consists primarily of crimes of violence against Diana. In addition to the
aforementioned assault charges, Sylvester was convicted of battery for slapping Diana in the
face. He was also convicted of inflicting corporal injury on a spouse for striking Diana in the
face numerous times with his fist. According to the probation report, officers responding to
Diana's residence during the latter incident noted that her face was completely swollen shut and
puffy, and she was cut and bleeding below her left eye. At the time of the life offense, Sylvester
was on probation for both convictions and a restraining order was in effect which, as Sylvester
told the 2006 Board, prohibited him from being on her property. The 2006 Board asked
Sylvester how many times he laid his hands on Diana before he killed her. Sylvester replied,
"[w]hatever the record said. It was at least three or four different incidents that I had spousal
abuse on Diana Strong." In addition, Sylvester told the probation officer that he had abused
cocaine for several years, and he told the 2006 panel that he smoked some rock cocaine an hour
or two before committing the life offense. According to his 2004 Life Prisoner evaluator,
"Sylvester feels that the use of cocaine was 99% the cause of his downfall."

During his incarceration for the life offense, Sylvester Strong was disciplined two times for
threatening staff and for disruptive behavior. He was also counseled six times for less serious
misconduct, most recently for being loud and disrespectful to staff in 1999. While Mr. Strong
received no disciplinary violations for substance use, he admitted to the 2006 Board that he
smoked some marijuana in 1992 or 1993.

I have considered various positive factors in reviewing whether Mr. Strong is suitable for parole
at this time. In addition to remaining discipline-free for more than 13 years, Mr. Strong made
efforts in prison to enhance his ability to function within the law upon release. He completed
vocational training in upholstery and received additional training in masonry. He held
institutional positions in prison industry as a porter, a furniture upholsterer, an industry worker, a
painter and a sewing machine operator, among other things. He participated in self-help and

Sylvester Strong, D-99287
Second-Degree Murder
Page 3

therapy, including Narcotics Anonymous, Alcoholics Anonymous, Anger Management, Peer Education Program and the Impact Program, a 13-week course which focused on a variety of issues, including domestic violence. He also completed several parenting, employability and re-entry classes. He maintains seemingly supportive relationships with family and friends and he received some positive evaluations from mental-health and correctional professionals over the years. His plans upon parole include living with his mother in Fresno County, his county of last residence, and working as a clerk in a cigarette store.

Despite the positive factors I have considered, the second-degree murder for which Sylvester Strong was convicted was especially grave, in part because the manner in which he killed Diana Strong — breaking into her home, threatening to kill her and then stabbing her multiple times with a kitchen knife — demonstrated an exceptionally callous disregard for her suffering and life. In addition, there is evidence in the record before me that Sylvester engaged in some level of premeditation. Lavelle Jones testified that when Sylvester entered the house he said, "Bitch, I am going to kill you." Lavelle also testified that when Sylvester cut him with the knife he told him that he was going to kill him too. According to the probation report, when Sylvester was arrested on a prior occasion for abusing Diana, he told responding officers that "[t]he next time you come out it will be for something." Indeed, the Court of Appeal opinion noted that there was "a year-long, course of violent conduct" (original emphasis) in this case. The Court of Appeal opinion also noted that "Strong's domestic problems and his violence against Diana long predated December 10, 1987. By the time that he finally murdered her, there was nothing unusual about his domestic problems or his resorting to violence. His violent course of conduct against Diana necessarily stopped with her murder." Sylvester had numerous opportunities to cease during this crime — after breaking through the front door, after hitting and threatening to kill Diana, after stabbing Lavelle and after he began stabbing Diana — yet he chose to continue, and in doing so he covered her house in her blood. One of the police officers testified that upon arriving at the scene of the murder he observed smears, pools, stains, and drippings of blood on the front porch, the screen door, the walls, the carpet, a highchair in the kitchen, a telephone, a desk, and on the leaves of a plant in the living room. The gravity of this shocking crime is alone sufficient for me to conclude presently that Sylvester Strong's release from prison would pose an unreasonable public-safety risk. The Fresno County District Attorney's Office expressed to the 2006 Board its opposition to Mr. Strong's parole, based in part on the gravity of the murder he committed.

Mr. Strong says he accepts responsibility for the murder and is remorseful for his actions. Nevertheless, and despite acknowledging to the 2006 Board that he had been violent toward Ms. Strong in the past, that he came to her house in violation of a restraining order, and that he killed her and only wounded Mr. Jones, Mr. Strong told the panel, "I got the knife to do some damage to Mr. Jones." When the 2006 Board asked him if he meant to use the knife on Mr. Jones or if he truly meant to murder his wife, Mr. Strong replied, "Mr. Jones was the culprit. The person I was after was Mr. Jones." "But," the panel responded, "you seemed to miss Mr. Jones and brutally murdered your wife." Based on the record before me, I do not accept Mr. Strong's version of events.

Sylvester Strong, D-99287
Second-Degree Murder
Page 4

At age 52 now, after being incarcerated for more than 18 years, Mr. Strong made some creditable gains in prison. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the negative factors weighing against Mr. Strong's parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Strong.

Decision Date: 10-26-2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT

# 8

APR 12 1988

1      MUNICIPAL COURT, CONSOLIDATED FRESNO JUDICIAL DISTRICT

2           COUNTY OF FRESNO, STATE OF CALIFORNIA

**F I L E D**

3      Before the Honorable Joan L. McIntosh, Judge

MAR 28 1988

4               Department Seven

FRESNO COUNTY CLERK

By _____ DEPUT.

5                   -oOo-

| | | |
|---|---|---|
| 6  THE PEOPLE OF THE STATE OF<br>7  CALIFORNIA, | ) ) ) | Case No. FO12661-5 |
| 8             Plaintiff, | ) ) | P.C. 187 |
| 9       vs. | ) ) | P.C. 245(a)(1) (4 Counts) |
| 10  SYLVESTER STRONG, | ) ) | # 380750-0 |
| 11             Defendant. | ) ) | |

12                   -oOo-

13  Fresno, California                 March 18, 1988

14                   -oOo-

15             PRELIMINARY EXAMINATION

16             REPORTER'S TRANSCRIPT

17                 -oOo-

18

19

20

21

22

23

24

25                   Reported by:

     HELD TO ANSWER:        SHIRLEY G. ASKINS, C.S.R.

26     March 18, 1988         Certificate No. 1106

1   the people on the other end of the phone.

2        A.   You want the conversation between the three

3   parties?

4        Q.   What you heard her saying into the telephone.

5        A.   Okay.  Well, the first time --

6        Q.   No, no, no, not the brother, not the sister, no;

7   the one having to do with where later she says that was

8   Sylvester.

9        A.   Well, when she picked up the phone and she -- he

10  asked her, from what I could -- from what I heard of the

11  conversation --

12        Q.   Just tell us what she said.

13        A.   She said -- she told me that he said --

14        Q.   No, just tell us what you heard her saying into

15  the telephone.

16        A.   She said, "I don't have no money right now," on

17  that order, something like that, "I don't have no money."

18        Q.   All right.  Do you remember anything else that she

19  said into the telephone?

20        A.   Yes.  And she said, "I have to go."

21        Q.   All right.  Now, when -- and anything else that

22  you can remember that she said into the telephone?

23        A.   No more than she said she have to go, she had some

24  kind of party to go to at her job.

25        Q.   All right.  Anything else?

26        A.   That's it.

16

1        Q.   What did she do after saying those things, those

2   three things?

3        A.   We started --

4        Q.   No -- well, I mean, concerning the phone, did she

5   stay on the phone?

6        A.   No, she didn't.  She got off the phone.

7        Q.   All right.

8        Q.   And when -- after she hung up the phone, what's

9   the next thing that she did?

10       A.   She started back talking to me.

11       Q.   And when she started back talking to you, what's

12   the first thing she said to you?

13       A.   "Well, I have to go now, I am getting ready for

14   the party."

15       Q.   Did she say anything about what happened on the

16   telephone?

17       A.   Yes.  She said something about some money.

18       Q.   Did she say that -- can you telling us how soon

19   after she hung up she said that?

20       A.   I'd say within three to four seconds.

21       Q.   Can you tell us if that was the first thing that

22   she said or it was not the first thing that she said?

23       MR. DREILING:   I am going to object to this leading.

24   The witness has answered the question as to what the first

25   thing she said was, and Mr. Cooper is attempting to lead him

26   into saying something else, and -- and I think the foundation

1   has not been laid.  My motion to strike should be granted at

2   this time.

3         MR. COOPER:  The foundation not has not been laid for

4   what?  I haven't made an argument yet.

5         MR. DREILING:  You with attempting to lay a foundation.

6         MR. COOPER:  For what?  Do you know?

7         MR. DREILING:  Yes.

8         MR. COOPER:  Tell me what it is.

9         MR. DREILING:  To put into evidence who was on the

10   other end of the line.

11         MR. COOPER:  Under what theory of admissibility am I

12   trying to lay the foundation?

13         MR. DREILING:  I am going to --

14         THE COURT:  The last objection was a leading objection,

15   and it is sustained.

16         MR. COOPER:  Q.   Mr. Jones, when you were there before

17   the time that this last phone call came and you were talking

18   with Diana Strong, and then after that phone call you know she

19   is on the phone with -- later she says it was Sylvester --

20   when she hangs up, do you notice that she is acting any

21   different when you think of her before that phone call?

22         A.   Yeah, there were a difference.

23         Q.   What was the difference?

24         A.   She acted a little bit nervous.

25         Q.   Little bit nervous?

26         A.   Yes.

26

1   the responses that he is relying on, but it seems to me that,

2   if he is attempting to use an emotional state as an exception

3   to the hearsay rule, it hasn't risen to that level in this

4   case based on this evidence.

5          I believe that the previous motion to strike as to this

6   witness's understanding as to who was on the other end of the

7   line is should be granted.

8          MR. COOPER:  I did -- I have nothing further to add on

9   1240, but I also offering it under 1241.  I'd submit the

10  foundation is sufficient under either.

11         THE COURT:  I believe it is also.  The motion to strike

12  will be denied.

13         MR. COOPER:  Q.  Now, Mr. Jones, can you tell us --

14  after this last phone call that you have told us about and

15  after Diana Strong says she -- tells you about the call and

16  she's got to be going, what happens next?

17         A.  We start -- there was a knock at door in about

18  five or ten minutes later.

19         Q.  All right.  Now, can you give us an idea what

20  happens between -- in that five to ten minutes?  Where you say

21  the knock came five to ten minutes later, what happens in

22  between there?

23         A.  Nothing.  She was still talking to me about what

24  she wanted me to do, and she was headed toward the kitchen.

25         Q.  What, if anything, does -- okay, she is headed

26  toward the kitchen; what happens then?

1          A.    That's when this doorbell rang.

2          Q.    Okay.  And when she is headed towards the kitchen,

3     where are you?

4          A.    Right beside her, more or less behind her, just

5     walking beside (inaudible) --

6              (The reporter asked the witness to repeat the

7              last part of his answer.)

8          THE WITNESS:  More or less in back of her walking.

9          MR. COOPER:  Q.    All right.  Now, after this moment

10    when you say you hear the doorbell ring, what happens next?

11         A.    She -- she looks out and she says, "Sylvester."

12         Q.    Now, did you actually look out at the same moment

13    that she did and see who was out there?

14         A.    No, I didn't.

15         Q.    As far as her seeing Sylvester, you're kind of

16    like guessing that?

17         A.    Just guessing.  She said it was Sylvester.

18         Q.    All right.  Now, after -- where did you see her

19    look out.  Through what did she look out?

20         A.    I think it was the kitchen.  I am not for sure.  I

21    know she looked.  I think it was the kitchen. 2

22         Q.    After she looks out, what happens then?

23         A.    She says, "Sylvester."

24         Q.    All right.  Just that word?

25         A.    Yeah.

26         Q.    What happens then?

1      A.   And -- and he began to get upset and he told her

2   to open the door, and she --

3      Q.   All right.

4      A.   -- she said, "I am not going to open it." I told

5   her, "The best thing for you to do is to go ahead and open the

6   door," because, you know, it cause a lot of -- lot less

7   confusion, because I didn't want Sylvester to think that

8   something was going on, you know what I am saying? And she

9   said, "I am not going to open the door because he is not

10  supposed to be here."

