# EXHIBIT  D

County of
# FRESNO

September 19, 1988

**Edward W. Hunt**
**District Attorney**

Honorable Mario Olmos
Fresno Superior Court, Dept. 6
1100 Van Ness
Fresno, CA 93721

            Re:  People vs. Sylvester Strong
                 Action #380750-0
                 D.A.# 87s-0589

Dear Judge Olmos:

        On September 12, 1988, the above-referenced defendant
appeared before you for jury trial on an Information alleging
one count of murder (with knife and four counts of felonious
assault (three with a knife  and one with gasoline).  On the
trial date, the defendant changed his plea in specifics to be
described within.

        The victim of four of the crimes was Diane Strong.
Diane was 30 years of age when she was murdered by the defendant
on December 10, 1987.  Diane had worked for Pacific Telephone
since her graduation from high school and had purchased her own
house at 2564 S. Barton, in Fresno.  In 1980, Diane married the
defendant and in 1982 a child (Sylvester Jr.) was born.

        Prior to the defendant's involvement with Diane, he
held no steady employment and, seemingly as a result of her
influence, he subsequently began employment with the City of
Fresno--S.P.C.A.

        Approximately 2 to 3 years before Diane's murder,
marital problems developed between Diane and the defendant as a
result of the defendant's use of cocaine.  The defendant began
to spend much, if not all, of his own earnings on cocaine and
then he began to use Diane's earnings, pass checks from Diane's
checking account, deplete their savings, and sell household
appliances and Diane's jewelry in order to finance his cocaine
use.  Neighbors, family members of Diane and the defendant as
well as co-workers of Diane and the defendant knew of the
defendant's cocaine use and the developing marital problems.

        As Diane began to resist the financial ruin the
defendant was bringing upon them, the defendant became
physically abusive.  Both family and friends were aware of many
instances of physical abuse ranging from slappings, to punching,
to the use of knives and guns.

Men came to the house looking for the defendant, because of money the defendant owed them for cocaine, and frightened Diane with explanations of how they were going to injure the defendant if he didn't pay up. Diane paid them several hundred dollars on behalf of the defendant.

Diane placed the defendant in a "live-in" drug abuse therapy program through Clovis Community Hospital, Clovis, Ca., and the defendant eventually abandoned the program.

On October 3, 1986, the defendant was reported by the Fresno Police Department as being involved in a $300.00 drug sale with a female drug dealer, which led to an argument and a traffic accident near the Fresno City dump site.

Subsequently, Diane began to consider involving the courts and dissolving her marriage to the defendant. On January 26, 1987, at 6:30 a.m., she called upon the Fresno Police Department because the defendant began slapping her in the face when she tried to discuss the divorce with him. Despite injuries to her face observable by the policeman, the defendant denied striking Diane and told the policeman, "The next time you come out it will be for something". Diane placed the defendant under citizen's arrest and the policeman cited the defendant to appear on March 11, 1987.

On February 12, 1987, at 3:00 a.m., Diane again called upon the Fresno Police Department because the defendant slapped her around, and struck her in the face and head numerous times with a closed fist. Again, there were observable injuries to her face including a cut below her eye. This time the defendant was taken to the Fresno County Jail.

Later that day (February 12), Diane contracted with Paralegal Assistance Unlimited, essentially a legal typing and filing service, for assistance in obtaining a dissolution of her marriage to the defendant. A petition for dissolution was filed on Diane's behalf, in the Fresno Superior Court, on February 19, 1987, and the defendant was served with a copy of that petition on February 20, 1987.

On July 2, 1987, at 8:48 a.m., Diane again called upon the Fresno Police Department because of another incident of spousal abuse. The defendant had been demanding money from Diane so that he could buy cocaine. When Diane refused to give him money, the defendant began punching Diane in the stomach and opened a pocket knife and slashed at Diane with it. Diane was able to jump sufficicently clear that she received only a slight cut to the right thigh. The defendant then punched Diane in the lip and the shoulder. The defendant left the area before the policeman arrived. The responding policeman observed the injuries to Diane. That night, Diane stayed with relatives in order to be safe from the defendant.

