# EXHIBIT  E

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number D-99287
                          )
SYLVESTER STRONG          )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2006

4:37 P.M.


PANEL PRESENT:

PHILIP INGLEE, Presiding Commissioner
MS. MOORE, Deputy Commissioner

OTHERS PRESENT:

SYLVESTER STRONG, Inmate
DEJON LEWIS, Attorney for Inmate
CORRECTIONAL OFFICER(S), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

```
_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum
```


Ramona Cota               Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 16 |
| Pre-Commitment Factors | 42 |
| Post-Commitment Factors | 62 |
| Parole Plans | 53 |
| Closing Statements | 89 |
| Recess | 98 |
| Decision | 99 |
| Adjournment | 114 |
| Transcriber Certification | 115 |

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER MOORE:**  -- the record

3    at 4:37.

4          **INMATE STRONG:**  How are you doing?

5          **DEPUTY COMMISSIONER MOORE:**  Very well.

6          **PRESIDING COMMISSIONER INGLEE:**  This is a

7    Subsequent Parole Consideration Hearing.  It's

8    for Sylvester Strong, S-T-R-O-N-G, D-99287.

9    Today's date is May the 31st, 2006, the time, as

10   previously noted is 4:37.  We are located at CFT

11   (sic) Soledad.  The inmate was received on 11/2

12   of 1988.  He was committed from Fresno County.

13   The life term began on 11/2/1988; the inmate's

14   minimum eligible parole date was 12/10 of 1999.

15   The controlling offense for which the inmate had

16   been committed is set forth in case number

17   3807500.  Charged in count one, murder second

18   degree, assault with a deadly weapon, in this

19   case a knife, Penal Code Section 187 and

20   245(a)(1).  The terms was 18 years to life, five

21   years, excuse me, 15 years base, 3 years added

22   to for the use of a knife.

23         **DEPUTY COMMISSIONER MOORE:**  Actually the

24   three years added was for the ADW, assault with

25   intent to do great bodily injury, I believe for

26   the second victim.  The 187 then the 245.

27         **PRESIDING COMMISSIONER INGLEE:**  Okay.

2

```
 1        DEPUTY COMMISSIONER MOORE:  My read on

 2   the abstract of judgment.

 3        PRESIDING COMMISSIONER INGLEE:  All

 4   right.  Why don't we go for just a short recess.

 5        DEPUTY COMMISSIONER MOORE:  Okay.

 6                  (Off the record.)

 7        DEPUTY COMMISSIONER MOORE:  We're back on

 8   the record.

 9        PRESIDING COMMISSIONER INGLEE:  Okay.

10   And the inmate received a term of 18 years to

11   life.  Fifteen years being the base and then the

12   second charge three years.  Which would be run

13   consecutively with the original, with the three

14   year charge going first.  Now you had a

15   question.

16        ATTORNEY LEWIS:  If I could direct you to

17   the court's judgment, not the abstract of

18   judgment.  On page five --

19        DEPUTY COMMISSIONER MOORE:  What court

20   judgment?

21        ATTORNEY LEWIS:  It's in the legal

22   documents.

23        DEPUTY COMMISSIONER MOORE:  You're

24   talking about the sentencing document?

25        ATTORNEY LEWIS:  Yes.

26        DEPUTY COMMISSIONER MOORE:  On page five?

27        ATTORNEY LEWIS:  The (overlapping) and
```

3

1   judgment.

2        **DEPUTY COMMISSIONER MOORE:**   What line?

3        **ATTORNEY LEWIS:**   Page 5 lines 15 through

4   20.  And on page 22.

5        **DEPUTY COMMISSIONER MOORE:**   The use of

6   the word enhancement?

7        **ATTORNEY LEWIS:**   No.  My client was

8   sentenced to -- He took a plea bargain for an 18

9   year lid.  And somehow, somewhere in the

10  documents life got tacked on.  This was not the

11  agreement that he and the DA had.  Where is the

12  incentive for him to take a life term?  He took

13  an 18 year lid.  It's mentioned in this judgment

14  twice.  An 18 year lid on page 5 lines 15

15  through 20.  And then on page 22 there's a

16  maximum term of 18 years on line 14 right there.

17  This is a subject that he has going on in the

18  court but we were hoping that we could use this

19  venue today to show that there has been a

20  mistake made on the abstract on judgment which

21  has just carried on year after year after year.

22       **DEPUTY COMMISSIONER MOORE:**   If I may ask

23  specifically, what is the error you believe ,

24  exists on the abstract of judgment?

25       **ATTORNEY LEWIS:**   Well it says 18 to life

26  when he didn't accept that deal.  He accepted an

27  18 year lid.

4

1       **DEPUTY COMMISSIONER MOORE:**   What is the

2   difference?

3       **ATTORNEY LEWIS:**   Eighteen to life, 18

4   year lid, meaning that he was only to do up to

5   18 years, not life.

6       **DEPUTY COMMISSIONER MOORE:**   If I may,

7   Commissioner?

8       **PRESIDING COMMISSIONER INGLEE:**   You mean

9   like a determinate sentence?

10      **ATTORNEY LEWIS:**   Yes.

11      **PRESIDING COMMISSIONER INGLEE:**   Sure, go

12   ahead.

13      **DEPUTY COMMISSIONER MOORE:**   If I may.

14      **ATTORNEY LEWIS:**   I mean, if I'm lacking

15   information please --

16      **DEPUTY COMMISSIONER MOORE:**   You are.

17      **ATTORNEY LEWIS:**   Okay.

18      **DEPUTY COMMISSIONER MOORE:**   One, the

19   appeal, it was not brought up on appeal.  They

20   reviewed it under the *Harvey* case.  There were

21   multiple victims and several different aspects

22   of the plea bargain that were developed and

23   ruled on and affirmed by the Appellate Court.

24   This is an indeterminate sentence.  On a murder

25   you cannot receive determinate time.  Any appeal

26   on this matter should have taken place and had

27   to be timely in 1987 or after.  To bring it up

5

1    now is inappropriate.   The sentence has been --

2    For each of Mr. Strong's hearing dates it has

3    been the same throughout.   It would not be an

4    appropriate time to bring up any concerns

5    regarding that.   The sentence was 15 years to

6    life plus three years for the assault with

7    intent to do great bodily injury on victim

8    Jones.   The remaining charges were dismissed,

9    the remaining three charges and the

10    enhancements.

11        **ATTORNEY LEWIS:**  The reason I'm bringing

12    it up, because, you know, I'm pretty learned

13    when it comes to the English language.  And if

14    it says to me, a maximum term of 18 years, and I

15    don't see life there or with enhancements, and

16    this was the motivation for him taking the plea

17    agreement in the first place, I thought that I

18    was compelled to bring it up here today.

19    Because this is a life hearing.   He shouldn't

20    even be doing life.

21        **DEPUTY COMMISSIONER MOORE:**  On page 5

22    lines 17 through 20 it indicates, "So it would

23    be the court placed an 18 year lid on this in

24    return for Mr. Strong's plea to second degree

25    murder, which has been offered by the people."

26    I think counsel, based on your experience and my

27    experience and this panel's experience, the only

6

1    sentence existing in California at the time that

2    this plea was entered is 15 to life for second

3    degree murder.  There were a number of

4    enhancements that could have been added for

5    weapons and multiple charges that could have

6    been added and were not.

7         PRESIDING COMMISSIONER INGLEE:  Let me,

8    let me --

9         ATTORNEY LEWIS:  I understand that but

10   that's not what I read, Commissioner.

11        PRESIDING COMMISSIONER INGLEE:  All

12   right, let me.  We're getting off, I believe --

13        ATTORNEY LEWIS:  Absolutely.

14        PRESIDING COMMISSIONER INGLEE:  -- into

15   an area which has nothing to do with a parole

16   hearing.  Your client may have objections.  He

17   may even have a basis for an appeal.  But this

18   is not the forum for it.

19        ATTORNEY LEWIS:  I understood that from

20   the very beginning but I thought I'd bring it to

21   your attention.

22        PRESIDING COMMISSIONER INGLEE:  No,

23   that's fine, that's fine, but we need to move

24   ahead.

25        ATTORNEY LEWIS:  Absolutely.

26        PRESIDING COMMISSIONER INGLEE:  And we

27   need to give this man a parole hearing and

7

1    that's what we intend to do.

2           **ATTORNEY LEWIS:**  All right.

3           **PRESIDING COMMISSIONER INGLEE:**  In my

4    concern over wanting to be sure that I had the

5    correct verbiage on here because of the nature

6    of this crime and how many different aspects of

7    the crime there is to review.  I was given some

8    direction by my Deputy Commissioner, which led

9    us then into other fields of interest that go, I

10   think, well beyond what we can or are expected

11   to do at this hearing.

12          **ATTORNEY LEWIS:**  I understand.

13          **PRESIDING COMMISSIONER INGLEE:**  All

14   right.  So we're going to move on now.  This

15   hearing is being tape-recorded.  And for the

16   purpose of voice identification each of us will

17   be required to state our first and last name,

18   spelling our last name.  When it comes to the

19   inmate's turn you will spell your last name and

20   state your CDC number.  Starting with myself my

21   name is Philip Inglee, that's I-N-G-L-E-E, I'm a

22   Commissioner.

23          **DEPUTY COMMISSIONER MOORE:**  Deputy

24   Commissioner Moore, M-O-O-R-E, with the Board of

25   Parole Hearings.

26          **ATTORNEY LEWIS:**  DeJon Lewis, L-E-W-I-S,

27   attorney for Mr. Strong.

8

1          **INMATE STRONG:**  My name is Sylvester

2     Strong.  My number is D-99287.

3          **PRESIDING COMMISSIONER INGLEE:**  And spell

4     your last name, please.

5          **INMATE STRONG:**  S-T-R-O-N-G.

6          **PRESIDING COMMISSIONER INGLEE:**  All

7     right, thank you.  Mr. Strong, in front of you

8     is an ADA statement.  I'd like to have you read

9     that if you would, please.

10          **INMATE STRONG:**  "The Americans

11               with Disabilities Act, ADA, is a

12               law to help peoples with

13               disabilities.  Disabilities are

14               problems that make it harder for

15               some peoples to see, hear,

16               breathe, talk, walk, learn, think,

17               work, or take care of themselves

18               than it is for others.  Nobody can

19               be kept out of public places or

20               activities because of a

21               disability.  If a disability has

22               -- If you have a disability you

23               have the right to ask for help to

24               get ready for your BPT Hearing,

25               get to the hearing, talk, read

26               forms and papers and understand

27               the hearing process.  The BPT will

9

1        look at what you ask for to make

2        sure that you have a disability

3        that is covered by the ADA and

4        that you have asked for the right

5        kind of help.  If you do not get

6        help or if you don't think you got

7        the kind of help you need, ask for

8        a BPT 1074 Grievance Form.  You

9        can also get help to fill it out."

10        PRESIDING COMMISSIONER INGLEE:  Did you

11 understand what you read?

12        INMATE STRONG:  Yes sir.

13        PRESIDING COMMISSIONER INGLEE:  Very

14 good.  This record reflects that you signed a

15 BPT Form 1073.  You signed that on 7/12 of 2005.

16 At that time you said you did not need any help

17 for your parole hearing.  Is that still true

18 today?

19        INMATE STRONG:  Yes sir.

20        PRESIDING COMMISSIONER INGLEE:  Do you

21 have any problems walking up and down stairs or

22 for a distance of 100 yards or more?

23        INMATE STRONG:  No sir.

24        PRESIDING COMMISSIONER INGLEE:  Do you

25 need glasses or a magnifying glass in order to

26 see or read documents?

27        INMATE STRONG:  I use reading glasses.

10

1          PRESIDING COMMISSIONER INGLEE:    Are they

2    adequate for today's hearing?

3          INMATE STRONG:    Yes sir.

4          PRESIDING COMMISSIONER INGLEE:    Good.    Do

5    you have any hearing impairments?

6          INMATE STRONG:    No.

7          PRESIDING COMMISSIONER INGLEE:    Have you

8    ever been included in the CCCMS or EOP program?

9          INMATE STRONG:    No sir.

10          PRESIDING COMMISSIONER INGLEE:    Are you

11    familiar with these programs?

12          INMATE STRONG:    I heard of them.

13          PRESIDING COMMISSIONER INGLEE:    They are

14    for inmates that have either emotional problems

15    or mental illness and they will have programs

16    specifically keyed for their benefit.    Have you

17    ever participated or been part of any program

18    such as this?

19          INMATE STRONG:    No sir.

20          PRESIDING COMMISSIONER INGLEE:    Have you

21    ever taken psychotropic medication, either in

22    prison or on the street?

23          INMATE STRONG:    No sir.

24          PRESIDING COMMISSIONER INGLEE:    How far

25    did you go in school before you arrived in

26    prison?

27          INMATE STRONG:    Twelfth grade.

11

1        **PRESIDING COMMISSIONER INGLEE:**   Did you

2   graduate?

3        **INMATE STRONG:**   Yes sir.   Washington

4   Union High School.

5        **PRESIDING COMMISSIONER INGLEE:**   Good.

6   Have you taken, did you take any special

7   education classes while you were growing up?

8        **INMATE STRONG:**   No sir.

9        **PRESIDING COMMISSIONER INGLEE:**   Do you

10  suffer from any disability that would prevent

11  you from participating in today's hearing?

12       **INMATE STRONG:**   No sir.

13       **PRESIDING COMMISSIONER INGLEE:**   All

14  right.   Counsel, do you have any comments or

15  concerns regarding the ADA rights of your

16  client?

17       **ATTORNEY LEWIS:**   No I do not.

18       **PRESIDING COMMISSIONER INGLEE:**   This

19  hearing is being conducted pursuant to Penal

20  Code Sections 3041, 3042 and the rules and

21  regulations of the Board of Prison Terms

22  governing parole consideration hearings for life

23  inmates.   The purpose of today's hearing is to

24  consider your suitability for parole.   In doing

25  so we will consider the nature and number of the

26  crimes you were committed for, your prior

27  criminal and social history and your behavior

12

1    and programming since your commitment.  We have
2    had an opportunity to review your Central File
3    and your prior hearing transcript.  You'll be
4    given the opportunity to correct or clarify the
5    record.  We will consider your progress since
6    your commitment and since your last hearing.
7    Your updated counselor's report and
8    psychological report will also be considered.
9    Any change in parole plans should be brought to
10   our attention.  We will reach a decision today
11   and inform you whether or not we find you
12   suitable for parole and the reasons for our
13   decision.  If you are found suitable for parole
14   the length of your confinement will be explained
15   to you.  The hearing will be conducted in two
16   phases.  I will discuss with you the crime that
17   you were committed for, your prior criminal and
18   social history, your parole plans and any
19   letters of support and opposition that may be in
20   file.  Deputy Commissioner Moore will discuss
21   with you your progress since your commitment,
22   your counselor's report and your psychological
23   evaluation.  Once that is concluded your
24   attorney will be given an opportunity to ask you
25   questions and also the Commissioners.  The
26   questions from -- I'll skip through that, we
27   don't have a district attorney with us today.

13

1   Before we recess for deliberations your

2   attorney, and you will be given an opportunity

3   to make a final statement regarding your parole

4   suitability.  Your statement should be directed

5   as to why you feel you are suitable for parole.

6   We will then recess and clear the room for our

7   deliberations.  Once we have completed our

8   deliberations we will resume the hearing and

9   announce our decision.  The California Code of

10  Regulations states that regardless of time

11  served a life inmate shall be found unsuitable

12  for and denied parole if in the judgment of the

13  panel the inmate would pose an unreasonable risk

14  of danger to society if released from prison.

15  You have certain rights.  These rights include

16  the right to a timely notice of this hearing,

17  the right to review your Central File and the

18  right to present relevant documents.  Counsel,

19  has your inmate's rights been met in this

20  regard?

21          **ATTORNEY LEWIS:**  Yes they have.

22          **PRESIDING COMMISSIONER INGLEE:**  You also

23  have the right to be heard by an impartial

24  panel.  Sir, o you have any objection to any

25  member of this panel?

26          **INMATE STRONG:**  No sir.

27          **PRESIDING COMMISSIONER INGLEE:**  Counsel,

14

1  do you have any objections to any member of the

2  panel?

3       **ATTORNEY LEWIS:**  No.

