**United States District Court**
For the Northern District of California

|   |   |
|---|---|
| 1 |   |
| 2 |   |
| 3 |   |
| 4 |   |
| 5 | UNITED STATES DISTRICT COURT |
| 6 | NORTHERN DISTRICT OF CALIFORNIA |
| 7 |   |

| 8 | SYLVESTER STRONG, | No. C 07-4927 SI (pr) |
|---|---|---|
| 9 | Petitioner, | **ORDER DENYING HABEAS PETITION** |
| 10 | v. |   |
| 11 | BEN CURRY, warden, |   |
| 12 | Respondent. |   |
| 13 |   |   |

## INTRODUCTION

Sylvester Strong, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Strong was convicted in Fresno County Superior Court of second degree murder and assault with a deadly weapon, and was sentenced in 1988 to 18 years to life in prison. His habeas petition does not challenge his conviction but instead challenges an October 27, 2006 decision by California Governor Arnold Schwarzenegger to reverse the decision of the Board of Parole Hearings ("BPH") that had found him suitable for parole.

The Governor identified the circumstances of the commitment offense (i.e., killing his ex-wife), Strong's extensive history of violence against his ex-wife, and his lack of remorse/insight about the crime as the reasons for his decision that Strong's release would pose an unreasonable risk of danger to society. The specifics of the crime and the circumstances

supporting the finding of unsuitability are described in the Discussion section later in this order.

Strong sought relief in the California courts. The Fresno County Superior Court denied his petition for writ of habeas corpus in a reasoned decision.[1] Traverse, attach. A. The California Court of Appeal and California Supreme Court summarily denied Strong's petitions for writ of habeas corpus. See Resp. Exhs. H-I.

Strong then filed his federal petition for a writ of habeas corpus. The court found cognizable claims that the evidence was insufficient to support the Governor's decision and that there was a breach of a plea agreement. The court ordered respondent to show cause why the writ should not issue. Respondent filed an answer and Strong filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that

---

[1] When he filed his federal petition, Strong attached a decision from the Fresno County Superior Court that denied his petition because of a procedural defect, i.e., he had not provided the necessary documentation. See Petition Exh. 1. Respondent then argued that there was no reasoned decision from any state court on the merits of Strong's claim. In his traverse, Strong stated that he had erroneously attached the wrong court decision as an exhibit to his petition and attached a different order from the Fresno County Superior Court to his traverse. In the decision attached to the traverse, the Fresno court rejected his claim on the merits.

2

state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.

3

1  Instead, the relevant question is whether there is any evidence in the record that could support
2  the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,
3  472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not
4  so devoid of evidence that the findings of the . . . board were without support or otherwise
5  arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence
6  standard of Superintendent v. Hill is clearly established law in the parole context for purposes
7  of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the governor's decision must also
8  satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191
9  (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence'
10 supports the conclusion that the inmate is unsuitable for parole because he or she currently is
11 dangerous"); In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002), cert. denied, 538 U.S. 980
12 (2003). Because the governor's review is an extension of the parole consideration process, the
13 governor's decision must be supported by some evidence.

14  A critical issue in parole denial cases concerns the parole authority's (and, hence, the
15 Governor's) use of evidence about the murder that led to the conviction. Three Ninth Circuit
16 cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on
17 this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v.
18 Carey, 505 F.3d 846 (9th Cir. 2007).[2] Biggs explained that the value of the criminal offense
19 fades over time as a predictor of parole suitability: "The Parole Board's decision is one of
20 'equity' and requires a careful balancing and assessment of the factors considered. . . . A
21 continued reliance in the future on an unchanging factor, the circumstance of the offense and
22 conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison
23 system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld
24 the initial denial of a parole release date based solely on the nature of the crime and the
25 prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs

---

27  [2]En banc review is now pending in a fourth case regarding the some evidence standard,
   Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir.
28 2008). The order granting en banc review states that the panel opinion is of no precedential
   value.