11     Q.   What do you mean "he is not supposed to be here"?

12     A.   She said she had a restraining order and that he

13  wasn't supposed to be on the premises.

14     Q.   Now, you said earlier, just a few moments ago, he

15  started to get upset. How -- how do you know that? What

16  makes you say that?

17     A.   From the tone of his voice when he told her -- he

18  knocking, kept knocking on the door, told her to open the

19  door. She didn't open it.

20     Q.   All right. So after her saying these things,

21  restraining order and so on, what happens then?

22     A.   Then after that, she wouldn't open the door,

23  Sylvester broke the door open.

24     Q.   All right. Now, before the moment when he broke

25  the door open, do you remember if he was always at that front

26  door or if -- or not?

23

1        A.   I couldn't say for sure, but I could hear

2    footsteps.  I think it was around -- he came in front of the

3    garage there.  I could hear somebody walking.

4        Q.   Okay.  And when you say he broke the door open,

5    Mr. Jones, can you give us any idea where you were when he

6    broke the door open?

7        A.   I was standing in the kitchen by the garage door.[3]

8        Q.   All right.  Can you give us any idea where Diane

9    Strong was then?

10       A.   She was standing right there by me.

11       Q.   And when you say that he broke the door open, what

12   did you see that makes you say that?

13       A.   I saw him when he came in after the door opened.[1]

14       Q.   Now, did you hear anything that makes you say he

15   broke the door open?

16       A.   Yes, I heard a noise when he ran into the door

17   with his bike.

18       Q.   Now, in terms of what you actually saw from where

19   you were in the kitchen, what did you see?  What's the first[3]

20   thing you saw of the defendant?

21       A.   The -- well, when he first broke the door down, he

22   kind of was leaning with his weight when he came in, not fell

23   but kind of leaning sideways.

24       MR. COOPER:  Okay.  Hold on a second, please.  Your

25   honor, I'd ask this diagram be marked People's 1 for

26   identification.

24

1          THE COURT:  It may be marked.

2              (Diagram marked Plaintiff's Exhibit No. 1

3              for identification only.)

4          MR. COOPER:  Q.  Mr. Jones, I am going to ask you to

5      take a look at this diagram.  First of all, I want you to

6      think about the house, the house you were in, Diana Strong's

7      house, okay, and ask you if you think you can remember it well

8      enough to think about where the kitchen was, where the 4

9      doorway -- the front doorway would be, and where the den was

10     and so on.

11         A.   Yes, I think, to the best of my knowledge.

12         Q.   All right.  Now, I am going to ask you to look at

13     this diagram, and I want to tell me honestly if it makes sense

14     to you, if it shows, as far as you can remember, where the

15     different rooms were, where like the kitchen would be, and the 5

16     front door when you come into the hallway, that kind of thing,

17     okay?

18         So let's look at it, and just looking at the different

19     lines and so on and things that are labeled, you know,

20     "table," "refrigerator," "couch," and ask you, if it makes

21     sense, can you tell us about -- does it make sense to you?

22         A.   Yes, some of it, not everything but some of it do,

23     and like this would -- here would be the door, right in here

24     (indicating), where you came in the front door, as well as I

25     can remember here.

26         Q.   Uh-huh.

25

1        A.   Now, let me see --

2        MR. DREILING:  Your honor, I'd like the record to

3   reflect that the witness is pointing to an area on the

4   diagram.  It appears to be in the middle of the kitchen.

5        THE WITNESS:  It would be -- this would be the door,

6   how he came in here, and the kitchen would be -- when you come

7   around this corner right in the kitchen in here, if I can

8   remember.  (Indicating throughout answer.)

9        MR. COOPER:  Q.   Okay.  At any rate, when -- from

10  where you were, can you tell us what room or what place the

11  defendant was when he first came into view?  Okay.  You told

12  us you were in the kitchen?

13       A.   Yes.

14       Q.   You say he -- he broke in the door?

15       A.   Yep.

16       Q.   Now, when you first saw him, what room is he in?

17       A.   He's in the hallway there; he is coming in the

18  front door.

19       Q.   Now, from where you are in the kitchen when you

20  see him in the hallway, is there -- is there a -- I mean, are

21  you looking through a window, through a doorway?  How were you

22  able to see in the hallway there?

23       A.   Because there is an opening there.

24       Q.   All right.  And you said something about the way

25  that he was, I don't know, bending over or something when you

26  first saw him?

1     A.  When he came in, he kind of -- when he hit the

2  door, he kind of lost his balance just a little bit, I would

3  say. He stood up, and then they started arguing, him and

4  Diana.

5     Q.  Okay. Mr. Jones, can you please show the judge

6  what you mean when you say he was kind of losing his balance a

7  little bit? Can you show her what -- what was -- what did you

8  see him doing when he first comes into view?

9     A.  Want me to get up?

10     Q.  Please.

11     A.  Well, when he came through the door -- this is the

12  door right here (indicating).

13     Q.  That's the front door?

14     A.  Yeah. And he more or less hit the door with his

15  arm and knocked it down. When he knocked it down, he kind of

16  stumbled a little bit like. He stood up in front of me like

17  this. Him and Diana started arguing, and he had a knife in

18  his hand. (Demonstrating throughout answer.)

19     Q.  When you say "stumbled a little bit forward like

20  this here," you were showing us that he was kind of leaning

21  over forward?

22     A.  When he hit the door, he kind of came -- he came

23  in like this here (demonstrating) and then he stood up.

24     Q.  And earlier did you say something about the wall

25  or -- or not was there?

26     A.  No.

1    Q.  Oh, no, okay. You said he had a knife in his

2  hand.  Did you see that when he first came through the door?

3      A.  Yes, I saw it when he came in after he turnt the

4  corner.

5      Q.  Which corner is that?

6      A.  When he came through -- when he came in the door

7  and -- when he first came in the door, then he turnt around

8  like this here (indicating). That's when I could see the

9  knife.

10      Q.  When you say "he turned around like this here,"

11  which way would he be facing then?

12      A.  He would be facing this way, toward the kitchen

13  (indicating).

14      Q.  All right. Would that be where you were?

15      A.  That's where Diane and I were standing.

16      Q.  Okay. You can sit down again. Mr. Jones, after

17  that moment when you see him, after he's broken in the door

18  and you see the knife, he turns and faces into the kitchen

19  there, what happens then?

20      A.  I tried to -- I tried to talk to Sylvester.

21      Q.  What do you mean? What did you do?

22      A.  Because I could see that he was upset and he was

23  mad, and I -- and he, you know, was accusing me of going with

24  his wife. And I told him -- I said, "That's a lie." I said,

25  "I never had anything to do -- as well as you know me, you

26  should know me better than that." And I, you know, talked to

1  him the best I could to try to calm him down and --

2      Q.   Okay.   What happened then?

3      A.   Nothing happened at the spare of the moment.   He

4  began to calm down a little bit.   He didn't do anything.

5      Q.   Then what happened?

6      A.   Finally about maybe two or three minutes later he

7  seemed to get really mad.

8      Q.   What happened then?

9      A.   Then they started fighting.

10      Q.   Who is "they"?

11      A.   Sylvester started fighting with Diane.

12      Q.   When you say Sylvester started fighting with

13  Diane, what do you mean?   What did he do?

14      Q.   Okay.   Diane broke -- Diana was standing by me,

15  and -- and Sylvester started talking to her, calling her names

16  and things.

17      Q.   What kind of names?

18      A.   He told her, "Bitch, I am going to kill you."

19      Q.   All right.   What happened then?

20      A.   Then Diane got real scared.   She was standing

21  aside of me.   She started edging from me, moving to the right.

22  Then she broke -- more or less took off running, and Sylvester

23  caught her.   That's when they started fighting.   He started

24  hitting her.

25      Q.   Mr. Jones, when you say towards the right she

26  started to move, then she broke in a run sort of, which --

1  towards which way?  I mean, what room or anything was she

2  headed for there?

3/  A.  She was in the kitchen.[2]

4  Q.  Which way was she headed?

5  A.  She was going toward the -- to the back, more or

6  less to the -- it's a wall there -- for the back yard.  She

7  was headed that way.

8  Q.  All right.  Let me ask you this:  From the
   [13]                                          [14]
9  kitchen -- well, if I look out the kitchen window in that

10  house, am I looking out to the street or to the side yard or

11  the back yard?

12  A.  You would be looking out in the front.
                                          [14]
13  Q.  All right.  Now, when she was in the kitchen and

14  she started going towards the right, is she headed towards the

15  side of the house, the back of the house?  Which way?

16  A.  The side of the house, more or less down the side

17  of the fence.

18  Q.  All right.  And when you said that he started

19  hitting her, can you give us any idea of where she was at when

20  you saw him starting to hit her?

21  A.  Well, as I can remember, from what I saw, they

22  was -- just as you -- refrigerator there, there is a wall
                          [15]
23  there in the kitchen.  When she started moving away from me, I

24  saw them when he reaching and grabbed her.  They started

25  tussling.  That's where they fighting at.  Then they went

26  round the corner.  I could hear -- I couldn't really see her

1    after they went round the building -- the corner there, but

2    she was screaming and hollering. I know they was fighting.

3    That when that happened, I said to myself it's time for me to

4    get out of here, because it's none of my business one way or

5    the other, because he's got a knife.[3]

6         Q.   You say "screaming and hollering." Do you

7    remember anything that was being screamed or hollered?

8         A.   No more than she said, "Sylvester, don't hurt me,"

9    something on this order.

10         Q.   Now, when you started -- you say it is time for

11    you to get out of there. Did you -- did you get out of there?

12         A.   Yes, I got out of there.

13         Q.   Now, before you actually got out of there, did you

14    do or say anything else?

15         A.   No, I didn't say anything. I just tried to talk

16    to -- when Sylvester first came in there with the knife[4] and --

17    you see, I was scared. Quite naturally I'd be scared. I

18    tried to calm him down and talk to him, because I have been

19    knowing him a long time, and, you know, I didn't want to see

20    either one of them get hurt.

21         Q.   Yes.

22         A.   I tried to talk to him the best I could, and he

23    listened to me for a while.

24         Q.   All right. Now, Mr. Jones, after you saw them go

25    around that corner, you said they were -- you couldn't see

26    them anymore?

1     A.   No.

2     Q.   But you heard screaming and hollering?

3     A.   Yeah.

4     Q.   Now, did you ever see Diana again before you left?

5     A.   Yes, I did.

6     Q.   Now, where were you when you saw her again?

7     A.   Okay.  After I got a chance to get out, I stood in

8  the front door and --

9     Q.   What did you do there?

10     A.   I just stood there, and I was still talking to

11  Sylvester.  I said, "Sylvester, don't you all hurt each

12  other," just like that.  By that time, Diane manages to get

13  away from Sylvester some kind of way.  She ran into me

14  standing in the door trying to get out.

15     Q.   You are in the door?  What door are you in?

16     A.   I am in the front door right there as you open it,

17  right there on the concrete.

18     Q.   All right.  Where did she come from?

19     A.   As well as I remember, she came from straight down

20  the hall there.

21     Q.   All right.  When you say she came at you, what

22  happened then?

23     A.   Okay.  When Diana ran into me and I -- she ran

24  into me trying to get out the door.  She was trying -- you

25  know, kind of wiggling, trying to get by me, and I noticed

26  that she was losing her balance.  She acted like she was a

1    little weak or something, and she fell down on her knees

2    there, and I looked down to see what was wrong.  I was going

3    to see if I could pick her up or whatever.  That's when I

4    looked around, and Sylvester had the knife and he was coming

5    at me.

6         Q.   When you say she kind of went down like on her

7    knees, where was that?

8         A.   As you enter the door on the concrete there.

9         Q.   All right.  You said you looked up and you saw

10   Sylvester?

11        A.   Yeah.  He was coming at me with the knife.

12        Q.   What happened then?

13        A.   And that's when he cut me on my hand.

14        Q.   What happened then?

15        A.   Then I just backed up and moved and got out of his

16   way, kept backing up, got in my truck and left.

17        Q.   Where was your truck?

18        A.   Parked right in front of his mailbox.

19        Q.   When you say that he cut you, did you keep

20   watching what was going on there?