Thereafter, during the month of July, 1987, Diane and

2

the defendant signed a separation agreement which, among other things, gave the defendant total ownership of a 1982 Mazda car, entitled the defendant to $3,000 for his community property interest in the Barton Street residence, made the defendant responsible for $100 per month child support to Diane beginning August 1, and restrained the defendant from "annoying, disturbing, harming or in any way interfering with" Diane or her residence.

On July 23, 1987, the defendant's employer terminated him as a result of an established pattern of absences from the job. The employer reinstated the defendant on August 20, 1987, but terminated the defendant again for the same reasons on November 5, 1987. The defendant would describe what he believed to be the positive aspects of cocaine usage to fellow-workers on the job. When applying for unemployment benefits, the defendant blamed his predicament on Diane's conduct.

During the separation of Diane and the defendant, there were occasions when Diane would attempt reconciliations with the defendant. However, none of them were fruitful.

During the month of August, Paralegal Assistance Unlimited requested a default judgment of dissolution, on Diane's behalf, from the Fresno Superior Court. However, in the last few days of August, Irene Zupko, of Paralegal Assistance, withdrew that request from the court's consideration because of a communication from Diane. Despite the availability of a final judgment of dissolution, Diane once again indulged the defendant and entertained a hope and belief that the defendant would mend his ways.

She chose not to press the assault and spousal abuse charges that the District Attorney's Office was prepared to file regarding the July 2, 1987 incident. She even tolerated a little backsliding by the defendant when, on September 8, 1987, he once again slapped her and assaulted her with a kitchen knife, cutting her on her abdomen. She was satisfied and felt that the courts could control the defendant when he pled guilty to a charge of battery (PC 242) regarding his assault on Diane that had occurred on January 26, 1987. That disposition (9-10-87), suspending 30 days in custody and placing the defendant on a 180-day conditional release to the community reassured Diane that he wouldn't hurt her again because he knew he would have to do 30 days in jail if he did. She was sufficiently reassured that she didn't mind dismissal of the charge (9-10-87) for his assault on her that had occurred on February 12, 1987. She was so optimistic about things that she informed the D.A.'s Office that she didn't even want a charge filed over the September 8, 1987 assault because the defendant had pled guilty on the earlier case and she was satisfied because he was on "probation" (i.e. conditional release).

The defendant, however, notwithstanding the apparent "con job" that he gave Diane, was showing a different face

3

to other persons.  One example being how, at a Labor Day 1987 get together of Diane's family, the defendant made the following remarks about Diane to Diane's sister-in-law, "Look at that bitch", "She thinks she's something", 'She wants to rule everybody", "I'm going to wind up killing her".  Another example being an occasion when the defendant complained to Diane's father about Diane.  The defendant was upset with Diane because she would not give the defendant money.  The defendant explained how, "One of these days I'm going to kill Diane" and when asked if he would kill Diane just over money, the defendant clarified that was what he meant.  This led to a call from Diane's mother to Diane's residence to check on Diane's safety and it was later that very night that Diane woke from her sleep to find the defendant standing over her bed and hear the defendant tell her how she couldn't keep him out of the house if he wanted in, even if she did change the locks.  [Note: Defendant was not living at Barton Street house at this time and Diane had already changed locks on doors and put locks on windows]

There was also an occasion when, although the defendant had been given the Mazda vehicle and already sold it or traded it away, he apparently felt that he should also have the pick-up truck vehicle that Diane had.  Diane noticed that the pick-up disappeared from her driveway and she located it at the defendant's residence, and locked herself inside it, and began to drive it off when the defendant leaped into the bed of the pick-up and began trying to smash in the rear window to gain access to the cab where Diane was.  It was only because Diane drove to the Police Department and the defendant's conduct drew the attention of Police officers that the defendant ran off.

During October, 1987, on one occasion when the defendant was looking for Diane, he contacted Diane's sister Sarah and told Sarah how he would "kill her (Diane) ass" when he found her.