4       **PRESIDING COMMISSIONER INGLEE:**

5  Mr. Strong, you will receive a copy of our

6  written tentative decision today.  That decision

7  is subject to review by the Decision Review Unit

8  and by the entire Board meeting as a body.  It

9  will become effective within 120 days.  It is

10  also subject to review by the Governor.  A copy

11  of the tentative decision and a copy of the

12  transcript will be sent to you.  As of May 1st,

13  2004 there were major changes limiting your

14  former rights to appeal Board decisions or

15  actions directly to the Board.  The old Board

16  regulations were repealed.  The current policy

17  is entitled Administrative Appeals

18  Correspondence and Grievances Concerning Board

19  of Prison Terms Decisions.  It is available in

20  the prison library for your review.  We are not

21  here to -- You are not required to admit your

22  offense or discuss your offense if you do not

23  wish to do so.  However, this panel does accept

24  as true the finding of the court and you are

25  invited to discuss the facts and circumstances

26  of the offense if you so desire.  The Board will

27  review and consider any prior statements you

15

1    have made regarding the offense in determining

2    your suitability for parole.  Deputy

3    Commissioner, is there any confidential material

4    in the file, and if so, will it be used today?

5         DEPUTY COMMISSIONER MOORE:  There is no

6    confidential material.

7         PRESIDING COMMISSIONER INGLEE:  All

8    right.  I have passed a hearing checklist marked

9    Exhibit One on to your attorney so we will all

10   be proceeding with the same set of documents.

11   Counsel, do you have all your documents?

12        ATTORNEY LEWIS:  I do sir.

13        PRESIDING COMMISSIONER INGLEE:  Okay.

14   Are there any additional documents to be

15   submitted?

16        ATTORNEY LEWIS:  No.

17        PRESIDING COMMISSIONER INGLEE:  Are there

18   any preliminary objections?

19        ATTORNEY LEWIS:  None.

20        PRESIDING COMMISSIONER INGLEE:  Will the

21   inmate be speaking to the panel?

22        ATTORNEY LEWIS:  Yes he will be.

23        PRESIDING COMMISSIONER INGLEE:  Will he

24   be speaking on all subjects?

25        INMATE STRONG:  Yes I will.  As you just

26   stated -- (alarm sounding)

27        DEPUTY COMMISSIONER MOORE:  It's a test.

16

1       PRESIDING COMMISSIONER INGLEE:  All

2   right, go ahead.  I want to be sure you're going

3   to be on the transcript.

4       INMATE STRONG:  Okay.  As you just

5   stated, you take the court's finding to be true,

6   as well as I do too.  There's few things that --

7   I'll talk about the case but there might be

8   something today that I haven't said previously

9   that I might want to say today concerning the

10  case.

11      PRESIDING COMMISSIONER INGLEE:  All

12  right.  That's your option, obviously, it's your

13  right to do so.  If you have any objection or

14  any concern just let us know. With that in mind

15  I will swear you in now, please raise your right

16  hand.  Do you solemnly swear or affirm that the

17  testimony you give in this hearing will be the

18  truth, the whole truth and nothing but the

19  truth?

20      INMATE STRONG:  Yes sir I do.

21      PRESIDING COMMISSIONER INGLEE:  Thank

22  you.  Counsel, if there is no objection we will

23  incorporate by reference the Statement of Fact.

24  And that is going to come not from the Appellate

25  Decision, because that is a very poor rendering

26  of the Statement of Fact.  I am going to use the

27  probation officer's report pages two through

17

1  five.

2          ATTORNEY LEWIS:  That will be fine.

3          PRESIDING COMMISSIONER INGLEE:  That

4  gives a complete rendering of the situation.

5  All right, Mr. Strong.

6          INMATE STRONG:  Yes sir.

7          PRESIDING COMMISSIONER INGLEE:  Tell us

8  what happened.

9          INMATE STRONG:  On December the 10th,

10  1987 I went to my wife's house, Diana Strong,

11  and I forced my way in.  I didn't have no

12  business being there because we was going

13  through a divorce.  In short, I ended up, she

14  ended up getting stabbed and she lost her life

15  by the cost of my hands.

16          PRESIDING COMMISSIONER INGLEE:  Okay.

17  You made it sound almost like a third person.

18  But you are, you are saying you were the

19  responsible party.

20          INMATE STRONG:  Yes sir.

21          PRESIDING COMMISSIONER INGLEE:  In her

22  death.

23          INMATE STRONG:  Yes sir.

24          PRESIDING COMMISSIONER INGLEE:  All

25  right.  All right.  How do you feel about it?

26          INMATE STRONG:  I was with Diana from the

27  time she was 19 to the time she was 30.  We had

18

1  a good lifestyle. We had a good lifestyle. We
2  had, I guess what you would say what the
3  American Dream was, the house, the cars, good
4  jobs. And somewhere along the line I guess I
5  got too confident in myself and I started using
6  cocaine. And that was -- That started the
7  destruction of our family right there by me
8  using cocaine. And everything after that just
9  went to the waysides as far as I was concerned.
10 I lost -- Now that I look back, I lost self-
11 respect for myself. I just got caught up in it.
12      **PRESIDING COMMISSIONER INGLEE:** Can you
13 tell us about the actual killing? I mean, I
14 know that you've already said you stabbed her
15 and she died from that action.
16      **INMATE STRONG:** Right.
17      **PRESIDING COMMISSIONER INGLEE:** But can
18 you tell us about what actually happened that
19 day.
20      **INMATE STRONG:** Well previously I had
21 called her and we was talking on the phone. And
22 we was going through a divorce and there was a
23 property settlement. I was waiting for my
24 property settlement from her. So when I talked
25 to her I asked her about it. And somehow it got
26 twisted around it was about money. But in fact
27 I hadn't been at -- I was living with my mother

19

1  for two months and me and her had been talking

2  on the phone prior to that.  And that day,

3  December the 10th of '87 she came over to my

4  mother's house and dropped off the insurance

5  policy.  And I found that she was over there and

6  I called her and I told her I was coming over.

7  When I went over there I saw the gardener's

8  truck there.  And I knocked on the door and they

9  wouldn't let me in and I kicked the door in and

10  I went in.

11         PRESIDING COMMISSIONER INGLEE:  Stop and

12  hold your thought for a second.  Did you have a

13  knife with you at the time?

14         INMATE STRONG:  That's Mr. Jones version

15  and that's what I said I wanted to discuss

16  today.  Because I agreed to that based upon the

17  DA telling me about the plea bargain.  But in

18  fact that knife came off the refrigerator.  I

19  never had the knife when entering the house.

20  And I never had the courage to say it in front

21  of the Board until today because it just keep on

22  -- My understanding when I took the plea

23  bargain, that I wouldn't have a life sentence.

24  I know I pleaded guilty to second-degree murder

25  but in return they told me they put an 18 year

26  lid on it.  And so I keep finding out after

27  hearing after hearing, they keep telling me I

20

1  have 18 to life.  Today I have the courage to

2  say that that was the DA's version.  I never had

3  a chance to tell my -- I never was put on the

4  witness stand and told my version.  That was

5  Mr. Jones' version about me coming through the

6  door with the knife.

7       PRESIDING COMMISSIONER INGLEE:  This is

8  the gardener?

9       INMATE STRONG:  Yes sir.

10      PRESIDING COMMISSIONER INGLEE:  Let me

11  ask you a question.  You've been in prison for a

12  long time.

13      INMATE STRONG:  I know.

14      PRESIDING COMMISSIONER INGLEE:  You're

15  heard -- These discussions have gone on from the

16  moment you, when the case was over, when your

17  trial was over.

18      INMATE STRONG:  I never went to trial,

19  sir.

20      ATTORNEY LEWIS:  He took a plea.

21      PRESIDING COMMISSIONER INGLEE:  You took

22  a -- I'm sorry.  But there was adjudication

23  though.  I mean, you heard what you were being

24  charged with.

25      INMATE STRONG:  Yeah, but at that time I

26  was --

27      PRESIDING COMMISSIONER INGLEE:  That's

21

1   what I'm referring to.

2        INMATE STRONG:  Yeah.  At that time I

3   was, at that time I wasn't in the right state of

4   mind.  And what the counselor, my counselor,

5   whatever he told me I went along with and I

6   believed him.  But then as I said, each time I

7   keep coming to these hearings and I keep hearing

8   18 to life, that wasn't the term that I pleaded

9   to.

10       PRESIDING COMMISSIONER INGLEE:  But you

11  have had all these years where this has been

12  used.  Have you appealed this?

13       INMATE STRONG:  Appealed it no, I'm

14  telling you now.

15       PRESIDING COMMISSIONER INGLEE:  Well this

16  is not, we're not the appeal process.

17       INMATE STRONG:  Right, right.

18       PRESIDING COMMISSIONER INGLEE:  I don't

19  mind you saying it.

20       INMATE STRONG:  Yeah, yeah.

21       PRESIDING COMMISSIONER INGLEE:  I

22  sincerely don't mind you saying it.  But we are

23  not the forum to necessarily get that turned

24  around.

25       INMATE STRONG:  I understand that. But I

26  haven't even had the courage to say it in here.

27       PRESIDING COMMISSIONER INGLEE:  I don't

22

1  understand, the courage. You seem like a rather
2  -- You seem like a man who would speak his mind.
3      INMATE STRONG: Yeah, to a degree. But I
4  never have. I just went along with the flow.
5  And that's the only discrepancy I have in the
6  statement.
7      PRESIDING COMMISSIONER INGLEE: Well your
8  minimum eligible parole date is 1999.
9      INMATE STRONG: Yes it was.
10      PRESIDING COMMISSIONER INGLEE: That in
11  itself is not necessarily all end all but it at
12  least gives you a marker. But when 1999 rolled
13  past and things kept on going on did it not
14  occur to you at the time that something was
15  amiss?
16      INMATE STRONG: Oh yes it did. But
17  again, I just, I didn't have the courage to say
18  it in front of, in here or nowhere. I just
19  didn't.
20      PRESIDING COMMISSIONER INGLEE: Okay, go
21  ahead. So you came in. And what you're telling
22  us today is that you took a knife off the
23  refrigerator.
24      INMATE STRONG: Yes sir, that's where the
25  weapon came from, the refrigerator. When I
26  first entered the house. Like I say, when I
27  entered the house I asked Mr. Jones, was he in

23

1    there, excuse me ma'am, are you in there fucking

2    my wife?

3            PRESIDING COMMISSIONER INGLEE:  Whatever

4    you have to say here to explain what really

5    happened.

6            INMATE STRONG:  Yeah, yeah.

7            PRESIDING COMMISSIONER INGLEE:  You're

8    not going to be hurting anyone's feelings, I can

9    assure you.

10           INMATE STRONG:  Okay.  And he said --

11           PRESIDING COMMISSIONER INGLEE:  I can't

12   speak for you but I'm sure that's the case.

13           INMATE STRONG:  And he said, he said he

14   wasn't so I asked him to leave.  So I stood up

15   in front of the refrigerator.  As he passed me

16   Mr. Jones struck me and I went down.  When I

17   went down and I came back up, that's when I

18   reached up on top of the refrigerator and

19   grabbed the knife.

20           PRESIDING COMMISSIONER INGLEE:  How large

21   a man was Mr. Jones?

22           INMATE STRONG:  He was a little larger

23   than I was, you know.  And that's when the

24   struggle started.

25           PRESIDING COMMISSIONER INGLEE:  Well,

26   you're right.  I'll read through the summary of

27   the crime, and this is a short summary.  It

24

1 states down here:

2           "Sylvester knocked at the door.

3           Diane would not open the door

4           because she had a restraining

5           order and Sylvester wasn't

6           supposed to be on the premises.

7           Sylvester became upset and broke

8           down the front door, broke the

9           front door open.  He had a knife

10          in his right hand."

11 Mr. Jones said the prisoner accused him of going

12 with his wife and said:

13          "Bitch, I'm going to kill you.

14          Diane took off running but

15          Sylvester grabbed her with the

16          left hand and started hitting her

17          with his right hand with the knife

18          still in his hand."

19 At that point Mr. Jones started to leave.  So

20 what's written down here is basically what

21 you're refuting at this time, is that correct?

22          **INMATE STRONG:**  The only thing I'm

23 refuting is that I came through the door with

24 the knife.

25          **PRESIDING COMMISSIONER INGLEE:**  Well it

26 doesn't indicate down here that you possibly had

27 to defend yourself.  There's a reason why you

25

1  took the knife off the -- If in fact you took

2  the knife off the refrigerator.

3       INMATE STRONG:  Yes sir.

4       PRESIDING COMMISSIONER INGLEE:  Did you

5  mean to use it on Mr. Jones or did you truly

6  mean to murder your wife?

7       INMATE STRONG:  Mr. Jones was the

8  culprit.  The person I was after was Mr. Jones.

9       PRESIDING COMMISSIONER INGLEE:  But you

10 seemed to miss Mr. Jones and brutally murdered

11 your wife.  I'm not trying to make you feel any

12 worse than you're feeling today I'm sure, but

13 that's the point.

14      INMATE STRONG:  But see, but see, as I

15 just stated earlier, that was the, that was

16 Mr. Jones' statement.  I never had a chance and

17 I never did tell nobody other than my attorney

18 what actually happened.

19      PRESIDING COMMISSIONER INGLEE:  Because

20 of the plea, the plea agreement.

21      INMATE STRONG:  Yes sir.  And that was

22 part of the plea bargain agreement from the DA,

23 to tell his version and I agree to it.  But I

24 never told nobody my version of how it happened

25 other than my attorney.

26      PRESIDING COMMISSIONER INGLEE:  Well you

27 have mentioned the fact in your previous version

26

1   down here.  You tell it.

2            INMATE STRONG:  But it's --

3            PRESIDING COMMISSIONER INGLEE:  In the

4   prisoner's version, and I'm only reading a

5   portion of it.

6            DEPUTY COMMISSIONER MOORE:  On the Board

7   Report.

8            PRESIDING COMMISSIONER INGLEE:  This is

9   on page two.

10           DEPUTY COMMISSIONER MOORE:  I think he

11  was asking which Board Report.

12           PRESIDING COMMISSIONER INGLEE:  I'm

13  sorry?

14           DEPUTY COMMISSIONER MOORE:  I think

15  Mr. Strong was inquiring as to which document

16  you're referring to, the Board Report.

17           PRESIDING COMMISSIONER INGLEE:  This is

18  the October, no more than that.  It's the only

19  other full Board Report I have right now that

20  has the complete, has a complete history in

21  here.  And that is the report of, the Board

22  Report of 2004.

23           DEPUTY COMMISSIONER MOORE:  October 2004?

24           PRESIDING COMMISSIONER INGLEE:  Which

25  goes back a couple of years.  You say in this

26  regard:

27           "Sylvester says he went to his

27

1           wife's home in hopes of talking to

2           her about reconciliation.  He did

3           not have a knife when he got

4           there."

5    So you apparently have already told somebody

6    this.

7           "When he broke the door down he

8           saw Mr. Jones and said, are you

9           fucking my wife?  Strong then told

10          Jones to leave.  As Mr. Jones was

11          leaving he hit strong and knocked

12          him down.  Strong got up and took

13          the knife from above the

14          refrigerator.  Jones and Strong

15          were struggling in the entryway at

16          the time Diana ran up and was

17          stabbed in the neck.  Mr. Jones

18          ran to his truck and left.  Strong

19          got a pillow for her head, opened

20          her blouse to check her wound and

21          called 911."

22   That's essentially what you're saying you have

23   not said to anybody but here it is in writing.

24          **INMATE STRONG:**  Well, like I said, it had

25   been a number of years.

26          **PRESIDING COMMISSIONER INGLEE:**  Well it

27   was two years ago that you apparently -- Two

28

1  years, possibly a little longer than that.  But
2  in that time period you apparently told your
3  counselor that because it's here.
4      INMATE STRONG:  But I never told the
5  Board that.
6      PRESIDING COMMISSIONER INGLEE:  Well you
7  meant to in 2004, apparently, because this is,
8  this is the document that the last hearing group
9  would have looked at.  The reason why I'm
10  reading it is because they haven't brought all
11  the facts forward into the new, into the updated
12  Board Report, which is the November 2005.  What
13  they're saying under the summary of the crime is
14  it remains the same as stated in the previous
15  hearing.  So I have to go back and refer to a
16  previous hearing in this regard.  And that's the
17  last previous hearing.  And in fact, as I said
18  -- So anyway, I don't carry this beyond what we
19  need to.  But it seems to me you have already
20  told people of this in the past.  All right.
21  Okay, well we have two stories.  We have the
22  story that came out of your plea bargain and
23  then we have a subsequent story that you
24  apparently had told at least two years ago and
25  again today.  Counsel, is there anything you
26  want to say about this?
27      INMATE STRONG:  No.