4

1  continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a
2  parole date simply because of the nature of Biggs' offense and prior conduct would raise serious
3  questions involving his liberty interest in parole." <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized
4  the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court: "Under
5  AEDPA it is not our function to speculate about how future parole hearings could proceed."
6  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on
7  unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-
8  offense behavior in determining parole suitability.  <u>See id.</u> (commitment offenses in combination
9  with prior offenses provided some evidence to support denial of parole at subsequent parole
10 consideration hearing).  <u>Sass</u> also put to rest any idea from <u>Biggs</u> that the commitment crime and
11 pre-offense behavior only support the initial denial of parole.  <u>Irons</u> determined that due process
12 was not violated by the use of the commitment offense and pre-offense criminality to deny
13 parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that in all three
14 cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem
15 a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due
16 process, the decision was made before the inmate had served the minimum number of years
17 required by his sentence."  <u>Irons</u>, 505 F.3d at 853.[3]  Interpreting this statement from <u>Irons</u> to
18 suggest that the offense can only be relied on until the minimum number of years has been
19 reached would suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the
20 case.  The dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole
21 based solely upon the commitment offense or pre-offense behavior violates due process.  Neither
22 logic nor <u>Irons</u> compel a decision that such reliance must cease when the prisoner reaches the
23 minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

24    The upshot of these three cases is that the BPH (and hence the Governor) can look at
25 immutable events, such as the nature of the conviction offense and pre-conviction criminality,

---

[3] Interestingly, <u>Irons</u> was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits.  In <u>Irons</u>, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging at 2001 parole decision.

to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[4]

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context. In addition to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Past criminal conduct is not some arbitrary factor like eye color that has nothing to do

---

[4]The California Supreme Court recently weighed in on the use of the commitment crime to deny parole in the companion cases of In re Lawrence, 44 Cal. 4th 1181 (Cal. 2008), and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008). The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Lawrence, 44 Cal. 4th at 1191 (emphasis in source). Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.

with present dangerousness. Recidivism concerns are genuine. See Ewing v. California, 538 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release). California's parole scheme does not offend due process by allowing the BPH (and hence the Governor) to predict that an inmate presents a present danger based on a murder he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.     State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code

§ 3041(b). California law adds a layer of review by giving the governor the power to review the BPH decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[5] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The governor of California is authorized to review the BPH's decision. The governor does not have unfettered discretion, but rather must make his parole decisions based on the same factors discussed above that the BPH is required to consider. See Rosenkrantz, 29 Cal. 4th at 625-26. "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." Cal. Const. art V, § 8(b). The constitutional provision also provides that no decision of the BPH on a lifer's parole eligibility becomes effective for a period of 30 days, during which the governor may

---

[5] The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner"; the prisoner has a previous record of violence; the prisoner has an unstable social history; the prisoner previously engaged in a sadistic sexual offense; the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

8

conduct his review. Nothing in the regulations, statutes or state constitution appears to require any deference by the governor to the BPH's decision. That is, he must consider the same factors and same evidence as the BPH but need not defer to any of its findings.

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole. The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[6]

/ / /
/ / /

---

[6] The California Supreme Court's determination in Lawrence that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988). However, Lawrence does not govern this court's analysis in every respect. This court is not bound by the discussion in Lawrence (see footnote 4, supra) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous. As to that point, Lawrence is persuasive authority, while the Ninth Circuit's holdings in Sass, Biggs, and Irons are binding authority. Also, Lawrence's determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

C.   **Some Evidence Supports The Governor's Decision In Strong's Case**

    1.   **The Governor's Decision And State Court Review**

Governor Schwarzenegger identified the circumstances of the murder, Strong's escalating violence against his ex-wife, and his lack of remorse/insight about the crime as the reasons for his determination that Strong was not suitable for parole. Resp. Exh. F.