21        A.   No, I didn't.

22        Q.   What were you doing after -- after that moment

23   when you say he cut you, what -- if you didn't keep watching,

24   what were you doing?

25        A.   Oh, I -- I didn't even know I was cut --

26        Q.   Okay.

33

1          A.   -- when I left, because -- like I say, I was

2    scared, and it wasn't any of my business one way or the other,

3    and all I wanted to do was get out and leave, because

4    situation like that is not -- you know, I was just a gardener.

5    I wasn't nothing else.  And when I left, I didn't -- I don't

6    know what happened after then.  All I know, when I left there,

7    she was right in the hall.  He liked picked her -- he picked

8    her up and -- some kind of a way they was in the hall when I

9    started -- the last I saw her.

10          Q.   Okay.  Now, let me make sure I understand.  When

11   you are -- at that time when you see that he is -- he is

12   coming at you with a knife?

13          A.   Yeah.

14          Q.   Then you said, "Well, I didn't really know then

15   that I was cut"?

16          A.   I didn't.

17          Q.   And you said you went to your truck.  Did you stop

18   looking?  What's going on here?

19          A.   No.  I kept backing up, and I could -- I could see

20   her in the hallway there, and I could -- could hear them

21   talking, but I don't know what happened after that.  All I

22   know, I could just hear voices.  I kept backing up and I went

23   straight to my truck and got in it and left.

24          Q.   Okay.  You said something about him picking her up

25   or something some kind of way.  What -- where were you when

26   you saw that happening?

24

1       A.   I was -- just as you turn the corner by the
2   garage, that's when I kept backing up, and -- and she was down
3   there on the concrete, and I saw him come to the door, and I
4   saw him more or less reach down to more or less pick her up or
5   whatever.  I couldn't really tell because it was dark.  I know
6   he did come to the front.

7       Q.   Okay.  Can you explain to us or show us what you
8   saw him doing when you say he kind of reached down?  What was
9   the motion that you saw?

10      A.   Well, as I can remember, he just -- after he --
11  she was laying there.  I think he knew that she was hurt and
12  he realized she was hurt.

13      Q.   What did you see him do?

14      A.   Just push the door open and reach down like to
15  pick her up like this here (indicating), and I couldn't see
16  nothing else after that.

17      Q.   Okay.  I have to say that in words for the record.
18  Okay.  You reached -- you showed us that -- with your right
19  arm, you showed us a gesture downward --

20      A.   Yes.

21      Q.   -- with your hand open as if to grab something?

22      A.   Yeah, reached down -- as well as I can remember,
23  he reached down and picked her up, and that's when I kept
24  backing up, and that's all I saw, and then I turned the corner
25  and got in my truck.

26      Q.   Did you actually see if he took hold of her?

1    here about an hour later, I went across the street.

2        Q.    Did you have a regular schedule that you kept over

3    there or did you just go when she called you?

4        A.    Just go whenever she needed me.

5        Q.    I see.

6        A.    But, on John's yard, I have been doing John's yard

7    for about almost -- been cutting his yard for about a year.

8        Q.    You have a regular schedule there?

9        A.    Cut his yard regular, plus the guy named Ray

10    across the street, I did his.  Put in winter rye for him, too

11        Q.    I see.  Now, on the night of the incident, you

12    recall arriving there about twenty minutes to 7:00?

13        A.    Somewhere around there, twenty minutes, quarter to

14    7:00.

15        Q.    And you and Diana, after you were admitted into

16    the house, were the only ones in the house?

17        A.    Only ones except for the -- somebody else had

18    called; they stopped by there.

19        Q.    Somebody --

20        A.    She said somebody else had stopped by.

21        Q.    Was it while you were there?

22        A.    No, it wasn't while I was there.

23        Q.    So while you were there, you and she were the only

24    ones in the house?

25        A.    We was the only ones in the house.

26        Q.    Did the doorbell ever ring prior to Sylvester

39

1    arriving?

2         A.    Not while I was there at the time.

3         Q.    After the third phone call, you testified it was

4    approximately five to ten minutes before Sylvester arrived?

5         A.    Yes, somewhere. About ten minutes. Sylvester got

6    there real soon.

7         Q.    Your best guess then, it was approximately ten

8    minutes afterwards?

9         A.    I'd say about ten minutes.

10        Q.    During that time, you and Diane continued talking?

11        A.    We was talking in between the telephone calls.

12        Q.    And after he arrived, he -- he knocked on the

13   door, is that right?

14        A.    Well, that's what I heard, somebody knock at the

15   door, and she said it was Sylvester.

16        Q.    And did you hear anyone outside other than the

17   knock on the door at that time?

18        A.    Well, when -- when she had opened the garage door

19   because she was getting ready to get in her truck and leave, I

20   could hear somebody walking by the garage.

21        Q.    Do you know if the outer garage door was open, the

22   large one that admits --

23        A.    No, the garage door was down.

24        Q.    All right. Do you know whether or not they have

25   an automatic garage door opener at the house?

26        A.    I think so. I am not positive. It was the garage

1   door opener or deal on top of the ceiling.

2         Q.   Okay.  You think that it does have an automatic --

3         A.   Yeah, I think so.  I mean, I couldn't --

4         Q.   Did she respond in any way to the knock at the

5   door or did she simply ignore it?

6         A.   Well, she didn't really open the door at first.

7   She says she wasn't going to open it.

8         Q.   Did she say that to you or to the person outside?

9         A.   She said it to me.  I told her, "The best thing

10  for you to do is open the door and let Sylvester in," I say,

11  "because, if you don't open it, he will probably get the wrong

12  impression."

13       And she said, "Well, I am not going to open it."  I

14  said, "Well, I wish you would open it because I don't want to

15  get mixed up in this here."

16       Q.   Approximately how long did it take before you

17  heard voices coming from outside after the first knock on the

18  door?

19       A.   Well, it wasn't no more than -- than maybe, I'd

20  say, two minutes at the most, somewhere around in that

21  neighborhood.

22       Q.   So two minutes after the first knock you could

23  hear someone talking outside?

24       A.   Yeah, yeah, I could hear Sylvester talking.

25       Q.   Now, are you sure it was Sylvester?

26       A.   I didn't see him, but I --

43

1        Q.    Recognized --

2        A.    -- I recognized the voice.

3        Q.    You are familiar enough with his voice to

4    recognize it?

5        A.    I think so.

6        Q.    And after you first heard the voices, how long was

7    it before -- or, the voice, Sylvester's voice, outside, how

8    long was it before the front door was broken in?

9        A.    About -- I'd say about four minutes at the most,

10   somewhere around there.

11       Q.    So we are looking at some time period of maybe six

12   minutes before he came into the house while he was outside?

13       A.    Maybe even not that long.  It was about five or

14   six minutes, give or take.

15       Q.    Now, you testified, when he came through the door,

16   that he sort of stumbled, is that right?

17       A.    Well, you know, when you push -- when you knock a

18   door open -- when he came in, he looked like he had kind of

19   lost his balance a little bit.  You know, when you run into

20   something and knock it open and come in there, then he just

21   more or less looked like he was a little bit leaning when he

22   hit it and came in, because it was up aside the wall, you

23   know, when you come in the front door.

24       Q.    Did he actually run into the wall inside?

25       A.    No.  What I am saying is, when he knocked the door

26   open and -- you know, when you hit it with your force --

42

1         Q.    I understand.

2         A.    -- and the door came open, kind of broke it off

3    the hinges, you know, knocked loose, and he came in.   Then

4    that's when he starts talking to Diane.

5         Q.    I see.   Now, do you remember talking to an officer

6    right after the incident, a police officer?

7         A.    Yeah.   He brought me downtown.

8         Q.    Do you remember that officer name?

9         A.    No, I don't even know his name.

10        Q.    Do you remember telling him that Sylvester

11   actually fell on the floor when he came in?

12        A.    No, I don't remember telling him he fell on the

13   floor.   All I said, when he knock the door open, he kind of

14   lost his balance when he came in.

15        Q.    Now, when you come through that front door --

16   okay.   Strike that.   Where were you when you saw him come

17   through the front door?

18        A.    I was standing there by the garage door in the

19   kitchen with Diane.

20        MR. DREILING:   If I may use the People's Exhibit 1 for

21   identification.

22        MR. COOPER:   Good luck.

23        MR. DREILING:   Q.   All right, using this as the front

24   door (indicating) --

25        A.    This would be the front door coming in, come in

26   through here (indicating).

45

1    Q.    Is it a wall that goes all the way to the ceiling?

2    A.    No, I don't think -- I don't think so.  I am not

3    for sure.  All I know is, I mean, you come through the front

4    door, there is an opening right here in the dining room where

5    the kitchen -- you walk in here and getting ready to go out

6    the garage door.  (Indicating throughout answer.)

7    Q.    Assuming there is a door here near the dining room

8    table, that would go into the garage?

9    A.    Yes.

10    Q.    If you were standing near that door, could you see

11    this front door?

12    A.    Not really see it.  Not -- what I am saying is --

13    he was not standing here.  He was in the opening.  He was

14    standing only about three or four feet -- three feet from

15    Diane and I when he was talking.  I could see Sylvester.

16    Q.    I am talking about when he came through the door.

17    Are you talking about a later time?

18    A.    Well, you couldn't see him completely, but after

19    he got in the door, you could see him.

20    Q.    It's your testimony that, when he came through the

21    door, he -- you couldn't actually see him lying on the surface

22    of the floor or anything like that?

23    A.    I didn't see him laying on the surface of the

24    floor.  I said he lost his balance when he came through the

25    door, when he hit the door and opened it.

26    Q.    Okay.  Now -- thank you.  On direct, you testified

1    that he turned to his right.  Would that be towards the

2    kitchen?

3          A.    Yes.

4          Q.    And that was the first time you saw the knife, is

5    that true?

6          A.    Yes.

7          Q.    Okay.  Where was the knife?

8          A.    In his hand.

9          Q.    Which hand?

10         A.    Well, as far as I can remember, it was in his

11   right hand.

12         Q.    Do you know whether Mr. Strong is right-handed or

13   left-handed?

14         A.    Well, I am not exactly sure, but that night, I

15   think he had it in his right hand at the time of the incident.

16   When something is going on like that, you know, you -- it

17   really shakes you up.

18         Q.    I understand that, and I am trying to make it as

19   easy on you as possible here.  When you first saw the knife,

20   would it be your testimony then that he was three or four feet

21   away from you?

22         A.    Yes, he was real close.

23         Q.    Real close?  You were standing right there by the

24   back garage door?

25         A.    Right there aside of Diane.

26         Q.    When you first saw the knife, how long had he been

47

1   in the house?

2        A.   Well, I'd say maybe about 20 minutes -- 20

3   seconds.   When I saw it after he first come in the door?

4        Q.   Right.

5        A.   Well, when he first came in, he turned the corner,

6   I could see the knife.

7        Q.   He would have been in the middle of the kitchen by

8   the time you saw the knife?

9        A.   When he came in the opening of the door was when I

10  saw the knife.

11       Q.   So he wasn't within three or four feet of you, he

12  was somewhat farther away?

13       A.   Well, I'd say about from here to -- from here to

14  this here right here, the -- the distance (indicating).

15       Q.   Okay.   You were standing near the --

16       A.   I was standing right there by the garage door with

17  his wife, Diane.

18       Q.   Okay.   Where was he standing -- strike that.   Do

19  you recall in the layout of that kitchen where the

20  refrigerator was?

21       A.   Not exactly.

22       Q.   You don't recall where he was standing when you

23  first saw the knife in relationship to the refrigerator then,

24  do you?

25       A.   I know where I saw Sylvester when he came through

26  the door.   Before the refrigerator, I am not for sure.

1   outside?

2          A.    Yeah, it was -- it was dark.

3          Q.    Do you recall what lights were on inside the

4   house?

5          A.    No, I don't recall.  I didn't have time to -- to

6   look at no lights.

7          Q.    Prior to Mr. Strong arriving at the house, do you

8   have any recollection as to the lighting inside the house when

9   you were talking to Diane?

10         A.    No.

11         Q.    Could you see clearly into all of the rooms --

12         A.    No.

13         Q.    -- that were -- you could not?  Could you see into

14  the living room from where you were seated?

15         A.    Yeah, the lights, but you couldn't see completely

16  because, when she turnt the corner, the only thing I could do

17  was hear her voice.