During the month of November, 1987, Diane finally gave up all hope of saving her marriage with the defendant.  Diane, in a noticeably frightened and excited state, re-contacted Irene Zupko with a tale about the defendant pouring gasoline on her and actually trying to set her on fire.  Diane told Irene to go ahead with the request for the final judgment of dissolution and wanted to know what kind of protection could she get from the defendant.  It was only then that she had Irene actually file a request for a court ordered restraing order whereas, in February, at the filing of the petition, although Diane had signed a declaration in support of a request for a court-ordered restraining order, Diane chose not to file the request.  Sylvester Strong, Jr. (5 years old at the time) had had the memorable experience of seeing the defendant take the lawnmower gasoline from the garage and pour it on Diane and try to light it.

Diane's sister-in-law, Vernetta, remembers how, in November, 1987, Diane, in tears, explained how she had come to be seriously frightened of the defendant, and Diane didn't know what to do because changing the locks on the house had failed to keep the defendant out and the defendant had stolen the handgun that she had for protection.  Diane had purchased another home and she explained to Vernetta that if she (Diane) could just hold out until Christmas, that she would be moving into her new house and she and her child would be safe because the defendant would not know where they were.

On November 16, 1987, Judge Dwayne Keyes signed the final judgment of dissolution, which incorporated all the terms of the July 1987 agreement signed by Diane and the defendant, and specified how the defendant was not to go within 100 yards of Diane's residence nor Diane's person wherever she might be.

As exemplified above, and as witnessed by neighbors, the defendant had not felt restrained by the July agreement from coming to Diane's residence.  One of the persons that had contact with him at Diane's residence was a gardener named Lavelle Jones.  Jones had been doing gardening work for many of the households in the neighborhood and had, approximately 2 to 3 months before the murder, been referred to Diane as a new gardening customer.  Jones was nine years older than the defendant, 12 years older than Diane, and had known both of them as children.  On one occasion, while Jones was doing yard work at the residence, the defendant contacted Jones and Jones, being aware of the problems between Diane and the defendant, asked the defendant if the defendant wanted Jones to continue doing the gardening for Diane.  The defendant encouraged Jones to continue the employment with Diane.

By December 1987, Diane was feeling somewhat encouraged by virtue of the final judgment of dissolution, its accompanying restraining order on the defendant's conduct, and the imminence of her move to her new home.  On that day (2 days before the murder), she attended a United Way luncheon with Norah Morgan, a friend and fellow worker from the phone company, where both Diane and Norah received plaques for their efforts in support of the United Way.  Norah remembers Diane to have mentioned the finality of the divorce and to seem relieved, contrary to Norah's previous observations of Diane.

Diane, in anticipation of her move to the new home, had contracted Lavelle Jones to landscape her new home and to move the larger of her furnishings to the new home when it was available for occupancy.

Since the defendant had been terminated from his job, since the defendant had suffered a wage attachment in February 1986 for his failure to pay toward the support of a child he fathered previous to the child he fathered with Diane, and considering his continued diversion of what finances he had to

5

the purchase of cocaine, there was little, if any, chance that he would pay toward the support of Sylvester, Jr.

It had been suggested to Diane by Paralegal Assistance Unlimited, that she could delay payment of the $3,000 "cash out" to the defendant from the Barton Street residence and progressively discount it vis-a-vis the defendant's $100 per month child support responsibility as those payments came due.

Diane had decided to try that course of action, as she explained to her sister Bennie on the very day of the murder, and as evidenced by even the defendant's sister's awareness that Diane had been delaying payment of the money to the defendant.

On the day of the murder, Diane did go to the defendant's residence where Diane conversed with the defendant's mother and sister. The defendant returned home after Diane's departure, learned that Diane had been there, and then the defendant left the house.

Eric Medley, an acquaintance of the defendant, was driving eastbound on Jensen Avenue, near the defendant's residence, when he was flagged down by the defendant who was walking quickly in the same eastbound direction. Eric drove the defendant to the corner of Cedar and Jensen (very near to Diane's residence) where the defendant got out. The defendant declined a ride directly to the house, although he told Eric that was his destination. The defendant's demeanor was not exceptional and he did not seem to be under the influence of alcohol nor any drug.

The defendant was observed loitering and moving about in Diane's neighborhood by other residents. One neighbor remembers the defendant to be standing in front of Diane's residence in the early evening at a time before what would be the eventual separate arrivals of Diane and Lavelle Jones.