29

1          PRESIDING COMMISSIONER INGLEE:   All

2    right.   Anything else about the actual murder?

3    How many times was your wife stabbed?

4          INMATE STRONG:   My understanding, once.

5    But what do they call it --

6          ATTORNEY LEWIS:   The autopsy?

7          INMATE STRONG:   The autopsy indicated

8    more.

9          PRESIDING COMMISSIONER INGLEE:   I was

10   going to say, it's quite a bit.   Okay, I'll just

11   read the -- I didn't have it tabbed but I just

12   found it.

13          "The Fresno County coroner's post-

14          mortem record indicates that

15          victim Diana Strong suffered a

16          stab wound from the back through

17          to the palm of her left hand.   The

18          victim's left thumb had a quarter-

19          inch deep incision wound.   A stab

20          wound was located one inch to the

21          right midline of the neck.   The

22          stab wound extended through the

23          right arterial jugular vein and

24          cut the --"

25   I'll have to spell it.

26          "-- A-Z-Y-G-O-U-S vein.   The

27          direction of the wound is from the

```
 1          upper rear to a 30 degree downward
 2          angle.  The stab wound was
 3          estimated to be two and a half
 4          inches.  Victim Diana strong was
 5          pronounced dead at Valley Hospital
 6          by Dr. Michael Solomon.  The cause
 7          of death is recorded as himeric
 8          (phonetic) shock due to a stab
 9          wound of the neck and chest."
10  Okay, anything else sir?  I know these are not
11  easy things to talk about, I understand.  Okay,
12  let's take a look at your prior criminal record.
13          DEPUTY COMMISSIONER MOORE:  I have some
14  questions about the offense.
15          PRESIDING COMMISSIONER INGLEE:
16  Certainly.  Let's go to the Deputy Commissioner
17  and she has some questions for you.
18          DEPUTY COMMISSIONER MOORE:  Were you
19  under the influence of cocaine on December 10th?
20          INMATE STRONG:  Yes ma'am I was.
21          DEPUTY COMMISSIONER MOORE:  When had you
22  used it?
23          INMATE STRONG:  When?
24          DEPUTY COMMISSIONER MOORE:  Uh-hmm.
25          INMATE STRONG:  During that course of
26  that day.
27          DEPUTY COMMISSIONER MOORE:  What time of
```

31

1   day did the stabbing and murder occur?

2        INMATE STRONG:  I believe around 6:30.

3        DEPUTY COMMISSIONER MOORE:  Were you

4   smoking it, snorting it or shooting it?

5        INMATE STRONG:  I was, I was smoking it.

6        DEPUTY COMMISSIONER MOORE:  Rock or

7   powder?

8        INMATE STRONG:  Rock.

9        DEPUTY COMMISSIONER MOORE:  And how long

10   had you been using cocaine prior to this event?

11        INMATE STRONG:  About ten months.

12        DEPUTY COMMISSIONER MOORE:  And there

13   were a number of other incidents in the month

14   prior to the murder, isn't that correct?

15        INMATE STRONG:  Yes ma'am it is.

16        DEPUTY COMMISSIONER MOORE:  Violent,

17   involving violence?

18        INMATE STRONG:  Yes ma'am.

19        DEPUTY COMMISSIONER MOORE:  Was anyone on

20   your case, you know, about the cocaine prior to

21   the day of the murder?

22        INMATE STRONG:  Anyone like who, ma'am?

23        DEPUTY COMMISSIONER MOORE:  Anyone.

24        INMATE STRONG:  Yes, I had -- You know, I

25   look back.  I had peoples telling me that I need

26   to put myself in check and I didn't hear them.

27        DEPUTY COMMISSIONER MOORE:  Were you

32

1   still employed by the City of Fresno when this

2   happened on December 10th?

3           INMATE STRONG:  No, I had -- No I wasn't.

4           DEPUTY COMMISSIONER MOORE:  How come you

5   weren't still employed?

6           INMATE STRONG:  I wasn't able to function

7   in my duties at work.

8           DEPUTY COMMISSIONER MOORE:  Were you

9   fired?

10          INMATE STRONG:  No, I just left.

11          DEPUTY COMMISSIONER MOORE:  When did you

12  quit work, about?

13          INMATE STRONG:  I can tell you.  I left

14  October the 15th, 1987.

15          DEPUTY COMMISSIONER MOORE:  And then

16  what, after six or seven years as a city

17  employee?

18          INMATE STRONG:  Eight.

19          DEPUTY COMMISSIONER MOORE:  Eight years.

20  So when you arrived at the house, your wife's

21  house, there was a restraining order in place?

22          INMATE STRONG:  Yes ma'am.

23          DEPUTY COMMISSIONER MOORE:  And how long

24  had that restraining order been in place?

25          INMATE STRONG:  Probably within maybe

26  three months.

27          DEPUTY COMMISSIONER MOORE:  About the

33

1  same time you quit work.

2       INMATE STRONG:  Yes ma'am.

3       DEPUTY COMMISSIONER MOORE:  Things were
4  escalating quickly.

5       INMATE STRONG:  Yes.

6       DEPUTY COMMISSIONER MOORE:  And the
7  restraining order told you to not do what?

8       INMATE STRONG:  I wasn't allowed to be on
9  the premises.

10      DEPUTY COMMISSIONER MOORE:  What else?
11 And contact?

12      INMATE STRONG:  That's being on the
13 premises.

14      DEPUTY COMMISSIONER MOORE:  How about
15 telephonic contact?  Were you allowed --

16      INMATE STRONG:  No, they didn't.  To my
17 understanding, I can't quite say but we talked
18 on the phone, you know.

19      DEPUTY COMMISSIONER MOORE:  What is it
20 you were so angry about that you kicked the door
21 in?

22      INMATE STRONG:  Because there was another
23 man inside the welding (sic) that I once lived
24 in and she wouldn't open the door and let me in.

25      DEPUTY COMMISSIONER MOORE:  And why
26 wouldn't she open the door?

27      INMATE STRONG:  Because I had a

34

1    restraining order, I wasn't supposed to be

2    there.

3

4            DEPUTY COMMISSIONER MOORE:  And how many

5    times had you laid hands on her before?

6            INMATE STRONG:  Whatever the record said.

7    It was at least three or four different

8    incidents that I had spousal abuse on Diana

9    Strong.

10           DEPUTY COMMISSIONER MOORE:  Did your

11   daughter Monique (phonetic) --

12           INMATE STRONG:  My son.  No, Monique --

13           DEPUTY COMMISSIONER MOORE:  Did your

14   daughter Monique live with you and Mrs. Strong?

15           INMATE STRONG:  No, Monique no.  She

16   didn't live with me.  The only one that was

17   living there was Sylvester Junior.

18           DEPUTY COMMISSIONER MOORE:  Monique is

19   younger than Sylvester?

20           INMATE STRONG:  She's older.

21           DEPUTY COMMISSIONER MOORE:  Older.

22           INMATE STRONG:  They made a mistake on

23   that.

24           DEPUTY COMMISSIONER MOORE:  Okay.  And

25   when you broke through the door was Sylvester at

26   home?

27           INMATE STRONG:  No he wasn't.

35

1          DEPUTY COMMISSIONER MOORE:  Does he go by

2    Junior?

3          INMATE STRONG:  Yes.

4          DEPUTY COMMISSIONER MOORE:  Where was he?

5          INMATE STRONG:  With his aunt Sarah.

6          DEPUTY COMMISSIONER MOORE:  How angry --

7    Describe to us how angry you were when you

8    busted through the door.

9          INMATE STRONG:  I was really pissed off

10   to the fact that she wouldn't open the door and

11   there was another man in there.  And we had been

12   talking on the phone for like two months, you

13   know.

14         DEPUTY COMMISSIONER MOORE:  What did that

15   mean to you?

16         INMATE STRONG:  I was under -- When I was

17   under the influence, you know.  Under the

18   influence all kinds of crazy things.  I'm

19   thinking they might be in there engaging into

20   some sexual act.  You know, everything that's

21   unimaginable was coming through once she, once

22   they wouldn't open the door, the door wasn't

23   opened.

24         DEPUTY COMMISSIONER MOORE:  Did you think

25   you still had control or rights to control her?

26         INMATE STRONG:  I didn't have no rights.

27   I didn't even have the right to be there.

36

1          DEPUTY COMMISSIONER MOORE:  Today you say

2     that.  I'm talking about December 10, 1987.

3          INMATE STRONG:  I didn't know it, no.  I

4     didn't know what I was thinking at that time.

5          DEPUTY COMMISSIONER MOORE:  On the other

6     dates that you assaulted your wife were you

7     under the influence of cocaine?

8          INMATE STRONG:  Yes ma'am.

9          DEPUTY COMMISSIONER MOORE:  And today you

10    indicate that you did not go into the house with

11    the knife.  In October of '04 when you spoke to

12    CC-I correctional counselor Hilliard (phonetic).

13    Does that name sound familiar to you?

14         INMATE STRONG:  Yes.

15         DEPUTY COMMISSIONER MOORE:  CC-I Hilliard

16    wrote down your statement that you did not come

17    in with a knife.  That you went and got it over

18    the refrigerator.

19         INMATE STRONG:  Yes ma'am.

20         DEPUTY COMMISSIONER MOORE:  How did you

21    -- Were there knives stored on top of the

22    refrigerator?

23         INMATE STRONG:  We had a chop -- On top

24    of the refrigerator we had a chopping block.

25    And it was right over the top of the freezer and

26    it just sat up there.  Once I was struck -- I

27    know it was there and I just stood up and

37

1    reached up.  Unfortunately I grabbed the longest

2    one in the block.

3          PRESIDING COMMISSIONER INGLEE:  These are

4    knives that are in a wooden --

5          INMATE STRONG:  Yes sir.

6          PRESIDING COMMISSIONER INGLEE:  I

7    understand.

8          DEPUTY COMMISSIONER MOORE:  So how is it

9    that Mr. Jones struck you?  Where is it?  What

10   did he do?

11         INMATE STRONG:  When I -- I was standing

12   by the refrigerator and I asked him to leave.

13   And as he was leaving --

14         DEPUTY COMMISSIONER MOORE:  Did you ask

15   him to leave?

16         INMATE STRONG:  Yeah, I told him to get

17   the fuck out.

18         DEPUTY COMMISSIONER MOORE:  That's not

19   asking.

20         INMATE STRONG:  Well.

21         DEPUTY COMMISSIONER MOORE:  That's

22   telling.

23         INMATE STRONG:  Well, yes.

24         DEPUTY COMMISSIONER MOORE:  Okay.

25         PRESIDING COMMISSIONER INGLEE:  It

26   wouldn't cause any confusion with me if you had

27   done that.

38

1              ATTORNEY LEWIS:  Clear as a bell.

2              DEPUTY COMMISSIONER MOORE:  So you told

3    him to get out.

4              INMATE STRONG:  Yes ma'am.

5              DEPUTY COMMISSIONER MOORE:  And what

6    happened?

7              INMATE STRONG:  He walked by me.  As he

8    walked by he and he turned back he struck me.

9              DEPUTY COMMISSIONER MOORE:  Tell me what

10   that means.  Did he tap you on the shoulder,

11   forehead, what?

12             INMATE STRONG:  No, he hit me in my face.

13             DEPUTY COMMISSIONER MOORE:  With what?

14             INMATE STRONG:  With his face.

15             DEPUTY COMMISSIONER MOORE:  And what

16   happened to you?

17             INMATE STRONG:  I went down.

18             DEPUTY COMMISSIONER MOORE:  To the

19   ground?

20             INMATE STRONG:  In the kitchen, in the

21   kitchen.  We was in the kitchen area in front of

22   the refrigerator, I went down.  When I went down

23   I stood back up.  When I stood back up I just

24   reached straight up and grabbed the knife.

25             DEPUTY COMMISSIONER MOORE:  And where was

26   Mr. Jones when you reached for the knife?

27             INMATE STRONG:  Headed for the front

39

1   door.

2          **DEPUTY COMMISSIONER MOORE:**   Running away?

3          **INMATE STRONG:**   He wasn't running, he was

4   leaving.

5          **DEPUTY COMMISSIONER MOORE:**   So he was

6   exiting the building.

7          **INMATE STRONG:**   No, he was -- He hadn't

8   even left.   He hadn't even reached the front

9   door.

10         **DEPUTY COMMISSIONER MOORE:**   Walking

11  towards the front door.

12         **INMATE STRONG:**   Right.

13         **DEPUTY COMMISSIONER MOORE:**   Away from

14  you.

15         **INMATE STRONG:**   We were still in the

16  kitchen area.

17         **DEPUTY COMMISSIONER MOORE:**   But he was

18  walking in the direction away from you, is that

19  right?

20         **INMATE STRONG:**   He wasn't standing over

21  me, if that's what you're asking me.

22         **ATTORNEY LEWIS:**   Just answer the question

23  specifically.

24         **INMATE STRONG:**   Yes, he was walking away.

25         **DEPUTY COMMISSIONER MOORE:**   So you got

26  the knife off the top of the fridge.

27         **INMATE STRONG:**   Right.

40

1      DEPUTY COMMISSIONER MOORE:  And what did

2  you do with the knife?

3      INMATE STRONG:  I came after him.

4      DEPUTY COMMISSIONER MOORE:  And where was

5  he when you were going, when you started out

6  after him?

7      INMATE STRONG:  He had reached the

8  hallway by then.

9      DEPUTY COMMISSIONER MOORE:  Okay.  And

10  then what did you do?

11      INMATE STRONG:  I tried to stab him and

12  he grabbed me.  He grabbed my hand and we

13  started struggling over the knife in the

14  hallway.

15      DEPUTY COMMISSIONER MOORE:  So did he

16  have both of his hands on your arm?

17      INMATE STRONG:  Yes, like this and we was

18  going back and forth.

19      DEPUTY COMMISSIONER MOORE:  And where was

20  Diana?

21      INMATE STRONG:  She came, she was in the

22  hallway and she just came up while we were

23  struggling in the hallway like this.  I don't

24  know what made her -- I don't even know what

25  made her come up that close.

26      DEPUTY COMMISSIONER MOORE:  So was she

27  screaming at you?

41

1          INMATE STRONG:  She was telling us to
2    stop.
3          DEPUTY COMMISSIONER MOORE:  And who else
4    had a weapon?
5          INMATE STRONG:  I'm the only one who had
6    the weapon.
7          DEPUTY COMMISSIONER MOORE:  Why did you
8    get a knife?
9          INMATE STRONG:  I wanted to do something
10   to Mr. Jones.
11         DEPUTY COMMISSIONER MOORE:  Why?
12         INMATE STRONG:  Because he had struck me.
13   If Mr. Jones would have just left there wouldn't
14   have been no confrontation whatsoever.
15         DEPUTY COMMISSIONER MOORE:  If you hadn't
16   picked up the knife there wouldn't have been a
17   confrontation whatsoever.
18         INMATE STRONG:  That's true too.
19         DEPUTY COMMISSIONER MOORE:  So you
20   brought a knife, you got the knife for a
21   fistfight, is that right?
22         INMATE STRONG:  I got the knife to do
23   some damage to Mr. Jones.
24         DEPUTY COMMISSIONER MOORE:  And you were
25   under the influence of cocaine?
26         INMATE STRONG:  Yes ma'am.
27         DEPUTY COMMISSIONER MOORE:  Okay.  That's

42

1   all the questions I have about the offense.

2           PRESIDING COMMISSIONER INGLEE:   From the

3   time that you had arrived at your wife's home

4   how long had it been since you had last used

5   cocaine?  An hour, two days, one day?

6           INMATE STRONG:  No, it was that same day.

7   It was maybe within the hour, an hour or two

8   before I went over.  Me and an associate of mine

9   had engaged in some more cocaine.

10          PRESIDING COMMISSIONER INGLEE:  What

11  about alcohol?  Alcohol wasn't your drug of

12  choice?

13          INMATE STRONG:  No.

14          PRESIDING COMMISSIONER INGLEE:  All

15  right.  Let's take a look at your prior

16  criminality.  Under juvenile record.  You

17  apparently have stated before that you had gone

18  to juvenile hall on one occasion in Fresno for

19  attempting to steal a car.  Is that correct?

20          INMATE STRONG:  Yes.

21          PRESIDING COMMISSIONER INGLEE:  Do you

22  recall what year that was?

23          INMATE STRONG:  No.  I was a teenager.

24          PRESIDING COMMISSIONER INGLEE:

25  Approximately how old?  Sixteen, 15?

26          INMATE STRONG:  Yeah, about 15, somewhere

27  in there.