The Murder:  First, the Governor described the circumstances of the crime:

> Prior to the offense, Diana Strong obtained a divorce and a restraining order against Sylvester Strong. According to the testimony of Lavelle Jones, set forth in the probation report, Lavelle went to Diana's house on the evening of the offense. While he was there, Diana had a telephone conversation during which she told the caller, "I don't have no money right now." When the call ended, Diana acted nervous and told Lavelle that Sylvester was the caller. Sylvester came to her house soon after, and told Diana to open the door. Diana told him she would not open the door because she had a restraining order and he was not supposed to be on the premises. Sylvester then broke open the door and stumbled inside. Lavelle testified that Sylvester was holding a knife. Sylvester accused Lavelle of going with Diana, and he started calling Diana names and said, "Bitch, I am going to kill you." Diana tried to run but Sylvester grabbed her and started hitting her. He was still holding the knife. Diana screamed, "Sylvester, don't hurt me." Lavelle began to leave and said, "Sylvester, don't you all hurt each other." Diana ran into Lavelle as she tried to leave through the front door. She lost her balance and fell to her knees by the entryway. Sylvester approached Lavelle, cut his hand with the knife and said he was going to kill him too. Lavelle ran out of the house. While walking toward his truck he observed Sylvester reach down towards Diana. Lavelle then entered his truck and drove away.

Resp. Exh. F, p. 1. Strong called the police, who responded and found him in the front of the house. The police found Diana lying on the floor inside the house, bleeding but not moving or making any noise. The front door frame was broken and had splintered apart. Another officer observed large amounts of blood in various locations throughout the home. The coroner's report indicated that the victim suffered a stab wound from the back through to the palm of her left hand, a 1/4" deep incised wound on her left thumb, and a stab wound about 2-1/2" deep into her neck that went through the jugular vein and an azygous vein.

The Governor's description of the crime summarized the information available in the preliminary examination testimony of Lavelle Jones, the November 15, 1989 California Court of Appeal opinion affirming the sentence, the report and recommendation of the probation officer filed October 25, 1988, and the prosecutor's September 19, 1988 letter to the sentencing judge regarding sentencing. See Resp. Exhs. B-D; Pet. Exh. 6. The Governor determined that

the murder "was especially grave, in part because the manner in which he killed Diana Strong – breaking into her home, threatening to kill her and then stabbing her multiple times with a kitchen knife – demonstrated an exceptionally callous disregard for her suffering and life." Resp. Exh. F, p. 3. The Governor also noted that there appeared to be "some level of premeditation" in the killing. Id.

Escalating Violence Against Victim: The second factor the Governor relied on was Strong's domestic violence history leading up to the murder he committed when he was 33 years old. There was evidentiary support for this, as there were at least five incidents before the murder. On July 2, 1987, Diana Strong ("Diana") reported to police that, during an argument about Strong's drug habit when she refused to give him money, he threw an unopened knife at her, then then picked it up and swung it at her causing a 6" scratch on her thigh; he also punched her in the face and her shoulder. Resp. Exh. C, p. 5. On September 8, 1987, Diana reported to police that, during a fight with her husband, she picked up a knife to defend herself but instead was cut by her husband on the left thumb and abdomen. Id. Strong's five-year old son reported that on one occasion Strong put gasoline on Diana. Id. Strong was charged with three counts of assault with a deadly weapon for these three incidents, but those charges were dismissed as part of his plea bargain in the murder case. In addition to those three incidents, Strong had a conviction for battery for slapping Diana's face in January 1987 and had a conviction for "inflicting corporal injury on a spouse for striking her in the face with his fist numerous times in February 1987." Pet. Exh. 3, pp. 2-3. At the time of the murder, Strong was on probation for these convictions and there was a restraining order prohibiting him from being on Diana's property. Strong attributed much of this violence to a loss of control occasioned by his abuse of cocaine.

The Governor's description of Strong's domestic violence history and cocaine abuse was based on the probation officer's report, the California Court of Appeal opinion, and Strong's statements at his 2006 BPH hearing.