18         Q.    I understand that, but as far as what you could

19  see, could you see clearly?

20         A.    Yes.

21         Q.    I am not talking about something that is blocked

22  from your view?

23         A.    What I could see, I could see clearly.

24         Q.    After you heard the knock outside -- and let me

25  get this straight, was it a knock or a doorbell that you

26  heard?

51

1        A.    I think it was a doorbell.  At least, that's what
2    she said when she went to the door.  And from what I could
3    hear, I think he rang the doorbell.

4        Q.    Do you actually recall the doorbell?  If you don't
5    know, just say you don't?

6        A.    Well, I don't.

7        Q.    Okay.  And after the first time you were aware
8    someone was outside -- and you testified earlier that it was a
9    couple of minutes before you heard him speak?

10       A.    Yes.

11       Q.    Did you hear any more knocks or ringing at the
12   door or anything like that?

13       A.    No.

14       Q.    And you and Diane were still in the kitchen or in
15   the dining room at that point?

16       A.    Yes, we was standing there.

17       Q.    Okay.  Do you recall whether a porch light was on?

18       A.    Can't remember whether it was on or off.

19       MR. DREILING:  Perhaps we can take a short break.

20       THE COURT:  I was going to ask if the reporter wanted a

21   break.  If this is as good a time as any, we will take a

22   ten-minute recess.

23       MR. DREILING:  Thank you.

24       THE COURT:  You may step down, Mr. Jones.

25       (Recess taken.)

26       THE COURT:  Please come up to the witness chair.

52

1    Mr. Dreiling, do you want to return to your cross-examination?

2          MR. DREILING:  Thank you, your honor.

3          MR. DREILING:  Q.   Mr. Jones, now, I think, when we

4    broke, we had Sylvester standing about three to four feet away

5    from you?

6          A.   Yes.

7          Q.   And he -- to the best of your recollection, he had

8    a knife in his right hand?

9          A.   Yes.

10         Q.   Were you standing near the door that goes into the

11   garage?

12         A.   Yes.

13         Q.   And where was Diane in relation to where you were?

14         A.   Diane was standing right beside me more or less

15   maybe about a feet from me, maybe six inches.

16         Q.   And I believe on direct you testified it was about

17   at this time they started fighting, something to this effect?

18         A.   Well, it wasn't pointblank they started right

19   there.  They argued for a few minutes; then they start

20   fighting.

21         Q.   Now, when you say "fighting," can you describe

22   what you actually saw?

23         A.   Okay.  I was trying to calm Sylvester down, trying

24   to get him to not have a fight, him and his wife.  By me

25   knowing him, I just talked to him in general.  And when she

26   broke and ran --

53

1    Q.    Let me stop you for just a minute.  When you were
2    trying to calm him down, did he seeming awfully agitated to
3    you?

4           A.    He were.  That's why I was trying to calm him
5    down.

6           Q.    And then -- then what happened?

7           A.    We talked for a few minutes, maybe a minute or two
8    at the most, and she began to -- to -- I could feel that she
9    were afraid of him because she saw the knife and started
10   inching away from me.  She broke and ran.  Then Sylvester ran
11   after her and caught her.

12          Q.    Where did he catch her?

13          A.    It was in the kitchen part there around the
14   corner.  They was fighting more --

15          Q.    It was in the kitchen?

16          A.    When they first started, and then --

17          Q.    When you say "fighting," what did you actually
18   see?

19          A.    Okay.  From what I could see -- I didn't see
20   everything, but from what I could see, when he first caught
21   her the first time, he reached and grabbed her.  I saw him hit
22   her like this here (indicating), maybe two or three times hit
23   her.

24          Q.    Okay.  When you saw him hit her, what did he hit
25   her with?

26          A.    He was hitting her with his right hand, as far as

1    I could see.  I was trying to get out.  That's when I -- I

2    got -- I came by him after he passed me and I could get out

3    the door because he had the knife.

4         MR. COOPER:  Excuse me.  For the record, the witness is

5    gesturing with his right arm, striking downward from above the

6    shoulder with the heel of the hand as the leading surface as

7    he was moving downward.

8         MR. DREILING:  And I believe that is an accurate

9    description of what the witness did.

10        MR. DREILING:  Q.   How many times did you see him make

11   that motion?

12        A.    Couldn't say exactly how many times, because, at

13   the time it was happening, I was scared; I was trying it get

14   out of there.  All I know, that he -- they was fighting, and

15   I -- when I -- when he came by me and gave me a chance to get

16   out the door, I could see them struggling.  He was hitting

17   her.  And then --

18        Q.    Excuse me.  Did you see the knife in his hand when

19   he was hitting her?

20        A.    Yeah, I could see, when he first reached and got

21   her, he had the knife.  Then I don't know what happened after

22   that.  All I know, that they was fighting.

23        Q.    You didn't see the knife when he was hitting her?

24        A.    When he first grabbed her, he had the knife in his

25   hand.

26        Q.    Did he grab her with his right hand or left hand?

55

1        A.    When they turnt the corner, I think he grabbed her
2    with his left hand?

3        Q.    You think or do you --

4        A.    Not for sure.  All I know, they was fighting,
5    because I wasn't -- when he gave me a chance to get out of the
6    house, I got out.

7        Q.    Now, when you testified that he was making this
8    motion with his hands, this striking motion, did you see the
9    knife in his hand at that time?

10       A.    Yes, I saw the knife.

11       Q.    Was it in the hand he was striking her with?

12       A.    Well, it was in his right hand.  They was -- what
13   I am saying is they was -- okay, they was fighting and they
14   was tussling in the room, and he was on top of her more or
15   less, she was down under, she was trying to get loose, and he
16   was -- as well as I could see the time I was standing there --

17       Q.    Just a moment.  Now, was she on the floor, laying
18   on the floor?

19       A.    I wouldn't say laying on the floor.  She was --
20   they was -- you know when you tussle and one will go one way,
21   the other one go the other?  She was trying to get loose from
22   him.

23       Q.    Was she standing or was she sitting or was --

24       A.    She was more or less standing and running at the
25   same time.

26       Q.    So she was on her feet?

56

1      A.   Yeah, at the time I saw her, as well as I can
2  remember.  Then I happened to look back; one time, I saw her
3  on the floor.

4      Q.   Okay.  And did you see her standing up after that
5  one time you saw her on the floor?

6      A.   No more -- the last time I saw her, when she fell
7  into me and I backed out the door.

8      Q.   She was standing when she came to you there?

9      A.   Well, she was not really standing.  She was druggy
10  kind of, you know, fumbling, going out the door.

11      Q.   She was on her feet?

12      A.   She was on her feet when she fell into me.

13      Q.   Now, getting back to this striking motion you
14  testified to, you say you don't remember how many times you
15  saw it.  Could it have been as many as ten times?

16      A.   Like I say, I couldn't say --

17      Q.   It's possible?

18      A.   -- how many times, but I know that I did see him
19  when he first grabbed her --

20      Q.   When he first grabbed her, you testified that he
21  had the knife in his hand?

22      A.   Yes, he had the knife with him.

23      Q.   But when he was hitting her, you testified that he
24  was hitting her with his right hand?

25      A.   Yeah.

26      Q.   Did you see the knife in his right hand when he

1   was hitting her?

2       A.   Well, when he first grabbed -- when she broke and

3   run, he took after her, and I happened to look.  That's when I

4   saw him hitting at her, but I don't know what happened.  They

5   turnt the corner, and she was screaming and hollering.

6       Q.   So you didn't see knife then, did you, when he was

7   hitting at her?

8       A.   When he first come in the door.  After they turnt

9   the corner, I don't know what happened after that.

10      Q.   Did you actually see him hit at her?

11      A.   I saw him hit at her when they moved away from me

12  and he reached to get her, and when she broke to run, he

13  grabbed her and started hitting her.

14      Q.   Did you see knife when he started hitting her?

15      A.   Yeah, I saw him when he first started hitting her,

16  and then they turnt the corner.  All I could hear was noise,

17  you know, screaming.

18      Q.   When he hit at her, did he have the knife in his

19  hand.

20      MR. COOPER:  Asked and answered; objection.

21      MR. DREILING:  I don't think it has been answered.

22      THE COURT:  Overruled.

23      THE COURT:  Can you answer?

24      THE WITNESS:  Yes.

25      MR. DREILING:  Q.   And you described that as hitting

26  at her, you don't describe that as stabbing at her?

58

1       A.   Well, that's my judgment.  I saw him hit at her,
2   you know, when she broke and ran, and I knew they was fighting
3   because I could see that much.

4       Q.   Did you see them --

5       A.   What happened after then when they turnt the
6   corner around there when she was screaming, I don't know what
7   happened.  All I know, I could hear voices.

8       Q.   And this -- when he grabbed at her, it was right
9   in the kitchen?

10      A.   Yeah, it was in the kitchen when she broke and
11  ran.

12      Q.   Which direction did she run in?

13      A.   Okay.  We was standing -- I was standing like
14  right here and Diane was standing here, and she went this way,
15  and Sylvester was like right out here when she broke and ran.
16  (Indicating throughout answer.)

17      Q.   Okay.  To place yourself in the Strong house --
18  and I believe on direct you testified that she was running
19  towards the back of the living room, is that correct?

20      A.   Right.

21      Q.   Now, was she out of the kitchen at any time then?

22      A.   Yes, as well as I can remember.  I didn't really
23  see them when they were around the corner.

24      Q.   When they went around the corner, what room did
25  they go around the corner into?

26      A.   They stayed in what you call the dining -- I guess

59

1    whatever you call it.

2            Q.    Dining room?

3            A.    After you get out of the kitchen, you go around

4    the corner, they was fighting back there, you know, I could

5    hear them.

6            Q.    They were behind the wall from you?

7            A.    Yeah.

8            Q.    What wall was that?

9            A.    That's the part from the kitchen.

10           Q.    The wall that divides the kitchen from, say, the

11   living room?

12           A.    Yeah.

13           Q.    Do you recall what was on that wall, you know, on

14   the kitchen side, what appliances were there?

15           A.    I don't remember that.

16           Q.    How many times did you actually see this hitting

17   motion.

18           MR. COOPER:  Asked and answered; objection?

19           THE WITNESS:  I can't say --

20           THE COURT:  Overruled.

21           THE WITNESS:  -- exactly how many times.  At that time

22   of night, you can't really determine.  All I know, they was

23   fighting.  I can't say how many times.

24           MR. DREILING:  Q.    Was it because it was too dark to

25   see?

26           A.    No, it wasn't too dark, because there was a light

60

1   on in there.

2          Q.    Where was the light on?

3          A.    All I know, there was a light on.

4          Q.    Was the light on in the kitchen or in the dining

5   room or in the living room?

6          A.    As well as I can remember, it was on in the

7   kitchen.

8          Q.    When he first made that motion, where were they?

9          A.    Just as you turn the corner from the garage door.

10  Well, she started inching from me.  You know where the table

11  is there, she went that way.  That's where Sylvester caught

12  her at when they started fighting.

13         Q.    Now, where were they in relation to the table?

14         A.    Maybe I am saying from -- say about two feet from

15  the table because -- because --

16         Q.    Okay.  Two feet on the kitchen side or the other

17  side of the table?

18         A.    The other side of the table going around to the --

19  going to the back of the -- of the -- the -- the -- the back

20  yard.

21         THE COURT:  Was there an objection?

22         MR. COOPER:  No, your honor, I withdrew it.

23         MR. DREILING:  Q.  So it would be away from the

24  kitchen?

25         A.    Yeah, it would be away.  Like you go around from

26  the kitchen, you put where the table was sitting, you go

61

1   around that way, that's like down the side of the house.

2          Q.    And that's -- that's first time you saw him make

3   that hitting motion?

4          A.    Yeah, that's the first time.

5          Q.    Where were you when you saw that?

6          A.    Standing right there by the -- by the -- in the

7   kitchen there, right in the center of the kitchen, because I

8   was getting ready to go out the door when I had a chance to

9   get by Sylvester.

10         Q.    In order to get to where he was when he made that

11  hitting motion, he would have to have had gone by you?

12         A.    Yeah, he came by me.  That's when he reached out

13  and caught her.  He came by me.  It gave me a chance to go out

14  the door.

15         Q.    Did you ever go back into the house at all after

16  this point?