Diane, in the meanwhile, had made some other stops, including a stop at her sister Sarah's where Diane was observed to be "fixing her nails" in anticipation of an evening out. Diane, who was an officer in the union at work, was to be attending a dinner, with Norah Morgan, at Nicola's Restaurant given in honor of the union president's birthday.

Unfortunately for Diane, she planned one more stop before going on to the dinner. She stopped in at her own home where she met and paid Lavelle Jones for past gardening and made final arrangements with Jones for moving her larger furnishings to her new house.

During Diane's brief discussions with Jones, one particular phone call came in. During the call, Jones heard Diane say, "I don't have no money right now", "I don't have no money", "I have to go". After the call, Jones noticed Diane to be "nervous", "shaky". Diane told Jones that the call had been

6

from the defendant. Diane went on to say that she owed Sylvester some money and "he wanted the money out of the house".

Besides Jones noticing an emotional change in Diane after the phone call, he noticed that she became intent upon concluding their business and leaving the house.

Jones recollects that it was within 5 to 10 minutes that someone loudly made their presence known at the front door of the residence and demanded to be let in. Diane looked out the front window and said, "Sylvester." Diane did not let the defendant in because "he's not supposed to be here" and she had a restraining order.

Then the front door was hit twice and on the second blow, it flew open with such force that its interior door knob pierced the hallway wall that it flew against, the deadbolt ripped out and shattered the doorjamb, and the deadbolt frame flew over 10 feet down the hallway. The defendant, his body being the projectile that burst open the front door, came to rest on the entry hallway. The defendant turned right and entered the kitchen area where Diane and Jones were. Jones noticed the knife in the defendant's hand as the defendant crossed the threshold into the kitchen.

The defendant yelled at Diane, called her names, and said, "bitch, I am gong to kill you." Diane broke and ran toward the dining room table. The defendant caught her near the refrigerator and began making downward striking motions at Diane with his right hand. They passed out of view into the dining area which eventually circularly gives way into the living room. The dining table was broken where they would have fallen into it.

Jones, being unable to verbally dissuade the defendant, took the opportunity to make his way out the front door. Hearing Diane's continued screams, he hesitated to make another verbal attempt to control things. While hesitating just outside the front door of the house, Jones saw Diane come running down the hallway and out the front door, where she weakly stumbled into Jones and fell to her knees on the concrete porch. Jones began to pick her up when he saw the defendant coming at him with a knife. The defendant slashed at Jones and Jones retreated to his truck, and began to drive off. As Jones was driving off, he saw the defendant reaching down toward Diane with his right hand in a grasping motion. A neighbor noticed the front door to close slowly as Jones drove off. Jones noticed he was cut after he had driven off.

Diane received three knife wounds: a wound passing from the back of the left hand through the hand to the palm, an incised wound at the base of the left thumb down to the level of bone, a wound passing fully through the jugular vein in the right supraclavicular area of the neck. Diane died from the wound to the jugular vein.

It is unknown to Lavelle Jones whether the defendant inflicted the fatal wound previous to Jones' departure or after the defendant dragged Diane back into the house and closed the door.

Certainly she received some wound before Jones' departure because blood transfers from Diane were found on his work uniform and this would have occurred when she fell into Jones outside the front door.

Recollecting the attention Diane paid to preparing her fingernails earlier at Sarah's house, it is instructive to note the broken false fingernail found in the kitchen sink and on the living room floor. The pathologist, at autopsy, noted fingernails to be broken off Diane's hands.

From the physical evidence above, the defendant's attack on Diane began in the kitchen area (broken fingernail in the sink), blood was first drawn in the area where the kitchen and dining areas meet (blood drops on child's high chair and dining table that was broken during struggle), Diane was able to break free of the defendant and run for the front door (broken fingernail where she broke free and circled through the living room and blood drops on living room carpet, desk and plant, and blood spatterings on the hallway walls in such a way as to indicate motion of the bleeding person toward the front door).

In the area where Diane was eventually located by law enforcement (on the floor just inside the front door) is the only place in the house where a large amount of blood was found. Also, the murder weapon (knife) was found lying next to Diane. The relatively light blood droppings and spatterings on Diane's route to the front door are not what would be expected from a 5/8" wide through and through wound of the jugular vein. The knife was at that location because that's where the defendant, after dragging her back into the house and closing the door, finished his work on Diane.