43

1        PRESIDING COMMISSIONER INGLEE:  Adult

2   convictions.  On 1/26/1987 the prisoner was

3   arrested by Fresno Police Department for

4   battery.  He was sentenced to 30 days county

5   jail and a $100 fine.  What was that all about?

6        INMATE STRONG:  What Ms. Moore was asking

7   about, during the times that I had assaulted

8   Diana.

9        PRESIDING COMMISSIONER INGLEE:  These are

10  those other periods?

11       INMATE STRONG:  Yes sir.

12       PRESIDING COMMISSIONER INGLEE:  She would

13  have you arrested.  You apparently were, and

14  hopefully you are no longer, but you apparently

15  were at that time a violent person.

16       INMATE STRONG:  I was out of control.

17       PRESIDING COMMISSIONER INGLEE:  In all of

18  those instances where you had been involved in

19  battery on your wife, were they all involved

20  with drugs at the same time?

21       INMATE STRONG:  Yes sir.

22       PRESIDING COMMISSIONER INGLEE:  You do

23  know that drugs are as easy to get today as they

24  were then, maybe in some cases easier?

25       INMATE STRONG:  Even so right here.

26       PRESIDING COMMISSIONER INGLEE:  I know.

27  But you're still -- I understand that.  And I

44

1  hear this from a lot of folks who are, who were

2  involved with drugs at one time and have not

3  been participating in drugs for the last, for

4  some time.  But you still are under a certain

5  amount of control here, you're in the state

6  prison.

7         INMATE STRONG:  Yes sir.

8         PRESIDING COMMISSIONER INGLEE:  When you

9  get out, you know, that's an open -- It's a free

10  world out there.

11         INMATE STRONG:  Yes sir, I understand

12  that.

13         PRESIDING COMMISSIONER INGLEE:  Drugs are

14  accessible.

15         INMATE STRONG:  But I don't have no

16  desire.  And the only thing I can do is tell you

17  today what I can do.  I don't have no desire to

18  use drugs no more.  And plus when I get out I'm

19  looking forward to becoming a member of NA on

20  the streets.  I know it's an ongoing thing.  You

21  just, you know.  Just because I do NA in here it

22  means when I get to the street it stops.  It

23  doesn't.

24         PRESIDING COMMISSIONER INGLEE:  You know

25  where you plan to do -- We'll be talking about

26  your parole plans here in just a moment.  But do

27  you already know where you're going?  Who you

45

1   can use as a sponsor and where you can go for NA

2   meetings?

3        INMATE STRONG:  Yes sir.

4        PRESIDING COMMISSIONER INGLEE:  Okay, and

5   we'll talk about that later.  All right.  On

6   2/12/1987 the prisoner was arrested by the

7   Fresno Police Department for inflicting corporal

8   punishment on a spouse.  Again the same?

9        INMATE STRONG:  Yes sir.

10        PRESIDING COMMISSIONER INGLEE:  In this

11   case you were sentenced to 60 days county jail.

12        INMATE STRONG:  Yes sir.

13        PRESIDING COMMISSIONER INGLEE:  Fined

14   $250.

15        INMATE STRONG:  May I make a comment on

16   that sir?

17        PRESIDING COMMISSIONER INGLEE:

18   Certainly.

19        INMATE STRONG:  It was -- Everything was

20   suspended.  I never spent 60 days in the county

21   jail.  I never did no jail time other than being

22   arrested for the spousal abuse and for another

23   incident.

24        PRESIDING COMMISSIONER INGLEE:  What

25   incident was that?

26        INMATE STRONG:  I believe when there was

27   a firearm in the back of a car.

46

1          PRESIDING COMMISSIONER INGLEE:  Is that

2   carrying a loaded weapon in a public place?

3          INMATE STRONG:  Yeah, it was a shotgun in

4   the back of the, the back of the car.

5          PRESIDING COMMISSIONER INGLEE:  It was in

6   1978.

7          INMATE STRONG:  Yeah.

8          PRESIDING COMMISSIONER INGLEE:  And that

9   was 1/19 of 1978.  Receiving stolen property and

10  then carrying a loaded firearm.  Then 4/6 of

11  1978 you were arrested again.

12         DEPUTY COMMISSIONER MOORE:  I'm sorry,

13  Commissioner, I have to turn the tape over.

14         PRESIDING COMMISSIONER INGLEE:  That's

15  all right.

16              (The tape was turned over.)

17         DEPUTY COMMISSIONER MOORE:  We're back on

18  the record at 5:35.

19         PRESIDING COMMISSIONER INGLEE:  I think

20  what I'm looking at is the final disposition of

21  this and in this case it was dismissed.  A

22  2/22/88 inflicting corporal punishment on

23  spouse.  Convicted, jail misdemeanor, 24 months

24  probation, 60 days jail.  It doesn't indicate

25  that that was dropped.

26         INMATE STRONG:  Sir, I never spent a day

27  in jail.

47

1          PRESIDING COMMISSIONER INGLEE:    I

2    understand, you know.   There is no way for me

3    sitting here this afternoon at 5:30 for me to

4    check on this.

5          INMATE STRONG:   Right.

6          PRESIDING COMMISSIONER INGLEE:    All I can

7    do is take a look at the rap sheet.   I'm looking

8    at -- I thought possibly they had typed it up

9    incorrectly on their report and that sometimes

10   happens.   That's the reason I'm going to the rap

11   sheet and looking at it.

12         DEPUTY COMMISSIONER MOORE:   I may be able

13   to shed a little light on that if you'd like,

14   Commissioner.

15         PRESIDING COMMISSIONER INGLEE:    Sure,

16   certainly.

17         DEPUTY COMMISSIONER MOORE:   In looking at

18   the original probation report that was written

19   in this matter there is a 1/26/87 entry for a

20   battery in which jail was suspended, except for

21   the arrest time that you spent in custody.   The

22   second offense, which was on 2/12/87 --

23         PRESIDING COMMISSIONER INGLEE:    That was

24   the injury on spouse.

25         DEPUTY COMMISSIONER MOORE:   Yes, correct,

26   injury on spouse.   I believe the entry plea was

27   on 2/26/88, which showed there was a sentence of

48

1   60 days but there is a suspended sentence

2   indicated in the probation report.  I don't know

3   if that gives any clarification.

4           PRESIDING COMMISSIONER INGLEE:  Well it

5   follows along with what Mr. Strong is saying.

6   Did you ever spend even an overnight period of

7   time in the county jail?

8           INMATE STRONG:  Just one time prior to

9   when I assaulted her in that gun incident.

10  Other than that I had never been to the county

11  jail.

12          PRESIDING COMMISSIONER INGLEE:  And how

13  many times were you in county jail?

14          INMATE STRONG:  Twice.

15          PRESIDING COMMISSIONER INGLEE:  And for

16  how long a period of time each time?

17          INMATE STRONG:  One night.

18          PRESIDING COMMISSIONER INGLEE:  So you

19  were there twice for --

20          INMATE STRONG:  Two day, for two days.

21          PRESIDING COMMISSIONER INGLEE:  For two

22  days.

23          INMATE STRONG:  Yes sir.

24          PRESIDING COMMISSIONER INGLEE:  On two

25  different occasions.

26          INMATE STRONG:  Yes sir.

27          PRESIDING COMMISSIONER INGLEE:  All

49

1   right.

2        ATTORNEY LEWIS:  I'm sorry, is that twice

3   for two days, a total of four, or is it one day

4   each time?

5        PRESIDING COMMISSIONER INGLEE:  He did

6   twice --

7        INMATE STRONG:  One day each time.

8        PRESIDING COMMISSIONER INGLEE:  He was

9   there twice, one day each.

10       ATTORNEY LEWIS:  Thank you.

11       PRESIDING COMMISSIONER INGLEE:  No, I

12   understand.  All right, anything else we should

13   know concerning your criminal background?

14       INMATE STRONG:  That's it right there in

15   front of you sir.  Everything you have is there.

16       PRESIDING COMMISSIONER INGLEE:  Well it's

17   disturbing.  Obviously, from what you tell me,

18   it's a drug-induced problem you had.  It's a

19   shame that somebody in your family didn't get a

20   hold of you and stop that cycle.  We probably

21   wouldn't be having this conversation today.

22       INMATE STRONG:  You're right sir, I agree

23   with you.  But they was, they was, my family

24   members was talking with me.  I just, I just

25   didn't hear them.

26       PRESIDING COMMISSIONER INGLEE:  You

27   weren't listening.

50

1          INMATE STRONG:  No sir.

2          PRESIDING COMMISSIONER INGLEE:  Okay,

3    let's take a look at your personal history.

4    Mr. Strong was born February 15, 1954 in Fresno,

5    California.  He was raised by his mother,

6    Dorothy Potts, P-O-T-T-S, his parents were never

7    married.  He believes his father was a man named

8    Pre Hacket?

9          INMATE STRONG:  Yes sir.

10          PRESIDING COMMISSIONER INGLEE:  Pre is

11    the first name, P-R-E, the last name Hacket, H-

12    A-C-K-E-T, who died in the early 1970s.

13    Sylvester has six brothers and one sister.  He

14    graduated from Washington Union High School in

15    1972.  He never served in the military.  At the

16    time of his arrest he was residing with his

17    mother.  Sylvester married Diana Pinson.

18          INMATE STRONG:  Yes sir.

19          PRESIDING COMMISSIONER INGLEE:  P-I-N-S-

20    O-N, the victim, on June 6, 1980 in Las Vegas,

21    Nevada.  They began experiencing marital

22    problems in 1986 and were divorced on November

23    19, 1987.  Their son, Sylvester Strong Junior

24    was born from this union and now resides with

25    his maternal grandmother in Fresno.  Does he

26    still live with her?

27          INMATE STRONG:  Yes.

51

1    **PRESIDING COMMISSIONER INGLEE:**  Sylvester

2    worked in animal control for the Society for the

3    Prevention of Cruelty to Animals for seven

4    years.  Some notations down here.  Supposed to

5    have received $3,000 from a property settlement

6    from his ex-spouse.  He did not receive it.  He

7    owed $9,000 to finance companies.  This is

8    referencing the point in time of the crime.  He

9    first used cocaine in 1985.  He used about a

10   gram a month until his arrest on December 10,

11   1987.  Sylvester feels that the use of cocaine

12   was 99 percent of the cause of his downfall.  He

13   married Gloria Summerfield (phonetic) on

14   2/29/2002.  There are no children from this

15   union.  There is no history of medical or

16   psychiatric problem.  There is no history of

17   sexual deviation.  Okay.  Did you ever try any

18   other drugs before you got into cocaine such as

19   -- well, I asked you about alcohol but

20   marijuana.  That was a big leap from nothing to

21   cocaine.

22   **ATTORNEY LEWIS:**  He didn't answer on the

23   record, he shook his head.  Could you say yes or

24   no.

25   **INMATE STRONG:**  No, I did not.  You know,

26   I hit marijuana once in a while but it wasn't no

27   big thing, you know.

52

1          PRESIDING COMMISSIONER INGLEE:   Did you

2    use it once?

3          INMATE STRONG:  Once or twice.

4          PRESIDING COMMISSIONER INGLEE:   Three

5    times, four times?

6          INMATE STRONG:  Once or twice.  It didn't

7    do nothing.  It was --

8          PRESIDING COMMISSIONER INGLEE:   All

9    right.  Well we have had a bit of a miscue

10   because we're going back to that discussion as

11   to your admitting to as to what really happened

12   the day of the killing.  My reason for asking

13   the question a couple of times was because you

14   obviously had your dates mixed up there.  And I

15   want to be sure that we have the right story

16   going into this.  Okay, anything else about your

17   personal life that we should know?

18          INMATE STRONG:  My personal life today or

19   then?

20          PRESIDING COMMISSIONER INGLEE:   All then.

21   Okay.

22          ATTORNEY LEWIS:  Answer yes or no.

23          PRESIDING COMMISSIONER INGLEE:   You've

24   got to say yes or no.

25          INMATE STRONG:  No sir, there isn't

26   anything else I want to say.

27          PRESIDING COMMISSIONER INGLEE:   All

53

1    right.   Let's take a look at your parole plans.

2    You plan to reside with your mother, Dorothy

3    Potts.

4              INMATE STRONG:   Yes sir.

5              PRESIDING COMMISSIONER INGLEE:   On South

6    Martin Luther King Boulevard in Fresno,

7    California.   You also applied -- Did you get any

8    results from the Salvation Army?

9              INMATE STRONG:   No I didn't.   What I did

10   with the Salvation Army is donated -- When I

11   wrote to the Salvation Army I donated $10 to the

12   hurricane victims program.   That's what the

13   Salvation Army was about.

14             PRESIDING COMMISSIONER INGLEE:   Well it

15   says here you also applied to the Salvation Army

16   Rehabilitation Center in Fresno, California

17   regarding participating in their program and

18   boarding facilities.

19             INMATE STRONG:   Yes, they never -- Well

20   they sent me a letter but -- I don't have it

21   with me today but it should be, a copy of it

22   should be in my C File.

23             PRESIDING COMMISSIONER INGLEE:   Well my

24   reason for saying that is that -- I'm not

25   suggesting that's better than your mother.   I'm

26   just saying that I've had several inmates who

27   have used the Salvation Army.

54

1          INMATE STRONG:  Yeah.

2          PRESIDING COMMISSIONER INGLEE:  And they

3    apparently had a pretty good program.  Now that

4    may or may not be the truth in all areas because

5    like anything else these things are different

6    from place to place.  But the two that I'm

7    familiar with are in Los Angeles and San Diego.

8          INMATE STRONG:  Yeah.  Even in San Diego

9    they have that, they've got some good programs

10   down there.

11         PRESIDING COMMISSIONER INGLEE:  They've

12   got some excellent programs.

13         INMATE STRONG:  Excellent, yeah.

14         PRESIDING COMMISSIONER INGLEE:  Amity is

15   another one.

16         INMATE STRONG:  Right.

17         PRESIDING COMMISSIONER INGLEE:  The Amity

18   program.

19         INMATE STRONG:  Right.  But I'm going to

20   be living with my mother.

21         PRESIDING COMMISSIONER INGLEE:  Okay.

22         INMATE STRONG:  There's a picture of the

23   home that I'm going to be living at.

24         PRESIDING COMMISSIONER INGLEE:  I was

25   just looking at it.  Your attorney

26   (indiscernible.  It's very nice.

27         INMATE STRONG:  All right.

55

1          PRESIDING COMMISSIONER INGLEE:   Your

2    employment.   Strong plans to work as a stocker

3    and a clerk at the Cigarette Outlet.

4          INMATE STRONG:   Correct.

5          PRESIDING COMMISSIONER INGLEE:   Located

6    on Fresno Street, Fresno and the telephone

7    number.   You hope to go back to work for

8    prevention of cruelty to animals.

9          INMATE STRONG:   Yes sir.

10         PRESIDING COMMISSIONER INGLEE:   Okay.

11   Have you made any inquiries with them?

12         INMATE STRONG:   They just told me when I

13   get out to come back and apply again, you know.

14   But that was about the extent of it.

15         PRESIDING COMMISSIONER INGLEE:   Okay, all

16   right.   In that regard let's take a look at your

17   letters.   The first letter we have is from the

18   District Attorney's Office in the County of

19   Fresno.   It's to:

20              "Dear Prison Terms.   Please be

21              advised that due to limited

22              resources a representative of this

23              office will not be able to attend

24              the above-referenced parole

25              consideration hearing.

26              Notwithstanding we want the Board

27              of Prison Terms to know this

56

1          office opposes the parole of the
2          above inmate."
3    This is referencing Sylvester Strong.
4          "Accordingly we hereby submit this
5          letter in opposition to giving
6          inmate Strong a parole date at
7          this time.  Opposition is based
8          on, number one, the violent and
9          calculated nature of the
10         commitment offense.  Number two,
11         the inmate's continued need for
12         self-help to help him understand
13         the nature of the interpersonal
14         relationship.  Number three, the
15         lack of insight into the
16         underlying reasons for the crime.
17         Number four, the inmate's prior
18         record of violence and the
19         unreasonable risk this person
20         poses to the general population if
21         released at this time."
22   And that's signed by James Sanderson, Deputy
23   District Attorney.  Okay.  While I'm into that I
24   will just make the notation that five 3042
25   letters were sent out from the prison in this
26   regard to the various agencies and courts that
27   were involved in your incarceration.  We

57

1    received one letter back, which I just read, and
2    that's from the District Attorney's Office.
3    Let's take a look at your letters of support.
4            "I am Gloria Strong, Sylvester
5            Strong's wife.  I am here to
6            support my husband in anything he
7            is in the need of.  I lived in an
8            apartment that my husband would
9            not be allowed to live in because
10           he is a felon.  I now live in a
11           house that he will be welcome in.
12           I love my husband and look forward
13           to him coming home.  I am disabled
14           and unable to see Sylvester and I
15           would like -- Please don't take
16           this as me not caring.  I love the
17           man I married.  I want him home."
18   Are you going to be living with your wife or
19   with your mother?
20           **INMATE STRONG:**  I'm going to parole back
21   to my mother's home because my wife has older
22   children and they take care of her.  I don't
23   have a relationship with them.  What I'm going
24   to do is first make the transition with my
25   mother and see how things are over there.
26   Because I want to try to keep myself in a safe
27   position, you know.