11

<u>Lack of Insight/Remorse</u>:  The third factor the Governor relied on was Strong's lack of insight/remorse.  The Governor wrote:

> Mr. Strong says he accepts responsibility for the murder and is remorseful for his actions. Nevertheless, and despite acknowledging to the 2006 Board that he had been violent toward Ms. Strong in the past, that he came to her house in violation of a restraining order, and that he killed her and only wounded Mr. Jones, Mr. Strong told the panel, "I got the knife to do some damage to Mr. Jones."  When the 2006 Board asked him if he meant to use the knife on Mr. Jones or if he truly meant to murder his wife, Mr. Strong replied, "Mr. Jones was the culprit.  The person I was after was Mr. Jones."  "But," the panel responded, "you seemed to miss Mr. Jones and brutally murdered your wife."  Based on the record before me, I do not accept Mr. Strong's version of events.

Resp. Exh. F, p. 3.  Although the Governor's decision does not explicitly say "Strong lacks remorse and insight," that is clearly the implication of this quoted paragraph.

The Fresno County Superior Court upheld the decision in a reasoned order.  After reviewing the evidence related to various statements the Governor made in his decision, the court explained:

> In the present case, the Governor's decision was supported by at least some evidence, since there are facts on the record that tend to show that the underlying offense was "especially heinous, atrocious, or cruel."  Petitioner had engaged in a pattern of violent abuse of his victim over the course of a year before the fatal attack.  He threatened to kill his wife, brought a knife to her home, then broke into her house and stabbed her multiple times.  He also threatened to kill Mr. Jones, and he cut Jones' hand.  He covered the house in his victim's blood.  Petitioner also attempted to minimize his culpability in his wife's murder during the parole hearing by stating that he only intended to harm Mr. Jones, despite many other facts to the contrary.  The Governor was entitled to disbelieve petitioner's version of events, and to conclude that petitioner has not yet taken full responsibility for his actions.  This is not a situation where the underlying offense was barely sufficient to meet the elements of the crime.  (<u>In re Scott</u>, <u>supra</u>, 133 Cal. App. 4th 573, 598.)  Rather, the facts on the record tend to show that petitioner acted with premeditation, and that he deliberately and viciously stabbed his wife to death.  In addition, the Governor's decision mentions some disciplinary problems after petitioner's incarceration.  The Governor also properly took into account the factors weighing in favor of granting parole, but ultimately concluded that the negative factors outweighed the positive ones.  Thus, the Governor's decision to reverse the Board's grant of parole was based on at least some evidence, and the court cannot overturn it.

Traverse, Attachment A, pp. 5-6.

2. <u>Analysis Of Federal Claim</u>

The Fresno court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), and to <u>In re Rosenkrantz</u>, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted

the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. See Rosenkrantz, 29 Cal. 4th at 665-67. Because the Fresno County Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). The state court did not unreasonably apply Superintendent v. Hill.

The Governor had considered circumstances and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). Another circumstance weighing against a finding of suitability for parole is prior violence. 15 Cal. Code Regs. § 2402(c)(2). The applicant's "mental state" and "past and present attitude toward the crime" also may be considered. 15 Cal. Code Regs. § 2402(b); cf. § 2402(d)(3) (existence of signs of remorse tends to indicate suitability). The Governor's ultimate conclusion was cast in terms of the requirement of California law, i.e., that he was reversing the BPH's decision to grant parole because he believed Strong's "release would pose an unreasonable risk of danger to society at this time." Resp. Exh. F, p. 4; see Lawrence, 44 Cal. 4th at 1191.

Strong attacks the components of the Governor's analysis as well as the ultimate conclusion the Governor reached. Strong incorrectly asserts that the Governor relied solely on the commitment offense. The Governor relied on the commitment offense and the history of violence against the victim and the lack of insight/remorse.