17         A.    No, I didn't.  I'd be crazy to do that.

18         Q.    How long did you wait there before you actually

19  left in your pickup?

20         A.    I didn't wait hardly any.  I never -- kept moving.

21         Q.    You kept moving?

22         A.    I say I never stopped moving.  I kept moving and I

23  went directly to my truck and left.

24         Q.    So at the point you first saw him hitting at her,

25  you were walking out of the house and never stopped?

26         A.    No, I didn't say that.  I said, when they started

1   fighting, I went to the door and I stood in the doorway, and

2   later on after -- after Diane got away from Sylvester one way

3   or the other, that's when she ran into me, and I told you that

4   I saw her down in the doorway there. For me to see that, I

5   couldn't have left at that split second, I had to stay there

6   may be 25 or 30 seconds, and I saw her fall -- falling in the

7   doorway there, and then that's when -- after he cut me on the

8   hand, I kept backing up; then I got in my truck and left.

9       Q.   Just a moment. Do you know when he cut you on the

10  hand?

11      A.   No, I -- I testified that I didn't know that I was

12  cut -- I said I didn't know that I was cut until I got about

13  maybe six or eight blocks down the street on Cedar in Calwa

14  and I happened to feel something stinging, and I looked down

15  and I saw that I had been cut on my hand. Then I left -- then

16  I kept driving. I went straight home and told my wife about

17  it when she come out of the bathroom.

18      Then John Chavez called me, the guy -- this Mexican

19  man, used to be my neighbor on Whitney, and he said, "Come

20  back over here. The police want to speak to you."

21      I said, "Okay." I went back at the residence on

22  Barton, and -- and the officer came up to me and went and told

23  me that he had to take me downtown, and he put me in the car

24  and took me downtown.

25      Q.   And you talked to an officer downtown?

26      A.   Yeah. I talked to one going downtown, too. And

64

1       Q.   Now, from the time you saw them go into the other

2   room or when they were fighting, you started to leave but you

3   stayed at the front door?

4          A.   Right.

5          Q.   How long did you wait at the front door?

6          A.   Maybe two minutes at the most, if it was that.

7   About two minutes, because they was struggling. I could hear

8   her screaming and hollering, and they was, you know, fighting.

9   And finally, like I said, she managed to get loose from

10  Sylvester and --

11         MR. DREILING:   I am going to ask to strike that

12  response.

13         MR. DREILING:   Q.   You didn't see any of that, did

14  you?

15         A.   No, I didn't see the second part. All I knew,

16  they was fighting.

17         MR. DREILING:   Okay.

18         THE COURT:   The answer may be stricken.

19         MR. DREILING:   Q.   Now, she came to you at the front

20  door from which direction?  Did she come through the kitchen?

21  Straight down the hall?

22         Q.   Down the hall.

23         Q.   Now, that would not be from the kitchen, is that

24  right?

25         A.   No.

26         Q.   That would be from a room that is on the other

# EXHIBIT 9

40

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                **D E C I S I O N**

3        **PRESIDING COMMISSIONER VAN COURT:**  Okay,

4    Mr. Strong.  Everyone has returned to the room that

5    was here during the hearing.  The Panel reviewed all

6    the information received from the public and relied on

7    the following circumstances in concluding that the

8    prisoner is not suitable for parole and would pose an

9    unreasonable risk of danger to society and a threat to

10   public safety if released from prison.

11       The offense was carried out in an especially

12   cruel and callous manner.  The offense was carried out

13   in a manner which exhibits a callous disregard for the

14   life and suffering of another.  Multiple victims were

15   attacked, one injured, one killed, in the same

16   incident.

17       These conclusions are drawn from the Statement

18   of Facts where the prisoner after talking to the

19   victim, his wife, on the telephone, the prisoner then

20   walked to the victim's house, kicked open the door,

21   caught his wife who was trying to get away, stabbed

22   her to death.  The second victim was the wife's

23   gardener, who was also stabbed, but managed to run to

24   his truck and get away.  His injuries were not life

25   threatening.

26       The prisoner has a record of violence and

27   **SYLVESTER STRONG    D-99287    DECISION PAGE 1  11/03/98**

C-FILE

41

1    assaultive behavior, an unstable social history.  He

2    failed to profit from society's previous attempts to

3    correct his criminality.  Such attempts included a

4    short county jail sentence for assaulting his wife.

5    The unstable social history and prior criminality

6    which included one arrest for an attempted grand

7    theft, grand theft auto.  Also as an adult, he was

8    arrested on 1/26/97 by the Fresno Police Department,

9    that was '87, Fresno Police Department for battery and

10   was found guilty, sentenced to 30 days and fined one

11   hundred dollars.  On 2/12/87, he was arrested for

12   inflicting corporal punishment to his spouse, was

13   given 60 days county jail time and a 250 dollar fine.

14   Also has admitted use of cocaine.

15        The prisoner needs to complete additional

16   vocational training to get a certificate so that we

17   can be assured of him having a well paying job when he

18   leaves here.  So we want you have a good -- at least a

19   vocational training.  Also, certainly, continue in any

20   beneficial self-help therapy and specifically the AA

21   and NA programming, one or the other.

22        You have failed to demonstrate evidence of

23   positive change.  Misconduct while incarcerated

24   included two CDC 115s, however the last one was on

25   9/28/93, five years ago.  He also had five minor

26   128(a)s.

27   **SYLVESTER STRONG     D-99287    DECISION PAGE 2  11/03/98**

42

1        The psychological, psychiatric report dated

2    9/5/98, authored by Dr. Stephen Terrini, states in a

3    small portion of it, diagnostic impression was Adult

4    Anti-Social Behavior Improved, Cocaine Abuse by

5    History in Institutional Remission, Cannabis Abuse by

6    History in Institutional Remission.  It says,

7        "Conclusions and Recommendations,

8        regarding violence potential and

9        consideration of several factors

10        including the criminal history, his

11        history of CDC 115s and his current pro-

12        social attitude, his violence potential

13        is estimated to be somewhat below

14        average relative to this inmate

15        population.  As this inmate has

16        acknowledged substance abuse problems,

17        abstinence monitoring and attendance to

18        self-help groups such as Narcotics

19        Anonymous should be a mandatory

20        condition of parole.  This inmate does

21        not have a mental disorder which would

22        necessitate treatment either during his

23        incarceration period or following

24        parole."

25    That was written by Dr. Stephen J. Terrini, on 8/6/98.

26        The prisoner should take advantage of any and

27    **SYLVESTER STRONG**    **D-99287**    **DECISION PAGE 3  11/03/98**

43

1    all therapy to assist you in gaining insight into why
2    he committed this crime.  Nevertheless, the prisoner
3    should be commended for being disciplinary-free for
4    the past five years.

5         The prisoner is denied parole for a period of
6    two years.  The hearing Panel finds that it is not
7    reasonable to expect that parole would be granted at a
8    hearing during the following two years and the
9    specific reasons for this finding are as follows:  The
10   prisoner committed the offense in an especially cruel
11   and callous manner.  Specifically, he did stab and
12   kill his wife and stabbed the second victim who
13   happened to be at the scene and he got minor injuries
14   while he was trying to get away.  As a result, a
15   longer period of observation and evaluation is
16   required before the Board should set a parole date.

17        The prisoner has not completed necessary
18   programming which is essential to his adjustment and
19   needs additional time to gain such programming.  We'd
20   like for you to complete some vocational training, to
21   come up with a well paying vocation so you can support
22   yourself and your son when you're released from prison
23   and definitely remain active in AA and NA, one or the
24   other, to build a real thick wall between you and the
25   idiotic use of narcotics or booze.  Okay?

26        **INMATE STRONG:**  Uh-hmm.

27   **SYLVESTER STRONG    D-99287    DECISION PAGE 4  11/03/98**

44

1      PRESIDING COMMISSIONER VAN COURT:  Certainly,
2    don't get any 115s.  And we could have given you as
3    much as a five year denial, but we were impressed with
4    your forthright responses.  And plus we want you to
5    certainly continue in that vain and certainly remain
6    disciplinary-free and upgrade vocationally and
7    educationally at every opportunity and participate in
8    self-help and therapy.  This is a copy of this
9    decision.

10      INMATE STRONG:  Thank you.

11      PRESIDING COMMISSIONER VAN COURT:  And I wish
12    you good luck.  Do you have anything you would like to
13    add, Commissioner Guaderrama?

14      COMMISSIONER GUADERRAMA:  Yeah, you're doing a
15    good job.  There's things that you need to do before
16    you're going to get a parole date and you know, get
17    into that substance abuse program up to your ears and
18    you know, don't mess around with that, don't get
19    involved in any kind of gangs, none of that nonsense
20    that goes on up here.  You got time to do now, but you
21    really got to just (inaudible).  It's tough getting
22    out, it's up to you.  Good luck.

23      INMATE STRONG:  All right, thank you.

24      PRESIDING COMMISSIONER VAN COURT:  That ends
25    the hearing -- Commissioner Bentley, would you like to
26    say anything?

27    SYLVESTER STRONG    D-99287    DECISION PAGE 5  11/03/98

45

1       COMMISSIONER BENTLEY:  No, I don't have

2   anything.

3       PRESIDING COMMISSIONER VAN COURT:  Okay, all

4   right.  Good luck.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION**       DEC 2 2 1998

27   **SYLVESTER STRONG    D-99287    DECISION PAGE 6  11/03/98**

# EXHIBIT
# 10

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### PAROLE CONSIDERATION HEARING
### NOVEMBER 1998 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### AUGUST 5, 1998

This is a psychological evaluation for the Board of Prison
Terms on inmate Sylvester Strong.  This report is the
product of a personal interview, conducted on 08/05/98, as
well as a review of his unit health record.  His Central
file was not reviewed, as it has been unavailable.  This
interview was a single contact with this inmate for the sole
purpose of preparing this report.

Inmate Strong was convicted of murdering his ex-wife.  His
description of that crime was very similar to that given in
a prior, BPT psychological evaluation in 1992.  Asked for
his thoughts and feelings regarding this crime, he stated
that, "I was a piece of shit."  He stated that the victim
did not deserve what happened to her, and he is quite aware
that he hurt a lot of people.  During this description, he
was very nearly tearful, and it certainly appeared that his
remorse was quite genuine.

His most recent CDC-115 violations were in 1993, according
to the inmate.

He acknowledges a problem with cocaine and does attend
Narcotics Anonymous.  He has participated in several self-
help groups, such as "Life Skills" at Corcoran, and a
parenting and entrepreneur class.  Educationally, he has a
high school degree.  Vocationally, he has experience in
textiles and masonry.  If paroled, his plans include
eventually opening a pet cemetery.

<u>MENTAL STATUS EXAMINATION</u>:  Inmate Strong is a 44-year-old,
                            tall, African-American male who
appeared his stated age.  He was appropriately dressed and
groomed.  He was cooperative, calm and alert.  His speech,
flow of thought and affect were all within the normal range.
His intellectual functioning was estimated to be in the
average to above average range.  He showed some insight into
his commitment offense.  His judgment appeared to be sound.
There was no evidence of a mood or thought disorder.

STRONG, SYLVESTER
CDC NUMBER:  D-99287
PAGE TWO

DIAGNOSTIC IMPRESSIONS:

AXIS I:     1)  Adult antisocial behavior, improved.
            2)  Cocaine abuse, by history, in institutional
                remission.
            3)  Cannabis abuse, by history, in institutional
                remission.
AXIS II:    No contributory personality disorder.
AXIS III:   No contributory physical disorder.

CONCLUSIONS AND RECOMMENDATIONS:

1)  This inmate is competent and responsible for his
    behavior.  He has the capacity to abide by institutional
standards and has generally done so during his
incarceration.

2)  Regarding violence potential, in consideration of
    several factors, including his criminal history, his
history of CDC-115s, and his current prosocial attitude, his
violence potential is estimated to be somewhat below average
relative to this inmate population.

3)  As this inmate has acknowledged a substance abuse
    problem, abstinence monitoring and attendance at self-
help groups, such as Narcotics Anonymous, should be
mandatory conditions of parole.

4)  This inmate does not have a mental health disorder which
    would necessitate treatment either during his
incarceration period or following parole.

STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

SJT/gj

d:  08/06/98
t:  08/10/98

# EXHIBIT
# 11

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA
**LIFE PRISONER DECISION FACE SHEET**

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement......................................................................... | | | |
| Date Life Term Begins.................................................................................... | +88 | 11 | 02 |
| At Large Time................................................................................................ | + | | |
| PAROLE DATE................................................................................................ | = | | |

## MISCELLANEOUS

*Denied*
*one (1) year*
*( Stipulated )*

Panel recommendations and requests:

☐ Become   ✓ Remain disciplinary free.
Work towards reducing his/her custody level.
✓ Upgrade  ✓ vocationally _____ educationally
☐ Participate in ✓ self-help (and) ✓ therapy.
☐ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES ☒ SENT      (Date) **08/10/01**

COMMITMENT OFFENSE

| P187 2ND | MURDER 2ND |
|---|---|
| (Code Section) | (Title) |
| 3807500 | **01** |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 11/02/88 | SAME | 12/10/99 |

| Type of Hearing | | If Subsequent Hearing, Date of Last Hearing |
|---|---|---|
| ☒ INITIAL  ☒ SUBSEQUENT (Hearing No.) | | |

Department Representative
**D.S. LEVORSE, C&PR**

| Counsel for Prisoner | Address |
|---|---|
| **PATRICK SPARKS** | |
| District Attorney Representative | County |
| **NO REPRESENTATIVE** | **FRESNO** |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date |
|---|---|
| Concurring (Name) | Date |
| Concurring (Name) | Date  1/24/0 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **STRONG, SYLVESTER** | **D99287** | **CTF** | 11/00 | 09/24/01 |

BPT 1001 (Rev. 1/91)

# EXHIBIT

# 12

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
NOVEMBER 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 28, 2000

This is a psychological evaluation for the Board of Prison
Terms on inmate Sylvester Strong, CDC# D-99287.  This report
is the product of a personal interview, conducted on
09/28/00, as well as a review of his Central file and unit
health record.  The interview was a single contact for the
sole purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I.   IDENTIFYING INFORMATION:

Inmate Strong is a 46-year-old, married, African-
American male.  His date of birth is 02/15/54.  His
religious affiliation is Christian.  There were no
unusual physical characteristics noted and the inmate
denied any history of using nicknames or aliases.

### II.  DEVELOPMENTAL HISTORY:

Inmate Strong denied any history of birth defects or
abnormalities of developmental milestones, any history
of cruelty to animals or a history of arson, any
significant childhood medical history, or a childhood
history of physical or sexual abuse as either a
perpetrator or a victim.

### III. EDUCATIONAL HISTORY:

Inmate Strong is a high school graduate, with the 12th
grade level completed.  He attended Washington High
School in Fresno, California.  He was not involved in
any special education.  He denied any behavioral
problems while attending school as well.  He reports
that he has taken some classes since his incarceration
within CDC.  He explained that he feels he might be
dyslexic, although he said he has never been tested for
this or told that he was dyslexic by any educational or
health care professionals.

STRONG, SYLVESTER
CDC NUMBER:  D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

### IV.  FAMILY HISTORY:

Inmate Strong denied that his family had any history of
criminal problems or any significant medical concerns.
He describes his relationship to his family as being
close.  He keeps in contact with his family on a
regular basis through writing and phone calls.  He
explained that his mother is still alive and is no
longer working.  His biological father died in the
early 1970s.  He has six brothers and one sister.

### V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Strong explains that he is a heterosexual male.
He denied any history of sexual aggression or high risk
sexual behavior.

### VI.  MARITAL HISTORY:

Inmate Strong is currently married for the second time.
His first marriage lasted for seven years and produced
one child who is now an 18-year-old male.  He reports
that he has been married for the second time since
February of 1992.  There are no children through this
marriage.  He reported that his first marriage was
problematic towards the end and he blames this on
substance abuse issues.  He describes his second
marriage as a close and positive relationship.  He
explained that he has learned a lot about himself and
what it takes to make a marriage and relationship
positive and lasting.  About his current wife, he
states, "I can talk to her about anything."  He
explained that his current wife is experiencing medical
problems.  In 1994, she had bypass surgery done, and
she is thinking of retiring from her job with the
County of Fresno.

### VII.  MILITARY HISTORY:

The inmate denied any military history.

### VIII. EMPLOYMENT AND INCOME HISTORY:

Inmate Strong reports that he has always had good jobs.
He worked for the city and county of Fresno.  He was
then employed from 1981 to 1987 with the SPCA (Special

STRONG, SYLVESTER
CDC NUMBER:  D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

Prevention of Cruelty to Animals).  He described this
as the first job that he really loved.  His desire is
to continue working with animals if he is released from
prison, and he would like to go to school in San Diego
and become more educated in the field of zoology.  He
would like to work in a zoo, possibly in San Diego.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Strong acknowledges a significant substance
abuse history.  He explained that, beginning around age
33, he started using cocaine heavily, and that this was
a contributing factor in the breakup of his first
marriage and in his commitment offense.  He added that
he considers himself to be a casual drinker.  He stated
that prior to the age of 33, he smoked marijuana
casually.  He explains that he has been involved in
Narcotics Anonymous regularly since 1994, and his
Central file acknowledges this NA involvement.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Strong denied any history of significant medical
problems or psychiatric problems.  His medical file
reveals that in January of 2000, he was diagnosed with
an adjustment disorder.  He explains that this was a
reaction he had after being placed in administration
segregation for reportedly being overfamiliar with a
female staff member.  He explained that he felt this
was an inaccurate interpretation of the events that
happened and that he was simply upset at the time for
being placed in Ad-seg.

## XI.    PLANS IF GRANTED RELEASE:

Inmate Strong plans to live with his wife if released.
He described her as somebody that is able to provide
emotional and financial support, and someone who can
help him make the transition from being incarcerated to
being back out in society.  He discussed in length his
plans to continue working with animals.  He would like
to go back to school and get some kind of a two year
college degree in zoology so he can continue serving
animals.  He wants to go to school in San Diego and
possibly work in the San Diego Zoo.  His plans seem

STRONG      D-99287      CTF-NORTH      10/05/00      gmj

STRONG, SYLVESTER
CDC NUMBER: D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

feasible based on his approximately seven year prior
experience already working in the animal care field and
his seemingly genuine interest in animals.

### CLINICAL ASSESSMENT

### XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Strong is a 46-year-old, African-American male.
He appears to be his stated age. He was appropriately
dressed and groomed during the interview. He was alert
and cooperative throughout the entire interview. His
speech was normal and delivered in complete sentences
and was understandable. His intellectual functioning
is estimated to be within the average range. There was
no evidence of depression, anxiety or psychotic
processes. He denied auditory or visual
hallucinations. He also denied suicidal or homicidal
thinking. He appears to be able to understand, retain
and carry out instructions. His general fund of
information is estimated to be average. His insight
and judgment appear to be fair. He is not receiving
any psychotropic medication at this time.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     1) Cocaine Dependency, in institutional
               remission.
            2) Adult Antisocial Behavior, by history.
AXIS II:    No Contributory Personality Disorder.
AXIS III:   No Contributory Physical Disorder.
AXIS IV:    Incarceration.
AXIS V:     GAF = 75.

### XIII. REVIEW OF LIFE CRIME:

Inmate Strong's version of what happened in his
commitment offense was congruent with the version found
in his Central file. He believes that the most
significant causative factor in his commitment offense
was his heavy use of cocaine, beginning around the age
of 33. There does not appear to be any significant
psychiatric condition reported that was a contributing
factor to the commitment offense.

STRONG, SYLVESTER
CDC NUMBER:  D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

He appears to be insightful regarding events that led
to the crime and potential factors that contributed to
the crime.  He seems to be genuinely remorseful towards
the victim, who was his first wife.  He explained that
he was the person that made the call to the police
after the murder was committed.  He also discussed his
efforts to change his ways and learn how to manage his
anger.

XIV.  ASSESSMENT OF DANGEROUSNESS:

    A.  Inmate Strong's behavior within CDC has improved
        with time.  He had two CDC-115 violations, both
        back in 1993.  He has received six CDC-128s, the
        last one dated 10/12/99.  Prior to his commitment
        offense, he had two adult convictions for domestic
        violence.  His history of aggressive behavior
        appears to be mostly revolved around the time of
        heavy cocaine use.  He has explained that he feels
        that his substance use was the contributory factor
        in the commitment offense as well as in the prior
        domestic violence charges.  Considering his history
        prior to CDC, his history within the CDC setting
        and his current mental status, it is felt that he
        would pose an average risk for violence when
        compared to this Level II inmate population.

    B.  Inmate Strong has a history of aggressive behavior
        while under the influence of substance use, and his
        early CDC history documented two serious rules
        violations.  However, he has demonstrated that he
        is learning to better manage his anger and seems to
        be concerned about making positive changes.  His
        lack of recent serious rules violations would imply
        that progress has been made.  His violence
        potential if released into the community is
        therefore estimated to be no higher than the
        average citizen in the community.

    C.  The most significant risk factor for this inmate as
        a precursor to violence would be the continued use
        of cocaine and/or other substances.  Should this
        inmate abuse these substances again, his violence
        potential would be considered much higher.

STRONG, SYLVESTER
CDC NUMBER: D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

    A.  This inmate is competent and responsible for his behavior. Overall, he has the capacity to abide by institutional standards. His behavior has improved during his incarceration period.

    B.  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

    C.  As inmate Strong has acknowledged a past problem with the use of cocaine, I would recommend upon parole:

        1)  Abstinence from all illegal drugs and alcohol.

        2)  Monitoring.

        3)  Mandatory attendance at self-help groups such as Narcotics Anonymous, which the inmate has already been actively involved in.


JEFF HOWLIN, Ed.D.
Staff Psychologist
Correctional Training Facility, Soledad

JH/gmj

D:  10/03/00
T:  10/05/00

# EXHIBIT
# 13

41

1    **CALIFORNIA BOARD OF PRISON TERMS**

2             **D E C I S I O N**

3        **PRESIDING COMMISSIONER RISEN:**  Okay.  We're

4    back on the record and everyone has returned to

5    the room who was here previously.  I think last

6    time I gave the wrong time.  But anyway, the time

7    right now is 1:35.  And we did not spend an hour

8    deliberating.  Okay?  The Panel reviewed all

9    information received from the public and relied on

10   the following circumstances in concluding that the

11   prisoner is not suitable for parole and would pose

12   an unreasonable risk of danger to society or a

13   threat to public safety if released from prison.

14   The offense was carried out in an especially cruel

15   and callous manner.  Multiple victims were

16   attacked and injured.  The victim was abused,

17   defiled during the offense.  The offense was

18   carried out in a manner that demonstrates an

19   exceptionally callous disregard for human

20   suffering, and the motive for the crime was

21   inexplicable and trivial in relation to the

22   offense.  This conclusion is drawn from the

23   Statement of Facts, where the prisoner went over

24   to his wife's house, took a knife from on top of

25   the refrigerator and told her that he was going to

26   kill her.  Then he stabbed her to death, and also

27   SYLVESTER STRONG  D-99287  DECISION PAGE 1  08/27/02

42

1    a man who was there at the location, a Mr. Jones.

2    The victim, Diana Strong, died at the scene.  The

3    prisoner has, on previous occasions, inflicted or

4    attempted to inflict serious injury on the victim.

5    The prisoner has an escalating pattern of criminal

6    conduct and violence.  The prisoner has programmed

7    in a limited manner while incarcerated.  He has

8    failed to upgrade vocationally as previously

9    recommended by the Board.  The prisoner has failed

10   to demonstrate evidence of positive change.