There may now be assertions by the defendant that he was not himself on that day because of drug (cocaine) use. However, it should be noted that the defendant denied being under the influence of drugs when asked about it by several different persons after the murder. Also, Eric Medley noticed nothing suggestive of drug use. Neither did police detectives, who attempted to interview the defendant at headquarters, notice any indications of drug use. The only such impression was of persons who saw the defendant within minutes of the murder and that was because they saw the defendant to be sweating and seeming to be upset. At 8:45 p.m. that night (approximately one and a half hours after the murder), the weather was clear and dry and the temperature was 65 degrees. The defendant, at the time of the murder, was dressed in thermal underwear bottoms, long-legged jeans, a long sleeved shirt, a vest, a V-neck sweater, high-topped tennis shoes with socks, and he had just

8

had the exciting experience of assaulting and mortally wounding his wife. All these factors are sufficient to make the soberest person perspire. A blood sample drawn from the defendant revealed only the presence of a cocaine metabolite, which is to be expected in the blood of a frequent cocaine user. In order for only the metabolite to be found, the cocaine would need to be entirely metabolized, and considering the 4-6 hour 1/2 life of the metabolite (benzoylecgonine), and the miniscule level of the metabolite found in the defendant's blood, an argument that the defendant was in a drug-induced frenzy at the killing seems unreasonable.

It seems more reasonable to infer from the defendant's conduct of the prior few years that the defendant was acting quite consistently with the assaultive state of mind evidenced by his prior conduct and his prior homicidal threats when he murdered Diane on December 10.

The loss of Diane from this world, from her family and friends, and from her now 6-year old son is a truly tragic one. Diane is easily recognized as an industrious and productive person who very early on began her work career and prospered at it, purchasing her own home, occupying positions in the employees' union, and distiguishing herself in civic contributions. Her influence on the defendant in the early years of their relationship was a positive one, effecting him so that he undertook steady, responsible employment himself. Diane did not forsake the defendant even when he began to have problems. She stayed with him, got him professional help, paid off his creditors, tolerated his diversion of their resources, tolerated his assaultive conduct, called on law enforcement only in the hopes of controlling the defendant's excesses, attempted reconciliations and postponed divorce, and only after the defendant gave her good reason to seriously fear for her very life and the life of her son did she obtain the divorce and restraining order and try to be free of the defendant.

Diane did everything that any woman, any person, could do to try to save her spouse and her marriage. Besides her own personal efforts, she employed all the assistance the community's institutions have to offer and applied them in a measured and enlightened way.

Diane's murder is attributable to the horrendous conduct of one person alone. That person is the defendant.

The defendant, through his conduct toward Diane during her life, showed how unworthy he was of her. Even in the wake of her death he remains the coward he was when he took her life through his failure to speak out and take responsibility for his actions. In statements to friends and family members since the murder, he characterizes it as an accident caused by Diane or blames the gardener for Diane's death. At the time of his plea he did not take responsibility for his conduct but simply made no statement and made no contest.

9

Three counts of PC 245 (felonious assault on Diane) were dismissed at the time of plea because, in light of PC 1170.1, any additional sentence would be insubstantial, and comment on these counts and the two municipal court cases might have greater impact if applied to other sentencing considerations and parole considerations on the murder charge.

The staying of the two knife enhancements and the midterm "lid" on the assault on Lavelle Jones were promises made by the court and not part of any dispositional offer made by the People.

The plaintiff agreed, for purposes of plea, that the killing was murder in the second degree because, although there was evidence from which a jury could find first degree murder, the evidence was not such that it could be reasonably certain that 12 jurors would unanimously conclude it was first degree murder. The evidence readily supported second degree murder.

The plaintiff respectfully requests that:

1) The defendant be sentenced to 15 years to life in the state prison; and

2) The court bear in mind all dismissed counts, all stayed enhancements, and the municipal court adjudications and determine that the sentence for Count Two be no less than the midterm of 3 years and that such sentence run consecutive to the murder charge.

Yours truly,

EDWARD W. HUNT
DISTRICT ATTORNEY

DENNIS J. COOPER
SR. DEPUTY DIST. ATTORNEY

JDC/er

cc:  Probation
     Charles Dreiling

10