58

1          PRESIDING COMMISSIONER INGLEE:   What city

2   does your wife live in?

3          INMATE STRONG:   In Fresno also.

4          PRESIDING COMMISSIONER INGLEE:   Okay.   I

5   may not have the second page of this letter but

6   if I do have -- You might ask your wife to, if

7   you don't get a date today and she sends another

8   letter, ask her to put her name down and sign it

9   with an address.

10         INMATE STRONG:   Okay.

11         PRESIDING COMMISSIONER INGLEE:   Okay,

12  this is from your mother, Dorothy Potts.

13             "I, Dorothy Potts, mother of

14             Sylvester Strong Sr., will have a

15             place for my son to live.   The

16             Parole Board may visit my home

17             anytime.   I can understand that

18             both sides of the family will

19             (indiscernible).   We pray and ask

20             for the forgiveness of God."

21  So that's a very nice letter from your mother

22  offering a place to live.   And I've seen the

23  picture, it's a very nice home.

24         INMATE STRONG:   Okay, thank you.

25         PRESIDING COMMISSIONER INGLEE:   And you

26  have a letter of support from Bobby Gilbert.

27         INMATE STRONG:   Yes sir.

59

1          PRESIDING COMMISSIONER INGLEE:   Who

2    apparently is a juvenile correctional officer.

3    And he is a nephew.

4          INMATE STRONG:   Yes sir.

5          PRESIDING COMMISSIONER INGLEE:   And then

6    you have a letter from Diana Harris who is your

7    sister.

8          INMATE STRONG:   Yes sir.

9          PRESIDING COMMISSIONER INGLEE:   Another

10   nice letter of support.   And I have another

11   letter from your -- Is Andrew or Anita your

12   brother or sister?

13         INMATE STRONG:   Andrew is my brother and

14   Anita is his wife.

15         PRESIDING COMMISSIONER INGLEE:   Okay, so

16   that was my question.   They sent a very nice

17   letter of support.   I have a letter here from

18   your job.   And it's only disconcerting because

19   it doesn't look like a job letter.   It looks

20   like something someone put on a typewriter and

21   sort of banged out.

22         INMATE STRONG:   Well, that's my uncle

23   John.   He owns the cigarette store and there's

24   his number.

25         PRESIDING COMMISSIONER INGLEE:   Well I'm

26   not doubting necessarily there is -- But, I

27   mean, it's -- Again, I'll accept this as being a

60

1   offer for a job.

2           INMATE STRONG:  Yeah.

3           PRESIDING COMMISSIONER INGLEE:   However,

4   it's a little disconcerting.  I don't really

5   demand that they be something that looks like

6   it's being sent from General Motors.

7           INMATE STRONG:  Okay.

8           PRESIDING COMMISSIONER INGLEE:   But let

9   me suggest that he might be a little more formal

10  and tell us a little more about the job, if in

11  fact you don't get a date today, okay.

12          INMATE STRONG:  Sir --

13          PRESIDING COMMISSIONER INGLEE:   And also,

14  it would also be nice if he signed it.

15          INMATE STRONG:  Sir, that's the second

16  time you indicated, if I don't get a date.  Is

17  it leading that way?

18          PRESIDING COMMISSIONER INGLEE:   We always

19  -- No, it has nothing to do with that.  It's how

20  we describe it.

21          INMATE STRONG:  Okay.

22          PRESIDING COMMISSIONER INGLEE:   If I said

23  nothing to you and we got to the end of this

24  hearing and you walked away and said, what on

25  earth can I do to possibly get out of here?  All

26  I'm doing you is giving hallmarks as we go

27  along.

61

```
1              INMATE STRONG:  Okay.

2              PRESIDING COMMISSIONER INGLEE:  As to

3    things you can do if you don't get a date today,

4    that's all.

5              INMATE STRONG:  All right, all right.

6              PRESIDING COMMISSIONER INGLEE:  Simple as

7    that.  So ask John.  You say this is your uncle?

8              INMATE STRONG:  Yes sir.

9              PRESIDING COMMISSIONER INGLEE:  To try to

10   come up with a little more formal letter telling

11   us what you're going to be doing.  And also have

12   him sign the letter, all right?

13             INMATE STRONG:  Okay.

14             PRESIDING COMMISSIONER INGLEE:  Such as

15   the address for the company.  You know, just,

16   okay.  All right, anything else in your parole

17   plans?

18             INMATE STRONG:  Other than attending NA

19   when I get out to the streets and going to work,

20   staying out of trouble.  Trying to get my life

21   back together.

22             PRESIDING COMMISSIONER INGLEE:  What will

23   you be doing for your uncle in his, for the

24   cigarette store?

25             INMATE STRONG:  Working in the store

26   stocking, as a stock, running the cash register.

27             PRESIDING COMMISSIONER INGLEE:  Will that
```

62

1   be a fulltime, 40 hour, 40 hour job?

2          INMATE STRONG:  Yes.

3          PRESIDING COMMISSIONER INGLEE:  Who is

4   doing that job now?

5          INMATE STRONG:  It's a family-owned

6   business.  My nephew and his wife.

7          PRESIDING COMMISSIONER INGLEE:  So he can

8   absorb you into the position?

9          INMATE STRONG:  Yes.

10          PRESIDING COMMISSIONER INGLEE:  All

11   right, with that let's move on to post-

12   conviction factors.

13          DEPUTY COMMISSIONER MOORE:  Thank you.

14   Mr. Strong, I am going to review with you with

15   some focus since your last hearing in November

16   of '04 of what has occurred and what you've

17   accomplished.  And also I'm going to have some

18   questions for you about some of the programming

19   that you've done.  If I am in error about

20   anything please let me know and we can make a

21   correction for the record.  I may ask you for

22   some updated information as well, okay?

23          INMATE STRONG:  Okay, Ms. Moore.

24          DEPUTY COMMISSIONER MOORE:  Your last

25   hearing date was on November 18, 2004, in which

26   you were denied parole for one year.  You were

27   asked to remain disciplinary-free, which you

63

1   have done.  You were asked to seek self-help

2   when available, specifically in the area of

3   domestic violence or a batterer's treatment

4   program.  Do any of those programs exist here at

5   CTF?

6           INMATE STRONG:  No ma'am, they doesn't.

7           DEPUTY COMMISSIONER MOORE:  Okay.  And

8   that's a frustration for you.

9           INMATE STRONG:  To a degree but I went

10  outside the institution and got some

11  information.

12          DEPUTY COMMISSIONER MOORE:  What did you

13  do?  What did you find out?

14          INMATE STRONG:  I went over to -- I had

15  someone, a friend of mine go over the Internet

16  and get some information that my counselor

17  entered into my C File and never gave me the

18  copies back.  But it's in my C File about

19  domestic violence.

20          DEPUTY COMMISSIONER MOORE:  Specifically

21  what?

22          INMATE STRONG:  How to prevent it, the

23  cause of it, you know.  What could I do to look

24  at myself.

25          DEPUTY COMMISSIONER MOORE:  Did you get

26  some materials to review?

27          INMATE STRONG:  Yes I did.

64

1        **DEPUTY COMMISSIONER MOORE:** Okay. And

2  this was from an Internet source?

3        **INMATE STRONG:** Yes ma'am.

4        **DEPUTY COMMISSIONER MOORE:** Okay.

5        **PRESIDING COMMISSIONER INGLEE:** While

6  she's looking at that, are there any books in

7  the library here?

8        **INMATE STRONG:** I already participated in

9  that particular program doing a book report on

10 it.

11       **PRESIDING COMMISSIONER INGLEE:** Do you

12 have your book reports with you?

13       **INMATE STRONG:** No, I don't have them

14 here, they're in the file. That was done

15 sometime on the last hearing. The only thing I

16 have with me present now is what I did since the

17 last Board Hearing.

18       **DEPUTY COMMISSIONER MOORE:** Okay. I'm

19 going to come back to that in a moment. I did

20 want to clarify for the panel that currently

21 there are no batterer's treatment programs

22 available here at CTF for you to participate in.

23 Is that correct?

24       **INMATE STRONG:** That's correct.

25       **DEPUTY COMMISSIONER MOORE:** Okay. You

26 were also asked to obtain and earn positive

27 chronos.

65

1          INMATE STRONG:  Yes ma'am.

2          DEPUTY COMMISSIONER MOORE:  Which I'll be

3    getting to and you do have.  Your classification

4    score is the lowest possible for a life inmate

5    of zero or a 19 with the life classification and

6    you obtained that score on August of '99.  You

7    are of a Medium-A custody level and you achieved

8    that in August of '99 as well.  You are clear of

9    any gang affiliation.  And your current work

10   assignment, and has been for the past five

11   years, almost five years, in the PIA upholstery

12   shop.  In which you have received -- You have

13   gone from average to above average to consistent

14   exceptional work reviews.  And your supervisor,

15   Arroyo (phonetic).

16         INMATE STRONG:  Yes ma'am.

17         DEPUTY COMMISSIONER MOORE:  Who has been

18   your supervisor for quite some time.  Almost

19   your entire period in this job.

20         INMATE STRONG:  Right.

21         DEPUTY COMMISSIONER MOORE:  You've been

22   promoted and you're probably pretty close to the

23   top of the pay scale as well for the level of

24   work you do.  The last report is dated on

25   February 1 of 2006.  You are to be commended for

26   an excellent work history.

27         INMATE STRONG:  Thank you.

66

1          DEPUTY COMMISSIONER MOORE:  You indicate

2    that you have your high school degree and my

3    concern that I have is about your -- They give

4    you here in prison grade placement and in 1998

5    you showed a 4.6.

6          INMATE STRONG:  Yes.  As I previously

7    stated in all the other hearings, the reason why

8    that came up is we was at a reception center and

9    they just popped the door open and told us they

10   want us to take a TABE test.  Every institution

11   I go to it seems like it's a TABE test.  And I

12   explained to the person at that place that I

13   have a high school diploma, I even presented it

14   to him.  He said he didn't care.  And I had a

15   nonchalant attitude where I didn't care so I

16   just marked anything basically.

17         DEPUTY COMMISSIONER MOORE:  Okay.

18         INMATE STRONG:  Which two wrongs don't

19   make a right.

20         DEPUTY COMMISSIONER MOORE:  That hurts

21   you.

22         INMATE STRONG:  Yeah.

23         DEPUTY COMMISSIONER MOORE:  It does in

24   the long run.  Because now I get concerned about

25   your ability to understand directions, obtain a

26   driver's license, you know.  There's many

27   directions we have to read, instructions when we

67

1  participate in the outside world.  I'm going to

2  use the same phrase the Commissioner said.

3  Should you not get a date today, that's only --

4  as you understand why we say that.

5          INMATE STRONG:  Right.

6          DEPUTY COMMISSIONER MOORE:  This is

7  something you want to talk to your counselor

8  about, seeing if you can take the TABE test

9  again.

10          INMATE STRONG:  Well I have rectified

11  that by stating and showing and having

12  Ms. Barnes from this institution not to take my

13  high school diploma that I have, to retrieve one

14  herself.  And the counselors told me that was

15  sufficient enough.

16          DEPUTY COMMISSIONER MOORE:  Let me tell

17  you where I'm coming from on this.  I have many

18  men sitting on that side of the table who have

19  high school diplomas that are of your age that

20  still can't read.  I don't believe that's the

21  case for you.  I don't believe you could have

22  obtained the seven years of employment, eight

23  years of employment with the City of Fresno

24  without those kinds of skills.  But if you do

25  get the opportunity to take the TABE test I

26  would highly recommend it.  Just so that we have

27  more proof, more evidence of your abilities,

68

1    that's all.  I do note that you do have a high

2    school diploma.  Your vocational training is in

3    upholstery.

4          **INMATE STRONG:**  Yes ma'am.

5          **DEPUTY COMMISSIONER MOORE:**  And you

6    recently attended, recently last year, an

7    upholstery training seminar put on by a private

8    company inside the prison.

9          **INMATE STRONG:**  Right.

10         **DEPUTY COMMISSIONER MOORE:**  And you

11   successfully completed that.

12         **INMATE STRONG:**  Correct.

13         **DEPUTY COMMISSIONER MOORE:**  Okay.  You

14   have no -- I saw some masonry work some time

15   ago.

16         **INMATE STRONG:**  Right, that was at

17   Pleasant Valley.  That was back in '96.  I had

18   like three more steps to complete the complete

19   trade and they transferred me here saying that

20   they, I was no longer needed there.  You know,

21   they needed the space and I didn't get an

22   opportunity to complete it.

23         **DEPUTY COMMISSIONER MOORE:**  And that's

24   what I noted, that you had completed the

25   majority of the units.

26         **INMATE STRONG:**  Yes.

27         **DEPUTY COMMISSIONER MOORE:**  And close to

69

1   getting the certification in there.  Are there

2   any other trades, vocations that you've received

3   training in?

4           INMATE STRONG:  No ma'am, other than

5   upholstery.

6           DEPUTY COMMISSIONER MOORE:  Okay.  You

7   have participated the majority of the time in

8   Narcotics Anonymous, some of it was also AA when

9   available.  The earliest chronos that I'm seeing

10  are in April of '01, 2001.  Were you

11  participating prior to that as well?

12          INMATE STRONG:  Yes ma'am.  I started NA

13  in '94 at Corcoran.

14          DEPUTY COMMISSIONER MOORE:  Okay.  And

15  whenever available you've been participating?

16          INMATE STRONG:  Yes ma'am.

17          DEPUTY COMMISSIONER MOORE:  Okay. Still

18  going?

19          INMATE STRONG:  Yes ma'am.

20          DEPUTY COMMISSIONER MOORE:  And what's

21  your clean and sober date?

22          INMATE STRONG:  Truthfully?

23          DEPUTY COMMISSIONER MOORE:  Well that's

24  what we're looking for here.

25          INMATE STRONG:  Okay.  I've been clean

26  since -- I got here in '96.  About '93, '92.

27          DEPUTY COMMISSIONER MOORE:  Okay.  So

70

1  while in custody at some time.

2          INMATE STRONG:  Yes.

3          DEPUTY COMMISSIONER MOORE:  You didn't

4  receive a 115 or a 128.

5          INMATE STRONG:  No.

6          DEPUTY COMMISSIONER MOORE:  Pruno or

7  drugs?

8          INMATE STRONG:  A pass of a joint.  I hit

9  it and passed it back.

10          DEPUTY COMMISSIONER MOORE:  Still using.

11          INMATE STRONG:  Yes.

12          DEPUTY COMMISSIONER MOORE:  Okay.  So

13  clean and sober then for coming up on ten years?

14          INMATE STRONG:  Yes ma'am.

15          DEPUTY COMMISSIONER MOORE:  Okay.

16          ATTORNEY LEWIS:  Thirteen.

17          DEPUTY COMMISSIONER MOORE:  Thirteen.

18  Did he say '93 or '95?

19          INMATE STRONG:  '93.

20          DEPUTY COMMISSIONER MOORE:  '93, okay.

21  Coming up on 13 years clean and sober.  Tell me

22  about the work you've done in Narcotics

23  Anonymous.  Tell me about your footwork.

24          INMATE STRONG:  Okay, what we do is it's

25  a program that gives you the insight and

26  understanding of why use drugs and the effect it

27  has on you.  We have steps that we participate

71

1  in.

2          DEPUTY COMMISSIONER MOORE:  Have you

3  worked all the steps?

4          INMATE STRONG:  I'm familiar with all the

5  steps.  But the steps that I cling to, that was

6  number one, that I admitted that I was powerless

7  over my addiction, that my life had became

8  unmanageable.  Then number two, I come to

9  believe a power greater than myself can restore

10  me back to sanity.  Then I go to number eight.

11          DEPUTY COMMISSIONER MOORE:  What happened

12  to four?

13          INMATE STRONG:  Well four.

14          DEPUTY COMMISSIONER MOORE:  A written

15  inventory.  A searching, moral and honest

16  inventory.