Strong also disputes the accuracy of some of the facts the Governor recited, but none of Strong's points rise to the level of indicating that the decision lacked evidentiary support. Strong states that he did not obtain a knife until after he arrived at the house. See Traverse, p. 2; 5/31/06 RT 23. There was, however, evidence in the record that he arrived with a knife: Jones unequivocally testified to that fact at the preliminary hearing and the probation officer's report states the same. Petition Exh. 8, 3/18/88 RT 26-27. Another point he makes is that the Governor was incorrect in writing that he threatened to kill Jones. See Traverse, p. 11. While Jones may not have given that testimony at the preliminary hearing (or at least not in the portion of the

1 transcript Strong has provided to this court), the statement was in the probation officer's report
2 and that report was available to the Governor. See Resp. Exh. C, p. 3.

3 He strenuously disputes the lack of insight/remorse determination. He argues that the
4 Governor did not even make that finding, but the clear meaning of the Governor's statements in
5 the paragraph that concluded with an observation that "I do not accept Mr. Strong's version of
6 events" was that the Governor thought Strong had not accepted responsibility for the crime and
7 therefore lacked insight and remorse. See Resp. Exh. F, p. 3. Strong also appears to urge that
8 any such finding would have been wrong. Although evidence of lack of insight/remorse is
9 harder to pinpoint as it is a mental state rather than an event, there was information in the record
10 to lead the Governor to conclude that Strong lacked remorse and insight. At the parole hearing
11 in 2006, Strong offered up a new version of the killing that made it sound like an accidental
12 killing of his wife during the course of defending himself against aggression by Jones. See RT
13 23, 25, 27, 38, 40-41; see also RT 90, 92 (Strong's attorney arguing that it was an accidental
14 killing).[7] The Governor had ample cause to disbelieve that story. First, it was contradicted by
15 the probation officer's report and testimony of Jones at the preliminary hearing in 1988. Jones
16 had testified that Strong had a knife in hand when he entered the house after breaking down the
17 door, that Strong came to the house after his ex-wife told him on the phone that she didn't have
18 any money, and that Strong cut Jones while going after his ex-wife. Second, the story that
19 suggested his ex-wife got killed by getting between him and Jones while they struggled was
20 incompatible with her multiple wounds – a 1/4" deep cut to the left thumb, a stabbing wound
21 passing from the back of the left hand through to the palm, and a 2-1/2" deep stabbing wound

---

23 [7]For example, Strong stated that he told Jones to leave and, "[a]s he passed me Mr. Jones struck me and I went down. When I went down and I came back up, that's when I reached up
24 on top of the refrigerator and grabbed the knife." RT 23, see RT 38. "I tried to stab him and he grabbed me. He grabbed my hand and we started struggling over the knife in the hallway. . .
25 [Diana] came, she was in the hallway and she just came up while we were struggling in the hallway like this. I don't know what made her – I don't even know what made her come up that
26 close." RT 40. In a Board Report for the 2004 parole consideration, the writer of that report recounted that Strong stated that he had gone to the house to reconcile with his ex-wife and was
27 irritated to find another man at the house so he told him to leave. "As Mr. Jones was leaving he hit Strong and knocked him down. Strong got up and took the knife from above the refrigerator.
28 Jones and Strong were struggling in the entryway at the time Diana ran up and was stabbed in the neck." RT 27 (reading from 2004 Board Report).

14

1  to the neck. Third, the story was incompatible with his plea of no contest to the murder and
2  assault with a deadly weapon charges. Although he claimed that he only recently developed the
3  courage to speak up and tell the truth about the killing, it defies reason that someone would
4  choose to plead no contest to murder and agree to life imprisonment because he didn't have the
5  strength to explain that it was an accident. Fourth, the story apparently was contrary to the
6  version of the crime he had been telling counselors and psychological evaluators over the years
7  in prison. Fifth, his extensive history of domestic violence against his ex-wife made it quite
8  unlikely that she was not the target when he broke down the door to her house that day. Sixth,
9  his statement that he was there in hopes of talking to his ex-wife about reconciliation is hard to
10 believe in light of him breaking down the door to her home. (Indeed, his story at the hearing
11 does not even match the story he tells in his traverse. See Traverse, p. 21 ("in a fit of anger
12 because she would not give him money due him, he stabbed her, resulting in her death."))