11   Misconduct while incarcerated includes six

12   128(a)s, the last, October of '99, leaving a job

13   assignment.  He has two serious 115 disciplinary

14   reports, the last one in September of 1993 for

15   threats to staff.  The psychological report of

16   10-5-2000, authored by Psychologist Jeff Howlin,

17   H-O-W-L-I-N, is not totally supportive in that

18   there are areas of concern.  On page four, he

19   states, quote, his insight and judgment appear to

20   be fair.  Under current diagnostic impressions,

21   Cocaine Dependency in Institutional Remission.

22   This is Axis I.  And then under sub two, Adult

23   Anti-social Behavior by History.  On page five,

24   under B, quote, inmate Strong has a history of

25   aggressive behavior while under the influence of

26   substance use, and his early CDC history documents

27   SYLVESTER STRONG  D-99287  DECISION PAGE 2  08/27/02

43

1    two serious rule violations.  The prisoner has

2    realistic parole plans.  He does have a viable

3    residence plan and he does have acceptable

4    employment plans.  The Hearing Panel notes that no

5    responses to the 3042 Notices were received, and

6    there was no one here that opposed a finding of

7    parole suitability.  The Panel makes the following

8    findings.  The prisoner's gains are recent, and he

9    must demonstrate an ability to maintain gains over

10   an extended period.  Nevertheless, the prisoner

11   should be commended for developing work skills in

12   three areas:  wood products -- should be two areas

13   -- and masonry.  Efforts in self-help group and

14   completing Impact programs.  In March of 2001, he

15   had a laudatory chrono for bringing to the

16   attention of prison authorities a very serious

17   injury to a fellow inmate.  The Panel recommends

18   that the prisoner continue to remain disciplinary

19   free.  That means not even 128(a)s.  If available,

20   upgrade vocationally.  And, if available, continue

21   to participate in self-help and therapy

22   programming.  Any comments?

23        **DEPUTY COMMISSIONER HARMON:**  Nothing more

24   than you present yourself very well, sir.  I want

25   you to understand something with the -- with the

26   vocational issues that we've discussed and the

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 3  08/27/02**

44

1    doctor's report and areas like that.  You could

2    have ended up with more time before your next

3    hearing, and -- but we feel you presented yourself

4    so well that we hope that you can gather the

5    information you need within the next year and be

6    able to make a presentation that will solidify

7    those areas of weakness, if that makes any sense.

8           **INMATE STRONG:**  I understand you.

9           **DEPUTY COMMISSIONER HARMON:**  Okay.   That's

10   all I have.  And I wish you luck, sir.

11          **PRESIDING COMMISSIONER RISEN:**  You're on the

12   right track.  Good luck.  And we'll adjourn at

13   1:40.

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **EFFECTIVE DATE OF THIS DECISION** _**SEP 1 3 2002**_____

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 4  08/27/02**

45

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, KRIS LIBERATO, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 44, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SYLVESTER STRONG, CDC No. D-99287, on AUGUST 27, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 3, 2002, at Sacramento County, California.

Kris Liberato
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT
# 14

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
SEPTEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 11, 2002

## ADDENDUM TO REPORT DATED 09/28/00

Inmate Sylvester Strong, CDC# D-99287, requested an
interview with me related to feedback he received about the
September 2000 psychological evaluation, as referenced by
the Board of Prison Terms.  He produced the documentation
commenting on a particular concern in the psychological
report, in which reference was made to a comment by me about
inmate Strong's insight and judgment.

I stated inmate Strong's insight and judgment was "fair" in
the September 2000 evaluation.  Documentation from the Board
said, "In other words, not good……fair.  In other words,
you're still lacking insight into your own behaviors……."

I felt it necessary to clarify the word "fair" for the
purposes of the September 2000 report.  It does not mean
that inmate Strong lacked insight into his own behaviors.
Insight was demonstrated by inmate Strong.  Judgment was
adequate.  However, there is probably room for small
improvement.  This applies for most Lifer inmates at this
institution.  I agree with Dr. Terrini's last addendum,
dated 08/05/98, where he states, "This man does not need one
to one therapy to address his commitment offense any more
than any other Lifer inmate needs this treatment."

In summary, I did not mean to imply that "fair" meant "not
good insight," or "lacking insight into his own behavior
about the commitment offense."  I hope this has helped
clarify this issue.

JEFF HOWLIN, Ed.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

STRONG        D-99287        CTF-CENTRAL        06/06/02        gmj

STRONG, SYLVESTER
CDC NUMBER:  D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

*Bill Zika, Ph.D.*

BILL ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:  12/11/02
T:  12/12/02

# EXHIBIT
# 15

1    **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3         **DEPUTY COMMISSIONER HARMON:**  You're on

4    record.

5         **PRESIDING COMMISSIONER MOORE:**  Thank you.

6    Let the record show that all interested parties

7    have returned to the room.  Sylvester Strong, CDC

8    number D as in David 99287.  This Panel has

9    reviewed all information received from the public

10   and relied on the following circumstances in

11   concluding that the prisoner is not suitable for

12   parole and would pose an unreasonable risk of

13   danger to society or a threat to public safety if

14   released from prison at this time.  Paramount

15   reasoning would be the timing and gravity of the

16   committing offense, Mr. Strong.  The offense was

17   carried out in a vicious and brutal manner.  There

18   were multiple victims attacked, injured, or killed

19   in the same incident.  The -- One victim was abused

20   or defiled during the offense.  This was the murder

21   of your wife Diana Strong, wherein the prisoner

22   went over to his wife's home, took a knife from the

23   top of the refrigerator and told her that he was

24   going to kill her, then he stabbed her to death.

25   And also this was not enough.  But then there was a

26   gentleman there, a Lavel Jones who was the gardener

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 1 10/21/03**

40

1   who was there at the time at the location, and the

2   victim was assaulted with a deadly weapon as well.

3   The victim's wife died at the scene of the crime.

4   The motive of this crime was inexplicable and very

5   trivial.  The offense was carried out in a

6   dispassionate manner -- or not a dispassionate, but

7   in an exceptionally insensitive disregard to human

8   suffering.  Excuse me.  The motive of the crime was

9   inexplicable or very trivial in relationship to the

10   offense.  These conclusions are drawn from the

11   Statement of Facts wherein the prisoner caused the

12   demise of his wife Diana Strong, as well as

13   assaulted with a deadly weapon Mr. Lavel Jones.

14   Caused the demise of his wife.  Previous record,

15   the prisoner on a previous occasion inflicted or

16   attempted to inflict serious injury on a victim.

17   The prisoner has an escalating pattern of criminal

18   conduct and violence.  He failed to profit from

19   society's previous attempts to correct his

20   criminality.  Such attempts included county jail

21   time and fines.  As well, the prisoner had an

22   unstable social history or prior criminality, which

23   included battery, that he received county jail time

24   and fines, as well as an inflicting corporal injury

25   to a spouse.  Again, the prisoner received county

26   jail time and a fine for this offense as well.

27   **SYLVESTER STRONG   D-99287   DECISION PAGE 2 10/21/03**

41

1    Institutional behavior, the prisoner has programmed

2    in a limited manner while incarcerated.  He's

3    failed to upgrade vocationally as previously

4    recommended by the Board.  He's not sufficiently

5    participated in beneficial self-help or therapy

6    programming at this time.  He has no new 115s, no

7    new 128s.  Psychosocial report was adequate.

8    Parole plans adequate.  No response to 3042

9    notices.  Counseling report was positive.  Remarks,

10   the Panel makes the following findings, that the

11   prisoner still needs some self-help and therapy in

12   order to face, discuss, understand, and cope with

13   stress in a nondestructive manner to better

14   understand the causative factors, or what caused

15   the prisoner's lifestyle of being under the

16   influence of narcotics, as well as taking the life

17   of someone that he professed to have loved, whom he

18   had married.  Until progress is made, the prisoner

19   continues to be unpredictable and a threat to

20   others.  The prisoner's gains are recent.  He must

21   demonstrate the ability to maintain these gains

22   over an extended period of time.  By that, I mean

23   that you must continue, Mr. Strong.  You're doing

24   some positive work at this point, but you still

25   need to do some other additional work.  You should

26   be commended.  No 115s as I mentioned earlier, no

27   **SYLVESTER STRONG   D-99287   DECISION PAGE 3 10/21/03**

42

1    128s, new ones.  You only had two 115s and six 128s

2    in your entirety.  You've been a member of AA or NA

3    since '94.  You accomplished sexually transmitted

4    diseases, took an Anger Management course in the

5    past, as well as the inmate employability program

6    in '02.  In the past, did Impact group, positive

7    work reports in the PIA furniture upholstery,

8    upgraded a seminar in -- I believe it was 2001, for

9    upholstery seminar through the Indiana Chair and

10   Frame Company.  However, these positive aspects of

11   your behavior don't outweigh the factors of

12   unsuitability.  This would be another one-year

13   denial, Mr. Strong.  Recommendations to you are to

14   continue to remain disciplinary-free.  If it's

15   available to you, to upgrade vocationally, as well

16   as if it's available to you, to upgrade

17   vocationally and educationally.  Excuse me.  As

18   well as if it's available to you, to participate in

19   beneficial self-help programming, whatever may be

20   available in either or either of the programs of

21   your choosing.  This would conclude the hearing

22   today.  Commissioner, any comments to Mr. Strong?

23        **DEPUTY COMMISSIONER HARMON:**  Nothing

24   further, other than what we've already discussed,

25   Sir.

26        **PRESIDING COMMISSIONER MOORE:**  That would

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 4 10/21/03**

43

1   conclude the hearing today, Mr. Strong.   Good luck

2   to you, sir.

3 ·           INMATE STRONG:   All right.

4           ATTORNEY FOX:   Thank you.

5           PRESIDING COMMISSIONER MOORE:   Time is 1430

6   hours.

7                          --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   FINAL DATE OF THIS DECISION_____ JAN 1 9 2004 _____

27   SYLVESTER STRONG   D-99287   DECISION PAGE 5 10/21/03

44

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, APRIL ALLEN, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of perjury
that I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1
through 43, and which recording was duly recorded
at CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of SYLVESTER STRONG, CDC No.
D-99287, on OCTOBER 21, 2003, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated November 4, 2003, at Sacramento
County, California.

April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT
# 16

45

```
1         CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3         DEPUTY COMMISSIONER MEJIA:   We're back on

4    record for our decision --

5         PRESIDING COMMISSIONER WELCH:   Okay,

6    Mr. Strong --

7         DEPUTY COMMISSIONER MEJIA:   -- in

8    Mr. Strong's case.

9         PRESIDING COMMISSIONER WELCH:   -- we have a

10   decision.  The Panel reviewed all of the

11   information received from the public and relied on

12   the following circumstances in concluding that the

13   prisoner is not suitable for parole and would pose

14   an unreasonable risk of danger to society or a

15   threat to public safety.  This offense was carried

16   out in an especially cruel and callous manner.  You

17   had a restraining order and you went there and you

18   kicked your wife's door in and you went in and two

19   people ended up hurt.  One ended up dead, killed,

20   your ex-wife.  The offense was carried out in a

21   dispassionate -- it was calculated, because you

22   went there.  The victim was abused.  She had a

23   restraining order against you for other incidents

24   on your rap sheet for domestic violence.  The

25   offense was carried out in a manner that

26   demonstrates a callous disregard for another human

27   SYLVESTER STRONG  D-99287  DECISION PAGE 1  11/18/04
```

46

1    being and particularly a woman or domestic partner.
2    The motive for this crime was inexplicable.  The
3    conclusion was drawn from the Statement of Facts,
4    wherein on December 10, 1987, the police was
5    dispatched to a residence regarding a stabbing.
6    When they arrived, they found the victim had been
7    stabbed and basically, she was deceased, Diana
8    Strong, the prisoner's wife.  And as I mentioned
9    earlier, the circumstances surrounding the death is
10   that the prisoner went to the -- his ex-wife's
11   residence, kicked the door in and basically, she
12   was stabbed to death.  The prisoner did have an
13   escalating pattern of violent conduct.  On the rap
14   sheet, there's two incidences of violent behavior
15   on the rap sheet for domestic violence.  You had a
16   record of violent and assaultive behavior, an
17   escalating pattern of violent behavior.  You had
18   failed previous grants of probation.  He failed to
19   profit from society's previous attempts to correct
20   his criminality.  That included probation.  He
21   failed to demonstrate -- to cease his behavior.
22   Even with the restraining order, the prisoner
23   persevered and continued until the victim was dead.
24   The prisoner has programmed since his last hearing.
25   The prisoner, educationally (indiscernible).  The
26   prisoner has probably gone as far as he can
27   **SYLVESTER STRONG  D-99287  DECISION PAGE 2  11/18/04**

47

1    educationally in the prison.  There is no provision

2    for him to go any higher than a high school diploma

3    unless he does it on his own.  So educationally, we

4    don't have a problem with the educational.