17          INMATE STRONG:  That's a good one too.

18          DEPUTY COMMISSIONER MOORE:  And they're

19  in order for a reason.

20          INMATE STRONG:  Yeah, they are in order

21  for a reason.  But they tell us to work it as

22  what fits our criteria.  Then I went to number

23  eight.  That really kind of struck me where I

24  made a list of all the people that I harmed and

25  became willing to make amends to them.

26          DEPUTY COMMISSIONER MOORE:  Well here's

27  my question, and it's great that you did the

72

1    list.

2            INMATE STRONG:  Yeah, yeah.

3            DEPUTY COMMISSIONER MOORE:  But why

4    didn't you do step four, writing the inventory?

5            INMATE STRONG:  I just really never got

6    into the -- I wrote it but either you're going

7    to use it or you're not.

8            DEPUTY COMMISSIONER MOORE:  How come you

9    didn't do step four?

10           INMATE STRONG:  I just didn't do it.  You

11   know, I went over them but I just didn't do step

12   four.

13           DEPUTY COMMISSIONER MOORE:  Because step

14   five is pretty related to step four.

15           INMATE STRONG:  They're all related

16   together.

17           DEPUTY COMMISSIONER MOORE:  But you have

18   to share with another human being and your

19   higher power the wrongs you did, the part that

20   you have.

21           INMATE STRONG:  Yes, that's --

22           DEPUTY COMMISSIONER MOORE:  Have you ever

23   done that?

24           INMATE STRONG:  Yes.

25           DEPUTY COMMISSIONER MOORE:  You have?

26   Who did you do that with, a sponsor?

27           INMATE STRONG:  I do it with, I do it in

73

1    NA.  We talk and we get in -- we have time on

2    the floor to talk about our case.

3          DEPUTY COMMISSIONER MOORE:   Who

4    introduced you to cocaine?  Beverly?

5          INMATE STRONG:  No.

6          DEPUTY COMMISSIONER MOORE:   Who?

7          INMATE STRONG:  A guy.

8          DEPUTY COMMISSIONER MOORE:   Why did you

9    use it?

10         INMATE STRONG:  Because I thought I had,

11   I thought I was on top.

12         DEPUTY COMMISSIONER MOORE:   Life wasn't

13   quite exciting enough?

14         INMATE STRONG:  I thought I had it all so

15   why not try a little cocaine.

16         DEPUTY COMMISSIONER MOORE:   And who is

17   Beverly Green (phonetic)?

18         INMATE STRONG:  That's Monique's mother.

19         DEPUTY COMMISSIONER MOORE:   And who is

20   Beverly Green?

21         INMATE STRONG:  That's the daughter,

22   that's my daughter's mother.

23         DEPUTY COMMISSIONER MOORE:   A woman you

24   had an affair with while you were married?

25         INMATE STRONG:  No.

26         DEPUTY COMMISSIONER MOORE:   No?

27         INMATE STRONG:  Beverly was, Beverly was

74

1    prior to, before Diana.

2          DEPUTY COMMISSIONER MOORE:   Before Diana.

3          INMATE STRONG:   Yes.

4          DEPUTY COMMISSIONER MOORE:   Well how old

5    -- I note a 1985 date and I note that you were

6    married from '87 so that's where my confusion

7    comes in.   And you know what, you had indicated

8    earlier that the date was wrong on Monique.

9          INMATE STRONG:   Yeah, yeah.

10         DEPUTY COMMISSIONER MOORE:   Tell me how

11   old Monique was when you committed the murder.

12         INMATE STRONG:   Monique had to be about

13   13 or 14.

14         DEPUTY COMMISSIONER MOORE:   At that time?

15         INMATE STRONG:   Yes.

16         DEPUTY COMMISSIONER MOORE:   Okay.

17         INMATE STRONG:   Beverly was my first

18   girlfriend that I went with from '67, from '67

19   to maybe '69.

20         DEPUTY COMMISSIONER MOORE:   Okay.

21         INMATE STRONG:   Beverly comes from a good

22   family.   Beverly had nothing --

23         DEPUTY COMMISSIONER MOORE:   Okay.

24         INMATE STRONG:   Beverly's family would

25   not tolerate nothing like that.

26         DEPUTY COMMISSIONER MOORE:   Well, the

27   dates in the initial report when you came into

75

1  prison had some different things there.

2          INMATE STRONG:  Yeah, yeah.

3          DEPUTY COMMISSIONER MOORE:  So thank you

4  for clearing that up.  Do you still have a

5  relationship with Monique?

6          INMATE STRONG:  Yes.

7          DEPUTY COMMISSIONER MOORE:  And how about

8  Junior?

9          INMATE STRONG:  Yes.

10         DEPUTY COMMISSIONER MOORE:  What does

11 Junior think about you killing his mom?

12         INMATE STRONG:  He didn't approve of it.

13         DEPUTY COMMISSIONER MOORE:  Well, how

14 about you go a little bit further than that.

15         INMATE STRONG:  He told me he didn't

16 understand what happened and why it happened and

17 I had to explain it to him.  In explaining it to

18 him he told me he still loved me and that meant

19 a lot to me.

20         DEPUTY COMMISSIONER MOORE:  How often do

21 you see your son?

22         INMATE STRONG:  I don't.  I stopped

23 seeing Sylvester when he turned 11.

24         DEPUTY COMMISSIONER MOORE:  Why is that?

25         INMATE STRONG:  He chose to do something

26 other than what I wanted him to do.

27         DEPUTY COMMISSIONER MOORE:  Which was?

76

1        INMATE STRONG:  He became a gang member.

2        DEPUTY COMMISSIONER MOORE:  Here in

3   Fresno?

4        INMATE STRONG:  Yes.

5        DEPUTY COMMISSIONER MOORE:  Which gang?

6        INMATE STRONG:  From my understanding

7   they call theyself (sic) a Deuce Diamond Crip.

8        DEPUTY COMMISSIONER MOORE:  At 11 years

9   old?

10        INMATE STRONG:  He was getting into it

11   the last time I saw him.  I recognized his

12   little outfit that he had on and we talked about

13   it.  After that he --

14        DEPUTY COMMISSIONER MOORE:  So you

15   haven't had contact with him?  He's 23 now?

16        INMATE STRONG:  Yeah, he'll be 23 July

17   the 1st.

18        DEPUTY COMMISSIONER MOORE:  Have you seen

19   him since?

20        INMATE STRONG:  You know, I don't want to

21   talk about Sylvester but I will say this.

22   Sylvester is off the track right now.  Sylvester

23   is incarcerated as well.

24        DEPUTY COMMISSIONER MOORE:  Locally or in

25   the state prison?

26        INMATE STRONG:  In the state prison.

27        DEPUTY COMMISSIONER MOORE:  Have you

77

1    attempted to try -- Drugs part of his life?

2          INMATE STRONG:  Truthfully, all I know,

3    he was involved in gangs.  I don't know.  But I

4    keep in contact with Sylvester through his

5    grandmother Ruby, Diana's mother.  I correspond

6    with Sylvester right now.  We write, you know.

7    I always write him.  But I lost, I lost control

8    of him at 11, you know.  In fact, that was the

9    last time I kissed him on the cheek and he told

10   me I couldn't do that no more.

11         DEPUTY COMMISSIONER MOORE:  Some pretty

12   serious consequences for taking the life of his

13   mother.

14         INMATE STRONG:  Yes.  And that I can

15   never change and that's something I have to live

16   with the rest of my life.

17         DEPUTY COMMISSIONER MOORE:  So coming

18   back to NA.  Has it been recommended to you that

19   you work the steps?

20         INMATE STRONG:  They tell us to work them

21   as we need them, you know.

22         DEPUTY COMMISSIONER MOORE:  What sort of

23   literature have you read in NA?

24         INMATE STRONG:  The literature that they

25   offer us in there, you know.  They have little

26   pamphlets and stuff.

27         DEPUTY COMMISSIONER MOORE:  Have you ever

78

1  read the book that AA uses called Alcoholics

2  Anonymous?

3          INMATE STRONG:  We have sessions in NA

4  that we take turns reading out the book.

5          DEPUTY COMMISSIONER MOORE:  The big book?

6          INMATE STRONG:  Yeah, the big blue book.

7          DEPUTY COMMISSIONER MOORE:  And have you

8  over obtained a copy of that for yourself?

9          INMATE STRONG:  No, when we go in there

10  we read it out.  They just have a couple of them

11  and they just pass them around within the

12  meeting.

13          DEPUTY COMMISSIONER MOORE:  What does

14  that book recommend?  That's pretty much the

15  bible of recovery, isn't it?

16          INMATE STRONG:  The thing is, my theory

17  is it's just, it's two things.  You're going to

18  use or you're not going to use, you know.  And

19  you find ways to -- It takes time to find out

20  how not to use and why you use and all that.

21  But we read the book.

22          DEPUTY COMMISSIONER MOORE:  Okay.

23  There's some other things that you've completed

24  since your last hearing.  The community reentry

25  video and discussion occurred.  Also anger

26  management class in July of '05.

27          INMATE STRONG:  Yes.

79

1      **DEPUTY COMMISSIONER MOORE:**  And there was

2  a tobacco awareness program that you also went

3  through in January of '06.  And I do want to,

4  even though it was prior to your last hearing,

5  in August of '02 you participated in a 13-week

6  IMPACT program.

7      **INMATE STRONG:**  Yes ma'am.

8      **DEPUTY COMMISSIONER MOORE:**  What did you

9  get from that?

10      **INMATE STRONG:**  With IMPACT?

11      **DEPUTY COMMISSIONER MOORE:**  Uh-hmm.

12      **INMATE STRONG:**  That was a real awesome

13  class.  We had various topics.  I mean, from

14  domestic violence to gangs to murder.  It was a

15  very interesting class that Captain Garrett

16  (phonetic) here at CTF was the sponsor of it.

17      **DEPUTY COMMISSIONER MOORE:**  And you

18  learned about your impact on what, your

19  behavior?

20      **INMATE STRONG:**  Basically when I went to

21  the IMPACT class was to try to get some

22  understanding on domestic violence.

23      **DEPUTY COMMISSIONER MOORE:**  Did you?

24      **INMATE STRONG:**  Yes.

25      **DEPUTY COMMISSIONER MOORE:**  What did you

26  learn?

27      **INMATE STRONG:**  That I cannot control no

80

1    person but myself.   That if my wife Gloria today

2    tell me she don't want to be with me, I have to

3    respect that.   I can't make her do something

4    that she don't want to do.   She's a grown

5    person.

6          DEPUTY COMMISSIONER MOORE:   Does Gloria

7    know about your history?

8          INMATE STRONG:   Gloria, in fact, was

9    working at the hospital.   Yeah, she know about

10   it, she know the whole case.

11         DEPUTY COMMISSIONER MOORE:   Okay.   We

12   also have a laudatory chrono, which you spoke

13   about earlier, and that was written by CC-I

14   Palmer in September of '05 in which you

15   participated with other inmates in making a

16   financial donation for the victims of the

17   Katrina Hurricane in the Louisiana/Mississippi

18   area.

19         INMATE STRONG:   Yes I did.

20         DEPUTY COMMISSIONER MOORE:   Good

21   community service.   I'm going to move on now.

22   Is there anything else you want to tell me about

23   programming, laudatory chronos, work, academics,

24   anything that I've missed or overlooked?

25         INMATE STRONG:   You covered everything

26   other than since the last Board Hearing I just

27   received seven laudatory chronos, which you

81

1  mentioned.

2       **DEPUTY COMMISSIONER MOORE:**   Okay.   Yes,

3  all for attendance at NA and AA.   Consistent

4  without a break, I would note.

5       **INMATE STRONG:**   Yeah.

6       **DEPUTY COMMISSIONER MOORE:**   Okay.   Your

7  disciplinary history involves two 115s that

8  occurred in '93, excuse me.   One for disruptive

9  -- Both in September of '93.   Disruptive

10  behavior and threatening staff.   About following

11  the rules.   Not wanting to follow the rules and

12  getting your back up in a loud way would

13  probably be the best way to characterize that.

14       **INMATE STRONG:**   Yes ma'am.

15       **DEPUTY COMMISSIONER MOORE:**   The 128s, you

16  had six of them total and the last one was in

17  October of '99.   Again about getting your back

18  up.   Loud and disrespectful to staff.   Wanting

19  to control your world is how I would

20  characterize them.   And the last one was in

21  October of '99.   And that's -- So nothing in the

22  past almost seven years, six-and-a-half years in

23  that respect and nothing for twelve-and-a-half

24  years as far as a 115.   You've been clear.   And

25  with no violence involved in any of them, any of

26  the write-ups.   Anything else that I need to

27  cover before I go to your psychological report?

82

1       INMATE STRONG:  No, that's basically

2   about everything.

3       DEPUTY COMMISSIONER MOORE:  Okay.  The

4   psychological evaluation I'm going to review is

5   dated October 11, 2004.  Is that yours, the one

6   you have, counsel?

7       ATTORNEY LEWIS:  Yes it is.

8       DEPUTY COMMISSIONER MOORE:  And it is

9   entitled the psychological evaluation and it's

10  written by Dr. Sexton, S-E-X-T-O-N, consulting

11  psychologist, and Senior Supervising

12  Psychologist, Zika, Z-I-K-A.  They indicate that

13  there was an interview of you for about two

14  hours that lasted -- In October of '04.  Do you

15  recall that?

16      INMATE STRONG:  Yes ma'am I do.

17      DEPUTY COMMISSIONER MOORE:  Okay.  They

18  reviewed all of your records as well.  They

19  found -- They reviewed your criminal history as

20  we've done here.  They also reviewed the 115s

21  and noted the '93, the two incidents in '93.  In

22  the question about the commitment offense you

23  discussed your substance abuse, the relationship

24  with your wife, your feelings of abandonment at

25  great length.  It was clear to the doctor that

26  you had a deep understanding of the underlying

27  causes for the offense and through numerous

83

1    courses that you've taken while incarcerated

2    have learned alternative behaviors.  And your

3    remorse appeared to the doctor to be genuine and

4    heartfelt.  You indicated that you continue to

5    be in communication with the victim's family.

6    That although you've remarried the victim's

7    mother, I think you referred to her as Ruby.

8        INMATE STRONG:  Yes ma'am, Ruby Pinson.

9        DEPUTY COMMISSIONER MOORE:  Continues to

10   be your mother-in-law and you are in contact

11   with her.  That she has forgiven you for the

12   offense and it appears to the doctor that her

13   forgiveness is very important to you.

14       INMATE STRONG:  Yes it was.

15       DEPUTY COMMISSIONER MOORE:  There were

16   some brief psychiatric contacts while you were

17   incarcerated, mostly for self-referrals for

18   depression.  One time you were placed on

19   Vistaril, V-I-S-T-A-R-I-L.  You're currently not

20   taking any medication and it doesn't appear to

21   have any lasting -- You do not appear to have

22   any current issues regarding depression or

23   anything like that.  They do make note that it

24   seems to be at about the time after a Board

25   Hearing or just before a Board Hearing that you

26   self-referred.

27       INMATE STRONG:  Yes ma'am it was.

84

1        **DEPUTY COMMISSIONER MOORE:**    Okay.

2    Consistent with previous reports there is no

3    evidence that you've ever experienced psychotic

4    symptoms or significant mood disorders.    You are

5    clear, well spoken and articulate.    Your

6    intellectual functioning appears to be in the

7    average range.    Under diagnostic impressions

8    there were no diagnoses determined to be present

9    other than being a life prisoner.    They indicate

10    your GAF score is at 85.    The doctor does say

11    that your diagnosis has changed from previous

12    reports in his opinion.    In the past there was a

13    label of adult antisocial behavior.    The doctor

14    states that there is no indication of that at

15    this time and that the diagnosis has been

16    removed from his clinical impressions of you.

17    It's clear that you've chosen not to abuse

18    cocaine.    Not because you don't have the

19    availability, because you don't wish to have

20    used it.    And as a result the substance abuse,

21    poly-substance abuse has been dropped from your

22    diagnosis as well.    I might also offer the

23    opinion that sometimes that can be as a result

24    of institutional remission of the abuse because

25    of institutional, you know, incarceration.    But

26    as you've stated, you can come by it while

27    you're inside.

85

1          INMATE STRONG:  Very easily.

2          DEPUTY COMMISSIONER MOORE:  Yeah.  Refers

3    to 35 chronos for self-help programs.  And this

4    was in '04, you've only added to that number.