13       The Governor reasonably questioned Strong's insight into the crime. The record shows
14 that Strong had a serious cocaine problem but also shows that he had an extremely serious
15 spousal abuse problem. Strong's statements at his parole hearing indicate that he appreciated the
16 problems cocaine had caused him but did not appreciate the domestic violence problem fully.
17 Strong's characterization of the crime as a "garden variety spousal murder," Traverse, p. 13,
18 ignores both the build-up of domestic violence toward the victim as well as the evidence of
19 premeditation (e.g., he had told an officer who responded to another incident of domestic
20 violence on January 26, 1987 that he had not hit his wife but "the next time you come out it will
21 be for something," Resp. Exh. C, p. 7, he came to the house on the night of the murder about ten
22 minutes after his wife told him she didn't have his money, he broke down the door, and he came
23 with a knife).

24       The determination that Strong lacked insight/remorse is important for the due process
25 analysis because it takes Strong's case out of that category of cases where the parole decision-
26 maker is relying on only the applicant's pre-incarceration factors. Here, there was not a reliance
27 on only the circumstances of the murder, but also on the history of criminality culminating in
28 the murder, as well as the lack of insight/remorse. See In re Shaputis, 44 Cal. 4th 1241, 1246

(Cal. 2008) (some evidence supported the Governor's determination that the petitioner remained a threat to public safety as the petitioner had "failed to take responsibility for the murder of his wife, and despite years of rehabilitative programming and participation in substance abuse programs, has failed to gain insight into his previous violent behavior, including the brutal domestic violence inflicted upon his wife and children for many years preceding the commitment offense.")

The Governor considered the many other factors in Strong's case in addition to the three discussed above. There were some other negative factors. Strong had one juvenile arrest for attempting to steal a car. He was on probation for the two domestic violence convictions when he killed Diana. Strong had a limited disciplinary history in prison: he had received two disciplinary write-ups in 1993 for threatening staff and disruptive behavior and had received six counseling memoranda for less serious misconduct, most recently for being loud and disrespectful to staff in 1999. He also admitted that he had smoked some marijuana in prison in 1992 or 1993.

The Governor recognized that Strong had been a very good prisoner during his incarceration in the California prison system. His numerous accomplishments included: he had remaining discipline-free for more than 13 years; he had completed vocational training in upholstery and had some training in masonry; he had worked in the prison industries as a porter, a furniture upholsterer, an industry worker, a painter, and a sewing machine operator; he participated in self-help and therapy; he had taken courses on violence, parenting, employability, and re-entry; he maintained supportive relationships with family members and friends; he had received positive evaluations from mental health and correctional professionals; and had received very good reviews for his work. He had parole plans to live with his mother and work as a clerk in a cigarette store run by his uncle. See Resp. Exh. F, pp. 2-3.

Notwithstanding all the positive factors for Strong, the Governor believed the criminal offense committed in 1988 that led to Strong's imprisonment was so bad that it – along with Strong's history of domestic violence and lack of remorse/insight about the killing – still had enough weight to show that he posed an unreasonable risk of danger to society if released from

16

1  prison in 2006. The Governor did not act arbitrarily or capriciously or without some evidentiary
2  support in determining that the circumstances of the crime committed showed that Strong
3  currently presented an unreasonable risk of danger to society if released, some 19 years into his
4  18-to-life sentence. Bearing in mind that the court's chore is to consider not whether some
5  evidence supports the reasons, but whether some evidence supports the conclusion that Strong's
6  release unreasonably endangers public safety, this court concludes that there was some evidence
7  to support the Governor's conclusion that Strong's release would pose an unreasonable risk of
8  danger to society at this time. Resp. Exh. F, p. 4. The Fresno County Superior Court's rejection
9  of Strong's insufficient evidence claim was not contrary to or an unreasonable application of the
10 Superintendent v. Hill some evidence standard. Strong is not entitled to the writ.