5    Vocationally, you're doing good vocationally in

6    Prison Industries.  So basically, your behavior in

7    prison is pretty good.  However, you have not, from

8    the Panel's prospective -- although, you've

9    participated in a lot of self-help, we still want

10   or feel that you have not sufficiently participated

11   in the kind of self-help that we feel that you

12   need.  And that's domestic violence, victim

13   awareness, that type of thing.  However, we do note

14   that you've participated in some.  The recent

15   psychological evaluation, the most recent

16   psychological evaluation shows that you're making

17   progress.  It shows that your level of

18   dangerousness, both in a structured, as well as an

19   unstructured environment has improved.  You're on

20   the right track.  The doctor writes, it is somewhat

21   difficult to predict the possibility of aggressive

22   behavior in the community.  What we need is a best

23   guess.  And he goes on to say that because of

24   maturity and substance free intellect, they feel

25   that it appears that you're no more violent

26   potential -- you have no more violence potenţial

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 3  11/18/04**

48

```
 1    than the average male in the general population.
 2    So that shows that you're making some progress.
 3    You do have parole plans.  The hearing Panel notes
 4    that a response to Penal Code 3042 notices indicate
 5    an opposition to a finding of suitability.  The
 6    Deputy District Attorney from Fresno spoke in
 7    opposition to a finding of suitability.  The Panel
 8    makes the following findings:  We find that you
 9    need to continue to participate in positive kinds
10    of programs.  The kind that will enable you to be
11    able to face, discuss, understand and cope with
12    stressful situations in a nondestructive manner.
13    Especially those that are domestic violence, you
14    need to.  And until enough progress is made, the
15    prisoner continues to be unpredictable and thereby
16    a threat to others.  The prisoner have made recent
17    gains and we want him -- the prisoner have made
18    gains recently and we want him to continue to make
19    those gains.  He's doing very good.  He has been
20    disciplinary free for over 10 years or close to it.
21    There are some positive things we want to commend
22    you for.  Certainly the vocational efforts in PIA,
23    you've got good recommendations from your PIA
24    supervisors and superintendent.  You're doing a
25    good job.  PIA, in a lot of ways is better than a
26    vocational program, because you actually get a --
27    SYLVESTER STRONG  D-99287  DECISION PAGE 4  11/18/04
```

49

1    you actually get a chance to put what you learn

2    into action.  You actually work on projects, so

3    you're doing real good from that prospective.  We

4    want to encourage you to continue to do that.

5    There's a lot of documentation in -- that you

6    brought in today to show that you are actively

7    trying to find out what's (indiscernible) to help.

8    And that's good, in that you're looking into your

9    parole possibilities via Social Services.  You have

10   a sponsor in the community, so those all -- for

11   substance abuse, AA -- NA, I believe, so all of

12   those things are good.  However, those positive

13   aspects at this time does not outweigh the factors

14   of unsuitability.  Your parole is going to be

15   denied for one year.  One of the reasons for the

16   denial is the crime.  The crime is certainly one of

17   the things that played into the mind of the Board.

18   Domestic violence, you had a restraining order.

19   The court told you stay away and you went there.

20   Now you're married again.  Certainly, we hope that

21   you have learned your lesson and that women are not

22   property.  Spouses are not property.  They are

23   individuals.  They do make decisions.  They've made

24   decisions not to be with you.  And those are the

25   kinds of things that you need to work on.  You need

26   to work on your attitude towards ownership.  No

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 5  11/18/04**

1   person owns another person. Each person in a

2   relationship have the opportunity at any given time

3   to dissolve that relationship. And when they

4   dissolve that relationship, they don't deserve to

5   have their door kicked in and to be murdered. And

6   certainly, the crime played a heavy part on our

7   hearts. However, you're doing a good job. You

8   need to continue to do what you're doing and

9   somewhere down the road, you'll be found suitable

10  for parole. Now, we recommend that you remain

11  disciplinary free. That you continue to

12  participate in your vocational program. And we do

13  know that our last colleague wrote to upgrade

14  educationally and we know that it may not be

15  possible for all inmates to upgrade educationally.

16  The institution will -- the Department of

17  Corrections wants to see everyone with at least a

18  ninth grade reading level. They want to see you

19  get a GED or a high school diploma. You have

20  achieved that. And after that, they really go into

21  vocation and you're doing what you're supposed to

22  do, what the department has offered you to do. So,

23  we're not going to put a -- any recommendation, as

24  far as educationally (inaudible) or for this time,

25  unless you choose to do it on your own. But we do

26  encourage you to continue with the work program

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 6  11/18/04**

51

 1   they have in CDC and continue with the vocational

 2   part, okay?  That concludes the reading of -- and

 3   we're not requesting a new psychological evaluation

 4   because that one was completed just this month and

 5   your parole is only denied for one year.

 6   Commissioner, comments?

 7        **DEPUTY COMMISSIONER MEJIA:**  You're doing

 8   all the right things, just like the Commissioner

 9   said.  Keep it up, okay?

10        **INMATE STRONG:**  All right.

11        **PRESIDING COMMISSIONER WELCH:**  Good luck

12   and continue the program that you're doing.

13   Thirteen-thirty-five.

14                    --o0o--

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:** ___MAR 1 8 2005___ .

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 7  11/18/04**

52

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 51, and which recording was duly recorded at the CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SYLVESTER STRONG, CDC No. D-99287, on NOVEMBER 18th, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated December 3rd, 2004, at Sacramento County, California.

Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT
# 17

## PSYCHOLⒶGICAL EVALUATIⒶN FOR THE BⒶARD ⒶF PRISⒶN TERMS
### (REVISED AUGUST 1998)
### PARⒶLE CⒶNSIDERATIⒶN HEARING
### NOVEMBER 2004 LIFER CALENDAR

### CⒶRRECTIⒶNAL TRAINING FACILITY, SⒶLEDAD
### ⒶCTⒶBER 12, 2004

This is an updated psychological evaluation for the Board of Prison Terms on inmate Sylvester Strong, CDC# D-99287. This report is the product of a psychodiagnostic interview of the inmate on 10/12/04, lasting approximately two hours. Additionally, the inmate's central file and unit health record were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Strong is a 50-year-old, African-American male born on 02/15/54. The inmate denies any tattoos, and none were visible. A distinguishing characteristic is his significant burns on his right arm; they are the result of an employment accident when he spilled hot tar. He denies the use of aliases or nicknames.

Inmate Strong has a brief but significant arrest history. The original probation officer's report indicates that in 1987, he was charged and found guilty of battery on his wife. Approximately a month later, he was found guilty of corporal injury to a spouse. Approximately eight months later, he committed the instant offense of murder of his spouse. At the time of the murder, the victim had a restraining order against the inmate. There are no other reported arrests.

After being committed to the Department of Corrections, the inmate has received two CDC-115s, one in 1993 for disruptive behavior, and approximately three weeks later, he received a 115 for threatening staff. To better understand both of these circumstances, it is recommended that the 115s be read in their entirety. The inmate also received six CDC-128A disciplinary reports, the last in 1999. He received this 128 for being loud and disrespectful to staff. It is significant that the inmate has not received a CDC-115 in approximately 11 years. He has not even received a CDC-128 in approximately five years. This demonstrates a significant improvement in his behavior within the institutional setting.

When questioned about the commitment offense, inmate Strong's description was completely consistent with that reported in the original probation officer's report. The inmate discussed his substance abuse, his relationship with his wife, his feelings of abandonment, etc., at great length. It is clear that he has a deep understanding of the underlying causes for the offense, and through the numerous courses he has taken in the Department of Corrections, has learned alternative behavior. The inmate's remorse appears genuine and heart-felt.

Inmate Strong indicates that he continues to be in communication with the victim's family, indicating that although he is remarried, the victim's mother continues to be his "mother-in-law." He indicates that his mother-in-law has forgiven him for the offense. It appears that her forgiveness was extremely important to the inmate.

| STRONG | D-99287 | CTF-CENTRAL | 10/11/04 | gmj |

**STRONG, SYLVESTER**
**CDC NUMBER: D-99287**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE TWO**

Inmate Strong has only the briefest psychiatric contacts with the Department of Correction's mental health services. On 04/10/00, as the result of a self-referral, stating that he was feeling depressed about his situation. He was given the diagnosis of dysthymia.

Inmate Strong was again seen on 04/20/00. At that time, he was given the diagnosis of anxiety, and was prescribed Vistaril. He was seen twice in 2002 on self-referral. The inmate was mostly concerned about his Board of Prison Terms reports and his continued incarceration. He was given no psychiatric diagnosis.

Inmate Strong was last seen on 02/19/03, again on a self-referral, again in reference to the BPT. He was given no diagnosis.

Other than that mentioned above, inmate Strong does not appear to have any known psychiatric history. He was never entered into the psychiatric services program and has never been identified as an ongoing patient. When questioned, the inmate denied taking the medication that was prescribed, saying that he calmed down on his own.

Inmate Strong denied any current medical problems, and denied that he had any ongoing medical conditions.

In assessing the inmate's current mental status, the previous psychological reports for the Board of Prison Terms were reviewed. Consistent with previous reports, there is no evidence that the inmate has ever experienced psychotic symptoms or a significant mood disorder. He denied ever experiencing auditory or visual hallucinations. He denied periods of mania. He denied significant periods of depression. There was nothing in his general presentation that suggested he suffered from a major mental illness; quite the contrary, he was clear, well-spoken, and articulate. His intellectual functioning is at least in the average range. His presentation was completely asymptomatic. As a result, the following diagnostic impressions are offered.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| **AXIS I:** | V71.09 – No Contributory Clinical Disorder. |
| **AXIS II:** | V71.09 – No Contributory Personality Disorder. |
| **AXIS III:** | No Contributory Physical Disorder. |
| **AXIS IV:** | Stressor – lifer incarceration. |
| **AXIS V:** | Current GAF = 85. |

STRONG          D-99287          CTF-CENTRAL          10/11/04          gmj

**STRONG, SYLVESTER**
**CDC NUMBER: D-99287**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE THREE**

Inmate Strong's diagnosis has changed somewhat from previous reports. Although it was reported that the inmate engaged in adult antisocial behavior, there is no indication of that at this time. For that reason, this diagnosis has been removed.

In the past, the inmate has been given the diagnosis of cocaine abuse, in institutional remission. Unfortunately, most institutions have drugs readily available for inmates who wish to abuse them. It is clear that this inmate has chosen not to abuse cocaine, not because he does not have availability, but he no longer wishes to abuse it. This is also true for cannabis abuse. As a result, both of these diagnoses will be dropped.

In the assessment of dangerousness, all of the above factors have been taken into account. It is significant that the inmate is currently 50 years of age, and has remained CDC-115-free for approximately 11 years. This, combined with the nearly 35 self-help programs he has attended while incarcerated, and his limited yet significant arrest history, it is clear that the inmate's aggressive behavior is changing for the better.

As a result, when the inmate's violence potential is compared to those inmates with whom he resides, it is considered to be below average. Inmate Strong has no assaultive history with the Department of Corrections.

It is somewhat difficult to predict the probability of aggressive behavior in the community. As people mature and change, behavior that they once found acceptable becomes unacceptable. What can be said is that as compared to the average parolee in the community, this inmate is much less likely to be violent while on parole, due in part to his age, greater maturity, and substance-free intellect. He appears to have no more violence potential than the average male in the general population of equal age.

There are no current precursors that would predict an increase in violence potential in the community. Substance abuse would clearly increase that potential, but it does not appear that substance abuse is currently a problem for this inmate, nor is it anticipated that it will be an issue for him when he is placed on parole.

As inmate Strong has participated in numerous self-help programs, no current recommendation can be given in this area. He has participated in most other programs available in CDC, and he appears to have reached maximum benefit.

If given the opportunity to parole, his prognosis is very good.

S. Sexton, Ph.D.
Consulting Psychologist
Correctional Training Facility, Soledad

STRONG, SYLVESTER
CDC NUMBER: D-99287
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

*Sait Z , Ph. D.*

**B. Zika, Ph.D.**
**Senior Supervising Psychologist**
**Correctional Training Facility, Soledad**

SS/gmj

D: 10/12/04
T: 10/15/04

*D:\Word Files\BPT - 2004\STRONG, SYLVESTER  D-99287  11-04  SEXTON.doc*