5    And a limited yet significant arrest history.

6    It's clear -- The doctor says it's clear that

7    your aggressive behavior from the late '80s and

8    early '90s is now changing for the better.  As a

9    result your violence potential compared to other

10   inmates with whom you reside is considered to be

11   below average.  You have no assaultive history

12   while you have been incarcerated.  The doctor

13   says it is somewhat difficult to predict the

14   probability of aggressive behavior in the

15   community.  As people mature and change,

16   behavior they have once found acceptable becomes

17   unacceptable.  What can be said is that compared

18   to the average parolee in the community you are

19   much less likely to be violent while on parole

20   due in part to your age, greater maturity and

21   your substance-free thinking or intellect.  You

22   appear to have no more violence potential than

23   the average male in the general population of a

24   similar age.  And I believe you're 52 now?

25         INMATE STRONG:  Yes ma'am, I am 52.

26         DEPUTY COMMISSIONER MOORE:  Okay.  There

27   are no current factors which would predict an

86

1   increase in violence potential in the community.

2   Substance abuse would clearly increase that

3   potential.  But it does not appear that

4   substance abuse is currently a problem nor is it

5   anticipated that it will be an issue for him

6   when he is placed on parole.  The comment about

7   your numerous self-help, no current

8   recommendation for additional self-help programs

9   from the doctor, and that you appear to have

10  reached your maximum benefit while incarcerated

11  from self-help.  What are your plans regarding

12  NA upon your release?

13      INMATE STRONG:  Well there's numerous NA

14  programs in Fresno.  My mother is going to make

15  sure that I get in one.  That's our discussions

16  when she comes up to visit me.  My mother visits

17  me regularly.  And she wants me to get into it.

18      DEPUTY COMMISSIONER MOORE:  How often do

19  you think you're going to have to go to

20  meetings?

21      INMATE STRONG:  Well, I'm going to try to

22  make them as often as possible.

23      DEPUTY COMMISSIONER MOORE:  Well how many

24  do you think you need a week?

25      INMATE STRONG:  I would say I'm going to

26  try to at least make a average of at least four

27  a week, you know.

87

1      DEPUTY COMMISSIONER MOORE:  What else are

2  you going to do when you start going to

3  meetings?  Do you need to get a sponsor?

4      INMATE STRONG:  My sister-in-law has been

5  my, she's going to be my sponsor.

6      DEPUTY COMMISSIONER MOORE:  And I'm going

7  to recommend to you that that not occur.  You

8  need a man to be your sponsor.  Not a family

9  member and not a woman.

10      INMATE STRONG:  Okay.

11      DEPUTY COMMISSIONER MOORE:  You have a

12  lot of footwork to do on the 12 steps of

13  Narcotics Anonymous, a lot.  It needs to be with

14  a man who has been clean and sober and is doing

15  the deal.

16      INMATE STRONG:  Okay, I acknowledge that.

17      DEPUTY COMMISSIONER MOORE:  So I want to

18  give you a little redirection on that.

19      INMATE STRONG:  Okay.

20      DEPUTY COMMISSIONER MOORE:  Get into

21  service as soon as you can.  Do you know what

22  that means when I say, get into service in NA?

23      INMATE STRONG:  No I don't.

24      DEPUTY COMMISSIONER MOORE:  You start

25  cleaning coffee cups, you clean up the ashtrays,

26  you set up the chairs.  You find a position

27  where you're the greeter at the meeting and you

88

1    welcome the people.

2         INMATE STRONG:  Oh, once on the streets.

3    Yeah, okay, I understand you now.

4         DEPUTY COMMISSIONER MOORE:  On the

5    streets.

6         INMATE STRONG:  Yeah, okay.  I do that

7    here.

8         DEPUTY COMMISSIONER MOORE:  Get into

9    service on the outside.

10        INMATE STRONG:  Okay.

11        DEPUTY COMMISSIONER MOORE:  Is there

12   anything else that you'd like to add at this

13   time regarding post-conviction factors?

14        INMATE STRONG:  That's it ma'am.

15        DEPUTY COMMISSIONER MOORE:  Okay.

16   Commissioner, thank you, I have completed my

17   presentation.

18        PRESIDING COMMISSIONER INGLEE:  Okay.

19   All right, I have no questions.  Do you have any

20   questions, counselor?

21        ATTORNEY LEWIS:  No I do not.

22        PRESIDING COMMISSIONER INGLEE:  All

23   right, would you go to the summary, please.

24        DEPUTY COMMISSIONER MOORE:  You are going

25   to be interrupted in the middle of it just to

26   let you know.

27        ATTORNEY LEWIS:  Will I?

89

1        **DEPUTY COMMISSIONER MOORE:**  Yeah, I'm

2   going to --

3        **PRESIDING COMMISSIONER INGLEE:**  You want

4   to take it, just go ahead and change those out?

5        **DEPUTY COMMISSIONER MOORE:**  Well I

6   haven't gotten the tapes unwrapped yet so you

7   may want to begin, sir.

8        **ATTORNEY LEWIS:**  Mr. Strong should be

9   found suitable for parole.  The following

10  supports Mr. Strong in his contention that he

11  has earned a second chance by being suitable for

12  parole.  He has definitely taken responsibility

13  for the life crime.  He has admitted guilt to

14  the Board here today and at other times.  He

15  admitted guilt to the psychological evaluators,

16  to a host of people.  And also he pled guilty to

17  the crime as well.  Mr. Strong has a stable

18  upbringing and he has experienced reasonable,

19  stable relationships with others.  Mr. Strong

20  has been commended with excellent and/or above

21  average work reports while incarcerated and he

22  has also worked well with others, his

23  supervisors and peers, and he has a great

24  attitude.  Mr. Strong has expressed remorse for

25  his crime, with not only psychiatric evaluators

26  but here today, and he is truly sorry.  More

27  importantly, however, Mr. Strong has

1   demonstrated his remorse by programming.  By

2   attending NA regularly, by going through

3   vocational training, by going through the IMPACT

4   program, anger management and a host of other

5   self-help programs.  Mr. Strong has committed --

6   Mr. Strong committed his crime as a result of

7   significant stress in his life due to drug

8   addiction, cocaine, and the fact that Mr. Jones

9   struck him.  Causing him to be enraged, which

10  caused the fight that ensued where his wife got

11  in the middle of that and was summarily struck

12  by the knife and killed.

13       DEPUTY COMMISSIONER MOORE:  And that's a

14  good pause point right there.

15       (Tape One was changed to Tape Two.)

16       DEPUTY COMMISSIONER MOORE:  We're back on

17  the record on tape two, it's 6:21.

18       ATTORNEY LEWIS:  Mr. Strong's education,

19  although he doesn't have a degree in college he

20  does have a high school diploma that was awarded

21  to him in 1972.  He can read and write and in

22  fact he held a job with the SPCA of Fresno for

23  several years, indicating that he can and has

24  more of a grade point average than what the

25  record shows.  Mr. Strong lacks any significant

26  history of violent crime as a juvenile, although

27  he had some run-ins with the law with respect to

91

1  domestic violence with his wife.  At the time of
2  the crime Mr. Strong was 33 years old and he is
3  now age 52.  At age 52 the probability of
4  recidivism is vastly reduced.  And in fact, the
5  circumstances surrounding the crime it seems to
6  me is one that probably would never occur again,
7  not in this gentleman's life, with respect to
8  how it went down.  Mr. Strong's parole plans are
9  solid and feasible.  He is now married,
10 remarried.  He has a residence that is assured
11 with his mother, Dorothy Potts, which she has
12 submitted support letters indicating so.
13 Mr. Strong has a job offer as a stocker at the
14 Cigarette Outlet in Fresno, which is owned and
15 operated by his uncle, John Cummings.  There are
16 letters in the file that show that Mr. Cummings
17 is willing to hire my client, although he didn't
18 sign them and place the date or his address on
19 the letter.  Mr. Strong has marketable skills
20 enabling him to readily find employment.  It is
21 believed that he could go back to the SPCA and
22 get his job as an animal control officer.  And
23 he also certifications in furniture upholstery,
24 which as mentioned earlier, he has excellent job
25 reports.  Mr. Strong's institutional activities
26 indicate an enhanced ability to function with
27 the law upon his release.  Through his

92

1    incarceration he has only received two 115s, the
2    last one of which was in 1993.  Mr. Strong has
3    engaged in numerous self-help groups, IMPACT,
4    anger management.  The IMPACT group was 13
5    weeks, tobacco awareness and a few others.  His
6    assessment of dangerousness by Dr. Sexton as
7    low.  Dr. Sexton opined that my client would be
8    less likely to be violent and he has maxed out
9    on all programs the CDC has to offer.  That was
10   indicated on the last page of his report.  In
11   conclusion, Mr. Strong has a network of support
12   which includes his mother, his family, his wife,
13   and including the victim's mom.  The family
14   support will not be there forever because people
15   do drift away.  Parole is more likely to be
16   successful if there is a family network
17   available.  Mr. Strong has a job offer.  This
18   will not always be available.  Mr. Strong has
19   parole plans that are feasible.  And Mr. Strong
20   has demonstrated that he can succeed without
21   resorting to violence.  The murder of his wife
22   was not an intentional act, it was a
23   circumstance that happened and it was an
24   accident.  We respectfully request that
25   Mr. Strong be given an opportunity to reenter
26   into society to be a viable member of society so
27   that he can continue on in his life and to maybe

93

1    share some of his experiences and some of his,

2    you know.  With regards to youth out there maybe

3    he can maybe show someone out there that it's

4    not, violence is not the way and maybe he can

5    change a few outlooks.  Maybe he can save his

6    son.  Maybe he can help some people out there.

7    We submit.

8          PRESIDING COMMISSIONER INGLEE:    All

9    right, thank you very much.  Give me a second,

10   give me a second.  Mr. Strong, this is now your

11   opportunity to tell us why you're suitable for

12   parole.

13         INMATE STRONG:   Okay.  Before I say that

14   I would like to go back to Deputy Commissioner

15   Moore.  That you never went back and talked

16   about that domestic violence package that I had

17   in my C File.

18         DEPUTY COMMISSIONER MOORE:   You are

19   correct.  And I know where it is, I will now do

20   that.  The only document that I could find and

21   review since the last hearing, and I'm just

22   going to double-check, was the three hour video

23   review that was offered.  Carl Reddick

24   (phonetic) was the video instructor.  Do you

25   recall that?

26         INMATE STRONG:   Yes ma'am.

27         DEPUTY COMMISSIONER MOORE:   And that was

94

1   on July of 2005 and Charlie Walker signed off on

2   your chrono on that.  And it was about anger

3   management and what drives your emotions.

4   That's what I was looking at when I spoke with

5   you.  The only other chronos that have been put

6   in your file since the date of the last hearing

7   is the tobacco awareness, your laudatory chronos

8   for all of your attendance at NA.  But there is

9   no -- Treatment and Management of Hepatitis and

10  the Katrina contribution.  So there was no other

11  -- What I was looking at was that anger

12  management.

13          INMATE STRONG:  What I was referring to,

14  I gave my counselor, Counselor Nuñez, a package

15  on domestic violence that I had received from

16  the streets and he told me he was going to

17  insert it into my file.  It was at least three

18  or four pages of --

19          ATTORNEY LEWIS:  (Inaudible).

20          INMATE STRONG:  Yes.

21          DEPUTY COMMISSIONER MOORE:  Okay, let me

22  just double-check one more thing.

23          INMATE STRONG:  And plus I had something

24  from -- Right there, yes.

25          DEPUTY COMMISSIONER MOORE:  Okay.  This

26  is, it's in the miscellaneous section of the C

27  File.  And it appears to be a handout, a

95

1  booklet.  A domestic violence booklet from

2  Oakland County.  Did you get to review this or

3  was it given directly?

4       INMATE STRONG:  I got a chance to review

5  it but I wanted him to insert it in my file and

6  return it to me before I came to the Board.  But

7  somehow they changed counselors and he never --

8  I put a request in to get it back but I never

9  did.

10      DEPUTY COMMISSIONER MOORE:  You want to

11 get a copy of this.  There are referrals in here

12 for resources both nationally and statewide.  A

13 number of factors regarding the cycle of

14 violence and how domestic violence in

15 relationships occurs, not only with spouses and

16 girlfriends but family members.  And there's

17 also from the Emergency College of -- American

18 College of Emergency Physicians a multiple page

19 document, four pages regarding how to observe

20 and identify domestic violence.  And also from

21 the USDA Safety, Health and Employee Welfare

22 Division, a domestic violence awareness handbook

23 that appears to be in excess of ten pages.  And

24 the web site that you referred to is from the

25 Mayo Clinic-dot-com that you asked a friend to

26 access for you.  And again, talks about

27 recognition, having a safety plan for the

1   victims, knowing the signs and how in a

2   relationship domestic violence is about power

3   and control. And also gives a number of

4   resources. Thank you for pursuing that with me.

5   It's in your best interest that I did put that

6   on the record. And if you could please try and

7   get a copy of this back to you through your

8   counselor.

9          INMATE STRONG:  I will do that, thank

10  you.

11         DEPUTY COMMISSIONER MOORE:  Thank you.

12         INMATE STRONG:  You're welcome.

13         PRESIDING COMMISSIONER INGLEE:  Tell us

14  why you are suitable for parole.

15         INMATE STRONG:  Well, the reason I feel

16  I'm suitable for parole is first of all I

17  changed my way of thinking. Meaning by that, I

18  know what, I know what got me here. I used to

19  think it was drugs but it was something deeper

20  than drugs. I had to look at myself and what

21  really got me to thinking that I was up so high

22  in life that I can use drugs and control drugs.

23  Then I said well, maybe it's something else. I

24  had lost respect for myself. I just had lost

25  respect, you know. When a person use drugs they

26  trying to escape something. And to me it was I

27  thought I had it all so why not do drugs. I

97

```
 1   know I hurt a lot of peoples.  I know I hurt
 2   Diana my wife's family, my family and friends,
 3   my son, you know.  I hurt a lot of peoples I
 4   don't even know about.  And the only way I could
 5   change that was to change myself and know that
 6   if I use drugs any more in my life I'm subject
 7   to go back to where I was and I don't want to go
 8   back there no more.  And I think I try to work
 9   these programs that the Department of
10   Corrections offered me, to take advantage of
11   them.  At first I wasn't willing to take
12   advantage of them, that's why I started taking
13   advantage of them in '96.  I was still going
14   through head-trips.  But once I realized that I
15   put myself here and I could help myself if I
16   would just follow the rules that the Department
17   of Corrections had laid out for me.  And that's
18   when I started feeling good about myself and
19   knowing that if I do this it's a chance that I
20   would be returned back to society.  I have
21   grandchildren.  I have peoples that I want to be
22   with.  I can apologize to everybody but the
23   person that I really want to apologize to I can
24   never apologize to.  The only thing I can do is
25   try to be a better person when I get out and
26   hopefully let something come out of that.  Other
27   than that that's about it.
```

98

1          **PRESIDING COMMISSIONER INGLEE:**  Okay,

2    very good.  We will now go into recess for

3    deliberation.   The time is now 6:33.

4                       **R E C E S S**

5                       --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

99

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER MOORE:  Back on the

4    record, it's 7:30.

5    PRESIDING COMMISSIONER INGLEE:    All

6    parties that were here before have since

7    returned.   This is in the matter of Sylvester

8    Strong, S-T-R-O-N-G, CDC number D-99287.

9    Mr. Strong, the panel reviewed all information

10    received from the public and relied on the

11    following circumstances in concluding that the

12    prisoner is suitable for parole.

13    INMATE STRONG:   Thank you.

14    PRESIDING COMMISSIONER INGLEE:   And would

15    not pose an unreasonable risk of danger to

16    society or a threat to public safety if released

17    from prison.  First off the prisoner has no

18    juvenile record of assaulting others.   Until his

19    instant offense the inmate had a stable social

20    history as exhibited by reasonable, stable

21    relationships with others.   While in prison he

22    has enhanced his ability to function within the

23    law upon release through participation in the

24    following areas of educational programs, self-

25    help, vocational programs and institutional job

26    assignments.   I will ask the Deputy Commissioner

27    SYLVESTER STRONG   D-99287   DECISION PAGE 1    05/31/06

100

1   if she would detail each one of these four

2   areas.

3             **DEPUTY COMMISSIONER MOORE:**   Thank you.

4   Mr. Strong, in reviewing your C File and

5   discussing with you today the following is what

6   I have determined to be present and proven

7   within the file.  In regards to educational

8   programs you came into prison with a high school

9   diploma.  You have not sought further

10  educational programs, per se, at an academic

11  level.  What you have sought is self-help.  And

12  it's evident in the past ten years that you have

13  been very active in your programming.