## D.    Breach of Plea Agreement Claim

Strong seems to argue in his petition that his plea agreement was breached because he pled guilty to second degree murder and cannot be punished for a crime greater than that agree to when entering into a contract with the state. Petition, p. 15. He cites Blakley v. Washington, 542 U.S. 296 (2004), and Santboello v. New York, 404 U.S. 257 (1971). In his traverse, he contends that the "sentencing court placed an '18 year lid' on Petitioner's sentence." Traverse, p. 6.

The claim for a breach of the plea agreement has no merit. "Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), the record does not show any term that was breached. His argument that he cannot be punished for a higher level crime than that to which he pled fails because he is within the life maximum for a second degree murder conviction. His argument that the plea agreement called for an 18-year "lid" or maximum sentence is not supported by the record he submits. The "lid" to which the trial court referred was for the assault with a deadly weapon count, not the murder count. See Pet. Exh.

17

4, RT 4 ("the Court could for a plea at this point put a midterm lid on the second count, the 245 subparagraph (a)" and stay the enhancements).  Strong agreed that there were no promises other than those set out on the record.  RT 7, 16.  Strong admitted that he understood that the second degree murder conviction carried a prison term of 15 years to life.  RT 13.  When Strong asked "[s]o what would the total be?" the judge responded that he would receive a 3-year midterm on the assault with a deadly weapon "and that would be served first, and it could be served consecutive to the indeterminate term of 15 years to life.  So that what you could be looking at is 18 years to life."  RT 17.  Strong confirmed that he understood.  RT 17.

To the extent Strong is contending that the Governor's reliance on facts not found to be true beyond a reasonable doubt and not found by a jury violates the rule set out in Apprendi and its progeny, the argument fails because Strong's Sixth Amendment rights were not implicated, let alone violated, by anything the Governor did in considering his case.

The rule from the line of Supreme Court cases that started with Apprendi v. New Jersey, 530 U.S. 466 (2000), is that, "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence [than the statutory maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence."  Cunningham v. California, 549 U.S. 270, 281 (2007).

Strong's argument runs into the insurmountable hurdle that the statutory maximum for his crime is life imprisonment.  No additional facts need to be found in order for Strong to be kept in prison for the rest of his life.  Nothing the Governor did has caused Strong's sentence to extend beyond the life maximum to which he was sentenced and for which he may be imprisoned based on the murder conviction.  He has no right to jury trial in connection with any decision whether to release him before the expiration of his life maximum term.  That the Apprendi line of cases does not apply is evidenced by the fact that an indeterminate sentencing scheme is one of the proposed solutions to the jury trial problems caused by determinate sentencing schemes the Court has invalidated.  See, e.g., Blakely v. Washington, 542 U.S. 296, 305 (2004) (citing with approval Williams v. New York, 337 U.S. 241 (1986) (judge's consultation of facts outside the trial record to decide whether to sentence defendant to death did

not violate the jury trial right because the indeterminate sentencing scheme allowed the judge to sentence the defendant to death or imprisonment)); see also id. at 332 (Breyer, J., dissenting) (noting that one of the alternatives to Guidelines-type sentencing scheme is indeterminate sentencing, such as California's former system).  In Blakely, the Court explained that indeterminate sentencing that gives a judge greater judicial power to set the sentence does not infringe on the province of the jury: "It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to the lawful imposition of the penalty.  Of course, indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant has a legal right to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned." Blakely, 542 U.S. at 308-09.  In sum, Apprendi and its progeny have no application to the parole decision for a prisoner serving an indeterminate life sentence, such as Strong.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 30, 2009

SUSAN ILLSTON
United States District Judge