14  Specifically you have received and taken part in

15  and enrolled in programs regarding parenting,

16  anger management, employability.  Since 1996

17  there are consistent chronos for attendance in

18  12 step programs, whether they are AA, NA or a

19  generic 12 step recovery program, specifically

20  at this facility, at this institution after you

21  arrived here.  There were a few before but

22  predominately here at CTF Soledad.  You have

23  been involved in several employability programs.

24  You also participated in the IMPACT program in

25  2002, a 13 week program.  That as you testified

26  to earlier and this is evidenced in the C File,

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 2   05/31/06**

101

1    talk about the impact on victims as you were

2    seeking more information about domestic

3    violence.  Because of a lack of domestic

4    violence programming here at CTF you did go

5    further than other inmates in that you sought

6    outside information regarding domestic violence

7    awareness.  How to deal with it.  Alternative

8    behaviors by seeking out information from

9    Oakland County with the domestic violence

10   handbook and other documents that you asked

11   friends on the outside to provide to you and are

12   found in the C File.  You have also participated

13   in community reentry programs on multiple

14   occasions.  As recent as 2006 but also prior to

15   that in your work towards becoming suitable

16   towards parole.  You have been active throughout

17   the past ten years, becoming very aware of the

18   programming needs that you have needed to become

19   suitable.  The next area is that of vocational

20   programs.  You have worked in the PIA upholstery

21   shop since June of 2001, receiving above average

22   to exceptional work reviews.  Your most recent

23   one, as I indicated, was in February of '06 by

24   supervisor Arroyo, A-R-R-O-Y-O, in which you

25   were found to be an exceptional employee.  You

26   have also received laudatory chronos from Arroyo

27   **SYLVESTER STRONG   D-99287   DECISION PAGE 3    05/31/06**

102

1  in '02 about your work.  You have received a

2  number of other laudatory chronos regarding your

3  contributions financial to the Katrina hurricane

4  victims.  And also on two occasions in 2000 and

5  2001 in which another inmate, either in your

6  cell or on your tier, was in a medical emergency

7  and you took it upon yourself to notify staff of

8  a man down and a need for medical attention.  In

9  one instance a cellmate, I believe, was

10  transported for immediate care to the hospital

11  for an appendix operation, appendectomy, and

12  another you thought may have been having a

13  stroke and received medical care.  You have also

14  participated in a parenting program.  I don't

15  know if I mentioned that earlier but I feel it's

16  very important, considering what you've told us

17  about your contact with your son up until the

18  age of 11 and where he is now and understanding

19  your impact.  What you've done made what his

20  reports look like when he talks about his

21  childhood.  Your vocational programs also

22  indicate that you are trying to maintain your

23  skills with upholstery by recently going through

24  upholstery training seminars that were offered

25  here at CTF.  Prior to that you were involved in

26  the masonry section.  I think it was at another

27  **SYLVESTER STRONG   D-99287   DECISION PAGE 4   05/31/06**

103

1    institution, at Pleasant Valley.

2         **INMATE STRONG:**  Yes ma'am, it was

3    Pleasant Valley.

4         **DEPUTY COMMISSIONER MOORE:**  And you

5    completed five of the eight units towards

6    completion.  And due to transfer that was why

7    you were unable to complete it.  Your reports

8    while there were, asking good questions, always

9    wanting to do more, seeking more information.

10    And the teacher and supervisor in that area

11    thought that you could make that a marketable

12    skill for yourself and you had indicated an

13    intention as such.  We've talked about

14    vocational programs, institutional job

15    assignments.  You have always -- Not always.  I

16    want to note a change, '93 to '95 was a

17    transitional time for you in prison.  You were

18    receiving some negative reports of attitude

19    towards supervisors and staff in your work as a

20    sewing machine operator, I believe at one time.

21    And in '93 -- Just as we go to '95 and you

22    started attending 12 step program and you

23    started to actively programming all of those

24    ratings changed.  They became average to above

25    average.  You started participating rather than

26    being a victim is the observation that I made.

27    **SYLVESTER STRONG  D-99287  DECISION PAGE 5   05/31/06**

104

1    Prior to that change you were a sewing machine

2    operator and receiving average and some fours

3    and fives on occasion.  Doing the job and

4    showing up.  Things changed in '95 and '96 in

5    your institutional job assignments, your

6    attitude and your work productivity.  You became

7    a good employee.  And those would be the areas

8    that I have been able to review and take from

9    your program, from your C File regarding your

10   programming.

11          **PRESIDING COMMISSIONER INGLEE:**  Until

12   your domestic problems with your deceased wife

13   began in 1987 you did not have any history of

14   violent crime.  Because of maturation, growth,

15   greater understanding and advancing age this has

16   all gone to reduce your probability of

17   recidivism in the future.  You have excellent

18   parole plans, which include a family job offer

19   and family support in general.  This also

20   includes living with your mother once paroled.

21   You have maintained close family ties while in

22   prison through both letters and visits and other

23   forms of communication such as telephone.  You

24   have maintained positive institutional behavior

25   which indicates a significant improvement in

26   self-control, with your last 115 being received

27   **SYLVESTER STRONG   D-99287   DECISION PAGE 6    05/31/06**

105

1    in 1993.  You have shown sincere signs of

2    remorse.  You have indicated that you understand

3    the nature and magnitude of the offense that you

4    committed.  You have accepted full

5    responsibility for your criminal behavior.  And

6    you have expressed a desire to change towards

7    good citizenship through both your discussion

8    today and also how you have demonstrated this

9    work through your self-help programming over the

10   last 10 to 15 years.  Now I want to talk about

11   your base term of confinement.  The base offense

12   of which the prisoner was convicted, what you

13   were convicted for, is murder second degree,

14   which is Penal Code 187.  This offense occurred

15   on 12/10/1987.  The term is derived from the

16   matrix located in CCR Title 15 at 2402(c)

17   second-degree murder, offense committed on or

18   after 11/8/1978.  In this regard the panel finds

19   that category C-III is appropriate in that C

20   indicates that the death of the victim resulted

21   from sincere, excuse me, severe trauma inflicted

22   with deadly intensity.  In regard to III.

23   Excuse me, I believe I said C-III and I meant

24   C-II so that will have to be a correction.  This

25   is C-II.  C being correct, that being severe

26   trauma.  II, is actually prior relationship.  In

27   **SYLVESTER STRONG  D-99287  DECISION PAGE 7   05/31/06**

106

1  that you had a strong prior relationship with

2  the deceased and you were involved in a personal

3  relationship with the prisoner (sic).   In this

4  case a family member or your former wife.

5      **DEPUTY COMMISSIONER MOORE:**  And if I may,

6  Commissioner.  You said 2402 rather than 3.

7      **PRESIDING COMMISSIONER INGLEE:**  We should

8  put it on, why don't you put it on --

9              (Off the record.)

10     **DEPUTY COMMISSIONER MOORE:**  We're back on

11  the record.

12     **PRESIDING COMMISSIONER INGLEE:**   It has

13  been brought to my attention that I may have

14  made a couple of errors in what I had been

15  previously discussing in regard to the base term

16  of confinement and I basically want to go back

17  through that again to be sure that we have

18  stated it correctly.   The base life offense of

19  which the prisoner has been convicted is murder,

20  second degree.   That is Penal Code 187.   The

21  offense occurred on 12/10 of 1987.   The term is

22  derived from the matrix located at CCR Title 15

23  at, this is where the correction will be made,

24  2403(c), second-degree murder, offense committed

25  on or after 11/8/1978.   The panel finds that

26  category C-II is appropriate in that C-III,

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 8    05/31/06**

107

1    excuse me, C is that the death resulted from

2    severe trauma inflicted with deadly intensity.

3    The inmate was acquainted with the victim and

4    that qualifies under prior relationship in that

5    the victim was involved in a personal

6    relationship with the prisoner.   In this case,

7    his former wife.   Which contributed to the

8    motivation for the act resulting in death.   The

9    panel assessed 228 months for the base offense

10   and notes that this is the middle term in the

11   matrix.   In this regard C-II.   The panel also

12   found that the prisoner personally used a deadly

13   weapon, in this case a knife, in the commission

14   of the crime under Penal Code Section 12022(b)

15   and accordingly assessed the following one-half

16   of 12 months, which is 6 months.   The total term

17   is calculated at 228 months for the base term, 6

18   months for the weapon, for the total term of 234

19   months.   The time credit from 11/2/1988 to

20   5/31/2006 is 68 months for a total period of

21   confinement being at 166 months.   Special

22   conditions of parole.   The following special

23   conditions of parole are hereby imposed.   You

24   will not use alcoholic beverages.   You will

25   submit to alcohol testing whenever required.

26   You will submit to anti-narcotic testing

27   **SYLVESTER STRONG   D-99287   DECISION PAGE 9   05/31/06**

108

1    whenever required.  You will submit to THC

2    testing, this is for marijuana, whenever

3    required.  You will participate in a substance

4    abuse program such as AA or NA as directed by

5    your parole officer.  You will attend parole

6    outpatient clinics as directed by your parole

7    officer.  You will have no contact with the

8    victim's family without the parole officer's

9    approval.

10                      (Off the record.)

11         DEPUTY COMMISSIONER MOORE:  We are back

12   on the record at 12 until 8.

13         PRESIDING COMMISSIONER INGLEE:

14   Mr. Strong, this is your first step.  You know

15   that this still has to be approved.  You're

16   reviewed by and eventually approved by the

17 - Governor.  Let me suggest to you, you can handle

18   this the way you like.  But my limited

19   background in this area has taught me over time

20   to warn prisoners about going off and becoming

21   too vocal about the fact that they just got a

22   parole.  I have heard, I can't tell you that I

23   actually experienced it or known somebody

24   specifically but I have heard that at times

25   sometimes prisoners who don't possibly will not

26   have a friend who might do something to

27   SYLVESTER STRONG  D-99287  DECISION PAGE 10  05/31/06

109

1  aggravate them and possibly cause them to be in

2  some type of altercation.  I would just avoid

3  this.  This is a personal observation and not an

4  order, okay.

5       INMATE STRONG:  Yes sir.

6       PRESIDING COMMISSIONER INGLEE:  Again,

7  lots of luck.  You deserve, you deserve the

8  opportunity for parole and we certainly hope

9  that you get it.

10      INMATE STRONG:  Okay.  I'd like to thank

11  both the panel members.

12      DEPUTY COMMISSIONER MOORE:  May I offer

13  some comments, Commissioner?

14      PRESIDING COMMISSIONER INGLEE:

15  Certainly, (inaudible).

16      DEPUTY COMMISSIONER MOORE:  Mr. Strong.

17      INMATE STRONG:  Yes ma'am.

18      DEPUTY COMMISSIONER MOORE:  The process

19  of review is still in existence, as Commissioner

20  Inglee has said.  This isn't a done deal.  Be

21  patient.  You have to go to work tomorrow don't

22  you?

23      INMATE STRONG:  Yes ma'am.

24      DEPUTY COMMISSIONER MOORE:  And you have

25  a lot to do.  And any type of occurrence of a

26  115 or a 128 between now and when that date

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 11  05/31/06**

110

1   comes could affect all of this completely and

2   totally.  I want to talk to you about NA.  The

3   first place you go if released is where?

4          INMATE STRONG:  To NA.

5          DEPUTY COMMISSIONER MOORE:  Now that was

6   a trick question.  The first place you go is

7   your parole.

8          INMATE STRONG:  Oh, yeah, yeah.

9          DEPUTY COMMISSIONER MOORE:  You report to

10  parole.

11         INMATE STRONG:  Yeah, yeah.

12         DEPUTY COMMISSIONER MOORE:  The second

13  place you're probably going to go is see your

14  mom.

15         INMATE STRONG:  Yes.

16         DEPUTY COMMISSIONER MOORE:  The third

17  place you're going to go is to an NA meeting.

18         ATTORNEY LEWIS:  He's married.

19         DEPUTY COMMISSIONER MOORE:  The third

20  place he's going to go is to an NA meeting.

21  Before he continues his relationship on the

22  outside.

23         INMATE STRONG:  I agree with you.

24         DEPUTY COMMISSIONER MOORE:  Good answer.

25  Within the first 10 to 14 days, in which you

26  will probably have attended 10 to 14 NA

27  SYLVESTER STRONG  D-99287  DECISION PAGE 12  05/31/06

111

1   meetings, you are to get a sponsor.   Your parole

2   agent will be all over you on that.

3           **INMATE STRONG:**  Yes ma'am.

4           **DEPUTY COMMISSIONER MOORE:**  It has to be

5   a man who is working the steps, who is clean and

6   sober, who has a job.  You might want to look

7   for one that's married.  Because wives, spouses,

8   family members can make you crazy when you're an

9   addict.  And you have to live life one day at a

10  time with them.  Find a man who has done that as

11  you work the steps with that man.  I wish you

12  the best of luck.  There's a lot of challenges

13  in front of you.  The world has changed somewhat

14  since your incarceration.  And I wish you good

15  luck.

16          **INMATE STRONG:**  Thank you very much.

17          **PRESIDING COMMISSIONER INGLEE:**  We do

18  have one more thing to do that I omitted.  And

19  that is in regard to the last psychological

20  report and I want to make an update to that.

21  The last psychological report was done by S.

22  Sexton, Ph.D.  That date is 10/11/2004.  In this

23  regard Dr. Sexton states that inmate Strong's

24  diagnosis has changed somewhat from previous

25  reports.  Although it was reported that the

26  inmate engaged in adult antisocial behavior

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 13  05/31/06**

112

1   there is no indication of that at this time.

2   For that reason this diagnosis has been removed.

3   In the past the inmate has been given a

4   diagnosis of cocaine abuse in institutional

5   remission.   Unfortunately most institutions have

6   drugs readily available for inmates who wish to

7   abuse them.   It is clear that this inmate has

8   chosen not to abuse cocaine.   Not because he

9   does not have the availability but he no longer

10  wishes to abuse it.   This is also true of

11  cannabis abuse.   As a result both of these

12  diagnoses will be dropped.   In the assessment of

13  dangerousness, all the above factors have been

14  taken into account.   It is significant that the

15  inmate is currently 50 years of age and has

16  remained CDC 115-free for approximately 11

17  years.   This combined with the nearly 35 self-

18  help programs that he has attended while

19  incarcerated and his limited yet significant

20  arrest history it is clear that the inmate's

21  aggressive behavior is changing for the better.

22  As a result, when the inmate's violence

23  potential is compared to those of inmates with

24  whom he resides it is considered to be below

25  average.   Inmate Strong has no assaultive

26  history with the Department of Corrections.   It

27  **SYLVESTER STRONG   D-99287   DECISION PAGE 14   05/31/06**

113

1  is somewhat difficult to predict the probability

2  of aggressive behavior in the community.  As

3  people mature and change, behavior that they

4  once found acceptable becomes unacceptable.

5  What can be said is that as compared to the

6  average parolee in the community this inmate is

7  much less likely to be violent while on parole,

8  due in part to his age, greater maturity and

9  substance-free intellect.  He appears to have no

10  more violence potential than the average male in

11  the general population of equal age.  There are

12  no current precursors that would predict an

13  increase in violence potential in the community.

14  Substance abuse would clearly indicate that

15  potential but it does not appear that substance

16  abuse is currently a problem with this inmate.

17  Nor is it anticipated that it will be an issue

18  for him when he is placed on parole.  As inmate

19  Strong has participated in numerous self-help

20  programs no current recommendation can be given

21  in this area.  He has participated in most other

22  programs available in the CDC and he appears to

23  have reached maximum benefit.  If given the

24  opportunity to parole his prognosis is very

25  good.  Signed S. Sexton, Ph.D., consulting

26  psychiatrist, Correctional Training Facility,

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 15  05/31/06**

114

1   Soledad.  Mr. Strong, good luck.

2          **INMATE STRONG:**  Thank you sir.

3          **PRESIDING COMMISSIONER INGLEE:**

4   Certainly.

5          **INMATE STRONG:**  Thank you, Ms. Moore.

6          **DEPUTY COMMISSIONER MOORE:**  Good luck to

7   you sir.

8                          --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE GRANTED**

24  **THIS DECISION WILL BE FINAL ON: SEPT 28, 2006**

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **SYLVESTER STRONG  D-99287  DECISION PAGE 16  05/31/06**

115

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 114, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF SYLVESTER STRONG, CDC NO. D-99287, on MAY 31, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated June 8, 2006, at Sacramento County, California.


Ramona Cota
Transcriber
**CAPITOL ELECTRONIC REPORTING**